# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| DURA AUTOMOTIVE SYSTEMS, INC., et al.,[1] | ) | Case No. 06-11202 (KJC) |
|  | ) |  |
|  | ) | Jointly Administered |
|  | ) |  |
| Reorganized Debtors. | ) |  |
|  | ) |  |
| James W. Korth, | ) |  |
| Appellant | ) |  |
| v. | ) | Civil Action No. 08-349 (SLR) |
|  | ) |  |
| Dura Automotive Systems, Inc., et al.,[2] | ) | Bankruptcy Appeal No. 08-36 |
|  | ) |  |
| Reorganized Debtors/Appellees | ) |  |

## OPENING BRIEF IN SUPPORT OF REORGANIZED DEBTORS' MOTION TO DISMISS APPEAL AS EQUITABLY MOOT

Marc Kieselstein, P.C.
Roger J. Higgins
Ryan Blaine Bennett
KIRKLAND & ELLIS, LLP
200 East Randolph Drive
Chicago, IL 60601
Telephone: 312-861-2000

Daniel J. DeFranceschi
Marcos A. Ramos
Jason M. Madron
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

COUNSEL FOR THE REORGANIZED DEBTORS

Dated: July 31, 2008

---

[1] The "Debtors" comprise the entities set forth in the Order Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure Directing Joint Administration of the Reorganized Debtors' Chapter 11 Cases, entered on October 31, 2006 [Bankruptcy Docket No. 68]. The Debtors became the "Reorganized Debtors" on June 27, 2008 (the "Effective Date"), when their confirmed plan of reorganization became effective.

[2] The "Appellees" comprise the Reorganized Debtors.

## TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT ......................1

II.    NATURE AND STAGE OF PROCEEDINGS................................................2

III.   STATEMENT OF FACTS................................................................3
       (a)    Commencement and Prosecution of the Chapter 11 Cases .....................................3
              (i)     The Original Plan - Fall 2007 ................................................3
              (ii)    The Ad Hoc Committee of Subordinated Noteholders - Fall 2007 ...........4
              (iii)   DIP Financing is Extended in Part and Replaced in Part - Winter
                      2007/2008 ................................................................7
              (iv)    Development of the Revised Plan - Spring 2008.........................8
              (v)     Overview of the Revised Plan............................................11
       (b)    The Confirmation Hearing ..........................................................14
       (c)    The Bankruptcy Court Denied Mr. Korth's Motion to Stay Because It Had
              Neither Legal Nor Factual Merit..................................................16
              (i)     The Bankruptcy Court Found That The Appeal Had Very Little
                      Likelihood of Success ................................................17
              (ii)    Mr. Korth Presented No Evidence That He Would Suffer
                      Irreparable Harm Absent a Stay Pending Appeal .........................20
              (iii)   Issuance of a Stay Would Have Substantially Harmed the
                      Reorganized Debtors...................................................20
              (iv)    The Public Interest Required Denial of the Korth Motion to Stay ...........21
       (d)    Implementation and Consummation of the Revised Plan......................21
              (i)     Senior Secured Revolving Credit Facility ................................22
              (ii)    The Second Lien Credit Facility ......................................23
              (iii)   The European First Lien Term Loan .....................................24
              (iv)    The European Factoring Agreements ...................................25
              (v)     The Taxable Sale Transaction..........................................25
              (vi)    Cash Distributions....................................................26
              (vii)   Equity Distributions..................................................26
              (viii)  Cancellation of Debt Securities and Old Common Stock.................27
              (ix)    Arrangements with Customers and Suppliers............................27

IV.    ARGUMENT.................................................................29
       (a)    The Revised Plan Has Been Substantially Consummated....................29
       (b)    The Bankruptcy Court Denied the Korth Motion to Stay Because It
              Lacked Factual Support ...........................................................32
       (c)    Vacating or Reversing the Confirmation Order Would Severely Prejudice
              Numerous Third Parties ..........................................................33
       (d)    Mr. Korth's Appeal, If Granted, Would Destroy the Revised Plan.....................35
       (e)    The Public Policy of Fostering Reliance on Final Confirmation Orders
              Strongly Supports Dismissal of the Appeal .........................................37

V.     CONCLUSION ................................................................39

i

## TABLE OF AUTHORITIES

**Cases**

*In re AOV Indus., Inc.*
    792 F.2d 1140 (D.C.Cir.1986) ........................................................ 32

*In re Armstrong World Industries,*
    348 B.R. 111 (D. Del. 2006) .......................................................... 37

*In re Box Bros. Holding Co.*
    194 B.R. at 42 ............................................................................... 38

*In re Cinderella Clothing Industries, Inc.,*
    93 B.R. 373 ................................................................................... 37

*In re Continental Airlines*
    91 F.3d 553 (3rd Cir. 1996) .................................................... passim

*In re Dura Automotive Systems, Inc.*
    Case No. 06-11202 (Bankr. D. Del.) ...................................... passim

*In re Genesis Health Ventures, Inc.,*
    226 B.R. 591 (Bankr. D. Del. 2001) .............................................. 37

*In re Grand Union Co. v. Saul, Ewing, Remick & Saul*
    200 B.R. 101 (D. Del. 1996) .......................................................... 32

*In re Highway Truck Drivers & Helpers Local Union #107*
    888 F.2d 293 (3rd Cir. 1989) ........................................................ 32

*In re Manges*
    29 F.3d 1034 (5th Cir. 1994) ........................................................ 35

*In re Martin's Aquarium, Inc.,*
    98 Fed. Appx. 911 (3d. Cir. 2004) ................................................ 16

*In re PWS Holding Corp.*
    228 F.3d 224 (3d Cir. 2000) .......................................................... 29

*In re Specialty Equipment Companies, Inc.*
    3 F.3d 1043 (7th Cir. 1993) .......................................................... 35

*In re Trans Marketing Houston, Inc.*
    62 F.3d 395 (5th Cir. 1995) .......................................................... 32

K&E 12969150.
RLF1-3307597-2

*In re Zenith Electronics Corp.*
   250 B.R. 207 (D.Del.2000) ............................................................................. 29

*Kurak v. Dura Automotive Systems, Inc.*
   379 B.R. 257 (Bankr. D. Del. 2007) ................................................... 5, 6, 12, 16

*Waldorf v. Shuta,*
   142 F.3d 601 (3d Cir.1998) ............................................................................ 16

**Statutes**

11 U.S.C. § 1101(2) ............................................................................................ 31

11 U.S.C. § 1102 .................................................................................................. 3

11 U.S.C. § 1127 ................................................................................................ 38

11 U.S.C. §§ 1125 .............................................................................................. 39

**Rules**

Fed. R. Bank. P. 3019 ........................................................................................ 38

K&E 12969150.
RLF1-3307597-2

## I.    **PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT**

The Reorganized Debtors respectfully request that the District Court dismiss Mr. Korth's appeal (the "Appeal") because it is equitably moot.

On June 27, 2008 (the "Effective Date"), the Debtors substantially consummated their *Revised Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (with Technical Amendments)* (the "Revised Plan"), which the Bankruptcy Court confirmed on May 13, 2008. *See Order Confirming Debtors' Revised Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Bankruptcy Docket No. 3332] (the "Confirmation Order") and *Notice of Effective Date and Final Fee Application Deadline* [Bankruptcy Docket No. 3518].[3]  Under applicable law in the Third Circuit, substantially consummating a confirmed chapter 11 plan will moot a pending appeal of the confirmation order when, as here, the equities favor dismissing that appeal. *In re Continental Airlines,* 91 F.3d 553, 558-59 (3d. Cir. 1996).  In particular:

- *The Revised Plan Has Been Substantially Consummated.*  Virtually all of the transactions contemplated by the Revised Plan were completed on or shortly after the Effective Date, including the major transactions referenced below.  The Debtors thereupon used those proceeds to immediately repay approximately $260 million of DIP facilities and other obligations and issued 2,281,000 shares of Preferred Stock to holders of Allowed Second Lien Facility Claims and commenced issuing 8,400,000 shares of New Common Stock to holders of Allowed General Unsecured Claims (other than Canadian General Unsecured Claims, which will receive cash distributions).  In addition, the Debtors paid certain professionals' fees and funding fees on the Effective Date;[4]

- *The Confirmation Order Was Not Stayed.*  On May 21, 2008, Mr. Korth filed a *Motion for Stay Pending Appeal* [Bankruptcy Docket No. 3383] (the "Korth Motion to Stay").  The Bankruptcy Court denied this motion, after notice and a hearing, on June 10, 2008,

---

[3]    All citations in this Brief to items appearing on the Bankruptcy Docket also appear on the *Debtors' Designation of Additional Items to be Included in the Record on Appeal [re: Docket No. 3382]* [Bankruptcy Docket No. 3434].

[4]    These transactions are described in more detail in this Brief and in the Current Report of Dura Automotive Systems, Inc., Form 8-K, filed June 27, 2008, which is attached hereto as **Exhibit A** (the "Effective Date 8-K"). The Reorganized Debtors also submit a declaration by Anthony C. Flanagan, Managing Director of AlixPartners, LLP, the Debtors' financial advisor, in support of this Motion and Brief, attached hereto as **Exhibit B** (the "Flanagan Declaration").

because Mr. Korth did not - and, indeed, could not - satisfy any of the requirements for obtaining a stay. *See Order Denying Motion for Stay Pending Appeal and Modification of Motion for Stay Pending Appeal to a Limited Stay Pending Appeal [Bankruptcy Docket Nos. 3383 and 3423]* [Bankruptcy Docket No. 3440]. Even Mr. Korth only half-heartedly pursued his Motion to Stay by failing to attend the hearing (appearing telephonically instead), declining to offer any evidence or otherwise question the Debtors' witnesses, and thereafter choosing not to appeal the Bankruptcy Court's order;

- *Appellate Relief Would Abrogate the Revised Plan.*  The only relief available to Mr. Korth - allowing him the "do-over" of objecting to the Revised Plan when he already had the opportunity to do so - would require vacating or reversing the Confirmation Order. That would necessitate putting the Reorganized Debtors back into chapter 11, facing the prospect of having to confirm the Revised Plan all over again. In other words, vacating the Confirmation Order would abrogate the Revised Plan. Such a result would be inimical to public policy, if only because the parties to the Revised Plan, both creditors and lenders, would be deprived of the benefits of their bargains, set forth in the Revised Plan as it was confirmed and substantially consummated.

- *Non-Creditor Parties Relied Upon the Confirmation Order's Finality.*  A great many parties relied upon the finality of the Confirmation Order when the Revised Plan was substantially consummated - after the Bankruptcy Court had denied Mr. Korth's motion to stay the Confirmation Order. Indeed, on the Effective Date, the Reorganized Debtors and their European affiliates borrowed and otherwise raised approximately $194 million (consisting of a $110 million Senior Secured Revolving Credit Facility and an approximately $84 million Second Lien Credit Facility) and €65 million (consisting of a €32.2 million term European First Lien Term Loan and €32.7 million in European Factoring Agreements) from a disparate consortium of lenders, investors and other counterparties in Europe and the United States. Moreover, distributions have been made to hundreds of creditors - some of whom, particularly members of Class 3 Senior Notes Claims, are not directly known to the Reorganized Debtors. Many of those and other creditors received preferred and common stock that may have subsequently changed hands. Vacating the Confirmation Order and unwinding all of the transactions consummated on the Effective Date so as to put all of these parties back to the status quo ante would be virtually impossible - and completely antithetical to public policy.

## II.    NATURE AND STAGE OF PROCEEDINGS

The Bankruptcy Court entered the Confirmation Order on May 13, 2008. On May 21, 2008, Mr. Korth filed his *Notice of Appeal* [Bankruptcy Docket No. 3382], and on May 28, 2008, filed his *Statement of the Issues to be Presented and the Items to be Included in the Record on Appeal of Confirmation Order for Revised Joint Plan of Reorganization* [Bankruptcy Docket No. 3394]. Mr. Korth has asserted four issues of Bankruptcy Court error for his appeal of the

2

Confirmation Order: (i) providing Mr. Korth with insufficient notice that he was required to appear at the Confirmation Hearing; (ii) providing Mr. Korth with insufficient time to review the Debtors' responses to his objections to confirmation; (iii) providing Mr. Korth with insufficient time to prepare to cross examine the Debtors' witnesses at the Confirmation Hearing; and (iv) failing to investigate Mr. Korth's objections to confirmation. Mr. Korth failed to obtain a stay of the Confirmation Order pending resolution of the Appeal, and the Debtors thereafter substantially consummated the Revised Plan, rendering the Appeal equitably moot. The Appeal, therefore, should be dismissed.

## III.    STATEMENT OF FACTS

### (a)    *Commencement and Prosecution of the Chapter 11 Cases*

On October 30, 2006, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On November 8 and 9, 2006, the Office of the United States Trustee appointed the official committee of unsecured creditors (the "Creditors' Committee") pursuant to section 1102 of the Bankruptcy Code. The Debtors' prepetition second priority lenders holding or controlling, in the aggregate, a substantial portion of the Debtors' prepetition second priority indebtedness formed the "Second Lien Group". On November 20, 2006, the Bankruptcy Court granted the Debtors final authority to borrow under their approximately $300 million debtor-in-possession financing facility (the "Initial DIP Facility").

### (i)    The Original Plan - Fall 2007

On August 22, 2007, the Reorganized Debtors filed the Original Plan [Bankruptcy Docket No. 1702] and the corresponding disclosure statement (as amended and modified, the "Original Disclosure Statement") [Bankruptcy Docket No. 1703]. The Reorganized Debtors subsequently engaged in weeks of negotiations with their various creditor constituencies

3

regarding the terms of the Original Plan. Those negotiations culminated in a global resolution of various issues among the Reorganized Debtors, the Creditors' Committee, and the Senior Notes Indenture Trustee, all of which was predicated on confirmation of the Original Plan, as modified. On September 28, 2007, the Reorganized Debtors filed a modified Original Plan and a modified Original Disclosure Statement incorporating this global resolution as well as certain other changes and revisions. Mr. Korth filed a *Letter Opinion on Adequacy of Disclosure Statement of Dura Automotive Systems*, on October 1, 2007 [Bankruptcy Docket No. 1949]. The Original Plan was rooted in the determination that Class 4 Subordinated Noteholders were subordinated to Class 3 Senior Noteholders and therefore would not be able to retain any recovery because Senior Notes' recoveries were to be substantially impaired. *See The Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Docket No. 1924], at p. 13-14; *see also Debtors' Memorandum of Law in Support of Confirmation of the Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Docket No. 2313], at pp. 54-56.

On October 4, 2007, the Bankruptcy Court entered an order approving the Original Disclosure Statement, as modified. *Order (A) Approving Disclosure Statement, (B) Fixing the Voting Record Date, (C) Scheduling Certain Hearing Dates and Deadlines in Connection with the Proposed Confirmation of the Debtors' Plan of Reorganization, and (D) Approving the Solicitation Procedures and Form of Solicitation Package and Notices* [Bankruptcy Docket No. 1973]. The Bankruptcy Court also approved the Debtors' proposed solicitation procedures and set November 26, 2007, as the hearing date for confirmation of the Original Plan. *Id.*

### (ii)     The Ad Hoc Committee of Subordinated Noteholders - Fall 2007

In July 2007, Mr. Korth and his company became actively involved in the Debtors' chapter 11 cases when his company, which appeared to hold approximately $1,253,000 (face

value) of Subordinated Notes, joined an ad hoc committee of Subordinated Noteholders that unsuccessfully challenged the subordination provisions contained in the Subordinated Notes Indenture. *See Supplemental Verified Statement of Ballard Spahr Andrews & Ingersoll, LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019* [Bankruptcy Docket No. 2203]. This ad hoc committee pursued objections to the Original Disclosure Statement, the Original Plan, and the $160 million backstopped common stock rights offering that formed the backbone of the Original Plan based in large part, upon these subordination provisions. *See, e.g., Objection by Certain Holders of 9% Senior Subordinated Notes of Dura Operating Corp. to Confirmation of the Debtor's Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Bankruptcy Docket No. 2242]; *Objection of Certain 9% Noteholders to Emergency Motion for an Order Pursuant to 11 U.S.C. § 363(b) Approving Amendment to Amended Backstop Rights Purchase Agreement* [Bankruptcy Docket No. 1935]; *Supplemental Objection by Certain Holders of 9% Senior Subordinate Notes of Dura Operating Corp. to Disclosure Statement* [Bankruptcy Docket No. 1931]. Certain members of this ad hoc committee also initiated an adversary proceeding against the Debtors challenging the enforceability of the subordination provisions contained in the Subordinated Notes Indentures. *See Kurak v. Dura Auto. Sys., Inc. (In re Dura Auto. Sys., Inc.)*, 379 B.R. 257 (Bankr. D. Del. 2007) (upholding enforceability of subordination provisions contained in the Subordinated Notes Indentures) (the "X–Clause Adversary Proceeding").

As a member of this ad hoc committee, Mr. Korth was privy to the wealth of discovery provided to his then-counsel in the Fall of 2007. In fact, the Debtors produced over 45,000 pages of materials to Mr. Korth through his counsel during that time frame, including a broad array of financial information, electronic communications among the Debtors and between the

Debtors and their advisors, as well as other information relevant to the Debtors' business. *See Debtors' Objection to J.W. Korth Pro Se Motion to Extend the Date for the Confirmation Hearing on the Revised Plan of Reorganization Along with the Date to Submit Objections* [Bankruptcy Docket No. 3167]. At no time during that process did Mr. Korth's counsel complain about the volume or content of that information, or assert that additional information was needed.

On August 20, 2007, and October 4, 2007, the Bankruptcy Court entered orders approving the Debtors' Backstop Rights Purchase Agreement, over the objections of the ad hoc committee of Subordinated Noteholders. *See Order Under Sections 363 and 503 of the Bankruptcy Code Authorizing the Debtors to (I) Enter into an Amended Backstop Rights Purchase Agreement in Connection with a Contemplated Rights Offering and (II) Pay Certain Associated Fees* [Bankruptcy Docket No. 1680] and *Order Pursuant to 11 U.S.C. § 363(b) Approving Amendment to Amended Backstop Rights Purchase Agreement* [Bankruptcy Docket No. 1974]. The ad hoc committee of Subordinated Noteholders appealed these orders, but subsequently withdrew those appeals after the Debtors failed to confirm the Original Plan. *See Ordered, Motion to Withdrawal Appeal by Holders of 9% Senior Subordinated Notes [Bankruptcy Docket No. 1982]* [Bankruptcy Docket No. 2767] and *Ordered, Motion to Withdrawal Appeal by Holders of 9% Senior Subordinated Notes [Bankruptcy Docket No. 1730]* [Bankruptcy Docket No. 2768].

On December 7, 2007, this Court granted the Debtors' motion for summary judgment in the X–Clause Adversary Proceeding. *See Kurak*, 379 B.R. 257 (upholding enforceability of subordination provisions contained in the Subordinated Notes Indentures). None of the Plaintiffs in that adversary proceeding appealed the Bankruptcy Court's decision. The X–Clause

6

Adversary Proceeding was later closed, and Ballard Spahr Andrews & Ingersoll, LLP withdrew its appearance in the Debtors' chapter 11 cases. *See Notice of Withdrawal of Entry of Appearance and Request for Notices Pursuant to Fed. R. Bankr. P. 2002 and 9010 and Local Rule 2002-1(d)* [Bankruptcy Docket No. 2567].

### (iii)    DIP Financing is Extended in Part and Replaced in Part - Winter 2007/2008

Despite the Debtors' progress in negotiating and soliciting a largely consensual Original Plan that was accepted by overwhelming majorities in every voting class, it became clear in mid-December 2007 that the Debtors' plan to exit chapter 11 prior to years' end would not come to fruition. Abnormally challenging credit market conditions made it impossible for the Debtors to obtain sufficient exit financing on acceptable terms. It was in this context that the Debtors wasted no time in re-evaluating their options in consultation with certain creditor groups.

The Debtors' first task in mid-December was to extend the December 31, 2007, maturity dates of the Existing DIP Facilities through mid-2008. The existing DIP lenders indicated, however, that they were unable to provide such a long extension on such short notice, and the Debtors were forced to seek instead a one-month extension through January 31, 2008, in contemplation of a request to further extend the maturity dates. *See Emergency Motion for Order Approving DIP Extension and Canada Restructuring*, filed on December 21, 2007 [Bankruptcy Docket No. 2511], ¶¶ 10-11 (the "December DIP Amendments Motion").

The Debtors proceeded with the December DIP Amendments because, in the short time available to them in late December, there were no other viable options — despite the fact that the terms, namely the fees paid to obtain the one-month maturity date extensions, were not particularly favorable. On December 28, 2007, and January 4, 2008, the Bankruptcy Court entered orders approving the December DIP Amendments. *See Order Approving DIP Extension*

7

*and Canada Restructuring*, entered on December 28, 2007 [Bankruptcy Docket No. 2555], and *Amended and Restated Order Approving DIP Extension, Modification to Final DIP Order and Canada Restructuring*, entered on January 4, 2008 [Bankruptcy Docket No. 2574] (collectively, the "December DIP Extension Orders").

The Debtors then immediately began working with a number of potential replacement DIP lenders to solicit proposals for potential replacement DIP facilities. These efforts culminated in a commitment letter from Ableco Finance LLC ("Ableco") on January 21, 2008, for the "Replacement DIP Facility." The Replacement DIP Facility was substantially premised on Ableco "stepping into the shoes" of the Initial DIP Facility lender. It also contained an enhanced pledge of 100% of the stock of the Debtors' foreign non-debtor subsidiaries (an increase from the pledge of 66% under the Initial Term Loan DIP Facility).

In addition, the Replacement DIP Facility imposed a June 9, 2008, deadline for plan confirmation and a June 20, 2008, deadline to exit chapter 11. Failure to meet either of these key remaining deadlines could have resulted in an immediate event of default. Moreover, the Replacement DIP Facility was set to expire on June 30, 2008.[5]

### (iv)    Development of the Revised Plan - Spring 2008

In early January 2008, even as they were securing the Replacement DIP Facility, the Debtors recognized that they would need to reduce proposed funded debt levels in any contemplated chapter 11 plan transaction in order to facilitate an emergence financing package that could be executed under then-existing credit market conditions. The Debtors therefore revaluated and updated their 2007 Business Plan to account for 2007 actual results and to serve as a foundation to develop a revised chapter 11 plan (the "2008 Business Plan"). The Debtors

---

[5]    In addition, the Debtors' letter of credit was set to expire on June 27, 2008.

K&E 12969150.
RLF1-3307597-2

provided the 2008 Business Plan to the Creditors' Committee and the Second Lien Group in mid-January 2008. *See* Disclosure Statement (as defined below) at p. 35.

Based upon the 2008 Business Plan and then-existing credit market conditions, the Debtors determined that a revised plan of reorganization would have to be predicated upon satisfying the Second Lien Obligations with equity instead of with cash, as contemplated by the Original Plan. The Debtors thereafter negotiated extensively with the Second Lien Group, the Senior Notes Indenture Trustee, and the Creditors' Committee over the terms of a revised chapter 11 transaction. This negotiation process culminated in an agreement in principle with both constituencies supporting the transactions contemplated by what would become the "Confirmed Plan." Subsequently, the Debtors, Second Lien Group, the Senior Notes Indenture Trustee, and the Creditors' Committee worked to finalize the revised plan and memorialize the related agreements. *See Debtors' Third Interim Report to Court on the Status of Their Chapter 11 Reorganization*, filed March 18, 2008 [Bankruptcy Docket No. 2969].

These efforts culminated on March 6, 2008, when, after several weeks of negotiations, the Debtors reached agreement with their key creditor constituencies, including the Creditors' Committee, the Senior Notes Indenture Trustee and the Second Lien Group, on the key terms of a revised economic deal regarding creditor recoveries for the Class 2 Second Lien Facility Claims, the Class 3 Senior Note Claims and the Class 5 Other General Unsecured Claims. On March 7, 2008, the Debtors filed their revised plan - which ultimately became the "Confirmed Plan" - incorporating those key terms. [Bankruptcy Docket No. 2922]. On March 13, 2008, the Debtors filed a revised disclosure statement for the revised plan (as amended from time to time and including all exhibits and supplements thereto, the "Disclosure Statement") [Bankruptcy Docket No. 2957], which more fully described the terms and conditions of that agreement.

In the weeks preceding the scheduled April 3 Disclosure Statement hearing, the Debtors modified the language in the Disclosure Statement, the revised plan and certain procedures by which eligible creditors could vote to accept or reject the Revised Plan (the "Solicitation Procedures") responding not only to issues and concerns raised by various parties, but also to objections filed to the Disclosure Statement, even where the Debtors believed that the objections requested information beyond the scope of the requirements for approval of the Disclosure Statement. These objections included Mr. Korth's March 28, 2008, objection to the Disclosure Statement. *See J.W. Korth Ad Hoc Committee of Creditors Pro Se Objection to the Revised Disclosure Statement* [Bankruptcy Docket No. 3014]. On March 31, 2008, the Debtors filed a second modified and supplemental Disclosure Statement [Bankruptcy Docket No. 3025] and form of revised plan [Bankruptcy Docket No. 3023] incorporating the agreed-upon modifications.

At the April 3, 2008, hearing to approve the Disclosure Statement, the Bankruptcy Court overruled Mr. Korth's objection to the Disclosure Statement because his objection did not concern any disclosure issues, but rather presented objections to confirmation of the Debtors' Revised Plan. *In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (Bankr. D. Del.), Hrg. Tr. April 3, 2008, at pp. 26-29 (attached hereto as Exhibit C). The Bankruptcy Court therefore overruled Mr. Korth's objection and approved the Disclosure Statement. *See Order (A) Approving Revised Disclosure Statement, (B) Fixing the Voting Record Date, (C) Scheduling Certain Hearing Dates and Deadlines in Connection with the Proposed Confirmation of the Debtors' Joint Revised Plan of Reorganization, and (D) Approving the Revised Solicitation Procedures and Form of Solicitation Package and Notices* (the "Scheduling and Disclosure Statement Order") [Bankruptcy Docket No. 3069].

10

On April 4, 2008, the Debtors filed a final modified Disclosure Statement to reflect final edits received from key parties and to conform fully with the Scheduling and Disclosure Statement Order [Bankruptcy Docket No. 3071].

### (v)    Overview of the Revised Plan

As discussed above, in section III(a)(ii) hereof, the Revised Plan's linchpin was satisfying the Second Lien Facility Claims in equity rather than in cash, as had been contemplated under the Original Plan. The nature of the new money investment also changed from the Original Plan. Instead of a backstopped $160 million common stock rights offering, the Revised Plan transactions were funded in part by the New Money Second Lien Investment and substituted equity distributions for certain other classes of claims that were slated to receive cash under the Original Plan. The Revised Plan provided as follows:

| Claims Category | Form of Recovery | Amount of Recovery |
|---|---|---|
| DIP Claims, Priority Claims, and Administrative Claims | Payment in full | 100% recovery |
| Class 1 Treatment (Other Secured Claims) | Payment in full | 100% recovery |
| Class 2 Treatment (Second Lien Facility Claims) | Conversion of Second Lien Claims into Convertible Preferred Stock | 100% recovery |
| Class 3 Treatment (Senior Notes Claims) | Conversion of Senior Notes Claims into New Common Stock | 19% recovery |
| Class 4 Treatment Subordinated Notes Claims | Discharge, without recovery | 0% recovery |
| Class 5 Treatment (Other General Unsecured Claims) | Conversion of General Unsecured Claims into New Common Stock or the cash equivalent thereof | Class 5A General Unsecured Claims (U.S.): 8% recovery<br><br>Class 5B General Unsecured Claims (Canada): 12.5% recovery |
| Class 6 Treatment (Convertible Subordinated Debenture Claims) | Discharge, without recovery | 0% recovery |
| Class 7 Treatment (Section 510 Subordinated Claims) | Discharge, without recovery | 0% recovery |
| Class 8 Treatment (Equity Interests) | Cancellation, without recovery | 0% recovery |

As indicated above, the Revised Plan paid in full, in cash, all DIP and Replacement DIP Facility Claims (except those surviving obligations set forth in Article IX.D.4 of the Revised

11

Plan) allowed as of the Effective Date. Class 2 Second Lien Facility Claims were repaid in full with New Series A Preferred Stock. Class 3 Senior Notes Claims were converted into approximately 95% of the New Common Stock. The Class 5A U.S. Other General Unsecured Claims will be converted into approximately 5% of the New Common Stock. The Class 5B Canadian General Unsecured Claims will be paid, in cash, on a pro rata basis, in full and final satisfaction of their claims, an aggregate amount equal to the higher of (a) the median of the Canadian Information Officer's estimate of the liquidation value of the Canadian Operating Debtor's assets as detailed in the Revised Canadian Liquidation Analysis; (b) the median value of the Canadian Operating Debtor's assets in a liquidation as detailed in the Debtors' Liquidation Analysis, attached as Exhibit I to the Disclosure Statement or (c) a pro rata recovery equal to other General Unsecured Claimants.

Most of the other principal terms of the Original Plan and prior settlements remained unchanged in the Revised Plan except to the extent necessary to conform them to the parameters of the new economic deal.[6] As under the Original Plan, the Revised Plan discharged the Class 4 Subordinated Notes Claims and the Class 6 Convertible Subordinated Debentures Claims, which were subordinated to the Senior Notes Claims, without recovery.[7] Class 7 Section 510(b) Subordinated Claims (to the extent any existed) and Class 8 Equity Interests also did not receive any distributions or retain any property interests under the Revised Plan.

---

[6]   These changes are more fully set forth in the Disclosure Statement.

[7]   As discussed above in section III(a)(ii), on December 7, 2007, the Bankruptcy Court upheld the enforceability of the subordination provisions of the 9% Subordinated Notes Indenture and denied the relief sought by certain claimants within Class 4 who initiated the X-Clause Adversary Proceeding against the Debtors and argued that Classes 4 and 6 were not, in fact, prohibited from receiving a distribution before Class 3 Claims are satisfied in full. *See Kurak*, 379 B.R. 257. Based upon that decision, the Subordinated Noteholders were not entitled to any recovery under the Revised Plan. *Id.* The Debtors' Revised Plan reflected this decision and provided for distributions that complied with those subordination provisions.

K&E 12969150.
RLF1-3307597-2

The Revised Plan's economics, including a revised (and lower) estimated total enterprise value (a midpoint total enterprise value estimated to be approximately $495 million under the Revised Plan as compared to a midpoint total enterprise value estimated to have been approximately $600 million under the Original Plan) did, however, result in lower recoveries for holders of Senior Notes and General Unsecured Claims. *See* Disclosure Statement at pp. 37-38.

Each Class of Creditors entitled to vote overwhelming approved the Revised Plan. Indeed, creditor support was widespread and consistent both on a consolidated and deconsolidated entity-by-entity basis. *See Affidavit of Alison M. Tearnen Regarding Votes Accepting or Rejecting the Debtors' Revised Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code*; *Declaration of Adam Sanderson Regarding Votes Accepting or Rejecting the Debtors' Revised Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code*; *Certification of Jane Sullivan With Respect to the Tabulation of Votes on the Debtors' Joint Plan by Holders of Noteholder Claims in Class 3*, each attached to the *Debtors' Memorandum of Law in Support of Confirmation of the Debtors' Revised Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (with Technical Amendments)* [Bankruptcy Docket No. 3277] as Appendix G. This support was not surprising given that both the Creditors' Committee and the Senior Notes Indenture Trustee publicly stated their support of the Revised Plan as the best deal possible for unsecured creditors. *See Statement of the Official Committee of Unsecured Creditors in Support of Confirmation of the Reorganized Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Bankruptcy Docket No. 3272]; *See also Joinder of the Bank of New York Trust Company, N.A. in the Statement of the Official Committee of Unsecured Creditors in Support of Confirmation of the Reorganized Debtors' Joint Plan of*

13

*Reorganization Under Chapter 11 of the Bankruptcy Code [Bankruptcy Docket Nos. 3023 and 3272]* [Bankruptcy Docket No. 3279].

### *(b)    The Confirmation Hearing*

The Scheduling and Disclosure Statement Order set May 13, 2008, at 10:00 a.m. (ET), as the date and time for a hearing to consider confirmation of the revised plan and any objections thereto (the "Confirmation Hearing"). Mr. Korth was keenly aware of the Confirmation Hearing Date as he was present at the April 3, 2008, hearing when the Bankruptcy Court established May 13, 2008, as the Confirmation Hearing date. *See In re Dura Automotive Systems, Inc.*, Case No. 06-11202 (Bankr. D. Del.) April 3, 2008, Hrg. Tr., attached hereto as **Exhibit C**.

Furthermore, Mr. Korth twice asked the Bankruptcy Court to delay the Confirmation Hearing: on April 16, 2008, and on May 9, 2008. *See J W Korth Pro Se Motion to Extend the Date for the Confirmation Hearing on the Revised Plan of Reorganization Along with the Date to Submit Objections* [Bankruptcy Docket No. 3145]; *Motion for Continuance of the Confirmation Hearing* [Bankruptcy Docket No. 3298]. He was present at the April 23, 2008 hearing when the Bankruptcy Court stated its intention to deny his motion to delay the Confirmation Hearing, holding that Mr. Korth presented no basis for delay and that Mr. Korth conceded he had sufficient information to draft an objection to confirmation if he so desired, and reiterated that the Confirmation Hearing would go forward on May 13, 2008. *See In re Dura Automotive Systems, Inc.*, Case No. 06-11202 (Bankr. D. Del.) April 23, 2008, Hrg. Tr. pp. 36, 39, which is attached hereto as **Exhibit D**. On April 29, 2008, the Bankruptcy Court entered its order denying Mr. Korth's first motion to delay. *See Order Denying J.W. Korth Pro Se Motion to Extend the Date for the Confirmation Hearing on the Revised Plan of Reorganization Along with the Date to Submit Objections* [Docket No. 3145] [Bankruptcy Docket No. 3216].

14

At the April 23, 2008, hearing the Bankruptcy Court further ordered the Debtors and Mr. Korth to provide expert reports and declarations, and to exchange witness and exhibit lists, on or before May 9, 2008. *Id.* The Debtors did so; Mr. Korth did not. Instead, on May 9, 2008, Mr. Korth again requested that the Bankruptcy Court delay the Confirmation Hearing. *See Motion for Continuance of the Confirmation Hearing* [Bankruptcy Docket No. 3298].

On May 12, 2008, the Bankruptcy Court held a status conference to discuss Confirmation Hearing logistics. At that hearing, the Court stated to Mr. Korth that it intended to deny Mr. Korth's May 9, 2008, request for delay - his second in less than a month - as being without merit and that the Confirmation Hearing would proceed as scheduled. *In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (Bankr. D. Del.) May 12, 2008, Hrg. Tr. at p. 14:16-17, which is attached hereto as **Exhibit E**. Mr. Korth stated that he did not plan to attend the Confirmation Hearing. *In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (Bankr. D. Del.) May 12, 2008, Hrg. Tr. at p. 14:20. Pursuant to the *Bankruptcy Court's General Chambers Procedures*, dated April 3, 2006 (the "Chambers Procedures"), and the *Instructions for Telephonic Appearances, Effective January 5, 2005* (the "Telephone Procedures")[8], the Bankruptcy Court warned Mr. Korth that he would have to attend in person in order to participate fully in the Confirmation Hearing. Mr. Korth responded that he would attend the Confirmation Hearing. *See In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (Bankr. D. Del.) May 12, 2008, Hrg. Tr. at pp. 14:22-24, 16:13-25, 17:1-17. Later that day, however, Mr. Korth informed the Debtors and the Bankruptcy Court that he would not attend the Confirmation Hearing and would instead participate in a limited fashion by telephone.

---

[8]  A copy of the Chambers Procedures and the Telephone Procedures are attached hereto as Exhibit H and I, respectively.

At the Confirmation Hearing, the Bankruptcy Court explicitly considered and overruled each and every one of Mr. Korth's objections based upon the parties' pleadings and evidence presented by the Debtors. *See In re Dura Automotive Systems, Inc.*, Case No. 06-11202 (Bankr. D. Del.) May 13, 2008, Hrg. Tr. at pp. 45-49, which is attached hereto as **Exhibit F**. The Bankruptcy Court held that several of Mr. Korth's assertions directly contradicted the Bankruptcy Court's published opinion in the X-Clause Adversary Proceeding,[9] that the Debtors' evidence persuaded the Bankruptcy Court that Mr. Korth's objections lacked merit, and that Mr. Korth failed to present any evidence to the contrary. *See id.* at pp. 46-49. Copies of the Confirmation Order, the May 12, 2008, status conference transcript and the May 13, 2008, Confirmation Hearing transcript are attached hereto, as Exhibits K, E and F, respectively.

### (c)    *The Bankruptcy Court Denied Mr. Korth's Motion to Stay Because It Had Neither Legal Nor Factual Merit*

On May 21, 2008, Mr. Korth filed a notice of appeal of the Confirmation Order, and on May 28, 2008, filed a statement of issues to be presented on appeal that contained four allegations of error:

(i)    the Bankruptcy Court provided Mr. Korth with insufficient notice that he was required to appear at the Confirmation Hearing;

(ii)    the Bankruptcy Court provided Mr. Korth with insufficient time to review the Debtors' responses to his objections to confirmation;

(iii)    the Bankruptcy Court provided Mr. Korth with insufficient time to prepare to cross examine the Debtors' witnesses at the Confirmation Hearing; and

(iv)    the Bankruptcy Court failed to investigate Mr. Korth's objections to confirmation.

---

[9]    *See Kurak*, 379 B.R. 257 (upholding enforceability of subordination provisions contained in the Subordinated Notes Indentures); *see also In re Martin's Aquarium, Inc.*, 98 Fed. Appx. 911 (3d Cir. 2004) ("[O]nce an issue has been decided, parties may not relitigate that issue in the same case.") (quoting *Waldorf v. Shuta*, 142 F.3d 601, 616 n. 4 (3d Cir.1998)).

*See Statement of the Issues to be Presented and the Items to be Included in the Record on Appeal of Confirmation Order for Revised Joint Plan of Reorganization* [Bankruptcy Docket No. 3394].

Also on May 21, 2008, Mr. Korth filed the Korth Motion to Stay. The Debtors objected to the Korth Motion to Stay on June 2, 2008. *See Debtors' Objection to J W Korth's Motion for Stay Pending Appeal* [Bankruptcy Docket No. 3408] (the "Debtors' Response to Korth Motion to Stay"). On June 4, 2008, Mr. Korth filed a modified motion attempting to limit the scope of stay he sought in the Korth Motion to Stay, admitting that a complete stay of the Confirmation Order would inflict substantial harm upon the Debtors. *See Modification of Motion for Stay Pending Appeal to a Limited Stay Pending Appeal* [Bankruptcy Docket No. 3423].

On June 5, 2008, the Bankruptcy Court held a hearing on the Korth Motion to Stay. At that hearing, the Bankruptcy Court again explicitly considered and rejected each and every one of Mr. Korth's assertions and entered an order denying the Korth Motion to Stay in its original and modified forms. *See Order Denying Motion for Stay Pending Appeal and Modification of Motion for Stay Pending Appeal to a Limited Stay Pending Appeal [Docket Nos. 3383 and 3423]* [Bankruptcy Docket No. 3440]. Indeed, the Bankruptcy Court found that each and every factor to be considered when addressing a motion to stay pending appeal strongly favored denial of the Korth Motion to Stay. *In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (Bankr. D. Del.) June 5, 2008, Hrg. Tr. at pp. 14-19. A copy of the June 5, 2008, hearing transcript is attached hereto as **Exhibit G**.

### (i)    The Bankruptcy Court Found That The Appeal Had Very Little Likelihood of Success

The Bankruptcy Court found that Mr. Korth had very little likelihood of success on the merits of the Appeal. *See id.* Hrg. Tr. at pp. 14-19.

17

**(A)      Mr. Korth had Ample Notice that He was Required to Appear in Person at the Confirmation Hearing in Order to Press his Objections**

As discussed above, Mr. Korth received actual notice of the Confirmation Hearing at the April 3, 2008, hearing at which the Bankruptcy Court entered the Scheduling and Disclosure Statement Order. The Bankruptcy Court thereafter repeatedly informed Mr. Korth that the Confirmation Hearing would go forward as scheduled. *See In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (Bankr. D. Del.) April 23, 2008, Hrg. Tr., pp. 36, 39; *In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (Bankr. D. Del.) May 12, 2008, Hrg. Tr., pp. 16-17. Indeed, on May 12, 2008, when Mr. Korth stated he did not intend to attend the Confirmation Hearing, the Bankruptcy Court reminded him, specifically, that he was required, pursuant to applicable local rules and chamber procedures, to attend the Confirmation Hearing in person to press his objections. *In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (Bankr. D. Del.) May 12, 2008, Hrg. Tr., pp. 16-17. During the June 5, 2008, hearing on the Korth Motion to Stay, the Bankruptcy Court reiterated this requirement:

> As I mentioned earlier, chambers procedures which have been in effect for some time along with the telephonic appearance policy of the Court require in Chapter 11 confirmation hearings specifically that the debtor, debtor's counsel, and all objecting parties must appear in person. In addition, appearances are required with respect to all evidentiary hearings and any other matter designated by the Court as one requiring a personal appearance. This is why I required the personal appearance of Mr. Korth in [sic] confirmation. He complained that the Court gave him too little notice to be able to appear in person. I think that puts it backwards. Rather, personal appearances are ordinarily expected. Telephone appearances are the exception and given at the discretion of the Court, and in a situation in which there is a substantial objection, particularly to confirmation of a plan - and I did consider your objection substantial, Mr. Korth, personal appearance is absolutely necessary especially when witnesses were to be examined in person.

18

*In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (Bankr. D. Del.) June 5, 2008, Hrg. Tr. at p. 14; *see also* Chambers Procedures and Telephonic Procedures.

> **(B)    Mr. Korth Had Sufficient Time to Review the Debtors' Responses to his Objections to Confirmation and to Prepare to Cross Examine the Debtors' Witnesses**

The Bankruptcy Court likewise found that Mr. Korth's second and third allegations of error were contrary to the established facts of his participation in the chapter 11 cases. Specifically, the Bankruptcy Court found that Mr. Korth had been actively involved in the Debtors' chapter 11 cases for more than 7 months and that the Debtors made every effort to provide Mr. Korth with all information requested; information that, in large part, had been available to Mr. Korth for several months and, in some cases, years. The Bankruptcy Court concluded that "what happened here was that you came fully immersed in the process just too late but not certainly without sufficient notice of what was moving forward. . . . So, I find the arguments about timing unavailing . . .." *In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (Bankr. D. Del.) June 5, 2008, Hrg. Tr. at pp. 15-16.[10] In fact, Mr. Korth was provided every opportunity to participate in the Reorganized Debtors' chapter 11 cases. That he missed those opportunities results only from his own inaction.

> **(C)    The Bankruptcy Court Considered, and Rejected, Each and Every One of Mr. Korth's Objections to Confirmation**

Contrary to Mr. Korth's contention that the Bankruptcy Court "failed to investigate" his objections to confirmation, the Bankruptcy Court stated specifically in its ruling at the Confirmation Hearing that:

> I have reviewed the debtors' brief in support of confirmation as well as all of the declarations that have been submitted in support,

---

[10]    The Reorganized Debtors' arguments regarding Mr. Korth's failure to act until it was too late are more fully set forth in the Debtors' Response to the Korth Motion to Stay, attached hereto as **Exhibit J**.

K&E 12969150.
RLF1-3307597-2

> and I will say the debtor has gone to, I think, very extensive and complete lengths to address each and every one of the objections that Mr. Korth has raised . . .. I reviewed and considered each and every one of them and the debtors' responses both in its brief and with respect to the various declarations that have been submitted and the testimony given today and find no merit in any of them, and therefore, I will overrule them.

*In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (Bankr. D. Del.) May 13, 2008, Hrg. Tr. at pp. 46-48.

### (ii)    Mr. Korth Presented No Evidence That He Would Suffer Irreparable Harm Absent a Stay Pending Appeal

The Bankruptcy Court found that Mr. Korth had offered no evidence of irreparable harm and that "because of [his] failure to take advantage of the opportunities that were afforded to [him] in the process until very late" Mr. Korth was not "in a position to claim that failure to give a stay causes irreparable injury." *In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (Bankr. D. Del.) June 5, 2008, Hrg. Tr. at p. 17.

### (iii)    Issuance of a Stay Would Have Substantially Harmed the Reorganized Debtors

The Bankruptcy Court found that "issuance of a stay would put the plan at the risk of failure" and subject to the Reorganized Debtors to numerous and substantial additional costs. *Id.* at p. 17.

### (iv)    The Public Interest Required Denial of the Korth Motion to Stay

After considering all of the arguments presented and the evidence placed on the record, the Bankruptcy Court found that:

> The public interest cannot tolerate any scenario under which private agendas can for (sic) the maximization of value. Having determined that, Mr. Korth, you're unlikely to succeed on appeal here, I find that the public interest is better served by allowing distributions under the plan, and the public interest, I think under these circumstances [lies in favor of] the expeditious administration of this bankruptcy case as well as in the

20

> preservation of the estate's assets for purposes of distributions to creditors rather than litigation of claims lacking a substantial possibility of success, outweighs any interest that you might have individually in obtaining a stay.

*Id.* at pp. 18-19.

### (d)    *Implementation and Consummation of the Revised Plan*

On June 27, 2008 (the "Effective Date"), the Debtors substantially consummated the Revised Plan. *See* Effective Date 8-K; *see also Notice of Effective Date and Final Fee Application Deadline* [Bankruptcy Docket No. 3518]. Consummation required completion of several corporate restructuring transactions, repayment of certain payment obligations on the Effective Date (such as repayment of the Replacement DIP Facility), as well as in the period following the Effective Date (such as payment of Administrative Claims, professionals fees, and certain indenture trustees fees), and issuance of securities to those parties receiving equity distributions under the Revised Plan. In order to make these distributions and to fund their ongoing working capital needs, the Reorganized Debtors' emergence from bankruptcy was predicated on funding from several key sources.

The Reorganized Debtors' exit financing package comprises a $110 million revolving credit facility, a €32.2 million (approximately $50 million) European first lien term loan, and an approximate $84 million U.S. second lien term loan (yielding approximately $67 million). In addition to these exit financing facilities, the Reorganized Debtors entered into various European accounts receivable factoring facilities totaling approximately €63 million. *See* Effective Date 8-K.

These exit financing facilities, together with cash from the Company's balance sheet, were used in part to finance distributions under the Revised Plan, providing cash to holders of DIP facility claims, administrative expense claims, certain priority claims, and Canadian general

unsecured claims.  Other general unsecured creditors and Holders of Senior Notes Claims receiving distributions under the Plan received new equity in the reorganized company to satisfy claims.  Effective June 27, 2008, all existing stock was cancelled.  *Id.*

This transaction significantly strengthened the Reorganized Debtors' capital structure by reducing total net debt from over $1.3 billion to approximately $180 million on the Effective Date, significantly reducing interest expenses for the Company as a whole, including non-Debtor affiliates.  The Debtors substantially consummated these transactions on the Effective Date.  *Id.*

### (i)     Senior Secured Revolving Credit Facility

On the Effective Date, New Dura, Dura Opco (as the "Borrower"), and certain of their domestic subsidiaries (as "guarantors") entered into the Senior Secured Revolving Credit and Guaranty Agreement (the "Senior Secured Revolving Credit Facility") with a syndicate of lenders, General Electric Capital Corporation as administrative agent and collateral agent, Wachovia Bank, National Association as syndication agent, and Bank of America, N.A. as issuing bank and documentation agent.  The Senior Secured Revolving Credit Facility consists of a $110 million revolving loan facility for a term of four years, including a letter of credit subfacility of $25 million.  *Id.*

The collateral agent received as collateral a first priority perfected security interest in substantially all existing and after-acquired property of each of the Borrower and the guarantors. The Senior Secured Revolving Credit Facility is also secured by a first priority lien on the collateral of the Borrower and the guarantors, other than that portion of the collateral on which the Second Lien Term Loan (as defined below) has a first priority lien. The Senior Secured Revolving Credit Facility has a second priority lien on the portion of the collateral on which the Second Lien Term Loan has a first priority lien, junior to the terms of the Second Lien Term

22

Loan.  All obligations under the Senior Secured Revolving Credit Facility are cross-collateralized with each other and with collateral provided by any subsidiary of DOC or any other guarantor. *Id.*

In addition to interest, the Borrower must pay certain fees to the lenders under the Senior Secured Revolving Credit Facility, including (i) annual fees in the amount of $100,000 payable to the Agent; (ii) a closing fee of $2.2 million, to be allocated among the lenders proportionately based on their respective committed amounts of the $110 million; (iii) certain monthly fees; (iv) certain premium payments; and (v) all reasonable costs and expenses, including certain legal and auditing expenses and enforcement costs and expenses of the agent and lenders. *Id.*

As of the Effective Date, $24.5 million was outstanding under the Senior Secured Revolving Credit Facility. *Id.*

### (ii)    The Second Lien Credit Facility

On the Effective Date, New Dura, DOC (as Borrower) and certain of their domestic subsidiaries (as guarantors) entered into the Senior Secured Second Lien Credit and Guaranty Agreement (the "Second Lien Credit Facility") with a syndicate of New Second Lien Lenders and Wilmington Trust Company as administrative agent and collateral agent. The Second Lien Credit Facility is a second lien term loan for a term of five years in a principal amount of $83.75 million issued with original issue discount ("OID") of 20% of the principle amount. *Id.*

The Second Lien Credit Facility is secured by (1) a first priority lien on the portion of the collateral consisting of (x) all intercompany indebtedness owed to New Dura, DOC and all guarantors from any foreign subsidiaries and (y) up to 100% of the equity interests of all first-tier foreign subsidiaries of New Dura, DOC and all other guarantors; and (2) a second priority lien on all collateral, junior to the liens of the Senior Secured Revolving Credit Facility. *Id.*

23

In addition to interest, the Borrower paid a funding fee of $8.375 million, representing 10% of the aggregate principal amount of the term loan commitments, (without taking into account any OID), which was allocated among the lenders pro rata in accordance with their respective commitments. *Id.*

Loans made on the Effective Date under the Second Lien Credit Facility were used to refinance the existing indebtedness under the Replacement DIP Facility, to otherwise enable consummation the Plan, and to fund working capital purposes and general corporate purposes. As of the Effective Date, $83.75 million was outstanding under the Second Lien Credit Facility. *Id.*

### (iii)    The European First Lien Term Loan

On June 27, 2008, Dura Holding Germany GmbH, a non-domestic subsidiary of DOC, and certain of Dura Holding Germany GmbH's non-domestic subsidiaries entered into the Credit Agreement (the "European First Lien Term Loan") with Blackstone Distressed Securities Fund (Luxembourg) SARL and GSO Domestic Capital Funding (Luxembourg) SARL as lenders and Deutsche Bank Trust Company Americas as administrative agent and collateral agent. The European First Lien Term Loan consists of a €32.2 million term loan for a term of four years. *Id.*

The European First Lien Term Loan is secured by a first priority lien on (i) all intercompany indebtedness of Dura Automotive Systems, Inc., Dura Operating Corp., and all other Guarantors owing to foreign subsidiaries of Dura European Holding LLC & Co. KG and the Guarantors (ii) 100% of the equity interests and assets (other than accounts receivable) of certain subsidiaries of Dura European Holding LLC & Co. KG (collectively, the "European First Term Loan Priority Collateral"). *Id.*

24

As of the Effective Date, €32.2 million was outstanding under the European First Lien Term Loan. *Id.*

### (iv)   The European Factoring Agreements

And finally, on the Effective Date, Dura Holding Germany GmbH and certain of Dura Holding Germany GmbH's non-domestic subsidiaries were party to certain receivables factoring agreements including (i) with GEFactoFrance for the purchase of receivables from a French subsidiary of New Dura and (ii) the purchase of receivables from COFACE Finance GmbH in an amount outstanding of €32.7 million on the Effective Date. *Id.*

### (v)   The Taxable Sale Transaction

The Revised Plan contemplated a taxable sale of substantially all of the assets of Dura Operating Corporation to New Dura Opco.  Completion of this sale required the following steps:

- Nominees for the creditors formed three new Delaware corporations: New Dura, Inc. ("Newco"), along with its wholly-owned direct subsidiary, New Dura Holdco, Inc. ("New Dura Holdco"), and its wholly-owned indirect subsidiary, New Dura Opco, Inc. ("New Dura Opco");

- On the day before the Effective Date, Dura Automotive Systems, Inc. amended its certificate of incorporation to change its name to "Old Dura, Inc." ("Old Dura") and immediately thereafter Newco amended its certificate of incorporation to change its name to "Dura Automotive Systems, Inc." ("New Dura");

- Then, through a series of transactions consummated on the Effective Date:

  - Old Dura sold: (a) its holdings of Atwood Automotive, Inc. to New Dura Holdco; and (b) substantially all of its other assets (including the stock of DOC) to New Dura Opco. In exchange therefor, Old Dura received (y) 8,400,000 shares of common stock, par value $0.01 per share, of New Dura (the "New Common Stock") and (z) 2,281,000 shares of Series A Redeemable Voting Mandatorily Convertible Preferred Stock, par value $0.01 per share (the "New Series A Preferred Stock");

  - New Dura issued 83,750 shares of New Series A Preferred Stock to the lenders under its new Senior Secured Second Lien Credit Facility (the "New Second Lien Lenders") as consideration for providing the facility;

25

- Except to the extent otherwise provided in the Revised Plan, Old Dura's notes, stock, instruments, certificates, and other documents evidencing the Senior Notes Claims, Subordinated Notes Claims, Convertible Subordinated Debentures Claims, Convertible Trust Guarantees and Equity Interests (including the 18,904,222 shares of Old Dura's Class A Common Stock, par value $0.01 per share, which were outstanding as of June 1, 2007) existing immediately prior to the Effective Date were cancelled; and

- Old Dura distributed, or will distribute, the New Common Stock to holders of Allowed General Unsecured Claims, including holders of Old Dura's Senior Notes, other than Canadian General Unsecured Claims (as defined in the Revised Plan) and the New Series A Preferred Stock to the holders of Allowed Second Lien Facility Claims (as defined in the Revised Plan).

*Id.*

Finally, on the Effective Date, Old Dura entered into an Asset Purchase Agreement with New Dura Opco whereby Old Dura sold New Dura Opco substantially all of its assets, including all of the outstanding equity interests in DOC, in exchange for New Dura Opco's holdings of New Series A Preferred Stock and New Common Stock. *Id.*

### (vi)    Cash Distributions

On and after the Effective Date the Reorganized Debtors used and will use funds from the sources described above to issue cash distributions under the Revised Plan. These distributions included repayment in full on the Effective Date of approximately $260 million in Replacement DIP Facility Claims. *Id*; *see also* Flanagan Declaration at ¶¶ 3-4.

### (vii)    Equity Distributions

On the Effective Date, the Reorganized Debtors issued 2,364,750 shares of Convertible Preferred Stock (2,281,000 shares were distributed to Second Lien Facility Claim holders, and 83,750 shares were distributed pursuant to the New Money Second Lien Loan as a lender commitment fee). Further, on the Effective Date, the Reorganized Debtors issued 8,400,000 shares of New Common Stock (7,234,060 shares have been distributed to the Senior Notes

26

Indenture Trustee on behalf of Senior Notes holders, approximately 146,000 shares will be distributed to holders of Allowed Class 5A Claims, and the remaining shares are being held in reserve for Disputed Claims pursuant to Article VI.C.4 of the Plan). *See* Effective Date 8-K; *see also* Flanagan Declaration at ¶¶ 3-4.

### (viii)    Cancellation of Debt Securities and Old Common Stock

Pursuant to the Revised Plan, on the Effective Date the following securities were cancelled:

- 8.625% Senior Notes due April 15, 2012, issued to the Indenture dated April 18, 2002;

- 9% Senior Subordinated Notes due May 1, 2009, issued pursuant to the Indentures, dated April 22, 1999, April 22, 1999, and June 22, 2001;

- 7.5% Convertible Subordinated Debentures due March 31, 2028, issued pursuant to the Junior Convertible Subordinated Indenture, dated as of March 20, 1998; and

- old common stock.

*See* Effective Date 8-K.

### (ix)    Arrangements with Customers and Suppliers

As the Reorganized Debtors stated repeatedly in their responses to Mr. Korth's pleadings, a quick exit from chapter 11 was crucial to obtaining, and maintaining, a robust supplier and customer base.    In fact, as the Reorganized Debtors' Chief Executive Officer explained in uncontroverted testimony at the May 13, 2008, confirmation hearing:

> In the auto industry the orders you receive today are produced usually three to five years in the future.    There's always that type of lead time from when you get the order and you go through the design process until you actually go to production where the revenue starts to come in.    So, because of that lead time, the customer needs to be convinced that in fact the company they're giving the order to has good stability, sustain-ability, and literally is going to be there three to five years out to be able to produce this product when the vehicles start going down the assembly line.    In 2007 ... we tried to be as transparent as possible with all of our

27

customers and in doing so we've prepared a timeline for exit and we would review on a monthly basis … our progress and our status. In doing that, we received [orders of] … about 80 to 90 percent of what we receive in a normal year … After we failed to get out [of chapter 11] in December, primarily due to the state of the U.S. credit market, the order book significantly dried up, and we've had a really difficult first quarter as far as obtaining new orders. Now, what we've done, is we … prepared a timeline [again] … Failure to exit [on May 13, 2008] … in my estimation would significantly reduce our chances of achieving and getting these orders.

*In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (KJC) (Bankr. D. Del.) May 13, 2008, Hrg. Tr. at pp. 19:1-20:7.

Indeed, since the Confirmation Order was entered, the Company has begun to reap the reward—in the form of new customer commitments—of the Reorganized Debtors departing chapter 11. *See* Declaration of Lawrence A. Denton, President and Chief Executive Officer of Dura Automotive Systems, Inc., in Support of Debtors' Objection to J W Kurth's Motion for Stay Pending Appeal, [Bankruptcy Docket No. 3409], at ¶ 4. Many, if not all of those and other commitments could be lost if the Reorganized Debtors' stay in chapter 11 were to be prolonged. *Id.* Although it is difficult to estimate the magnitude of such potential lost commitments, it is likely that annual sales could decrease by potentially as much as several tens of millions of dollars if the Revised Plan is undone. *Id.*

Such a loss of future business would potentially decrease the value of the Reorganized Debtors upon exit. Such a loss of value would directly—and adversely—impact Senior Notes and Other General Unsecured Claims recoveries—which are in the form of New Common Stock, the value of which depends directly upon the Reorganized Debtors' going concern value.

28

## IV.    ARGUMENT

The Third Circuit Court of Appeals has held that the "widely held and accepted doctrine" of equitable mootness, which is unique to bankruptcy proceedings, mandates that an appeal from a court order confirming a chapter 11 plan of reorganization should be dismissed if in light of the confirmed plan having been substantially consummated, grant of an appeal would be inequitable to the requested relief. *In re Continental Airlines*, 91 F.3d 553, 559 (3d Cir. 1996) (*en banc*); *see also In re PWS Holding Corp.*, 228 F.3d 224, 236 (3d Cir. 2000) (quoting *In re Chateaugay Corp. (Chateaugay I)*, 988 F.2d 322, 325 (2d Cir. 1993)); *In re Zenith Electronics Corp.*, 250 B.R. 207, 214 (D. Del. 2000). The Third Circuit looked to five factors in determining whether to dismiss a bankruptcy appeal because it is equitably moot because the appellee's chapter 11 plan had been substantially consummated:

(1)    whether the plan of reorganization has been substantially consummated;

(2)    whether a stay was obtained;

(3)    whether the relief requested would affect the rights of parties not before the court;

(4)    whether the relief requested would affect the success of the plan; and

(5)    the public policy of affording finality to bankruptcy judgments.

*See Continental*, 91 F.2d at 560. Here, the evidence shows that each one of the *Continental* factors compels this Court to dismiss the Appeal.

### (a)    *The Revised Plan Has Been Substantially Consummated*

"[T]he foremost consideration [in determining whether an appeal is equitably moot has been] whether the reorganization plan has been substantially consummated." *PWS Holding*, 228 F.3d at 236; *see also Continental*, 91 F.3d at 560. Section 1101(2) of the Bankruptcy Code defines "substantial consummation" as the:

29

    (A)    transfer of all or substantially all of the property proposed by the plan to be transferred;

    (B)    assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and

    (C)    commencement of distribution under the plan.

11 U.S.C. § 1101(2); *Continental*, 91 F.3d at 561.

Plan consummation is an especially compelling factor in favor of determining that an appeal is equitably moot when the reorganization at issue involves intricate transactions or where outside investors have relied upon confirmation of the plan, such that "a reversal of the order confirming the Plan likely would put [the debtor] back into bankruptcy" by unraveling the confirmed plan. *Continental*, 91 F.3d at 561, 567 (specifically noting "the merger of 53 debtors other than Continental with and into Continental, the investment of $110 million in cash by Air Partners and Air Canada in the reorganized Continental, the transfer by foreign governments of various route authorities, and the assumption by the reorganized Continental of unexpired leases and executory contracts worth over $5.0 billion" and concluding that "no prudential considerations would support an attempt by an appellate court, district or court of appeals, to fashion even a limited remedy" for the appellant). These chapter 11 cases involve many such intricate transactions:

- A consortium of lenders, investors and counterparties from the United States and Europe infused approximately $260 million and €65 million to the Reorganized Debtors in reliance upon the Revised Plan;

- The Reorganized Debtors assumed unexpired leases and executory contracts with over $900,000 in cure costs;

- The Reorganized Debtors created new legal entities, merged former legal entities out of existence, and formed a charitable trust to hold the remainder of the Debtors' estates;

<div align="center">30</div>

- The Reorganized Debtors distributed, or will distribute, over $270 million to creditors, and approximately 8,400,000 shares of New Common Stock and approximately 3,263,722 shares of New Series A Preferred Stock to other creditors pursuant to the terms of the Revised Plan.

*See* Section III(d), above.  Indeed, to date, distributions under the Revised Plan have not only

commenced, but in many cases are complete:

- <u>DIP Claims, Priority Claims, and Administrative Claims</u> - Distributions to (i) Holders of DIP Claims are complete, (ii) Holders of Allowed Priority Claims as of the Effective Date are being released as the Claims reconciliation process progresses, and (iii) Holders of Allowed Administrative Claims as of the Effective Date are being released as the Claims reconciliation process progresses.

- <u>Class 1 (Other Secured Claims)</u> - Allowed Other Secured Claims will be paid in full as the Claims reconciliation process progresses.

- <u>Class 2 (Second Lien Facility Claims)</u> - Distributions are complete.  Pro rata distributions of equity in the Reorganized Debtors were distributed to Holders of Second Lien Facility Claims on or shortly after the Effective Date.

- <u>Class 3 (Senior Notes Claims)</u> - Distributions are complete.  Pro rata distributions of equity in the Reorganized Debtors were distributed to agents for the Holders of Senior Notes Claims on the Effective Date.  These agents thereafter were required to distribute these equity distributions to the beneficial holders of Senior Notes Claims.  The identities of these beneficial holders is unknown to the Reorganized Debtors.

- <u>Class 5 (General Unsecured Claims)</u> - Pro rata distributions of equity in the Reorganized Debtors will be distributed to Holders of Allowed Class 5A Other General Unsecured Claims, and pro rata distributions of cash will be distributed to Holders of Allowed Class B Canadian General Unsecured Claims as the Claims reconciliation process progresses.

*See* Flanagan Declaration at ¶¶ 3-4; *see also* Effective Date 8-K.  In sum, consummating the

Revised Plan required weeks of intense activity to complete all of the intricate, and inter-

dependent, transactions called for under the Revised Plan.  *See* Section III(d), above.  There is no

remedy for Mr. Korth that would not result in a confused, massive attempt to unravel each of

these actions.  This factor, indeed each of the five *Continental* factors, decisively favor dismissal

of the Appeal.

K&E 12969150.
RLF1-3307597-2

### (b)    The Bankruptcy Court Denied the Korth Motion to Stay Because It Lacked Factual Support

The Third Circuit has repeatedly emphasized the critical importance of an appellant obtaining a stay of the confirmation if it hopes to avoid equitable mootness.  As the court explained in *In re Highway Truck Drivers & Helpers Local Union #107*, 888 F.2d 293 (3d Cir. 1989):

> It is obligatory upon appellant . . . to pursue with diligence all available remedies to obtain a stay of execution of the objectionable order (even to the extent of applying to the Circuit Justice for relief . . .), if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from.

*Id*. at 297.

Moreover, as another court rightly pointed out: "A stay not sought, and a stay sought and denied, lead equally to the implementation of the plan of reorganization." *In re Trans Marketing Houston, Inc.*, 62 F.3d 395 (5th Cir. 1995) (quoting *In re UNR Indus., Inc.*, 20 F.3d 766, 770 (7th Cir.), *cert. denied*, 115 S.Ct. 509 (1994)); *see also In re AOV Indus., Inc.*, 792 F.2d 1140, 1147 (D.C. Cir. 1986) (noting that the failure to obtain a stay has the same practical effect as a failure to seek a stay at all).  Indeed, "[t]he existence or absence of a stay is a critical factor in determining whether to dismiss an appeal under the doctrine of equitable mootness."  *Grand Union Co. v. Saul, Ewing, Remick & Saul (In re Grand Union)*, 200 B.R. 101, 105 (D. Del. 1996).

As detailed above, the Bankruptcy Court denied the Korth Motion to Stay on June 5, 2008.  In fact, the Bankruptcy Court found that the Korth Motion to Stay failed each and every criteria for issuance of a stay: (i) Mr. Korth's Appeal had no likelihood of success on the merits; (ii) Mr. Korth did not face irreparable injury in the absence of a stay; (iii) the Debtors and other parties-in-interest, however, faced substantial harm if a stay was issued; and (iv) a stay was not

32

in the public interest.  *See Order Denying Motion for Stay Pending Appeal and Modification of Motion for Stay Pending Appeal to a Limited Stay Pending Appeal [Docket Nos. 3383 and 3423]* [Bankruptcy Docket No. 3440]; *see also In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (Bankr. D. Del.) June 5, 2008, Hrg. Tr. at pp. 14-19.  Mr. Korth did not appeal this denial and Mr. Korth's failure to obtain a stay allowed the Reorganized Debtors to proceed with consummation of the Revised Plan.

In sum, Mr. Korth's failure to obtain a stay pending appeal not only highlights the wholesale lack of merit to the Appeal, but further allowed consummation of the Revised Plan and the creation of circumstances that cannot be unraveled without substantial prejudice to numerous third parties.

### (c)    *Vacating or Reversing the Confirmation Order Would Severely Prejudice Numerous Third Parties*

The Third Circuit considers effects on third parties to be of great concern when addressing assertions of equitable mootness:

> High on the list of prudential considerations taken into account by courts considering whether to allow an appeal following a consummated reorganization is the reliance by third parties, in particular investors, on the finality of the transaction. . .  The concept of "mootness" from a prudential standpoint protects the interests of non-adverse third parties who are not before the reviewing court but who have acted in reliance upon the plan as implemented.

*Continental*, 91 F.3d at 562 (citing *In re Manges*, 29 F.3d 1034, 1039 (5th Cir. 1994), and *Rochman v. Northeast Utils. Serv. Group*, 963 F.2d 469, 474-75 (1st Cir. 1991), *cert denied*, 506 U.S. 908 (1992)).

In this case there is no doubt that the interests at stake in the Appeal extend far beyond those of the Reorganized Debtors and Mr. Korth.  In fact, hundreds of parties have entered into

transactions, committed $100 million in cash and other resources to the Reorganized Debtors and made plans in reliance upon the finality of the Confirmation Order. Reversing the Confirmation Order would substantially prejudice each of these third parties, including:

- *Exit Funding Participants*: The consortium of lenders, investors and counterparties have infused approximately $295 million and €65 million in reliance upon confirmation of the Revised Plan. *See* Section III(d), above. These parties would be severely harmed should the Confirmation Order be reversed and the Reorganized Debtors' resources so depleted that it could not repay the borrowed funds.

- *Customers and Suppliers*: Numerous critical customers and suppliers have earmarked production capacity, personnel and other resources in reliance upon successful confirmation and implementation of the Revised Plan and the resulting relative financial stability that the Reorganized Debtors now enjoy. As Mr. Denton testified, emergence from chapter 11 is a key component to the Debtors' ability to secure new orders from customers and improved payment terms from suppliers. *See Declaration of Lawrence A. Denton, President and Chief Executive Officer of Dura Automotive Systems, Inc., in Support of Debtors' Objection to J W Korth's Motion for Stay Pending Appeal* [Bankruptcy Docket No. 3409].

- *Holders of New Common Stock and Preferred Stock*: These parties received pro rata shares of new common stock or preferred stock in exchange for the discharge of their claims against the Reorganized Debtors. These shares are freely tradable and many recipients may have already completed sales of their distributions. Furthermore, as indicated above, the Reorganized Debtors do not know, and have no way of learning, the identities of the individual beneficial Holders of Senior Note Claims who may have received equity distributions under the Revised Plan; let alone the individuals those beneficial holders may have traded their distributions to. *See* Section III(d), above; *see also* Flanagan Declaration at ¶¶ 3-4.

- *New Money Second Lien Investors*: In addition, certain Second Lien Noteholders, Senior Noteholders and outside investors infused additional cash into the Reorganized Debtors' capital structure in exchange for equity distributions. *See* Section III(d), above. These investors did so based upon the supposed finality of the Confirmation Plan and the business plan and financial projections contained therein. Reversal of the Confirmation Order would wipe out that investment because the Reorganized Debtors do not have sufficient funds to repay it.

In short, reversal of the Confirmation Order would wreak havoc upon a wide range of interested parties as well as the Reorganized Debtors. The Appeal must be dismissed.

34

### (d)    Mr. Korth's Appeal, If Granted, Would Destroy the Revised Plan

The transactions undertaken pursuant to the Revised Plan must be viewed "against the backdrop of the relief sought - nothing less than a wholesale annihilation of the Plan." *In re Manges*, 29 F.3d at 1043; indeed, reversing the Confirmation Order "would knock the props out from under the authorization for every transaction that has taken place." *Matter of Quality Spice Corp.*, 107 B.R. 843, 854-55 (D.N.J. 1989) (quoting *In re Roberts Farms, Inc.*, 652 F.2d 793, 797 (9th Cir. 1981)). The Appeal seeks nothing less than such a wholesale annihilation: Mr. Korth seeks reversal of the Confirmation Order pending completion of his own "investigation" into the issues he raised in his objection to the Revised Plan. *See* Korth Statement of Issues on Appeal.

It is also important to bear in mind that the Revised Plan was a "consensual arrangement arrived at through lengthy negotiation." *In re Specialty Equip. Cos.*, 3 F.3d 1043, 1047 (7th Cir. 1993). Indeed, it directly results from the shared sacrifices of Holders of Second Lien Facility Claims, Senior Notes Claims, and General Unsecured Claims - each of which classes voted overwhelmingly to accept the Revised Plan, and each of whose representatives - the Second Lien Group, the Senior Notes Indenture Trustee, and the Creditors' Committee - offered their full support of the Revised Plan. Only under the Revised Plan can these parties and additional outside lenders receive "the benefit of [their] bargain." *Continental*, 91 F.3d at 553 (quotations omitted). That benefit would be destroyed if this appeal were to be successful.

At its heart, the Appeal requests the District Court to require the Bankruptcy Court to impose an alternative plan of reorganization on the Reorganized Debtors and their creditor constituencies. Mr. Korth requests additional time to investigate his own allegations. To allow Mr. Korth to do so would require "undoing" the Revised Plan's transactions. Distributions made

<div align="center">35</div>

under the Revised Plan would have to be recovered, pooled, and parsed out according to a starkly different distribution scheme. In particular, equity distributions made to Holders of Senior Notes Claims would have to be recouped, pooled, and then re-distributed equally between Holders of Senior Notes Claims and Holders of Subordinated Notes Claims. This proposal presents an impossible situation.

First, of the 8,400,000 shares of New Common Stock that were issued on the Effective Date, 7,234,060 of those shares have been distributed to the Senior Notes Indenture Trustee on behalf of Senior Notes holders. *See* Section III(d), above; *see also* Flanagan Declaration at ¶¶ 3-4. The identity of each Holder of Senior Notes is unknown to the Reorganized Debtors, and brokers for the underlying Holders of Senior Notes have informed the Reorganized Debtors that they are not obligated to disclose those identities. *See* Flanagan Declaration at ¶¶ 3-4. Furthermore, issued shares of New Common Stock are eligible to be traded on the "pink sheet" market, operated by Pink OTC Markets, which is open to participation by accredited investors. *See* http://www.sec.gov/answers/pink.htm, visited on July 28, 2008. It is thoroughly possible, therefore, that these 7,234,060 shares of New Common Stock no longer belong to the original, unknown, recipients and have already been passed on to new, unknown, recipients. Reversing the Confirmation Order "would do nothing more than create an unmanageable, uncontrollable situation for the Bankruptcy Court." *Quality Spice*, 107 B.R. at 855 (quoting *Roberts Farms*, 652 F.2d at 797).

And second, the Bankruptcy Code does not permit a court to "impos[e] a different plan of reorganization" on the parties in lieu of the bargained-for, substantially consummated Revised Plan. *Continental*, 91 F.3d at 553, 564-65 (quoting *Specialty Equip.*, 3 F.3d at 1047). The Revised Plan was confirmed, by the overwhelming vote of the Debtors' creditors, on its very

specific terms. If the Appeal is successful, and if it were possible to recoup distributions made to Senior Notes Holders, those distributions would then be pooled and split among the Senior Notes Holders and the Subordinated Notes Holders. This is not at all the transaction that the Senior Notes Holders voted for. This very different transaction would need to be submitted to creditors for approval, which means starting the entire plan-drafting and confirmation process over. *See* Fed. R. Bank. P. 3019 (providing procedure for modifying a chapter 11 plan that has been accepted, but only if it has not yet been confirmed); *see also* 11 U.S.C. § 1127 (providing procedures that allow a plan proponent to modify a chapter 11 plan post-confirmation only if the plan has not yet been substantially consummated); *In re Cinderella Clothing Indus., Inc.*, 93 B.R. 373 (Bankr. E.D. Pa. 1988) (holding same). Mr. Korth's proposal cannot simply bypass this process and be imposed upon the creditor body. *See* 11 U.S.C. §§ 1125, 1127, 1129 (setting forth standards for confirmation of a chapter 11 plan); *see also In re Armstrong World Indus.*, 348 B.R. 111, 120 (D. Del. 2006) (analyzing same); *In re Genesis Health Ventures, Inc.*, 226 B.R. 591, 606, n. 23 (Bankr. D. Del. 2001) (same).

It is much too late to start over from scratch. Even if that were possible, reversal of the Confirmation Order would severely threaten the Reorganized Debtors' survival. Without the exit financing facilities, the Reorganized Debtors would not have enough cash to conduct the basic functions of their business.

### (e)   *The Public Policy of Fostering Reliance on Final Confirmation Orders Strongly Supports Dismissal of the Appeal*

The fifth and final factor in assessing application of equitable mootness is the public policy favoring finality of bankruptcy judgments. As the Third Circuit explained:

> [W]e should ask whether we want to encourage or discourage reliance by investors and others on the finality of bankruptcy confirmation orders. The strong public policy in favor of

37

> maximizing debtors' estates and facilitating successful reorganization, reflected in the Code itself, clearly weighs in favor of encouraging such reliance. Indeed, the importance of allowing approved reorganizations to go forward in reliance on bankruptcy court confirmation orders may be the central animating force behind the equitable mootness doctrine.

*Continental*, 91 F.3d at 565 (citing *In re Pub. Serv. Co. of N.H.*, 963 F.2d 469, 471-72 (N.H. 1992) and *Metro Property Mgmg. Co. v. Info. Dialogues, Inc.*, 662 F.2d 475, 477 (8th Cir. 1981)); *see also In re Box Bros. Holding Co.*, 194 B.R. 32, 42 (D. Del. 1996) (noting the "strong public policy in proceeding with the implementation of the reorganization plan of a debtor in the federal bankruptcy laws").

The public policy favoring finality of confirmation orders applies with particular force in this case. First, the Bankruptcy Court afforded Mr. Korth every opportunity to present his arguments and evidence during the chapter 11 cases. After considering all of Mr. Korth's arguments and his wholesale lack of evidence, the Bankruptcy Court resoundingly and explicitly rejected them. *In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (Bankr. D. Del.) May 13, 2008, Hrg. Tr. at pp. 46-49. Second, these chapter 11 cases have received considerable media attention and no doubt will continue to do so if the Confirmation Order is reversed. Such a reversal would place the assets and businesses of many third-parties that have agreed to deal with the Reorganized Debtors in reliance upon the Revised Plan at great risk and would send an unfortunate and very public message to creditors in chapter 11 cases to come: assist reorganizing debtors at your peril. This would directly undermine the stated public policy of encouraging reliance upon the finality of bankruptcy confirmation orders. The Appeal must be denied.

## V.    <u>CONCLUSION</u>

WHEREFORE, the Reorganized Debtors respectfully request that the Bankruptcy Court

dismiss the Appeal as equitably moot and grant such other and further relief as is just and proper.

Dated:  July 31, 2008
        Wilmington, Delaware

                                              *Marcos A. Ramos*

                              Daniel J. DeFranceschi (No. 2732)
                              Marcos A. Ramos (No. 4450)
                              Jason M. Madron (No. 4431)
                              RICHARDS, LAYTON & FINGER, P.A.
                              One Rodney Square
                              920 North King Street
                              Wilmington, Delaware  19801
                              Telephone:  (302) 651–7700
                              Facsimile:  (302) 651-7701
                              Email: defranceschi@rlf.com
                                       ramos@rlf.com
                                       madron@rlf.com

                              –and–

                              KIRKLAND & ELLIS LLP
                              Marc Kieselstein, P.C.
                              Roger J. Higgins
                              Ryan Blaine Bennett
                              200 East Randolph Drive
                              Chicago, Illinois  60601
                              Telephone: (312) 861–2000

                              COUNSEL FOR THE REORGANIZED
                              DEBTORS

## Exhibit A

Effective Date 8-K

8-K12G3 1 k27841e8vk12g3.htm FORM 8-K PURSUANT TO RULE 12G3

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 8-K

### CURRENT REPORT
### Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

**Date of Report (Date of earliest event reported): June 27, 2008**

# Dura Automotive Systems, Inc.

(Exact name of registrant as specified in its charter)

| Delaware | 000-21139 | 26-2773380 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**2791 Research Drive, Rochester Hills, Michigan 48309**

(Address of principal executive offices) (Zip Code)

Registrant's telephone number, including area code: **(248) 299-7500**

**N/A**

(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐ W ritten communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Solicitin g material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ P re-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ P re-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

## ITEM 1.01 Entry into a Material Definitive Agreement.

*Preliminary Note*

On June 27, 2008 (the "Effective Date"), Dura Automotive Systems, Inc. ("DASI"), its wholly-owned subsidiary, Dura Operating Corp. ("DOC"), and certain of their affiliates organized in the United States (collectively, the "Debtors") satisfied, or otherwise obtained a waiver of, each of the conditions precedent to the effective date specified in Article VIII of the Debtors' Revised Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (With Further Technical Amendments) (the "Plan"), dated May 12, 2008, as confirmed by an order (the "Confirmation Order") of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") entered on May 13, 2008.

The description of the Plan in this Current Report on Form 8-K is qualified in its entirety by reference to the full text of such document, a copy of which was attached as Exhibit 2.1 to the Current Report on Form 8-K filed by DASI on May 19, 2008 and is incorporated by reference herein as well as the Final Plan Supplement filed with the Bankruptcy Court on June 26, 2008, a copy of which is filed herewith as Exhibit 2.2 and is incorporated by reference herein. Capitalized terms used but not defined herein shall have the meaning given to them in the Plan.

As contemplated by the Plan, prior to and on the Effective Date, DASI and DOC took part in a corporate reorganization. In early June 2008, nominees for the creditors formed three new Delaware corporations: New Dura, Inc. ("Newco"), along with its wholly-owned direct subsidiary, New Dura Holdco, Inc. ("New Dura Holdco"), and its wholly-owned indirect subsidiary, New Dura Opco, Inc. ("New Dura Opco"). On the day before the Effective Date, DASI amended its certificate of incorporation to change its name to "Old Dura, Inc." ("Old Dura") and immediately thereafter Newco amended its certificate of incorporation to change its name to "Dura Automotive Systems, Inc." ("New Dura"). Then, through a series of transactions consummated on the Effective Date:

- Old Dura (formerly known as DASI) sold (a) its holdings of Atwood Automotive, Inc. to New Dura Holdco and (b) substantially all of its other assets (including the stock of DOC) to New Dura Opco. In exchange therefor, Old Dura received (y) 8,400,000 shares of common stock, par value $0.01 per share, of New Dura (the "New Common Stock") and (z) 2,281,000 shares of Series A Redeemable Voting Mandatorily Convertible Preferred Stock, par value $0.01 per share (the "New Series A Preferred Stock");

- New Dura issued 83,750 shares of New Series A Preferred Stock to the lenders under its new Senior Secured Second Lien Credit Facility (the "New Second Lien Lenders") as consideration for providing the facility, as more fully described under Item 2.03 of this Current Report on Form 8-K;

- Except to the extent otherwise provided in the Plan, Old Dura's notes, stock, instruments, certificates, and other documents evidencing the Senior Notes Claims, Subordinated Notes Claims, Convertible Subordinated Debentures Claims, Convertible Trust Guarantees and Equity Interests (including the 18,904,222 shares of Old Dura's Class A Common Stock, par value $0.01 per share, which were outstanding as of June 1, 2007) existing immediately prior to the Effective Date were cancelled; and

2

- Old Dura distributed the New Common Stock to holders of Allowed General Unsecured Claims, including holders of Old Dura's Senior Notes, other than Canadian General Unsecured Claims (as defined in the Plan) and the New Series A Preferred Stock to the holders of Allowed Second Lien Facility Claims (as defined in the Plan).

New Dura is the successor registrant to Old Dura pursuant to Rule 12g-3 under the Securities Exchange Act of 1934 (the "Exchange Act").

*Asset Purchase Agreement*

On the Effective Date, Old Dura entered into an Asset Purchase Agreement with New Dura Opco whereby Old Dura sold New Dura Opco substantially all of its assets, including all of the outstanding equity interests in DOC, in exchange for New Dura Opco's holdings of New Series A Preferred Stock and New Common Stock.

This description of the Asset Purchase Agreement is qualified in its entirety by reference to the full text of such agreement, a copy of which is filed herewith as Exhibit 10.1 and is incorporated by reference herein.

*Registration Rights Agreement*

On the Effective Date, New Dura entered into a Registration Rights Agreement with each of the creditors who received an issuance of New Series A Preferred Stock pursuant to the Plan. The Registration Rights Agreement provides the holders of the New Series A Preferred Stock with registration rights applicable to their shares of New Series A Preferred Stock and the New Common Stock (the "Registrable Securities").

Under the Registration Rights Agreement, and subject to certain restrictions, the holders of not less than 20% of each class of Registrable Securities have the right to request that New Dura effect the registration of the Registrable Securities held by such requesting holders, plus the Registrable Securities of any other holder giving New Dura a timely request to join in such registration (a "Demand Registration"). Additionally, under the Registration Rights Agreement, and subject to certain restrictions, if New Dura proposes to register any of its securities (other than pursuant to a Demand Registration) then New Dura must provide the holders of Registrable Securities with piggyback registration rights to have their Registrable Securities included in such registration, subject to certain limitations.

New Dura agreed to pay certain expenses related to the filing of registration statements pursuant to the Registration Rights Agreement, except that certain underwriting fees and taxes relating to the Registrable Securities shall be borne by the sellers of securities included in such registration in proportion to the aggregate selling price of the securities to be so registered. The Registration Rights Agreement contains other customary provisions, including indemnification provisions. New Dura has agreed not to take any action to terminate or suspend its reporting obligations under the Exchange Act without the approval of the holders of a majority of its New Common Stock (which vote shall not include the vote of the holders of New Series A Preferred Stock on an as-converted basis) prior to the earlier of (i) three years after the Effective Date or (ii) if New Dura's merges with or into or consolidates with another entity or sells all or substantially all of its assets to another entity, in any case other than a direct or indirect wholly-owned subsidiary of New Dura.

This description of the Registration Rights Agreement is qualified in its entirety by reference to the full text of such agreement, a copy of which is filed herewith as Exhibit 10.2 and is incorporated by reference herein.

The description of the Senior Secured Revolving Credit Facility and Second Lien Credit Facility set forth in Item 2.03 are hereby incorporated by reference.

## ITEM 1.02 Termination of a Material Definitive Agreement.

*Debt Securities of the Debtors*

On the Effective Date and pursuant to the Plan, the following outstanding debt securities of certain of the Debtors were cancelled, and the indentures governing such debt securities were terminated:

- 8 .625% Senior Notes due April 15, 2012, issued by DOC pursuant to the Indenture, dated April 18, 2002, among DOC (as issuer), certain affiliates of DOC (as guarantors), and BNY Midwest Trust Company (as trustee);

- 9 % Senior Subordinated Notes due May 1, 2009, issued by DOC pursuant to the Indentures, dated April 22, 1999, April 22, 1999, and June 22, 2001, among DOC (as issuer), certain affiliates of DOC (as guarantors), and U.S. Bank Trust National Association (as trustee), as amended, supplemented or otherwise modified;

- 7 .5% Convertible Subordinated Debentures due March 31, 2028, issued by Old Dura pursuant to the Junior Convertible Subordinated Indenture, dated as of March 20, 1998, among Old Dura (as issuer) and The First National Bank of Chicago (as trustee); and

*Second Lien Facility*

On the Effective Date and pursuant to the Plan, the $225 million Second Lien Facility governed by the Credit Agreement dated May 3, 2005 by and among DOC, as Borrower, Old Dura and all subsidiaries of Old Dura as Guarantors, JPMorgan Securities, Inc. and Banc of America Securities, LLC as sole and exclusive joint bookrunners, lead arrangers and syndication agents, and Wilmington Trust Company as collateral agent of the other lenders therein, as amended, was repaid and terminated. The creditors holding Allowed Second Lien Facility Claims (as defined in the Plan) relating to the Second Lien Facility were paid in full in shares of New Series A Preferred Stock on the Effective Date.

*DIP Facilities*

On the Effective Date and pursuant to the Plan, the debtor in possession facility loans consisting of (i) the $90 million Senior Secured Super-Priority Debtor In Possession Revolving Credit and Guaranty Agreement, dated as of November 30, 2006 and as amended

4

from time to time, by and among DOC, as Borrower, DASI, and certain subsidiaries of DASI and DOC, as Guarantors, General Electric Capital Corporation, as Administrative Agent and Collateral Agent, Goldman Sachs Credit Partners L.P., as Sole Bookrunner, Joint Lead Arranger and Syndication Agent, and Barclays Capital (the investment banking division of Barclays Bank, PLC), as Joint Lead Arranger and Documentation Agent, Bank of America, as Issuing Bank, and each of the Lenders party thereto (the "Revolving DIP Agreement"), and (ii) the $170 million Senior Secured Super-Priority Debtor in Possession Term Loan and Guaranty Agreement, dated as of January 30, 2008 and as amended from time to time, among DOC, as Borrower, DASI, and certain subsidiaries of DASI and DOC, as Guarantors, various lenders and issuing banks, Ableco Finance LLC as Administrative Agent, Collateral Agent, Sole Bookrunner, Lead Arranger, Documentation Agent and Syndication Agent, and Bank of America, N.A. as Issuing Bank (the "Term Loan DIP Agreement" and, together with the Revolving DIP Agreement, the "DIP Credit Agreements"), except those surviving obligations set forth in Article IX.D.4 of the Plan (collectively, the "Allowed DIP Facility Claims") were repaid in full and terminated. The creditors holding Allowed DIP Facility Claims were paid in full in cash on the Effective Date.

5

**ITEM 2.03 Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant.**

*Senior Secured Revolving Credit Facility*

On the Effective Date, New Dura, DOC (as the "Borrower"), and certain of their domestic subsidiaries (as "guarantors") entered into the Senior Secured Revolving Credit and Guaranty Agreement (the "Senior Secured Revolving Credit Facility") with a syndicate of lenders, General Electric Capital Corporation as administrative agent and collateral agent, Wachovia Bank, National Association as syndication agent, and Bank of America, N.A. as issuing bank and documentation agent. The Senior Secured Revolving Credit Facility consists of a $110 million revolving loan facility for a term of four years, including a letter of credit subfacility of $25 million.

The outstanding principal balance under the Senior Secured Revolving Credit Facility shall initially bear interest, at DOC's option, at a fluctuating rate equal to (a) the Base Rate (as defined in the Senior Secured Revolving Credit and Guaranty Agreement) plus 1.50% per annum, or (b) LIBOR plus 2.75% per annum. The applicable margins shall be subject to adjustment prospectively on a quarterly basis based on DOC's average Excess Borrowing Availability (as defined in the Senior Secured Revolving Credit and Guaranty Agreement) for the fiscal quarter then ended; provided, that such adjustments shall not occur prior to delivery of the Borrower's borrowing base certificate for the month ending December 31, 2008. The definitive documentation contains provisions regarding the delivery of financial statements, and the timing and mechanics of subsequent prospective adjustments to the applicable margins.

In addition, DOC must pay certain fees to the lenders under the Senior Secured Revolving Credit Facility, including (i) annual fees in the amount of $100,000 payable to the Agent; (ii) a closing fee of $2.2 million, representing 2% of the aggregate loan amount, to be allocated among the lenders proportionately based on their respective committed amounts of the $110 million; (iii) a monthly fee initially in an amount equal to 1.0% per year on the average unused daily balance of the Senior Secured Revolving Credit Facility (less any outstanding letters of credit), to be adjusted up or down prospectively on a quarterly basis based on DOC's Excess Borrowing Availability (as defined in the Senior Secured Revolving Credit and Guaranty Agreement); (iv) monthly fees for all letters of credit, in an amount equal to the LIBOR margin on revolving loans on the outstanding face amount of all letter of credit; (v) a premium payment in an amount equal to the amount of the Senior Secured Revolving Credit Facility commitment reduced or terminated multiplied by 1.0% during the first two years following the agreement's closing date and 0% thereafter, in the event that the Senior Secured Revolving Credit Facility is reduced or terminated prior to the second anniversary of the closing date; and (vi) all reasonable costs and expenses, including certain legal and auditing expenses and enforcement costs and expenses of the agent and lenders.

DOC is required to make prepayments as follows: promptly upon receipt thereof in the amount of 100% of the net cash proceeds of (i) any sale or other disposition of assets of DOC or New Dura and any guarantor in excess of an amount to be mutually agreed and except for sales of inventory in the course of business and other dispositions of assets to be

6

agreed; (ii) any sales or issuances of equity (subject to certain customary exceptions) or debt securities of New Dura, DOC or any of the guarantors and/or any other indebtedness for borrowed money incurred by DOC or any of the guarantors after the closing date (other than permitted issuances of equity and permitted amounts and types of indebtedness, each to be mutually agreed upon); and (iii) insurance proceeds and condemnation awards to the extent not reinvested in the business.

The collateral agent will receive as collateral a first priority perfected security interest in substantially all existing and after-acquired property of each of DOC, New Dura and the guarantors. The Senior Secured Revolving Credit Facility will also be secured by a first priority lien on the collateral of DOC, New Dura and the guarantors, other than that portion of the collateral on which the Second Lien Term Loan (as defined below) has a first priority lien. The Senior Secured Revolving Credit Facility will have a second priority lien on the portion of the collateral on which the Second Lien Term Loan will have a first priority lien, junior to the terms of the Second Lien Term Loan. All obligations under the Senior Secured Revolving Credit Facility will be cross-collateralized with each other and with collateral provided by any subsidiary of DOC or any other guarantor.

The Senior Secured Revolving Credit Facility contains customary covenants for facilities of this type. In addition, DOC must also comply with certain financial covenants, including (i) a minimum EBITDA for DOC and the guarantors, (ii) minimum Excess Borrowing Availability (as defined in the Senior Secured Revolving Credit and Guarantee Agreement) at all times of $10 million; and (iii) maximum capital expenditures for DOC and guarantors.

Loans made on the closing date under the Senior Secured Revolving Credit and Guaranty Agreement will be used to refinance the existing indebtedness under the Existing DIP Revolving Credit Facility, to otherwise enable DOC to consummate the Plan, and to fund working capital purposes and general corporate purposes. As of the Effective Date, $24.5 million will be outstanding under the Senior Secured Revolving Credit Facility.

This description of the Senior Secured Revolving Credit Facility is qualified in its entirety by reference to the full text of such agreement, a copy of which is filed herewith as Exhibit 10.3 and is incorporated by reference herein.

*Second Lien Credit Facility*

On the Effective Date, New Dura, DOC (as Borrower) and certain of their domestic subsidiaries (as guarantors) entered into the Senior Secured Second Lien Credit and Guaranty Agreement (the "Second Lien Credit Facility") with a syndicate of New Second Lien Lenders and Wilimington Trust Company as administrative agent and collateral agent. The Second Lien Credit Facility is a second lien term loan for a term of five years in a principal amount of $83.75 million issued with original issue discount ("OID") of 20% of the principle amount. The relative rights of the Senior Secured Revolving Credit Facility and the Second Lien Credit Facility will be set forth in an intercreditor agreement (the "Intercreditor Agreement") which will include provisions governing their respective collateral rights and obligations.

7

The outstanding principal balance under the Second Lien Credit Facility shall bear interest, at DOC's election, at a rate per annum equal to (a) the ABR plus the Applicable Margin or (b) the Eurodollar Rate plus the Applicable Margin (each as defined in the Senior Secured Second Lien Credit Facility Agreement). Interest shall be payable in cash or, at the option of DOC, in kind such that all interest payments are added to the principle amount of the term loans under the Second Lien Credit Facility.

In addition, DOC must pay a funding fee of $8.375 million, representing 10% of the aggregate principal amount of the term loan commitments, (without taking into account any OID) to be allocated among the lenders *pro rata* in accordance with their respective commitments.

DOC will make mandatory prepayments as follows, to the extent that the Senior Secured Revolving Credit Facility has been repaid in full: (i) 100% of the net cash proceeds of any incurrence of debt (other than permitted debt) by the parties to the loans and their domestic subsidiaries; (ii) 100% of the net cash proceeds of any sale or disposition by the parties to the loans and their domestic subsidiaries of any assets (in excess of $1 million) except for sales of inventory or obsolete, uneconomic, surplus or worn-out property, in each case, in the ordinary course of business, and subject to customary thresholds and exceptions (including the right to reinvest the proceeds); and (iii) a certain percentage excess cash flow for each fiscal year of DOC commencing with the fiscal year ending December 31, 2009, with stepdowns to be mutually agreed and with a right to reinvest the mandatory prepayment resulting from excess cash flow.

The Second Lien Credit Facility will be secured by (1) a first priority lien on the portion of the collateral consisting of (x) all intercompany indebtedness owed to New Dura, DOC and all guarantors from any foreign subsidiaries and (y) up to 100% of the equity interests of all first-tier foreign subsidiaries of New Dura, DOC and all other guarantors; and (2) a second priority lien on all collateral, junior to the liens of the Senior Secured Revolving Credit Facility (other than the portion of the collateral which the Second Lien Credit Facility will have a second priority lien, as set forth in this section).

The Second Lien Credit Facility contains customary covenants for facilities of this type. In addition, DOC must also comply with financial covenants, including a maximum leverage ratio and maximum capital expenditures.

Loans made on the closing date under the Second Lien Credit Facility will be used to refinance the existing indebtedness under the Existing DIP Revolving Credit Facility, to otherwise enable DOC to consummate the Plan, and to fund working capital purposes and general corporate purposes. As of the Effective Date, $83.75 million will be outstanding under the Second Lien Credit Facility.

8

This description of the Second Lien Credit Facility is qualified in its entirety by reference to the full text of such agreement, a copy of which is filed herewith as Exhibit 10.4 and is incorporated by reference herein.

*European First Lien Term Loan*

On June 27, 2008, Dura Holding Germany GmbH, a non-domestic subsidiary of DOC, and certain of Dura Holding Germany GmbH's non-domestic subsidiaries entered into the Credit Agreement (the "European First Lien Term Loan") with Blackstone Distressed Securities Fund (Luxembourg) SARL and GSO Domestic Capital Funding (Luxembourg) SARL as lenders and Deutsche Bank Trust Company Americas as administrative agent and collateral agent. The European First Lien Term Loan consists of a €32.2 million term loan for a term of four years. The loan will carry an interest rate of EURIBOR plus 925 bps, including a 2% OID.

The European First Lien Term Loan will be secured by a first priority lien on (i) all intercompany indebtedness of DASI, DOC and all other Guarantors owing to foreign subsidiaries of Dura European Holding LLC & Co. KG and the Guarantors (ii) 100% of the equity interests and assets (other than accounts receivable) of certain subsidiaries of Dura European Holding LLC & Co. KG (collectively, the "European First Term Loan Priority Collateral"). As of the Effective Date, €32.2 million will be outstanding under the European First Lien Term Loan.

*European Factoring Agreements*

On the Effective Date, Dura Holding Germany GmbH and certain of Dura Holding Germany GmbH's non-domestic subsidiaries were party to certain receivables factoring agreements including (i) with GEFactoFrance for the purchase of receivables from a French subsidiary of New Dura and (ii) the purchase of receivables from COFACE Finance GmbH in an amount outstanding of €32.7 million on the Effective Date. The European Factoring Agreements contain representations and warranties and conditions precedent that are customary for transactions of this type.

## ITEM 3.02 Unregistered Sales of Equity Securities.

As disclosed under Item 1.01 above, pursuant to the Plan, New Dura has issued or will issue (i) 8,400,000 shares of New Common Stock to holders of Allowed General Unsecured Claims, other than Canadian General Unsecured Claims, and (ii) 2,281,000 shares of New Series A Preferred Stock to be distributed to the holders of Allowed Second Lien Facility Claims. Additionally, New Dura will issue 83,750 shares of New Series A Preferred Stock to the New Second Lien Lenders in payment of the funding fee.

Based on the Confirmation Order, New Dura relied on Section 1145(a)(1) of the United States Bankruptcy Code ("Bankruptcy Code") to exempt from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act"), the issuance of the New Common Stock and New Series A Preferred Stock to creditors as outlined above. Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws if three principal requirements are satisfied:

- the s ecurities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan of reorganization with the debtor, or of a successor to the debtor under the plan of reorganization;

- the recipien ts of the securities must hold claims against or interests in the debtor; and

- the s ecurities must be issued in exchange, or principally in exchange, for the recipient's claim against or interest in the debtor.

To the extent that Section 1145(c)(1) was not available, New Dura relied upon Section 4(2) of the Securities Act, or Regulation D promulgated thereunder, to exempt from the registration requirements of the Securities Act the issuance of securities contemplated by the Plan, including the issuance of the shares of New Series A Preferred Stock (and the shares of New Common Stock issuable upon the conversion of the New Series A Preferred Stock) to the New Second Lien Lenders on the Effective Date. The description of the conversion and other rights of the Preferred Stock set forth in Item 5.03 of this Current Report on Form 8-K is incorporated by reference herein.

The forms of stock certificates that will represent the New Common Stock and New Series A Preferred Stock are filed herewith as Exhibits 4.1 and 4.2 and are incorporated by reference herein.

## ITEM 3.03 Material Modifications to Rights of Security Holders.

As disclosed under Items 1.01 and 1.02 above, pursuant to the Plan, the holders of Old Dura's senior notes will receive New Common Stock, and the Old Dura common stock, convertible trust guarantees, senior notes, senior subordinated notes and convertible subordinated debentures will be cancelled. Holders of the senior subordinated notes, convertible subordinated debentures, convertible trust guarantees and common stock of Old Dura will receive no recovery under the Plan. The New Common Stock will be registered under Section 12(g) of the Exchange Act.

10

## ITEM 5.01 Changes in Control of Registrant.

On the Effective Date and except as otherwise provided in the Plan, Old Dura's notes, stock, instruments, certificates, and other documents evidencing the senior notes claims, subordinated notes claims, convertible subordinated debentures claims, convertible trust guarantees and equity interests (including the 18,904,222 shares of Old Dura's Class A Common Stock, par value $0.01 per share, which were outstanding as of June 1, 2007) existing immediately prior to the Effective Date were cancelled.

On the Effective Date and pursuant to the Plan, and second lieu Credit Facility, Pacificor, LLC and its affiliates acquired beneficial ownership of 907,000 shares of New Series A Preferred Stock and, based on their percentage ownership of Class 3 Claims (which percentage Pacificor, LLC informed the Debtors of on the Effective Date), approximately 2,264,000 shares of New Common Stock, which shares, when aggregated, represent approximately [38]% of the voting power of New Dura on the Effective Date (taking into account the fact that the shares of New Series A Preferred Stock vote on an as-converted basis, as described in Item 5.03).

## ITEM 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.

*Departing Directors and Officers*

On the Effective Date and pursuant to the Plan, the following directors resigned from the board of directors of Old Dura: Walter P. Czarnecki, Jack K. Edwards, James O. Futterknecht, Jr., J. Richard Jones, Nick G. Preda and Ralph R. Whitney, Jr.

*Newly Appointed Directors and Officers*

On the Effective Date and pursuant to the Plan, the following individuals were appointed members of the Board of Directors of New Dura (the "New Dura Board"): Fred Bentley, Stephen J. Gilbert, Tim Leuliette, Andy Mitchell, Peter Reilly, and Jeff Stafeil.

Lawrence A. Denton, a director of Old Dura and New Dura prior to the Effective Date, will remain on the Board of Directors of New Dura following the Effective Date.

Biographical information regarding the members of the New Dura Board is set forth below.

***Fred Bentley*** is chief operating officer of Hayes Lemmerz International, Inc., a worldwide producer of aluminum and steel wheels. At Hayes Lemmerz he was instrumental in changing the company's global operational footprint and introducing lean manufacturing practices. Prior to Hayes Lemmerz, Mr. Bentley served in positions of increasing responsibility at Honeywell (formerly AlliedSignal) where he rose to the position of Managing Director, Europe, and Frito-Lay (PepsiCo).

***Lawrence (Larry) A. Denton*** is former chairman of the board and has been president and chief executive officer of DURA since January 2003. He assumed the role of chairman in 2005. From 1996 to 2002, Mr. Denton was president of Dow Automotive, a $1 billion business unit of the Dow Chemical Company. Under his leadership, Dow Automotive became one of the top 100 global suppliers to the automotive industry, growing from $300 million to more than $1 billion in revenue in six years. Prior to that, he spent 24 years with Ford Motor Company, where he held a variety of senior management positions.

11

***Steven J. Gilbert*** is Senior Managing Director and Chairman of Sun Group (USA). He is also Chairman of the Board of Gilbert Global Equity Partners, L.P., a billion dollar private equity fund. From 1992 to 1997 he was the Founder and Managing General Partner of Soros Capital L.P. Mr. Gilbert has 35 years of experience in private equity investing, investment banking and law. He has served as a director on the boards of more than 25 companies over the span of his career, including Office Depot, Inc., Magnavox Electronic Systems Company, Affinity Financial Group, Inc., GTS-Duratek, and Parker Pen Limited.

***Timothy D. Leuliette*** is chairman of the board for DURA and is currently chairman and CEO of Leuliette Partners LLC, an investment and financial services firm. He is the former co-chairman and co-CEO of Asahi Tec and former chairman, president, and CEO of automotive supplier Metaldyne Corporation. He has also served as president & COO of privately held Penske Corporation, and prior to that president and CEO of ITT Automotive and executive vice president at ITT. Over his career he has held executive and management positions at both vehicle manufacturers and suppliers and has served on both corporate and civic boards, including as chairman of the Detroit Branch of the Federal Reserve Bank of Chicago.

***Andrew (Andy) B. Mitchell*** is chief executive and chief investment officer of investment firm Pacificor LLC. Prior to joining Pacificor, Mr. Mitchell was a vice president and co-portfolio manager at ING Funds, and prior to that a vice president and senior analyst at Merrill Lynch Asset Management. Mr. Mitchell was also a senior high yield analyst and assistant vice president at Wertheim/Schroder Investment Services. Previous experience also includes operational experience in the oil refining industry with Exxon and in the mining and construction industries with Chevron Resources.

***Peter Reilly*** is president and chief operating officer of Strategic Industries, LLC ("Strategic"). Strategic is a diversified holding company with subsidiaries in the Automotive and Consumer Products segments. He joined the company at its inception in 2000 as the chief financial officer. The company was created through a leveraged buyout by Citicorp Venture Capital from US Industries, Inc. ("USI") a Fortune 500 conglomerate, publicly listed on the New York Stock Exchange. Mr. Reilly has significant experience repositioning portfolio companies and helping them capitalize on international opportunities. Prior to joining Strategic, he served as Treasurer for USI and various senior financial positions with its predecessor, Hanson Industries, PLC and its subsidiaries.

***Jeffrey M. Stafeil*** has strong international and financial experience and is currently chief financial officer and board member for Germany-based Klöckner Pentaplast, the world's leading producer of films for the pharmaceutical, food and technology product packaging market. Formerly he was the Executive Vice President and CFO at automotive supplier Metaldyne Corporation, now Asahi Tec Corporation. Since 2006 he has served on the board of directors and is co-chairman of the audit committee for Meridian Corporation, an automotive supplier that exited bankruptcy in December 2006.

*Amendment of Compensatory Arrangements*

On May 8, 2008, Mr. Denton, Ms. Skotak, Old Dura and DOC entered into amendments of their respective existing change of control agreements dated June 16, 2004 (the "COC Amendments").

12

The COC Amendments provide a revised definition of "Change of Control" instances as well as an aggregate cap on the amount an officer may receive from New Dura as a result of the change of control agreements, and in the case of Mr. Denton, an employment agreement and the senior executive retirement plan ("SERP").

The COC Amendments also amend the instances in which the officer may terminate his or her employment in order to receive severance benefits upon a Change of Control so that a material diminution in the officer's authority or power or a material adverse change in the conditions under which he or she works would trigger such officer's severance benefits under his or her respective change of control agreement.

On May 8, 2008, New Dura amended the SERP in order to conform its definition of change of control to match in that of the COC Amendments. On the same date, New Dura amended the employment agreement of Mr. Denton to provide him with a company sale incentive payment in place of his restricted stock units, which were cancelled. The amount of the sale incentive payment varies with the amount and timing of any such sale. Each of the amendments to the compensatory arrangements has been filed as an exhibit to this Current Report on Form 8-K and is incorporated by reference herein.

### ITEM 5.03 Amendments to Articles of Incorporation or Bylaws; Change in Fiscal Year.

New Dura filed a Certificate of Incorporation with the Delaware Secretary of State on June 6, 2008, under the name "New Dura, Inc.", which was amended by (i) the First Amendment to the Certificate of Incorporation on June 20, 2008, to amend New Dura's authorized share capital and (ii) the Second Amendment to the Certificate of Incorporation on June 25, 2008, to change the entity's name to "Dura Automotive Systems, Inc." (as amended from time to time, the "Amended Certificate").

On June 20, 2008, New Dura filed a Certificate of Designations relating to the New Series A Preferred Stock with the Delaware Secretary of State, setting forth the terms of the New Series A Preferred Stock and the rights of the holders thereof (the "Certificate of Designations").

New Dura also adopted Bylaws effective as of June 6, 2008 (the "Bylaws"). The following description sets forth a summary of the key provisions of the Amended Certificate, Certificate of Designations and the Bylaws. This description of the Amended Certificate, the Certificate of Designations and the Bylaws is qualified in its entirety by reference to the full text of these documents, copies of which are filed as Exhibits 3.1 through 3.5, respectively, and are incorporated by reference herein.

*Amended Certificate*

Authorized Capital Stock

The total number of shares of all classes of stock that New Dura is authorized to issue is 158,182,000 shares, consisting of 155,555,000 shares of New Common Stock, par value $0.01 per share, and 2,627,000 shares of preferred stock, par value $0.01 per share. All shares of the New Common Stock and Series A New Preferred Stock issued on the Effective Date are fully paid and nonassessable.

13

## Voting Rights

At every annual or special meeting of stockholders of New Dura, each holder of New Common Stock is entitled to cast one vote for each share of New Common Stock.

## Dividends

Holders of New Common Stock are entitled to receive dividends on a per share basis, if and when declared payable from time to time by the board of directors.

## Preemptive or Similar Rights

The New Common Stock is not entitled to preemptive or other similar subscription rights to purchase any securities of New Dura.

## Conversion Rights

The New Common Stock is not convertible or exchangeable into any other security of New Dura.

## Preferred Stock

The board of directors of New Dura is authorized to provide for the issuance of shares of preferred stock of New Dura in one or more series, to fix or alter from time to time the designation, powers, preferences, and rights of the shares of each such series and the qualifications, limitations, or restrictions of a wholly unissued series of preferred stock, to establish from time to time the number of shares constituting any such series or any of them, and to increase or decrease the number of shares of any series subsequent to the issuance of shares of that series, but not below the number of shares of such series then outstanding.

Prior to the Effective Date, the sole director of New Dura created a series of 2,627,000 shares of preferred stock of New Dura designated as New Series A Preferred Stock governed by the Certificate of Designations related thereto. The New Series A Preferred Stock accrues dividends at a rate of 20% per year, which amount will compound semi-annually. All accumulated and unpaid dividends will be added to the initial liquidation value per share and shall continue accruing until the earlier of (i) the redemption of the share by New Dura, (ii) the conversion of the share in accordance with provisions of the Certificate of Designations and (iii) the date New Dura otherwise acquires the share.

New Dura may elect to redeem all or any of the shares of New Series A Preferred Stock outstanding at any time in cash at a price per share equal to the liquidation value of a share at such time, which amount is equal to the sum of the initial liquidation value per share, accumulated dividends thereon and accrued but unpaid dividends thereon from and including the last dividend reference date to and excluding the redemption date. If New Dura calls for the redemption of all or any of the New Series A Preferred Stock prior to the third anniversary of the Effective Date, the holders of the affected shares are entitled to convert a specified number of those shares into New Common Stock pursuant to the terms and conditions of the Certificate of Designations, which amount shall be apportioned on a pro rata basis per holder.

Except as provided in the preceding paragraph, no holder of the New Series A Preferred Stock may convert his or her shares into shares of New Common Stock prior to the

14

third anniversary of the Effective Date. On the third anniversary of the Effective Date, all shares of the New Series A Preferred Stock will automatically be converted into a number of shares of New Common Stock according to the formula specified in the Certificate of Designations based on the aggregate liquidation preference of the shares. Assuming that (i) no portion of the liquidation preference has been prepaid, (ii) no redemptions have taken place and (iii) no shares of New Series A Preferred Stock have been issued to management under any equity incentive plan the shares of the New Series A Preferred Stock will convert into 94% of the New Common Stock on the third anniversary of the Effective Date.

The New Series A Preferred Stock will have equal voting rights and will vote together as a single class with the New Common Stock and any other class of preferred stock so entitled to vote with the New Common Stock on an as-converted basis (assuming conversion in full on the third anniversary of the Effective Date). The New Series A Preferred Stock will also have separate class voting rights with respect to certain activities of New Dura.

The affirmative vote of the holders of a majority of the outstanding New Series A Preferred Stock will be required for New Dura to (or permit a subsidiary to):

- • d eclare or pay dividends on a class or series of capital stock (other than on the New Series A Preferred Stock);

- • r edeem, purchase or otherwise acquire capital stock or other equity securities;

- • iss ue securities having dividend rights or a liquidation preference equal or senior to the New Series A Preferred Stock;

- • a uthorize, issue or reclassify any equity securities into notes or debt securities containing equity features;

- • m erge or consolidate with an entity, or sell more than 25% of New Dura's assets, if the holders would not receive a consideration equal to the liquidation preference; and

- • liq uidate or dissolve New Dura.

The affirmation vote of the holders of not less than 85% of the then-outstanding Series A Preferred Stock, voting as a separate class shall be required for New Dura or any of its subsidiaries to:

- • b ecome subject to an agreement or instrument that would restrict New Dura's performance of its obligations under the Certificate of Designations; or

- • e nter into or modify agreements with officers, directors, employers or affiliates or persons or entities related thereto.

For purposes of liquidation, dissolution or winding up of New Dura, the New Series A Preferred Stock will rank senior to any other class or series of capital stock of New Dura, the terms of which are not expressly senior to or partial with the New Series A Preferred Stock.

The Certificates of Designations may be amended by the affirmative vote of not less than 85%, 66 2/3% or a majority of the shares of the New Series A Preferred Stock,

depending on the content of the amendment, each as specified in Article 9 of the Certificate of Designations.

### Restriction on Issuance of Non-Voting Securities

New Dura shall not issue any class of non-voting equity securities unless and solely to the extent permitted by section 1123(a)(6) of the Bankruptcy Code; provided, however, that this restriction (A) will have no further force and effect beyond that required under section 1123(a)(6) of the Bankruptcy Code; (B) will have such force and effect, if any, only for so long as section 1123(a)(6) of the Bankruptcy Code is in effect and applicable to the corporation; and (C) in all events may be amended or eliminated in accordance with applicable law from time to time in effect.

### Number of Directors

The Amended Certificate provides that the board of directors of New Dura shall consist of seven directors until the third anniversary of the Effective Date (the "Initial Term"). The current directors will serve for the duration of the Initial Term. After the third anniversary of the Effective Date, the number of directors shall be no greater than seven and no less than three and the exact number of directors shall be fixed from time to time by a resolution approved by the board of directors.

### Removal of Directors

The Amended Certificate provides that, subject to the rights of the holder of any series of New Series A Preferred Stock then outstanding, any director may be removed at any time for cause, at a meeting called for that purpose, by the vote of 66 2/3% of the votes of all outstanding shares of New Dura entitled to vote generally in the election of directors, voting together as a single class.

### Vacancies on the Board of Directors

The Amended Certificate provides that, subject to the rights, if any, of the holder of any series of the preferred stock then outstanding, vacancies in the board of directors occurring after the Initial Term, or any vacancies created by death, resignation, retirement, disqualification, removal from office or any other cause occurring at any time may be filled (as long as there is at least one remaining director) by a majority vote of the non-employee directors or the sole remaining director. At any given time at least two directors shall be considered "independent" within the meaning of the rules promulgated by the Nasdaq National Market. Directors elected to fill vacancies during the Initial Term will hold office until the end of the Initial Term. Directors elected to fill a directorship newly created, or other vacancies occurring, after the Initial Term will hold office until the next annual meeting of stockholders and a successor is elected.

### Amendment of the Certificate of Incorporation

The Amended Certificate provides that New Dura Board reserves the right to amend, alter, change or repeal any provision contained in the Amended Certificate, however, the affirmative vote of holders representing at least 85% of the then-outstanding shares of New Series A Preferred Stock is required to adopt any provision inconsistent with, to amend or repeal any provision of, or adopt any Bylaw inconsistent with certain articles of the Amended

16

Certificate including provisions dealing with the board of directors, action by written consent or the holders of the New Common Stock and amendment to the Amended Certificate (the 85% vote). The 85% vote shall not apply in any instances in which New Dura is consummating a merger, recapitalization, or asset sale permitted under the Series A Certificate of Designators (the then-outstanding shares of New Series A Preferred Stock represent a value of less than $50,000).

### Special Meetings of Stockholders

The Amended Certificate provide that special meetings of New Dura's stockholders may be called as provided for in the Certificate of Incorporation, which current permits special meetings to be called only by any of: (i) the New Dura Board pursuant to a resolution adopted by majority vote; (ii) the holders representing not less than 25% of the voting power of all outstanding shares of New Dura entitled to vote (as long as the then-outstanding shares of New Series A Preferred Stock represent a value of at least $50,000); (iii) the chairman of the Board or (iv) the CEO of New Dura.

### Quorum at Meeting of Stockholders

The Bylaws provide that the presence in person or by proxy of the holders of a majority of the shares entitled to vote at a meeting of stockholders shall constitute a quorum for the transaction of business. The stockholders present at a duly called or held meeting at which a quorum is present may continue to do business until adjournment. If a quorum is not present, the stockholders entitled to vote shall have the power to adjourn the meeting until a quorum is present.

### Advance Notice Procedures for Stockholder Proposals

The Bylaws contain an advance notice procedure for stockholder proposals to be brought before a meeting of stockholders, including proposed nominations of persons for election to the Board of Directors. Stockholders at an annual meeting will only be able to consider proposals or nominations specified in the notice of meeting or brought before the meeting by or at the direction of the Board of Directors or otherwise properly brought before the meeting by a stockholder who has given New Dura's corporate secretary timely written notice, in proper form, of the stockholder's intention to bring that business before the annual meeting.

### Action by Written Consent of Holders of New Common Stock

Holders of New Common Stock may take action by written consent in lieu of a stockholder meeting until the earlier of time when (i) the New Common Stock is registered under Section 12(b) of the Exchange Act and (ii) the holders of the New Series A Preferred Stock cease to own at least a majority of the voting power of all outstanding shares of New Dura entitled to vote generally in the election of directors voting together as a single class.

### Limitation of Personal Liability of Directors

The Amended Certificate provides that, to the fullest extent permitted under Delaware law, a director of New Dura shall not be personally liable to New Dura or its stockholders for monetary damages for any breach of fiduciary duty owed to New Dura or its stockholders.

17

Indemnification

The Amended Certificate and the Bylaws provide that New Dura shall indemnify to the fullest extent authorized or permitted by law any person made, or threatened to be made, a defendant or witness to any action, suit or proceeding (whether civil, criminal or otherwise) by reason of the fact that he or she is or was a director or officer of New Dura or by reason of the fact that such director or officer, at the request of New Dura, is or was serving any other corporation, partnership, joint venture, trust, employee benefit plan, or other enterprise in any capacity, against all expense, liability and loss (including attorneys' fees and related disbursements, judgments, fines, excise taxes and penalties under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), penalties and amounts paid or to be paid in settlement) actually and reasonably incurred or suffered in connection therewith. Such indemnification shall continue if the person has ceased to be a director, officer, partner, member or trustee and shall inure to the benefits of his or her heirs. The indemnification permitted by the Bylaws shall not be deemed exclusive of any other rights to which any person may be entitled under any agreement, vote of stockholders, or disinterested directors, pursuant to the direction of any court of competent jurisdiction or otherwise.

Pursuant to the Amended Certificate, New Dura may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee, or agent of the corporation.

Section 203

New Dura has elected not to be governed by Section 203 of the Delaware General Corporate Law.

Amendment of the Bylaws

The Amended Certificate provides that New Dura Board reserves the right to amend, alter, change or repeal any provision contained in the Bylaws. However, the affirmative vote of (i) the holders representing at least a majority of all outstanding shares of New Dura entitled to vote generally in the election of directors, voting together as a single class (provided that the then-outstanding shares of New Preferred Stock represent a value of less than $50,000) and (ii) the holders of at least a majority of the then-outstanding shares of New Series A Preferred Stock is required to adopt any provision inconsistent with, to amend or repeal any provision of, or adopt any Bylaw inconsistent therewith.

18

**ITEM 8.01 Other Events.**

On June 27, 2008, New Dura issued a press release announcing its emergence from chapter 11 bankruptcy protection and the appointment of the new members of the New Dura Board of Directors pursuant to the Plan. A copy of the press release is attached hereto as Exhibit 99.1.

19

Forward-Looking Statements

This Current Report on Form 8-K of New Dura and the documents incorporated by reference into this Current Report from the filings of its predecessor, Old Dura (formerly known as DASI), as well as other statements made by Old Dura or New Dura, may contain forward-looking statements within the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995, that reflect, when made, Old Dura or New Dura's current views with respect to current events and financial performance. Such forward-looking statements are and will be, as the case may be, subject to many risks, uncertainties and factors relating to New Dura's operations and business environment, which may cause the actual results of New Dura to be materially different from any future results, express or implied, by such forward-looking statements. Factors that could cause actual results to differ materially from these forward-looking statements include, but are not limited to, the following: (i) the ability of New Dura to successfully implement all post-emergence aspects of the Plan as confirmed; (ii) the ability of New Dura to manage liquidity needs and operate subject to the terms of its financing facilities; (iii) the potential adverse impact of the Chapter 11 cases on New Dura's liquidity or results of operations; (iv) the ability of New Dura to maintain contracts that are critical to its operations; (v) the ability of New Dura to execute its business plans and strategy, and to do so in a timely fashion; (vi) financial results that may be volatile and may not reflect historical trends; (vii) the ability of New Dura to attract, motivate and/or retain key executives and associates; (viii) New Dura's ability to obtain and maintain normal terms with vendors and service providers; (ix) New Dura's ability to avoid or continue to operate during a strike, or partial work stoppage or slow down by any of its unionized employees or unionized employees of any of its significant customers; (x) general economic or business conditions affecting the automotive industry either nationally or regionally, being less favorable than expected; and (xi) increased competition in the automotive components supply market. Other risk factors have been listed from time to time in Old Dura's Securities and Exchange Commission reports, including but not limited to the Annual Report on Form 10-K for the year ended December 31, 2006, and will be listed from time to time New Dura's Securities and Exchange Commission reports. Ultimately, results may differ materially from those in forward-looking statements as a result of various factors including, but not limited to those items listed under Part I. Item 1A. Risks Factors of the Annual Report on Form 10-K for the year ended December 31, 2006. Old Dura and New Dura disclaim any intention or obligation to update or revise any forward-looking statements, whether as a result of new information, future events and/or otherwise.

## Item 9.01 Financial Statements and Exhibits

| Exhibit No. | Description |
|---|---|
| 2.1 | The Debtors' Revised Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (With Further Technical Amendments), as amended, modified and supplemented (incorporated by reference to Exhibit 2.1 attached to the Current Report on Form 8-K filed by Old Dura on May 19, 2008). |
| 2.2 | Final Plan Supplement in support of the Revised Plan of Reorganization, dated June 26, 2008.* |
| 3.1 | Certificate of Incorporation of New Dura, Inc.* |
| 3.2 | First Amendment to the Certificate of Incorporation of New Dura, Inc.* |
| 3.3 | Certificate of Designations of the Series A Redeemable Voting Mandatorily Convertible Preferred Stock of New Dura, Inc.* |
| 3.4 | Second Amendment to the Certificate of Incorporation of New Dura, Inc.* |
| 3.5 | Bylaws of Dura Automotive Systems, Inc. (formerly known as New Dura, Inc.)* |
| 4.1 | Form of Stock Certificate of Common Stock of Dura Automotive Systems, Inc.* |
| 4.2 | Form of Stock Certificate of Preferred Stock of Dura Automotive Systems, Inc.* |
| 10.1 | Asset Purchase Agreement, dated as of June 27, 2008, by and between New Dura Opco, Inc. and Old Dura, Inc. (f/k/a Dura Automotive Systems, Inc.)* |
| 10.2 | Registration Rights Agreement, dated as of June 27, 2008, by and between Dura Automotive Systems, Inc. and each of the New Preferred Stockholders listed therein.* |
| 10.3 | Senior Secured Revolving Credit and Guaranty Agreement, dated as of June 27, 2008, among Dura Operating Corp. as Borrower, Dura Automotive Systems, Inc. as Parent, Certain Subsidiaries of Dura Automotive Systems, Inc. and Dura Operating Corp. as Guarantors, Various Lenders, and General Electric Capital Corporation as Administrative Agent and Collateral Agent.* |
| 10.4 | Senior Secured Second Lien Credit and Guaranty Agreement, dated as of June 27, 2008, among Dura Operating Corp. as Borrower, Dura Automotive Systems, Inc. as Parent, Certain Subsidiaries of Dura Automotive Systems, Inc. and Dura Operating Corp. as Guarantors, Various Lenders, and Wilmington Trust Company as Administrative Agent and as Collateral Agent.* |
| 10.5 | Credit Agreement dated as of June 27, 2008, among Dura Automotive Grundstueckverwaltungs GmbH, Dura Automotive Body & Glass Systems GmbH, Dura Automotive Plettenberg Leisten & Blenden GmbH, Dura Automotive Selbecke Leisten & Blenden GmbH, Dura Automotive Holding GmbH & Co. KG, Dura Automotive Systems Einbeck GmbH, Dura Automotive Systems GmbH, and Dura Automotive Systems Rotenburg GmbH as German Borrowers, Dura Automotive Systems CZ. S.R.O. as the Czech Borrower, Dura European Holding LLC & Co., KG and Dura Holding Germany GmbH as Guarantors, the Subsidiary Guarantors Party Hereto from Time to Time, the Lenders Party Hereto, and Deutsche Bank Trust Company Americas as Administrative Agent and Collateral Agent.* |
| 10.6 | Amendment No. 1 to Change in Control Agreement, dated May 8, 2008, among Theresa Skotak, Dura Automotive Systems, Inc. and Dura Operating Corp.* |

---

*    Filed herew ith.

21

---

| Exhibit No. | Description |
|---|---|
| 10.7 | Intercreditor Agreement dated June 27, 2008 among Dura Operating Corp, Dura Automotive Systems, Inc., Certain Subsidiaries of Dura Automotive Systems, Inc. and Dura Operating Corp. as Guarantors, Wilmington Trust Company as Administrative Agent under the Senior Secured Second Lien Credit and Guaranty Agreement and General Electric Capital Corporation as Administrative Agent under the Senior Secured Revolving Credit and Guaranty Agreement.* |
| 10.8 | Revolving Credit Agreement Pledge and Security Agreement, dated June 27, 2008, by and among each of the grantors party thereto and General Electric Capital Corporation, as collateral agent.* |
| 10.9 | Second Lien Pledge and Security Agreement, dated June 27, 2008, by and among each of the grantors party thereto and Wilmington Trust Company, as collateral agent.* |
| 10.10 | Dura Automotive Systems, Inc. 2003 Supplemental Executive Retirement Plan (incorporated by reference to Exhibit 10.6 to Form 10-K for the year ended December 31, 2003, filed with the SEC on March 11, 2004). |
| 10.11 | Amendment to Dura Automotive Systems, Inc. 2003 Supplemental Executive Retirement Plan, dated May 8, 2008.* |
| 10.12 | Employment Letter, dated December 23, 2002, relating to the offer of employment for Mr. Lawrence Denton (incorporated by reference to Exhibit 10.8 to Form 10-K for the year ended December 31, 2003, filed with the SEC on March 11, 2004). |
| 10.13 | Amendment No. 1 to Employment Letter, dated May 8, 2008, between Lawrence Denton and Dura Automotive Systems, Inc.* |
| 10.14 | Form of Change of Control Agreement dated as of June 16, 2004 (incorporated by reference to Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2004, filed with the SEC on August 6, 2004). |
| 10.15 | Amendment No. 1 to Change in Control Agreement, dated May 8, 2008, among Lawrence Denton, Dura Automotive Systems, Inc. and Dura Operating Corp.* |
| 99.1 | Press Release issued by Dura Automotive Systems, Inc. dated June 27, 2008, Regarding Emergence from Bankruptcy and Appointment of New Board of Directors.* |

---

*    Filed herew ith.

---

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

DURA AUTOMOTIVE SYSTEMS, INC.

Date: June 26, 2008

BY: /s/ Theresa Skotak
      Theresa Skotak
      Vice President and Chief Administrative
      Officer

23

## EXHIBIT INDEX

| Exhibit No. | Description |
|---|---|
| 2.1 | The Debtors' Revised Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (With Further Technical Amendments), as amended, modified and supplemented (incorporated by reference to Exhibit 2.1 attached to the Current Report on Form 8-K filed by Old Dura on May 19, 2008). |
| 2.2 | Final Plan Supplement in support of the Revised Plan of Reorganization, dated June 26, 2008.* |
| 3.1 | Certificate of Incorporation of New Dura, Inc.* |
| 3.2 | First Amendment to the Certificate of Incorporation of New Dura, Inc.* |
| 3.3 | Certificate of Designations of the Series A Redeemable Voting Mandatorily Convertible Preferred Stock of New Dura, Inc.* |
| 3.4 | Second Amendment to the Certificate of Incorporation of New Dura, Inc.* |
| 3.5 | Bylaws of Dura Automotive Systems, Inc. (formerly known as New Dura, Inc.)* |
| 4.1 | Form of Stock Certificate of Common Stock of Dura Automotive Systems, Inc.* |
| 4.2 | Form of Stock Certificate of Preferred Stock of Dura Automotive Systems, Inc.* |
| 10.1 | Asset Purchase Agreement, dated as of June 27, 2008, by and between New Dura Opco, Inc. and Old Dura, Inc. (f/k/a Dura Automotive Systems, Inc.)* |
| 10.2 | Registration Rights Agreement, dated as of June 27, 2008, by and between Dura Automotive Systems, Inc. and each of the New Preferred Stockholders listed therein.* |
| 10.3 | Senior Secured Revolving Credit and Guaranty Agreement, dated as of June 27, 2008, among Dura Operating Corp. as Borrower, Dura Automotive Systems, Inc. as Parent, Certain Subsidiaries of Dura Automotive Systems, Inc. and Dura Operating Corp. as Guarantors, Various Lenders, and General Electric Capital Corporation as Administrative Agent and Collateral Agent.* |
| 10.4 | Senior Secured Second Lien Credit and Guaranty Agreement, dated as of June 27, 2008, among Dura Operating Corp. as Borrower, Dura Automotive Systems, Inc. as Parent, Certain Subsidiaries of Dura Automotive Systems, Inc. and Dura Operating Corp. as Guarantors, Various Lenders, and Wilmington Trust Company as Administrative Agent and as Collateral Agent.* |
| 10.5 | Credit Agreement dated as of June 27, 2008, among Dura Automotive Grundstueckverwaltungs GmbH, Dura Automotive Body & Glass Systems GmbH, Dura Automotive Plettenberg Leisten & Blenden GmbH, Dura Automotive Selbecke Leisten & Blenden GmbH, Dura Automotive Holding GmbH & Co. KG, Dura Automotive Systems Einbeck GmbH, Dura Automotive Systems GmbH, and Dura Automotive Systems Rotenburg GmbH as German Borrowers, Dura Automotive Systems CZ. S.R.O. as the Czech Borrower, Dura European Holding LLC & Co., KG and Dura Holding Germany GmbH as Guarantors, the Subsidiary Guarantors Party Hereto from Time to Time, the Lenders Party Hereto, and Deutsche Bank Trust Company Americas as Administrative Agent and Collateral Agent.* |

---

\*    Filed herewith.

24

| Exhibit No. | Description |
| --- | --- |
| 10.6 | Amendment No. 1 to Change in Control Agreement, dated May 8, 2008, among Theresa Skotak, Dura Automotive Systems, Inc. and Dura Operating Corp.* |
| 10.7 | Intercreditor Agreement dated June 27, 2008 among Dura Operating Corp, Dura Automotive Systems, Inc., Certain Subsidiaries of Dura Automotive Systems, Inc. and Dura Operating Corp. as Guarantors, Wilmington Trust Company as Administrative Agent under the Senior Secured Second Lien Credit and Guaranty Agreement and General Electric Capital Corporation as Administrative Agent under the Senior Secured Revolving Credit and Guaranty Agreement.* |
| 10.8 | Revolving Credit Agreement Pledge and Security Agreement, dated June 25, 2008, by and among each of the grantors party thereto and General Electric Capital Corporation, as collateral agent.* |
| 10.9 | Second Lien Pledge and Security Agreement, dated June 25, 2008, by and among each of the grantors party thereto and Wilmington Trust Company, as collateral agent.* |
| 10.10 | Dura Automotive Systems, Inc. 2003 Supplemental Executive Retirement Plan (incorporated by reference to Exhibit 10.6 to Form 10-K for the year ended December 31, 2003, filed with the SEC on March 11, 2004). |
| 10.11 | Amendment to Dura Automotive Systems, Inc. 2003 Supplemental Executive Retirement Plan, dated May 8, 2008.* |
| 10.12 | Employment Letter, dated December 23, 2002, relating to the offer of employment for Mr. Lawrence Denton (incorporated by reference to Exhibit 10.8 to Form 10-K for the year ended December 31, 2003, filed with the SEC on March 11, 2004). |
| 10.13 | Amendment No. 1 to Employment Letter, dated May 8, 2008, between Lawrence Denton and Dura Automotive Systems, Inc.* |
| 10.14 | Form of Change of Control Agreement dated as of June 16, 2004 (incorporated by reference to Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2004, filed with the SEC on August 6, 2004). |
| 10.15 | Amendment No. 1 to Change in Control Agreement, dated May 8, 2008, among Lawrence Denton, Dura Automotive Systems, Inc. and Dura Operating Corp.* |
| 99.1 | Press Release issued by Dura Automotive Systems, Inc. dated June 27, 2008, Regarding Emergence from Bankruptcy and Appointment of New Board of Directors.* |

---

\*   Filed herew ith.

25

## Exhibit B

Flanagan Declaration

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DURA AUTOMOTIVE SYSTEMS, INC., et al.,[1] | ) | Case No. 06-11202 (KJC) |
| | ) | |
| | ) | Jointly Administered |
| | ) | |
| Reorganized Debtors. | ) | |
| | ) | |

| | | |
|---|---|---|
| James W. Korth | ) | |
|       Appellant | ) | |
| | ) | Civil Action No. 08-349 |
| v. | ) | |
| | ) | |
| Dura Automotive Systems, Inc., et al.,[2] | ) | |
| | ) | |
|     Reorganized Debtors/Appellees | ) | Bankruptcy Case No. 06-11202 |
| | ) | Bankruptcy Appeal No. 08-36 |

---

**DECLARATION OF ANTHONY C. FLANAGAN IN SUPPORT OF REORGANIZED
DEBTORS' MOTION TO DISMISS APPEAL AS EQUITABLY MOOT**

---

I, Anthony C. Flanagan, make this declaration and state:

1.    I am a Managing Director of AlixPartners, LLP ("AlixPartners"). All facts set forth in this declaration (the "Declaration") are based upon my personal knowledge, information supplied to me by the Debtors and other parties-in-interest, my review of relevant documents or my opinion based upon my knowledge of the Debtors. If I am called upon to testify, I can and will testify competently to the facts and opinions set forth herein.

---

[1]    The "Debtors" comprise the entities set forth in the Order Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure Directing Joint Administration of the Reorganized Debtors' Chapter 11 Cases, entered on October 31, 2006 [Bankruptcy Docket No. 68]. The Debtors became the "Reorganized Debtors" on June 27, 2008 (the "Effective Date"), when their confirmed plan of reorganization became effective.

[2]    The "Appellees" comprise the Reorganized Debtors.

2.      AlixPartners was engaged by Dura Automotive Systems, Inc. ("Company") in November 2006 to act as its financial advisor during the Chapter 11 process. AlixPartners responsibilities include assisting the Company with preparation of its business plan, customer negotiations, cash modeling and analysis, preparation of a liquidation analysis, creditor communications, creditor claims management and other financial analyses as required by the Company. I have been working with the Company since AlixPartners was engaged by the Company.

**Substantial Consummation of the Revised Plan**

3.      On June 27, 2008 (the "Effective Date"), the Debtors substantially consummated the Revised Plan. In addition to certain cash distributions, on the Effective Date, the Reorganized Debtors also made distributions of equity. In particular, the Reorganized Debtors commenced, and in some cases completed, distributions to their creditor constituencies. The current status of these distributions is as follows:

(i)     DIP Claims, Priority Claims, and Administrative Claims - Distributions to (i) Holders of DIP Claims are complete; (ii) Holders of Allowed Priority Claims as of the Effective Date are being released as the Claims reconciliation process progresses; and (iii) Holders of Allowed Administrative Claims as of the Effective Date are being released as the Claims reconciliation process progresses.

(ii)    Class 1 (Other Secured Claims) - Allowed Other Secured Claims will be paid in full as the Claims reconciliation process progresses.

(iii)   Class 2 (Second Lien Facility Claims) - Distributions are complete. Pro rata distributions of equity in the Reorganized Debtors, consisting of approximately 2,281,000 shares in the aggregate, were distributed to Holders of Second Lien Facility Claims in satisfaction of their Claims on or shortly after the Effective Date.

(iv)    Class 3 (Senior Notes Claims) - Distributions, consisting of 7,234,060 shares, have been distributed to the Senior Notes Indenture Trustee on behalf of Senior Notes holders. Pro rata distributions of equity in the Reorganized Debtors were then distributed to agents for the Holders of Senior Notes Claims on the Effective Date. These agents thereafter were required to distribute these equity

2

distributions to the beneficial holders of Senior Notes Claims. To my knowledge, the identities of these beneficial holders are unknown to the Reorganized Debtors.

(v) <u>Class 5 (General Unsecured Claims)</u> - Pro rata distributions of equity in the Reorganized Debtors, consisting of approximately 146,000 shares in the aggregate, will be distributed to Holders of Allowed Class 5A Other General Unsecured Claims, and pro rata distributions of cash will be distributed to Holders of Allowed Class B Canadian General Unsecured Claims, as the Claims reconciliation process progresses.

4.    In addition to the distributions described above, approximately 1,000,000 additional shares of New Common Stock will be distributed to Holders of Class 3 Senior Notes Claims and Class 5A General Unsecured Claims upon completion of the Claims dispute resolution and reconciliation process.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  July **30**, 2008

Anthony C. Flanagan
Anthony C. Flanagan

## Exhibit C

April 3, 2008, Hearing Transcript

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          .    Case No. 06-11202(KJC)
                                .
                                .
DURA AUTOMOTIVE SYSTEMS,.
INC.,                           .    824 North Market Street
                                .    Wilmington, DE 19801
                                .
          Debtor.              .    April 3, 2008
. . . . . . . . . . . . .            2:32 p.m.

TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:            Richards, Layton & Finger, P.A.
                           By:  JASON MICHAEL MADRON, ESQ.
                           920 North King Street
                           Wilmington, DE 19801

For the Trustee:           Office of the U.S. Trustee
                           By:  WILLIAM HARRINGTON, ESQ.
                           844 King Street
                           Suite 2207, Lockbox 35
                           Wilmington, DE 19801

Audio Operator:            Nicole Schaefer

Proceedings recorded by electronic sound recording, transcript
produced by transcription service

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-mail:  jjcourt@optonline.net

(609) 586-2311    Fax No. (609) 587-3599

APPEARANCES (Cont'd):

| | |
|---|---|
| For M. Donnelly: | Fox Rothschild, LLP<br>By: SCOTT EARLE, ESQ.<br>Citizens Bank Center<br>Suite 1300<br>919 North Market Street<br>Wilmington, DE 19801 |
| For Ableco Finance Ltd: | Buchanan Ingersoll & Rooney PC<br>By: TERESA K.D. CURRIER, ESQ.<br>The Brandywine Building<br>1000 West Street<br>Suite 1410<br>Wilmington, DE 19801 |
| For Committee of Unsecured Creditors: | Young Conaway Stargatt & Taylor LLP<br>By: EDMON L. MORTON, ESQ.<br>The Brandywine Building<br>1000 West Street<br>17th Floor<br>Wilmington, DE 19801 |
| For Committee of Unsecured Creditors: | Kramer Levin Naftalis & Frankel LLP<br>By: DOUGLAS MANNAL, ESQ.<br>JENNIFER SHARRET, ESQ.<br>1177 Avenue of the Americas<br>New York, NY 10036 |
| For Second Lien Group: | Bracewell & Giuliani LLP<br>By: DAVID C. ALBALAH, ESQ.<br>1177 Avenue of the Americas<br>19th Floor<br>New York, NY 10036 |
| For Second Lien Group: | Potter Anderson & Corroon LLP<br>By: GABRIEL R. MacCONAILL, ESQ.<br>1313 North Market Street<br>6th Floor<br>Wilmington, DE 19801 |
| For Second Lien Group: | Bracewell & Giuliani LLP<br>By: KURT A. MAYR, ESQ.<br>225 Asylum Street<br>Suite 2600<br>Hartford, CT 06103-1516 |

3

```
APPEARANCES (Cont'd):

For Bank of New York:      Bayard
                           By:  ERIC M. SUTTY, ESQ.
                           222 Delaware Avenue
                           Suite 900
                           Wilmington, DE 19899

For Bank of New York:      Willkie Farr & Gallagher LLP
                           By:  STEVEN Z. SZANZER, ESQ.
                           787 Seventh Avenue
                           New York, NY 10019-6099

                           Duane Morris LLP
                           By:  MICHAEL R. LASTOWSKI, ESQ.
                           1100 North Market Street
                           Suite 1200
                           Wilmington, DE 19801-1246

                           James Korth, Pro se

TELEPHONIC APPEARANCES:

For the Creditor:          Seward & Kissel LLP
                           By:  JOHN R. ASHMEAD, ESQ.
                           One Battery Park Plaza
                           New York, NY 10004

For the Debtor:            Togut, Segal & Segal, LLP
                           By:  HOWARD P. MAGALIFF, ESQ.
                                DAVID M. SMITH, ESQ.
                           One Penn Plaza
                           New York, NY 10119

For the Creditor:          Schulte Roth & Zabel LLP
                           By:  LAWRENCE V. GELBER, ESQ.
                           919 Third Avenue
                           New York, NY 10022

For the Debtor:            Kirkland & Ellis LLP
                           By:  RYAN BLAINE BENNETT, ESQ.
                           200 East Randolph Drive
                           Chicago, IL 60601-6636

For the Creditor:          Kelley Drye & Warren, LLP
                           By:  JENNIFER A. CHRISTIAN, ESQ.
                           101 Park Avenue
                           New York, NY 10178-0002
```

**J&J COURT TRANSCRIBERS, INC.**

4

```
TELEPHONIC APPEARANCES (Cont'd):

For the Creditor:          Winston & Strawn LLP
                           By:  CAREY D. SCHREIBER, ESQ.
                           200 Park Avenue
                           New York, NY 10166-4193

For Axis Specialty         McClain, Maney & Patchin, P.C.
Insurance:                 By:  TONY L. DRAPER, ESQ.
                           711 Louisiana Street
                           Suite 3100
                           Houston, TX 77002

For the Debtor:            Dura Automotive Systems, Inc.
                           By:  THERESA SKOTAK, ESQ.

For JPMorgan Chase         JPMorgan Chase Bank
Bank:                      By:  ALEX SHAYEVSKY, ESQ.
```

1          THE CLERK:  All rise.

2          THE COURT:  Good afternoon, everyone.

3          UNIDENTIFIED ATTORNEY:  Good afternoon, Your Honor.

4          MR. HIGGINS:  Good afternoon, Your Honor.  Roger

5 Higgins for the debtors.  Your Honor, there are, I think, a

6 couple of different items on the agenda today.  Obviously, the

7 main one is approval of the disclosure statement and the

8 solicitation procedures.  The first one is, if there are any

9 objections, which we do not believe there to be any, to the

10 motion to shorten time, and then there is Mr. Korth's Rule 2004

11 motion which you listed for today for a status hearing.

12          So, I propose that we look to the motion to shorten

13 time, Your Honor.  I think you had signed the order.  You know,

14 I'm happy to discuss or to make argument as to the reasons for

15 this.  I think they were put forward in our motion and nobody's

16 objected.

17          THE COURT:  No.  And I've reviewed the papers.  I

18 have no questions.

19          MR. HIGGINS:  Thank you, Your Honor.  That brings us

20 to the -- to really, quite frankly, the main event which is the

21 disclosure statement.  We -- I think we've told this story a

22 couple of times now in various pleadings in the status report

23 we gave you a couple of weeks ago, also in our disclosure

24 statement brief, the path since December and, you know, in

25 putting together a consensual deal among the second liens, the

6

1  Committee, the senior notes, that we believe --

2       THE COURT:  I'm sorry to interrupt, Mr. Higgins.  Let
3  me address the phone participants and ask, please, that they
4  all be certain that their phones are on mute.  I can hear some
5  noise coming from the telephone connection.  Thank you.  Please
6  continue.

7       MR. HIGGINS:  Thank you, Your Honor.  A consensual
8  deal by all parties, and I think that the lack of objections
9  other than that of Mr. Korth's is testament to the fact that
10  all the parties are on board with the transactions that are
11  contemplated by the revised plan as set forth in the disclosure
12  statement.

13       Very quickly, this assumes at its very base that the
14  second lien is converted into equity in the form of a
15  convertible preferred security as a new money second lien loan
16  of $80 million face -- excuse me -- $80 million in proceeds,
17  $100 million in face amount, and exit financing whereas a term
18  loan contemplated $150 million and a revolver contemplated at
19  $110 million.

20       I think it's safe to say, Your Honor, at this point
21  that we were working very hard on all aspects of the financing.
22  We do not have commitment letters in hand at this time, but we
23  are -- we believe, and we remain confident, that this -- that
24  achieving the -- that it's -- that the financing and getting
25  these commitment letters prior to the 8th of May is entirely

**J&J COURT TRANSCRIBERS, INC.**

7

1  achievable and we look forward to doing so, and we're clearly

2  doing it on a parallel track with approval of the disclosure

3  statement today, and then also commencing the solicitation

4  process next week for a full week period such that we can get

5  to the 13th of May.

6          Your Honor, if you've got any other questions

7  regarding the -- sort of the outlines of the deal, I'm happy to

8  answer them, but I think we've probably belabored them enough

9  in our various pleadings.

10          THE COURT:  I've read the pleadings and I have no

11  questions at this point.

12          MR. HIGGINS:  All right.  Thank you, Your Honor.  In

13  terms of objections as I mentioned before, Your Honor, we don't

14  have any objections of any major creditor constituencies.

15  Major creditor constituencies are all on board.  We did receive

16  two letter objections from a Ms. Ford and Mr. Wells.  Ms. Ford

17  is an owner of -- a holder of convertible trust preferred and

18  Mr. Wells is a holder of nine percent subordinated notes.  Both

19  have essentially asked, "Please pay me."

20          We think it's unfair, Your Honor, to the extent to

21  which those are classic objections.  We really believe that

22  they are confirmation objections, and we'd either ask that they

23  be overruled or bound over for confirmation.  You know, we

24  would follow your lead in regards to that.

25          THE COURT:  Well, let me just for the record whether

8

1  either of those individuals are present or represented today
2  either in person or on the telephone.  I hear no response.  I
3  agree with the debtor's position.  These are, in essence,
4  confirmation objections, and for purposes of the disclosure
5  statement, I will overrule them.
6          MR. HIGGINS:  All right.  Thank you, Your Honor.
7  That brings us to Mr. Korth.  Mr. Korth, obviously, is the --
8  his various pleadings are the subject of your order yesterday.
9  I understand Mr. Korth is in the courtroom today.  I did want
10 to point out, Your Honor, that at this point we don't know
11 whether Mr. Korth himself owns any subordinated notes or other
12 Dura securities.  Whether senior notes, convertible preferred
13 or equity.
14         We've asked Mr. Korth point blank yesterday.  Have
15 not received an e-mail -- any response from him regarding
16 whether he directly himself owns any of these securities.  And
17 also wanted to point out that the Rule 2019 statement filed by
18 the Ballard law firm last fall clearly indicates that the
19 holdings that are averted to are held through his company.  And
20 so, at this point, Your Honor, I'm not, you know, if he's not a
21 direct holder then we don't think he's got standing to object
22 to the disclosure statement.
23         THE COURT:  All right.  Well, let me talk to Mr.
24 Korth.
25         MR. HIGGINS:  All right.  Thank you, Your Honor.

1         THE COURT:  If you would, sir, yes.

2         MR. KORTH:  Hello.

3         THE COURT:  Good afternoon and welcome.

4         MR. KORTH:  I'm here for myself and not for the ad

5 hoc committee or J.W. Korth and Company.

6         THE COURT:  Okay.  And so that you understand, sir,

7 the reason that I ordered -- that I entered the order yesterday

8 that I did, it was actually before I got to the part of the

9 debtor's brief where the debtor raised the issue.  And I did it

10 upon receipt of your motion to shorten so that you'd have the

11 maximum amount of time available to react to it, meaning

12 obtaining counsel if it were necessary.  But, I'd like first to

13 address the question that the debtor just raised, and that is,

14 individually, are you a creditor of any of the Dura entities?

15         MR. KORTH:  Yes, I am.

16         THE COURT:  Okay.  And what's the nature of that

17 debt?

18         MR. KORTH:  I own common stock.  I don't know how

19 many shares.  There might be three or 400 shares.  Last night I

20 bought 200,000 shares from my father -- 200,000 at eight and

21 five-eighths percent notes.  And I bought one million of the

22 Dura nines from our company.

23         THE COURT:  Okay.  Well, I will accept, at least for

24 the moment, that representation and allow you to be heard.

25         MR. KORTH:  Thank you.  I'm here to object to the

10

1 adequacy of the disclosure statement, and I think I've been

2 relatively clear in what my objections are.  This document is a

3 document, as I see it, is not unlike a prospectus on where

4 they're probably more serious than a prospectus because there's

5 an awful lot of people that are going to take less money than

6 they expected from a situation.  And I'm really not saying --

7          THE COURT:  If any.

8          MR. KORTH:  If any.  And I'm really not saying as I

9 stand here that the plan as is set forth might not be the

10 appropriate plan.  But, what I'm saying here right now, and I'm

11 standing here for myself legally, and also for myself as I have

12 to face my clients, and I have to say something about what

13 happened to a company that appeared in -- as late as August

14 2006 to be a relatively strong ability to handle its debt on at

15 least even in a bankruptcy situation, and to where today it's

16 being sold, at least the common stock, for a mid-value, I

17 believe, of $84 million when on the balance sheet it looks like

18 less the debt would be approximately a billion and two or a

19 billion and three.  That's a very large discrepancy.

20          And Mr. Higgins really kind of drew my hand out here

21 when he sent me a letter and said, now if you want to object to

22 the disclosure statement you'd better get it done.  So, I

23 basically did it.  And I did it last -- I believe last

24 Thursday.  I've been following this company very, very closely

25 since January of '05 when I wrote a research report about it,

**J&J COURT TRANSCRIBERS, INC.**

1 and basically said to my customers and to the world as they
2 read the research report, that this company had enough
3 subsidiaries, was diversified enough, had enough diverse
4 business, that in the event that it ever could get to this kind
5 of a situation, that it could sell its subsidiaries and
6 maintain its liquidity.  I have not changed my opinion of that
7 at all at this point in time.

8          As I go through my objections here, basically we see
9 a company with 94 subsidiaries, and I see another thing where
10 it says 85 subsidiaries, but I think we're splitting hairs
11 either way.  Each one of these subsidiaries was basically
12 rolled up into Dura as a holding company, and each one of them
13 did a separate kind of business.  One made windows, one made
14 pedals, one made latches.  Today they still make these things.
15 Today they still have trademarks and patents on a lot of these
16 systems that they have; the Dura systems, pedal systems,
17 actuators, whatever.

18          I went to the liquidation value that was put forth by
19 the debtor and really found two things.  First, the only person
20 that seems to be signing off on the liquidation value is the
21 debtor.  I don't see another party like Miller Buckfire or
22 AlixPartners or somebody else saying, you know, this is, you
23 know, at least signing anything saying this is the liquidation
24 value of this company.

25          It appears that the company liquidation value was

**J&J COURT TRANSCRIBERS, INC.**

12

1 only made up by the management. And then I go and look at what
2 the management's been doing, and I see that the management had
3 made a deal last fall basically to acquire ten percent of the
4 reorganized debtor basically as a part of the plan. And then I
5 see the management still under negotiation right now with the
6 unsecured creditors committee, unless they made a deal, which I
7 guess they can tell us, and the second lien holders, and it's
8 very, very vague in the disclosure statement as to what that
9 deal might be.

10      But, based on the deal last fall, it's obvious to me
11 that the management has an incentive to acquire the -- their
12 company as cheap a value as possible. And then -- so that's a
13 conflict of interest. So, I then looked to say -- when I say
14 there's a conflict of interest, where do I find the third
15 party, basically, that signs off on this? Almost in every
16 transaction in the world. When there's a conflict of interest,
17 a third party signs off on it. There is no third party here
18 that I've identified.

19      Then I started looking at the numbers and I become
20 very concerned. First, the liquidation analysis itself -- this
21 statement is made right in the disclosure statement. It says,
22 "The liquidation analysis prepared based on a review of the
23 debtor's assets and estimates the hypothetical liquidation
24 values were determined primarily by assessing classes of assets
25 as opposed to appraising specific assets. For the preparation

**J&J COURT TRANSCRIBERS, INC.**

13

1 of this analysis, the debtors did not retain third party

2 experts to value the individual assets."

3          Reading into the liquidation I see, you know, classes

4 of machines, classes of buildings, classes of -- like you just

5 took the thing, shut her down, and sold it as these desks,

6 these phones, these chairs, not as operating companies.  They

7 say in here that they review this as an operating company.  I'm

8 talking at this point especially about the non-debtor

9 subsidiaries.

10          There's 54 subsidiaries.  They seem to be operating

11 all over the world in profitable markets that, essentially, we

12 have no information whatsoever in terms of their income and in

13 terms of their balance sheet, in terms of their debt.  We see a

14 book value that's filed with your court.  In the monthly

15 reports it's been consistent, really for the last year and a

16 half, of 900 million, $159 million for these non-debtor assets.

17          We see them evaluating these non-debtor assets at two

18 million to two million twenty.  That's a $700 million

19 discrepancy between book value and realizable value based on

20 their analysis.  That discrepancy is so large that it just

21 brings in question.  And then you look on the actual disclosure

22 statement, and rather than putting that discrepancy on the

23 disclosure statement, and I'm willing to believe the disclosure

24 statement requires to show the book value and also realizable

25 value.

14

1      This firm put on the letters n/a.  And n/a doesn't
2  even have a footnote.  It doesn't say what n/a means.  We could
3  assume it might mean non-applicable, but if it's non-applicable
4  I simply ask why?  And it seems a disclosure statement is
5  supposed to ask my father, or now me because I bought his bonds
6  last night, to take 19 percent on his money, it ought to at
7  least tell me why $700 million of book value turned into $200
8  million of asset value in companies that seem to be operating
9  profitably around the world.

10      Then I looked at the net worth values between the
11 monthly operating reports, which are basically the historical
12 balance sheets and the book value after the plan, and we see a
13 discrepancy of $650 million between the two.  I think this
14 should be explained.  I am basically arguing here that this
15 disclosure statement's inadequate.  That it needs to explain
16 these things for any person that has to sit here and make a
17 decision whether to vote for this reorganization or to accept
18 the -- or ask for this company to be liquidated in an orderly
19 fashion.

20      The next thing I'm very concerned about, and have
21 been ever since the beginning, is in November '06 the
22 management of this company wrote off and -- first they carried
23 this for many, many years, and certified it six months prior to
24 their bankruptcy filing, in the first month right after the
25 bankruptcy filing they wrote off $637 million worth of

15

1    goodwill.  The explanation in the SEC document for the goodwill
2    is minimal.  Absolutely minimal.  It basically says we looked
3    at it.  We didn't think it was worth that much anymore so we
4    wrote it off.

5          THE COURT:  Well, what they said specifically and
6    what they've asserted in their papers here in bankruptcy court
7    is that under the applicable accounting standards, the goodwill
8    had been impaired and needed to be written down.

9          MR. KORTH:  I think they -- whatever the -- I agree.
10   I guess maybe I'm being a little bit overly stated there.  But,
11   I think they should describe the impairment.  I think the
12   impairment should be described.  I think it's something that
13   the investors in this company basically throughout the world --
14   we have investors in South America.  We have investors in
15   Europe.  And a lot of the world is watching this whole
16   situation, and I think our reputation in the world is really at
17   stake at this point.  And I think we should be as clear as
18   possible.  If this company is really worth this much we should
19   say why.  And we should disclose the things that ought to be
20   disclosed.

21         The disclosure statement does not say anything about
22   who owns the eight and five-eighths percent senior notes, and
23   does not say who owns -- are the second lien holders, who they
24   are, what relationships they have with the committees who are
25   making decisions here.  I see the second lien ad hoc committee

J&J COURT TRANSCRIBERS, INC.

is negotiating directly with the management in their disclosure
statement. Whether that's appropriate or not I think is for
you to decide.

I think, basically, the law says, as I understand it,
that the insiders aren't allowed to vote for a plan, and if
they have undue influence they may be insiders. And insiders
negotiate with people like management. And it looks to me like
they're negotiating with management which would say to me
they're insiders. And a reasonable man test would say that
they're insiders when they're taking that kind of an activity.

We requested more information which we believe we
have a right to if we file a motion in front of this Court.
And we filed that motion, and we've asked for some very
specific things. There's a list of 16 items. Each item is
related to the objections I have to the disclosure statement,
and we would really like a third party to get a hold of these
items, take a look at all the subsidiaries, look at their
income statements and their balance sheets for the last couple
of years, find out what business they're actually doing, who
they're doing it with, and put a real valuation as to whether
that subsidiary could be sold.

The average subsidiary in there is probably worth at
least, based on the balance sheet before the reorganization,
something like, they paid 20 to $25 million for each one on
average. Are they worth four million today? That's what

17

1 they're basically saying.  I'd like to see somebody else

2 besides management who has an incentive to buy this company

3 inexpensively tell me that, and be able to tell my investors

4 that.

5          In conclusion, I also think that our trustee for the

6 nine percent holders who I have to -- happened to deal with

7 quite extensively last summer may have changed their tune and

8 gotten, essentially, a large payment for not representing their

9 constituency.  We were in progress with them.  They had their

10 own ad hoc committee.  They had hired a financial consultant.

11 They did not ask anybody for any kind of reward from nine

12 percent holders or otherwise that I knew about, and suddenly in

13 September of last year they turned around and said we need

14 $500,000 right now or we cannot continue to represent you.

15          Simultaneously, Mr. Kurack (phonetic) had filed the

16 ex clause litigation which you ruled on, and we asked them

17 simply to join that litigation.  They refused to join that

18 litigation.  They wanted $500,000 to join that litigation.  We

19 were baffled, quite honestly, and I asked them to resign.  They

20 refused to resign.  They said they had no good reason to

21 resign.  And then the next -- in the disclosure statement that

22 came out in October I find out they basically received a

23 commitment, in so many words, to receive a million $20,000 from

24 the debtor.  That was never there before, and suddenly they've

25 really -- they've stopped representing any of the bondholders.

**J&J COURT TRANSCRIBERS, INC.**

18

1  This is a problem in my view.

2          So, for all the reasons that I've put up here, I am
3  requesting that you don't approve the disclosure statement
4  today.  Let us get our 16 items.  Let us go through them.  Let
5  us get a third party -- not me, but a third party to evaluate
6  these companies and come back and evaluate the disclosure
7  statement and put forth the plan.  And with that I rest.

8          THE COURT:  Thank you, sir.  Let me hear first from
9  the debtor, then I will hear from anyone else who cares to be
10 heard in connection with the request to approve the disclosure
11 statement.

12         MR. HIGGINS:  Your Honor, Roger Higgins for the
13 debtors.  I think first and foremost, and we've expressed this
14 in our papers, particularly in our disclosure statement brief
15 we filed on Monday afternoon, Your Honor, that Mr. Korth's
16 objection is at its very heart a confirmation objection.  What
17 he is doing is taking issue with the liquidation analysis on
18 one hand and the valuation analysis on the valuation on the
19 other.

20         What Mr. Korth is suggesting is that he believes
21 there are alternative ways to value this company based on
22 various items that he identified.  And to the extent to which
23 he believes that he's right, then we believe that he should
24 press that objection as a confirmation objection and hold the
25 debtors to their burden of proof at confirmation regarding

19

1  whether the liquidation analysis is accurate, whether it was

2  prepared properly with the proper assumptions.  And the debtors

3  will be clearly prepared to carry their burden of proof as to

4  that.

5        And similarly too, and I think even perhaps more

6  fundamentally, that Mr. Korth is suggesting that this company

7  is worth more or has more value than the -- than what is stated

8  in the disclosure statement, particularly with regard to the

9  total enterprise value that the investment bankers, Miller

10 Buckfire, have estimated for this company.  And what he's

11 suggesting is that the economic deal that was worked out

12 between the senior notes indenture trustee who represents all

13 of the senior notes, including those senior notes held by Mr.

14 Korth, the Committee, which represents those senior notes, and

15 the second lien group which is the senior in pair of class in

16 these Chapter 11 cases.

17       What he's suggesting is that economic deal doesn't

18 work.  That it doesn't give enough to the senior notes.

19 Obviously, respectfully, we disagree.  But, again, that is a

20 confirmation issue and not an issue for disclosure.  And,

21 particularly, Your Honor, Mr. Korth points to various SEC

22 filings, also to the monthly operating reports, and conflates

23 those items or those reports, those with the liquidation

24 analysis and valuation, all of which have very different

25 purposes.

**J&J COURT TRANSCRIBERS, INC.**

1      THE COURT:  And I think the debtor is right about

2  that, but one thing that occurs to me as I hear Mr. Korth make

3  his presentation, and again, I have read all the papers that

4  have been submitted in this connection, is, what is the

5  liquidation scenario based upon really liquidation -- the

6  forced liquidation?

7      MR. HIGGINS:  The liquidation, Your Honor, is

8  basically an orderly liquidation of non-operating assets here

9  in the United States.  And it -- and we, you know, obviously at

10  confirmation we'll put this on a much more -- in much more

11  detail.  In the United States it's basically

12  non-operating assets.  Non-U.S. -- where there are non-U.S.

13  operating entities such as the European entities.  Those are

14  valued at what we believe those entities could be sold for as a

15  going concern business, and what would, quite frankly, be a

16  distress sale environment.  And that represents what we believe

17  could be garnered in the way of cash and liquidating for

18  purposes of the best interest test.

19      The valuation, on the other hand, is a total

20  enterprise valuation.  And I think as we explained in the

21  disclosure statement in some detail, based upon the going

22  concern value of the company as a whole, not only as European

23  operations, but also it's North American operations, and it's

24  upon that enterprise value that, you know, around that is --

25  revolves the economic deal worked out between the various

**J&J COURT TRANSCRIBERS, INC.**

21

1  creditor constituencies.

2          THE COURT:  Anything further?

3          MR. HIGGINS:  No, Your Honor.

4          THE COURT:  All right.  Let me hear from others.

5          MR. MANNAL:  Good afternoon, Your Honor.  Doug Mannal

6  from Kramer Levin on behalf of the creditors committee.  Your

7  Honor, the creditors committee believes that the disclosure

8  statement contains adequate information as required under

9  Section 1125.  The committee also believes that this plan

10  provides the best recovery for unsecured creditors as a whole,

11  and presents the debtors with the greatest opportunity to

12  achieve a successful reorganization.

13          We are here today, Your Honor, to determine adequate

14  information of a kind that would enable a hypothetical investor

15  to make a determination on the plan.  And the committee

16  strongly believes, as stated in its statement filed with this

17  Court, that the information contained in the disclosure

18  statement provides adequate information.  For this reason the

19  committee respectfully requests that this Court approve the

20  disclosure statement.  Thank you.

21          THE COURT:  Thank you.  Does anyone else care to be

22  heard?

23          MR. ASHMEAD:  Your Honor, this is John Ashmead from

24  Seward & Kissel.  I'm on the line.  Is anyone standing up to

25  speak there?

22

1          THE COURT:  Yes, there's several, but you may go
2    ahead if you like.
3          MR. ASHMEAD:  ·All right.  I represent U.S. Bank who
4    is taking a tongue lashing here.  I just wanted to be clear to
5    Your Honor that U.S. Bank wholly disputes Mr. Korth's
6    assertions and characterizations insofar as they relate to U.S.
7    Bank.  In fact, I'm reminded of the old cynical saying, no good
8    deed goes unpunished.
9          Be that as it may, we're not seeking relief before
10   the Court today, nor is anyone on our behalf, so we didn't file
11   anything.  And I think, you know, just to be clear to the
12   extent that Mr. Korth has misunderstood anything in his
13   communications with U.S. Bank, which I don't think is the case
14   in reality, he certainly could've spoken with his former
15   counsel at Ballard Spahr who I had any number of discussions
16   with on a range of topics, and sufficed to say, the statements
17   that Mr. Korth has made now several times are just inaccurate
18   and out of context and not correct.
19         Finally, the extensive formal and informal efforts of
20   U.S. Bank at getting a recovery for the sub noteholders are
21   well known to the debtors, to the committee, and Mr. Korth.
22   And those efforts, in fact, have continued to date, including
23   what we think was, you know, fruitful result, at least getting
24   the sub noteholders the opportunity to participate in the new
25   second lien facility as part of the plan exit.

1          As for the fees and expenses, not only is that

2    customary we paid, there was, in fact, the resolution here of

3    our charging lien which we had a right to assert on the double

4    DIP to be paid to the senior noteholders.  That was a

5    compromise that was reached in the past, and that's why that's

6    in there.

7          We feel it's terribly unfortunate that our sub

8    noteholders are not getting a recovery here, and we've

9    continued throughout to work on their behalf to try to get them

10   something.  But, I have no legal or factual argument at my

11   disposal that can change the facts of the status of this

12   company, the status of the economy, and the fact that Your

13   Honor ruled on the ex clause which became a final order in a

14   way that that was ruled upon.

15         So, I'm sorry that Mr. Korth put debt in equity, and

16   also recommended it to his clients after the filing that

17   there's not a whole lot I can do about that.  And with that,

18   Your Honor, I rest.

19         THE COURT:  Thank you.

20         MR. SUTTY:  Good afternoon, Your Honor.  Eric Sutty

21   of Bayard on behalf of the Bank of New York Trust Company, the

22   indentured trustee for the eight and

23   five-eighths senior notes due in 2012.  I'd like to introduce

24   to the Court Steven Szanzer of Willkie Farr and Gallagher.  A

25   motion for admission pro hac was filed this morning.

**J&J COURT TRANSCRIBERS, INC.**

24

1            THE COURT:  All right.  Thank you.

2            MR. SZANZER:  Good afternoon, Your Honor.  Steven

3   Szanzer from Willkie Farr and Gallagher representing the Bank

4   of New York Trust Company.  That's the trustee for the senior

5   notes.

6            In these Chapter 11 cases, the senior notes are in a

7   first loss position, and therefore they bear the most risk in

8   these cases right now.  Given the current circumstances of the

9   cases, the indentured trustee believes that time is of the

10  essence and for the debtors to confirm a plan of reorganization

11  and for the debtors to emerge from bankruptcy.  Under the

12  original plan, the senior noteholders who are anticipated to

13  receive a recovery of 55 percent under the revised plan, the

14  senior noteholders anticipate receiving a 19 percent recovery.

15  Designated trustee fears that if the plan process gets dragged

16  along much father there will be a further deterioration in the

17  debtor's estates, and therefore further reduce the -- any

18  recoveries that the senior noteholders actually receive

19  pursuant to the plan.

20           The sub noteholders, as everybody knows, are

21  currently out of their money right now.  Their valuation for

22  the original plan provides them with no recovery whatsoever.

23  The current plan also provides them with no recovery

24  whatsoever.  So, everything's being borne by the senior

25  noteholders.  And for that, the senior noteholders request --

**J&J COURT TRANSCRIBERS, INC.**

25

1  on behalf of the senior noteholders request that the plan be --
2  the disclosure statement be approved as we believe that it
3  provides adequate information.  Thank you.

4           THE COURT:  Thank you.  Does anyone else care to be
5  heard?  I hear no response.  Mr. Korth, I'll hear you again
6  briefly.

7           MR. KORTH:  I'd just like to --

8           THE COURT:  You need to be near a microphone, sir.

9

10          MR. KORTH:  I'd just like to ask one question.  Has
11  the management agreement been made?  Because in the disclosure
12  statement as it states right now, they're in negotiations.  And
13  it seems to me, if they haven't got the negotiation done, is a
14  fairly salient part of the disclosure statement, and I'm just
15  asking right now, is that deal done and what does it entail?

16          THE COURT:  Does the debtor care to respond?

17          MR. HIGGINS:  Your Honor -- and this disclosure is
18  actually in the disclosure statement and will be also set forth
19  in the plan supplement that will be filed on or before April
20  28th.  The -- any management equity incentive plan will be
21  dealt with by the new board of reorganized Dura after the
22  effective date of the plan.  And there will be, you know,
23  there's no commitments understanding that up to ten percent of
24  the equity of reorganized debtor has been reserved for some
25  plan that will be dealt with after the effective date and,

26

1 essentially, after these Chapter 11 cases end.

2          THE COURT:  All right.  So, the short answer to the

3 question of whether an arrangement has been finalized is no?

4          MR. HIGGINS:  The short answer is no, Your Honor,

5 yes.

6          THE COURT:  All right.  Thank you.  Yes, Mr. --

7          MR. KORTH:  Just for the record, Mr. Higgins did say

8 that there is ten percent reserved for the management.

9          THE COURT:  Up to, yes, he did.

10          MR. KORTH:  I just wanted to make sure that was

11 there.

12          THE COURT:  All right.  Thank you.  All right.  Mr.

13 Korth, I will turn to your objections.  Note that I have read

14 them as well as the debtor's response in its brief.  And I tend

15 to agree with the debtor that the core of your objections are

16 one which normally would go to confirmation.  It is not

17 necessary under the current state of bankruptcy law for a

18 debtor to make its valuation case at the disclosure hearing,

19 and the law is pretty clear about that.

20          And absent evidence to the contrary, and I've heard

21 your argument, but in a court, argument is not evidence, that

22 the valuation is so wildly off base that it does not provide

23 accurate information to the creditor body, I can't sustain that

24 objection.  With respect to the differences between the monthly

25 operating reports and the liquidation values, the debtor's

**J&J COURT TRANSCRIBERS, INC.**

1  right.  You're comparing mostly apples and oranges there.

2        It may be that you're absolutely right about the

3  value of the company, but typically how that unfolds is

4  pursuant to an objection to confirmation.  Evidence will be

5  submitted by the debtor, a confirmation I anticipate if such an

6  objection is filed, and then objectors are given the

7  opportunity to offer contrary evidence.  This is not the first

8  time I've held such a confirmation hearing, but the burden

9  rests on the debtor.  But, I must advise you that in the

10 absence of contrary evidence, it's difficult for a Court to

11 conjure up what other valuation there should be for purposes of

12 determining whether the plan should be confirmed or not.

13       There is a dynamic that's been argued before as you

14 argue here that in cases in which management is promised a

15 certain portion, or has the opportunity to acquire a certain

16 portion of the equity, that there is this incentive to

17 undervalue the company.  That argument's been made before me

18 and it could be made again.  I'm not suggesting the argument

19 has merit or it doesn't have merit under these circumstances,

20 but you're free to make it.

21       So, for these reasons and the reasons the debtor has

22 offered in its brief, and with respect to the other parties,

23 all of whom have signed on in a way, I'm going to overrule the

24 objections that you've made and approve the disclosure

25 statement.  Now, that having been said, I will tell you it does

**J&J COURT TRANSCRIBERS, INC.**

1 not foreclose you, and we'll get to in a minute in terms of
2 information to which you may be entitled that you do not yet
3 have in your possession.

4      You will still be free to argue that if you think the
5 relationship among the constituents or relationships among the
6 constituents that have formulated and/or agreed to and/or
7 consented to the plan were improper in any way.  You can still
8 argue that at confirmation as part of a confirmation objection.
9 I'm not foreclosing any of those arguments today.  All I'm
10 saying is that, as the debtor has proposed, the disclosure
11 statement contains adequate information within the meaning of
12 the bankruptcy code.  Do you have any questions about my
13 ruling?  Go ahead.

14      MR. KORTH:  No.  I do -- I would like to say, though,
15 if we are going to continue to ask for these disclosures and
16 make this evaluation, I really need you to accept my motion to
17 --

18      THE COURT:  Well, here's what I thought I would do,
19 and I'll hear from others if anyone else has a view on it.
20 There is a hearing -- an omnibus hearing scheduled for April
21 10th.  And I would be inclined to schedule your motion for
22 hearing at that time to determine what, if any, additional
23 information should be provided to you.  I think the debtor
24 suggested in its brief that the motion should be scheduled for
25 a time later in April, but I'd be willing to accelerate that

1  time to give you sufficient time to receive and review the
2  information to determine what further position you'd like to
3  take with respect to confirmation.  And you may attend that
4  hearing by telephone if you like, sir.

5          MR. KORTH:  That would be good because I came all the
6  way from Miami, so --

7          THE COURT:  Now, I will say to you, you are perfectly
8  entitled to represent yourself.  Obviously, you're an
9  articulate person who's able to think through the issues, and
10 my visceral impression is you are -- well, you exhibit the
11 qualities of an investor who's not unsophisticated.  Put it
12 that way.

13         MR. KORTH:  Thank you.

14         THE COURT:  But, as we get closer to -- as you get
15 closer to determining whether you wish to file a confirmation
16 objection and/or pressing such objection at confirmation,
17 and/or sifting through information you might wish to seek, I
18 will tell you, this is the kind of matter in which the
19 assistance of counsel, I think, would be most helpful to you.
20 It's not required, but I think you should consider it again if
21 you haven't -- if you've considered and rejected the thought or
22 haven't yet considered it.  And I leave you to your own
23 thoughts and decisions in that respect.  Are you available on
24 the 10th at ten o'clock?

25         MR. KORTH:  Yes, I am.

                    **J&J COURT TRANSCRIBERS, INC.**

30

1          THE COURT:  Okay.

2          MR. HIGGINS:  Your Honor, I just wanted to point out

3  that the omnibus hearing that was originally scheduled for

4  April the 10th has been moved to April the 23rd.  So, if we did

5  want to have a hearing we would have to schedule a separate

6  hearing for April 10th which we're perfectly -- we will be able

7  to attend, obviously.

8          THE COURT:  Yes, it was -- it's still listed as on my

9  calendar, and nothing else has been put in its place.  So, my

10  mistake.  Let me ask, are you available?

11          MR. HIGGINS:  We are, Your Honor.

12          THE COURT:  And all the parties -- well, let me put

13  it this way.  I know what Mr. Korth wants, and I would be

14  inclined to say that if there are no other matters scheduled

15  we'd conduct the hearing completely by telephone provided that

16  that can be done practically.

17          MR. HIGGINS:  Your Honor, I think how that will play

18  out will depend upon the meetings that, obviously, we're going

19  to have to have with Mr. Korth.  And, quite frankly, which have

20  not happened as are required under the local rule.  Also, it is

21  our view, Your Honor, that because as you have just ruled, that

22  Mr. Korth's objection really is fundamentally a confirmation

23  objection that his requests -- his information requests are

24  really discovery requests and should be governed by Rule 26 by

25  Rule 2004.

**J&J COURT TRANSCRIBERS, INC.**

31

1    Having said that, different rules apply there.
2  Obviously, there are different procedures, different
3  safeguards, and we would -- are happy to work with Mr. Korth to
4  provide him discovery that he doesn't already have,
5  understanding that he has a great deal of discovery through his
6  former counsel, Ballard Spahr.

7    THE COURT:  Well, and understanding also that the
8  debtor pretty much knows what the substance of his objections
9  to confirmation are at this point.  So, it's seems to me the
10  focus on what's relevant to that exercise ought to be fairly
11  obvious to all.

12    MR. HIGGINS:  We believe so, Your Honor, and we
13  believe we would be happy as long as the -- his requests are
14  not unduly burdensome and are indeed, as you point out,
15  relevant to the issues at hand.

16    THE COURT:  All right.  We'll schedule then -- I'll
17  tell you what.  We'll tentatively schedule that hearing, then,
18  for the 10th at ten o'clock by telephone.  Should the parties
19  reach agreement, I'll accept an order under certification.
20  Should there be a reason why we
21  can't -- it wouldn't be practical to have the hearing by
22  telephone, I'd ask that the parties advise me in advance.

23    MR. HIGGINS:  We will do so as far in advance as we
24  can, Your Honor.

25    THE COURT:  Okay.  Does anyone else care to be heard

32

1 on that matter?  I hear no response.

2        MR. HIGGINS:  Your Honor, that leaves us with the

3 approval of the confirmation time line, and also the

4 solicitation procedures forms of ballots and all of the other

5 ancillary documents.  We filed a fresh order -- disclosure

6 statement order on Monday, along with forms of ballots and

7 notices.  We have since made some minor -- a set of minor

8 conforming changes.  I am happy to hand up an order at this

9 time, and the extent to which you feel necessary, I'll walk you

10 through.  We believe there are no substantive changes in there

11 are compared to what was filed on Monday.

12        THE COURT:  All right.  If you'd hand them up,

13 please.

14        MR. HIGGINS:  If I may approach, Your Honor.

15        THE COURT:  You may.  Thank you.

16        MR. HIGGINS:  Perhaps, Your Honor, before we walk

17 through this, if I could just spend a minute talking about the

18 confirmation time line.  We have taken the liberty of putting

19 those dates in.  I know that we've been in contact with

20 chambers regarding your availability on the 13th of May for a

21 planned confirmation hearing that revolves around the May 8th

22 deadline imposed by the DIP lenders for the debtors to obtain

23 an exit financing commitment letters.  We see there are three

24 there, one for the revolver, one for the term loan, and then

25 one for the new money second loan -- second lien loan.  And so,

1 we saw that May 13th was soon after that as was practicable and
2 given your availability.

3         And then as we move backwards from there, we would
4 have a voting deadline of May 7th, a plan objection deadline of
5 May 2nd.  We worked out with the United States Trustee the
6 deadline to file the plan supplement of April 28th, and we
7 would commence solicitation on April 10th.  That will give us
8 four weeks between April 10th and May 7th for solicitation.
9 And the solicitation will be of all Class 2, Class 3 and Class
10 5 holders.

11         Rather than asking them if they wanted to change
12 their votes, just those who voted the last time around, if they
13 wanted to change their votes, we are electing to go out to all
14 creditors.  And this is driven in no small part by the fact
15 that because the senior notes are held through nominees, we
16 have no way of being able to verify exactly who voted in
17 October versus now, and so we elected to solicit the entire
18 class, and then also solicit the other two classes in their
19 entireties.

20         MR. HIGGINS:  And so, with that, Your Honor, I would
21 proffer this form of order.  As I said before, we have made
22 some changes regarding making sure that language regarding the
23 leases and other dates conform from notices to each of the
24 ballots, and they are all, word for word, the same.

25         THE COURT:  All right.  Does anyone else care to be

J&J COURT TRANSCRIBERS, INC.

34

1 heard in connection with the procedures established in the
2 proposed form of order?  I hear no response.  All right.  The
3 order has been signed.  Is there anything further for today?
4         MR. HIGGINS:  I believe that it is for the agenda
5 today, Your Honor.
6         THE COURT:  All right.  Thank you.  That concludes
7 this hearing.  Mr. Korth, I wish you a safe trip home.  Court
8 is adjourned.
9                         * * * * *
10              C E R T I F I C A T I O N
11         I, Kathleen Betz, court approved transcriber,
12 certify that the foregoing is a correct transcript from the
13 official electronic sound recording of the proceedings in the
14 above-entitled matter, and to the best of my ability.
15
16 /s/ Kathleen Betz              DATE:  April 10, 2008
17 KATHLEEN BETZ
18 J&J COURT TRANSCRIBERS, INC.
19
20
21
22
23
24
25

                    J&J COURT TRANSCRIBERS, INC.

## **Exhibit D**

April 23, 2008, Hearing Transcript

1

1

2    UNITED STATES BANKRUPTCY COURT

3    DISTRICT OF DELAWARE

4    Case No. 06-11202

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    DURA AUTOMOTIVE SYSTEMS, INC.,

9

10        Debtor.

11

12    - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              824 North Market Street

16              5th Floor

17              Wilmington, Delaware

18

19              April 23, 2008

20              10:02 AM

21

22    B E F O R E:

23    HON. KEVIN J. CAREY

24    U.S. BANKRUPTCY JUDGE

25

2

1

2    HEARING re Motion of Allied Motion-Motor Products, Inc. for

3    Clarification of the Terms of Sale.

4

5    HEARING re Amended Motion for an Order under Fed. R. Bankr. P.

6    9019 Approving Atwood Working Capital adjustment Settlement.

7

8    HEARING re J.W. Korth Pro Se Motion for Administrative

9    Expenses.

10

11   HEARING re J.W. Korth Pro Se Motion to Extend the Date for

12   Confirmation Hearing.

13

14

15

16

17

18

19

20

21

22

23

24   Transcribed by:  Penina Wolicki

25

3

1

2    A P P E A R A N C E S :

3    KIRKLAND & ELLIS, LLP

4         Attorneys for Debtor

5         200 East Randolph Drive

6         Chicago, IL 60601

7

8    BY:   ROGER HIGGINS, ESQ.

9         ADAM GOLDSTEIN, ESQ.

10        JOY LYU MONAHAN, ESQ. (TELEPHONICALLY)

11        MICHAEL SLADE, ESQ. (TELEPHONICALLY)

12        MARC KIESELSTEIN, ESQ. (TELEPHONICALLY)

13

14   RICHARDS, LAYTON & FINGER, P.A.

15        Attorneys for Debtor

16        920 North King Street

17        Wilmington, DE 19801

18

19   BY:   DAN DEFRANCESCHI, ESQ.

20

21

22

23

24

25

```
                                                          4

 1

 2     YOUNG CONAWAY STARGATT & TAYLOR, LLP

 3           Attorneys for Creditors' Committee

 4           1000 West Street

 5           Wilmington, DE 19801

 6

 7     BY:   BLAKE CLEARY, ESQ.

 8

 9     KRAMER KEVIN NAFTALIS & FRANKEL, LLP

10           Attorneys for Creditors' Committee

11           1177 Avenue of the Americas

12           New York, NY 10036

13

14     BY:   DOUGLAS MANNAL, ESQ.

15           JENNIFER SHARRET, ESQ.

16

17     ECKERT SEAMANS CHERIN & MELLOTT, LLC

18           Attorneys for Atwood Mobile Products LLC

19           300 Delaware Avenue

20           Wilmington, DE 19801

21

22     BY:   MICHAEL BUSENKOL, ESQ.

23

24

25
```

5

1

2    HUNTON & WILLIAMS, LLP

3           Attorneys for Atwood Mobile Products LLC

4           1445 Ross Avenue

5           Dallas, TX 75202

6

7    BY:   JARRETT HALE, ESQ.

8

9

10   LANDIS RATH & COBB, LLP

11          Attorneys for J.P. Morgan

12          919 Market Street

13          Wilmington, DE 19889

14

15   BY:   REBECCA BUTCHER, ESQ.

16

17

18   STEVENS & LEE, P.C.

19          Attorneys for Allied Motor Motion

20          1105 North Market Street

21          Wilmington, DE 19801

22

23   BY:   JOSEPH H. HUSTON JR., ESQ.

24

25

6

```
 1
 2    UNITED STATES DEPARTMENT OF JUSTICE
 3          Office of the U.S. Trustee
 4          844 King Street
 5          Wilmington, DE 19801
 6
 7    BY:   RICHARD L. SCHEPACARTER, ESQ.
 8
 9    BRACEWELL & GIULIANI, LLP
10          Attorneys for Second Lien Holders
11          1177 Avenue of the Americas
12          New York, NY 10036
13
14    BY:   DAVID ALBALAH, ESQ.
15
16    BRACEWELL & GIULIANI, LLP
17          Attorneys for Second Lien Committee
18          225 Asylum Street
19          Hartford, CT 06013
20
21    BY:   KURT MAYR, ESQ. (TELEPHONICALLY)
22
23
24
25
```

7

```
 1
 2    SCHULTE ROTH & ZABEL
 3         Attorneys for Ableco - Creditor
 4         919 Third Avenue
 5         New York, NY 10022
 6
 7    BY:   LAWRENCE GELBER, ESQ. (TELEPHONICALLY)
 8
 9
10    DEWEY & LEBOEUF, LLP
11         Attorneys for General Electric Capital Corp.
12         1301 Avenue of the Americas
13         New York, NY 10019
14
15    BY:   CAREY D. SCHREIBER, ESQ. (TELEPHONICALLY)
16
17
18    JAECKLE, FLEISCHMANN & MUGEL, LLP
19         Attorneys for Allied Motion - Creditor
20         12 Fountain Plaza
21         Buffalo, NY 14202
22
23    BY:   JOSEPH ALLEN, ESQ. (TELEPHONICALLY)
24
25
```

8

1

2   ALSO PRESENT:

3        THERESA SKOTAK, Dura Automotive Systems, Inc.

4        (TELEPHONICALLY)

5        LAWRENCE DENTON, Dura Automotive Systems, Inc.

6        (TELEPHONICALLY)

7        JAMES W. KORTH, J.W. Korth and Company

8        MARK LEZANIC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

9

1                   P R O C E E D I N G S

2          THE CLERK:  All rise.  Be seated, please.

3          THE COURT:  Good morning, all.

4          MR. HIGGINS:  Good morning, Your Honor.  Roger

5   Higgins for the debtors.  We have three matters going forward

6   today.  The first of which is Allied Motion regarding the

7   clarification of the terms of their agreement and whether that

8   was assigned.  And then we have two items for Mr. Korth's two

9   motions -- two motions that Mr. Korth has filed.  I would

10  propose that we go forward with item number 11, Allied, and I

11  would yield the podium to counsel for Allied.

12         THE COURT:  Very well.

13         MR. HUSTON:  Good morning, Your Honor.

14         THE COURT:  Good morning.

15         MR. HUSTON:  All these tall guys.  May it please the

16  Court, Joseph Huston of Stevens & Lee on behalf of Allied Motor

17  Motion Products.  And on the phone is my co-counsel Joseph

18  Allen, Your Honor, as well.  I'm going to be very brief.  We've

19  plowed this ground many times.  Your Honor, I'm sure, is

20  familiar with what's in the papers.

21         THE COURT:  I am.  But I have a question, threshold

22  question, I think.  At some point, and we have debated this, I

23  think, probably the third time, but I'm not certain --

24         MR. HUSTON:  At least.

25         THE COURT:  -- yeah.  There was an issue about

10

1    whether the vehicle that Allied had used to request the relief

2    that it's requesting was not appropriate.  I think when we last

3    left it, I said look, see if the parties can agree that we can

4    decide it in this context.  If not I'll make a decision about

5    something.  I take it, it's not expressly set forth in the

6    paper, but I take it the parties have now agreed that the

7    vehicle of Allied Motion is appropriate, while at least it's

8    not objected to, for the Court to reach the issues that Allied

9    would like it to reach.

10           MR. HUSTON:  I certainly say for us, that that is my

11   understanding --

12           THE COURT:  Okay.

13           MR. HUSTON:  -- I don't think any of the parties has

14   a different point of view.

15           THE COURT:  All right.

16           MR. HUSTON:  I think the thought is it's teed up

17   today properly on the merits.

18           MR. HALE:  Atwood would agree with that, Your Honor.

19           THE COURT:  Okay.

20           MR. GOLDSTEIN:  The debtors agree, Your Honor.

21           THE COURT:  All right.  I thought so, but the papers

22   just -- this is not a criticism -- the papers didn't confirm

23   that.  I just wanted to make sure.

24           MR. HUSTON:  It comes from being a little bit too

25   close it, I guess, Your Honor.  Forgive us.

11

1           THE COURT:  All right.

2           MR. HUSTON:  As is set forth in our amended joint

3    pre-argument statement, the parties agree on the law.  The

4    parties agree virtually on all the facts, except some that we

5    think are not particularly relevant.  And the parties all

6    contend for the position that the agreement as written is

7    unambiguous.  Where we part company is how that unambiguous

8    language should be applied.

9           THE COURT:  Usually.

10          MR. HUSTON:  The important --

11          THE COURT:  Well, let me ask you this.

12          MR. HUSTON:  Um-hum.

13          THE COURT:  Keying off the statement that you just

14    made.  The issues in the amended joint pretrial statement

15    number 2, was changed slightly, but now reads:  "Was the CSA

16    assigned to Atwood as the result of the assumption order in the

17    APA the sale order and/or Atwood's continuing dealings with

18    Allied after the sale date".  Is that relevant?

19          MR. HUSTON:  That was put in at the debtor's request,

20    Your Honor.  We believe that that is irrelevant.

21          THE COURT:  That was my initial reaction as well.

22    But I'll let parties argue to the contrary if they wish.

23          MR. HUSTON:  At some point in round one and a half or

24    two, we made the contention that that was an issue that could

25    be taken into account as a consequent -- as conduct consistent

12

1    with our view that not only we, but also Atwood, believe that

2    they had actually taken on the contract and there was some --

3              THE COURT:  Okay.  So I could use it, at least in

4    your view, to divine the intent of the parties rather than

5    concluding as a matter of law that a contract can be assigned

6    or assumed by implication.  And that's what gave rise to my

7    question.  It does to the latter point.  I don't know that that

8    can be done and whether it's relevant here.

9              MR. HUSTON:  I believe that in the debtor's

10   statement, they make the argument that that conduct is

11   consistent with actually a course of dealing, perhaps.  But

12   I'll let the debtor speak.  Because that's water that they like

13   to carry.

14             THE COURT:  Okay.

15             MR. HUSTON:  We're not, obviously, not adverse to

16   that.  But what we think is that the context in which this

17   arose is undisputed.  And while the contract is not ambiguous,

18   and therefore this would not be deemed extrinsic evidence on

19   the issue, the cases are clear, that the Court can, in

20   interpreting the language, take into account the context.  And

21   the context is that there was a significant amendment of the

22   consigned stock agreement between Allied and the debtors.  That

23   contract was assumed pursuant to motion and an order of this

24   Court.  There was then -- Atwood, as the debtor, continued to

25   purchase from us pursuant to the terms of that assumed

13

1    contract.  There was then an issue that --

2           THE COURT:  Well, I know there was the dispute about

3    the form of how the purchases were made.  But at bottom, and

4    Allied alleges this, Atwood had the benefit of the terms of the

5    contract and took advantage of the benefits.

6           MR. HUSTON:  You're one step ahead of me, as usual.

7    IÆm talking about prior to the sale.  Prior to the sale, Atwood

8    as debtor, before the assets were sold, the parties just

9    performed under that agreement --

10          THE COURT:  Right.

11          MR. HUSTON:  -- without a question.  There came a

12   point in time a little while before the sale when Allied became

13   concerned about what might be a gap period and who was going to

14   have to pay for accounts receivable that were incurred in the

15   ordinary course, and there was a motion of limited objection to

16   the sale order, and we then inserted paragraph 36 of the sale

17   order, which made it clear, and I'll look at the precise

18   language in just a minute on that, Your Honor.  The sale order

19   made it clear that there were no defaults to be cured at that

20   point in time.  However, with respect to accounts receivable

21   that arose prior to the closing date, Atwood -- Dura, the

22   debtors, would pay them, and regardless of when they actually

23   arose, any accounts receivable that were billed after the

24   closing date would be paid for by the purchaser.  And that was

25   put into the order.  So that was the background.  In other

14

1    words --

2                THE COURT:  And I recall testing you about why there

3    wasn't language inserted into the order which expressly

4    acknowledged that there was an assumption into being an

5    assignment of this contract to the purchaser.  We don't need to

6    retread that.  I under --

7                MR. HUSTON:  And I will tell you, Your Honor, I

8    expected you to ask me that question again.  And the answer is,

9    to us it was so clear that it was a three party arrangement,

10   that it simply didn't occur to us.

11               THE COURT:  Right.

12               MR. HUSTON:  It would have been better drafting.  We

13   would not be here were it there.

14               THE COURT:  Okay.  Now, the parties take the position

15   that the language is not ambiguous but ought to be read their

16   respective ways?

17               MR. HUSTON:  Precisely.

18               THE COURT:  If I were to conclude there were

19   ambiguity, and that's why I kept telling the parties it might

20   be good to have an evidentiary hearing, which apparently

21   everybody agrees they don't want, it would be my intention to

22   make a decision based upon the agreed facts.

23               MR. HUSTON:  You are always free to conclude that,

24   once again, the parties are wrong and that as a matter of law

25   there is an ambiguity, such that the Court can't resolve that,

15

1    in which event -- and really the way we have this teed up is,

2    the parties believe that their respective reading of the

3    "unambiguous" language leads to a certain result.  But that

4    doesn't mean that you're bound by that.  If you say I don't

5    find that clarity that the parties do and therefore I find this

6    is ambiguous, and therefore you need to develop a factual

7    record for me.

8            THE COURT:  Well, what the parties assert, I would

9    really characterize more as certainty.  Clarity is not so

10   apparent to me.  I mean, after having lived with this issue for

11   a while, I will tell you, I'm coming to the conclusion that the

12   order and agreements, taken together, can legitimately be read

13   more than one way.

14           MR. HUSTON:  And I think the case law says that that

15   does not necessarily mean that they are ambiguous, and that

16   being subject to more than one reasonable interpretation

17   doesn't necessarily make it ambiguous, you know, legally

18   ambiguous.

19           THE COURT:  No, but it could be a reason to find

20   ambiguity.

21           MR. HUSTON:  Agreed.

22           THE COURT:  Okay.

23           MR. HUSTON:  Agreed.  And again, since we have plowed

24   this ground several times, Your Honor, my remarks will be

25   brief.  Turning to the section 7.7 of the Asset Purchase

16

1    Agreement, which was Exhibit B to our papers.  The precatory

2    provisions of the agreement say you can't take into account the

3    headings of the sections in interpreting the agreement.  And I

4    think that's just standard language, okay, so fine.  So let's

5    take out the first three words, "Cure of Defaults".  What does

6    this paragraph deal with?  This deals with the fact that the

7    purchaser -- it recites:  "Purchaser shall at or prior to the

8    closing cure any and all monetary defaults under the assumed

9    contracts and leases".  Defines terms.  Jumping a little bit

10   ahead:  "so that such assumed contracts and assumed leases may

11   be assumed by sellers and assigned to purchaser in accordance

12   with the provisions of Section 365 of the bankruptcy code".  So

13   what this provision deals with, and this is context as opposed

14   to seizing on the heading, the context is for agreements as to

15   which there were cure amounts and which had yet to be assumed,

16   this was the agreement by the purchaser to cure the defaults,

17   such that those contracts could be assumed.

18          THE COURT:  Let me just stop you there for a

19   moment --

20          MR. HUSTON:  Yup.

21          THE COURT:  -- and say something with which I do not

22   expect you to disagree, necessarily, but I say it now, so that

23   others who will rise to speak may take their own position on

24   it.  Your best argument, I think, is succinctly set forth in

25   paragraphs 11 and 12 of the most recently filed, it's called

17

1    reply.  I think that's your best argument.

2              MR. HUSTON:  Forgive me, Your Honor.  Is that in --

3              THE COURT:  It's Romanette iv in the binder, in the

4    hearing binder.  It's titled Reply of Allied Motion Motor

5    Products, Inc.  It was filed December 7th -- I'm sorry, it's

6    not your most recent filing.  But I think that's your best

7    argument.

8              MR. HUSTON:  I don't have that, Your Honor.  If

9    you'll just tell me what --

10             THE COURT:  It says:  "When you read the APA as an

11   entire document, it's apparent from section 7.6 and 7.7 that

12   the phrase 'may remain subject to rejection' prohibited the

13   purchaser's ability to refuse assignment.  And if the phrase

14   'may remain subject to rejection means what Atwood urges, that

15   even contracts that have been assumed could be rejected, it

16   would make the phrase itself meaningless surplusage".

17             MR. HUSTON:  Yes, Your Honor.  And thank you.  I've

18   seen that.  And we make that argument again in our separate

19   submission here. And that was about what I was going to say,

20   Your Honor.

21             THE COURT:  And that's why I stopped you --

22             MR. HUSTON:  Yeah.

23             THE COURT:  -- because --

24             MR. HUSTON:  It's got --

25             THE COURT:  -- it's your best argument, I think.

18

1          MR. HUSTON:  Exactly.  And therefore, why would that

2    language even be in there, and you would have to read it out of

3    the agreement.  If the parties meant, and again, perhaps this

4    is the same issue of drafting that's in the sale order, if it

5    were to mean what Atwood contends, that language would not be

6    there.  It would simply say that they could reject any of the

7    assumed contracts and assumed leases, period, full stop, game

8    over.  And so in order to take their position, you'd have to

9    ignore the last language. And I think that what I was going to

10   do is, given the context of this particular provision, where

11   that appears, it really can mean nothing other than agreements

12   that haven't already been assumed as to which there are

13   defaults.

14          And what I referred to before, Your Honor, is in the

15   sale order, paragraph 36, it recites specifically that:  "For

16   clarification of payment of outstanding obligations not

17   currently in default," the debtors, etcetera, etcetera, are

18   going to engage in the payment regime which I recited earlier.

19   So we think that given the context of the overall transaction,

20   given the provision in which that language appears, and given

21   the rules of construction that you cannot ignore language that

22   can only be there for a particular purpose, there really is

23   only one way to go, and that's the way that we suggest.

24          THE COURT:  Thank you.

25          MR. HALE:  Good morning, Your Honor.  Jarrett Hale on

1    behalf of Atwood Mobile Products.  As Mr. Huston said, I won't

2    take up this Court's time reiterating arguments that this Court

3    has already heard and read multiple times.  I do want to

4    address a few of the points that Mr. Huston raised as well as

5    raise a few issues that I don't believe that the Court has

6    heard.

7              There seems to be a lot of dispute over whether or

8    not there's any ambiguity in what is subject to rejection.  And

9    7.7 obviously is the linchpin for these arguments.  I think one

10   thing that gets lost in this, is when you get look at 7.7

11   there's a defined term in there "assumed contracts".  And

12   perhaps one of the issues here is, anytime you've got a deal

13   such as this, you've got two different disciplines to come

14   together:  one, corporate non-bankruptcy lawyers, and

15   bankruptcy lawyers.  So perhaps, the defined term "assumed

16   contract" may not have been the best to use in a bankruptcy

17   proceeding when you're talking about assumption being a term of

18   art for bankruptcy lawyers.  But that's the way it was drafted.

19   It's defined, so it's not ambiguous.

20             But the interesting thing about assumed contract is

21   it states that it's all contracts on 2.1(c), all contracts and

22   purchase orders in the ordinary course of business, and all

23   contracts and purchase orders between execution and closing.

24   Contracts itself is a defined term.  And contract means, any

25   oral or written contract, any indenture, note, bond, lease,

20

1    license or other agreement.

2          There was a lot raised at the last hearing as to what

3    contract wouldn't be subject to rejection.  Surely this is

4    superfluous.  I would posit to you, Your Honor, that certainly

5    in many instances, indentures, notes, bonds and licenses are

6    not subject to rejection.  Those are not executory contracts.

7    That is an entire class of agreements, if you will, that are

8    not subject to rejection, and therefore are captured in that

9    language that we are discussing here today.  They make it sound

10   as though it's just thrown in there, it doesn't mean anything,

11   but it certainly does.  If you look at the schedule of 2.1(c),

12   there are sixty agreements there listed under the heading of

13   Post-Petition Agreements, all of which were struck.  And we're

14   here today talking about one.

15         There's certainly no ambiguity in the case law that

16   post-petition contracts, entered post-petition, are still

17   subject to rejection.  The same is true with pre-petition

18   contracts that are signed.  I know the debtors raised in one of

19   their arguments in this stipulation that because it was a new

20   agreement therefore it doesn't fall under 365.  I would

21   disagree with that.  But even if I did agree, I would say that

22   it didn't matter, because a post-petition contract, while not

23   under 365 when it's created, is subject to rejection under 365,

24   and that's clearly set forth in the Trans World Airlines case

25   by the Third Circuit.  It creates a different priority of a

21

1    class of claim, but obviously still very much subject to

2    rejection.

3            So I don't think that that language is superfluous

4    when you consider things like notes, and indentures and bonds,

5    all of which were contracts and agreements, intellectual

6    property licenses, all of which were part of this deal, some of

7    which were sold and some of which weren't.  But subject to

8    rejection means an executory contract, or one that can

9    otherwise be rejected under 365, we can refuse assignment.

10           Section 7.7 also says that Atwood could "refuse

11   assignment of or otherwise reject".  I think refused assignment

12   is a key phrase there, because refusing assignment presupposes

13   one of two things:  a contract already assumed; or a post-

14   petition obligation.  Because a contract can't be assigned

15   unless it is also assumed.  So obviously the parties

16   presupposed they were going to have previously assumed

17   contracts or post-petition contracts when they drafted that

18   phrase.  So I don't think it's superfluous, and I think it's

19   very clear.  And again, Your Honor, with regard to that section

20   7.7, the "may remain subject to rejection" is not redundant or

21   superfluous, again, because of the patents, licenses, bonds,

22   and all the other issues set forth in the definition of

23   contract, which is incorporated into assumed contracts.

24           And finally, Your Honor, I would just argue that

25   there simply is no ambiguity.  The case law is clear of what

22

1    rejection means.  This was a contract that still was subject to

2    rejection. The Allied certainly has recourse in order to be

3    made whole through 365.  They can apply for an administrative

4    claim, which I would assume that they would certainly be

5    entitled to.  With regard to the course of dealing argument,

6    Allied was aware, as early as November when they filed their

7    motion, that we did not intend to take that contract.  But

8    that, again, even though I would argue that there is no

9    ambiguity, if this Court finds ambiguity, I can certainly state

10   that Atwood would not be opposed to an evidentiary hearing if

11   we needed to go that route.

12            THE COURT:  Now, we're going to stop -- this will be

13   it --

14            MR. HALE:  Understood, Your Honor.

15            THE COURT:  But let me ask you the same question that

16   I asked Mr. Huston.  If it was, at the time of the sale

17   hearing, not the purchaser's intention to assume this contract,

18   why wasn't language inserted into the sale order to make that

19   clear?

20            MR. HALE:  Well, I think, Your Honor, one of the

21   reasons is, at the time of the sale hearing, we're entering the

22   order and everyone knew that there was going to be a period of

23   time between the entry of the order and the closing.  The

24   parties were still working on minor terms as they related to

25   the APA, were still determining what contracts were and weren't

23

1    to be assigned.  It's a complicated transaction in which you

2    even had contracts that both Dura and Atwood were party to,

3    half of which needed to be assigned or that knew Atwood was

4    going to need to use; and how do you deal with a contract

5    that's three-party?  You can't --

6                THE COURT:  Well, was this one of those contracts?

7                MR. HALE:  This one is not, Your Honor.

8                THE COURT:  And you told me, unless I misunderstood

9    you just now, that the purchaser intended not to assume this.

10   So are you telling me that Atwood knew this at the time, the

11   purchaser knew this at the time of the sale hearing or didn't?

12               MR. HALE:  I can't say with certainty, Your Honor,

13   what my client believed at that time.  But they did know that

14   they had a provision in the contract that allowed them a period

15   of time, five days prior to the sale, negotiated with the

16   debtor, to make a determination of which contracts would or

17   would or not be -- and I would question, Your Honor, even if

18   they did know, and even if they had an idea, what difference

19   would it have made?  Allied would be in the same position.  If

20   we'd said we don't want to take it, they'd still have an admin

21   plan.

22               THE COURT:  Well, the difference is that had it been

23   addressed in the sale order, there would be no question here

24   today.

25               MR. HALE:  I understand that Your Honor.

24

1          THE COURT:  That's the difference.

2          MR. HALE:  And I do remember at our first hearing

3    Your Honor stated that the language in the sale order could be

4    read to have been very carefully crafted, to comply or to

5    coincide with this section 7.7.  And while I did not draft that

6    particular provision, I can assure you, Your Honor, that that

7    was taken into account.  And it's very clear that what Allied

8    was concerned about when they entered into the sale order, was

9    purchase orders that were falling into this gap period.  And

10   it's very carefully crafted to state that any payables that

11   actually accrue will be paid by whoever it is that incurred

12   them at the time of the sale.

13          THE COURT:  Yeah, look, I know hindsight's twenty-

14   twenty.  It would have been so simple for Allied to insist

15   there be a provision that the purchaser was taking assignment

16   to this contract, and equally as simple for the purchaser to

17   say that the language was without prejudice to the purchaser to

18   exercise its rights under section 7.7.

19          MR. HALE:  Agreed, Your Honor.

20          THE COURT:  Okay.

21          MR. HUSTON:  Thank you very much.

22          THE COURT:  Thank you.

23          MR. GOLDSTEIN:  Hi, Your Honor.  My name's Adam

24   Goldstein from Kirkland & Ellis in Chicago on behalf of the

25   debtors.  Initially, we'd like you to know that we agree with

25

1    Allied's interpretation of the Asset Purchase Agreement.  Plus,

2    I would like to add that section 36 of the sale order, the

3    debtors also do not believe it's ambiguous.  It's clear that

4    paragraph 36 of the sale order only makes sense in a world

5    where that agreement, where the CSA has been, in fact,

6    assigned; because it clearly states that post-closing

7    obligations are to be paid for and due by Atwood, the

8    purchaser, and pre-closing obligations are paid for by the

9    debtors, by Atwood.  And so, that provision makes pretty clear

10   that this agreement has been assigned.  Otherwise, that whole

11   paragraph is essentially mere surplusage.

12           Remember, Your Honor, this is not a case where these

13   things are being ordered pursuant to purchase orders.  It's

14   part of a long-term consignment agreement where it's invoiced

15   based on what is used and what's in stock.  And it's reported

16   on a weekly basis, which I might add, was continued after the

17   closing.  And so, in other words, there'd be need to say that

18   post-closing that the purchaser would have to pay for purchase

19   orders if the agreement was not being continued, because

20   obviously a purchaser would have to pay for purchase orders and

21   invoices that become due to them.  There's no need to clarify

22   that by means of an agreed upon sale order prior to that.  And

23   under 365(k) of the bankruptcy code, once an agreement has been

24   assigned, as the debtors contend it was, by the sale order,

25   there's no ability to reject it afterwards.

26

1              In addition, if you believe -- if this Court believes
2       that the agreement itself was ambiguous, or that the language
3       is ambiguous, you can look at the conduct post-closing.
4       Atwood, the purchaser, availed itself of pricing terms, of
5       payment terms, net forty-five versus net thirty days, and
6       availed itself of specific provisions of a consignment
7       agreement.  This was not done by purchase order.  It was done
8       where they had a certain amount of motors on site in the Salt
9       Lake City facility, and based on how many were used, they would
10      report back weekly, and then they would be sent an invoice for
11      that amount.  Everything took place as it did prior to the
12      closing with the debtors as it did post-closing with the
13      purchaser and Allied.  So that shows an intent to have, at
14      least, assigned the agreement.  They were operating under that
15      assumption.  And only later did they decide to resource and try
16      to find a cheaper supplier of the engines.  In addition, Your
17      Honor, you could also -- basically, what Atwood is trying to do
18      is take a very technical approach by looking at certain
19      language of the bankruptcy code and interpreting the Asset
20      Purchase Agreement in that light.
21              THE COURT:  We live in the technical world here, do
22      we not?
23              MR. GOLDSTEIN:  I agree, Your Honor.  And if that is
24      the case, if you take a look at what exactly, what contract
25      that was, I mean, section 2.1(c) of the Asset Purchase

27

1    Agreement is pretty clear that contracts that are negotiated in

2    the ordinary course of business, which is defined specifically

3    as occurring post-petition but prior to the closing date, those

4    things are not subject to rejection.  And here, while the

5    consigned stock agreement existed prior to that, the terms of

6    such were substantially modified to the point where the

7    contract was almost a completely new obligation.  I mean, you

8    take a look at the price terms, there was a drastic price cut

9    negotiated.  There were also payment terms which are not

10   normally granted, an extra fifteen days, an extension of

11   credit.  Plus, initially the contract could be cancelled within

12   sixty days, whereas post-closing, or post the negotiation of

13   this new agreement, it had to take place for a minimum duration

14   of a year plus sixty days notice, and then after that, there

15   would have to be a six-month period where basically the

16   inventory would be run down and you would continue purchasing.

17          And I mean, that's an entirely new obligation on

18   behalf of the debtor.  So if you're looking at bankruptcy law

19   technically and interpreting the contracts in that light, then

20   as a result of that, this agreement was not subject to

21   rejection.  Because it would be -- as the case Richmond Leasing

22   v. Capital Bank that is cited in the debtor's position

23   statement, it falls entirely outside the realm of Section 365;

24   because new obligations are added, and as this Court knows,

25   it's well established that an executory contract is either

28

1    assumed or rejected in toto.  You cannot give the new

2    privileges or the new rights to a creditor or to one party of

3    the contract as opposed to another.

4           Atwood's counsel makes the argument that even post-

5    petition contracts can be rejected.  First, Your Honor, that's

6    not what Section 365 says.  And the case that they cite to,

7    Trans World Airlines, it's an entirely different type of

8    contract.  It's a Section 1110 agreement that is in the context

9    of, you know, transportation leases.  A post-petition contract

10    can certainly be breached, however, under the clear terms of

11    the Asset Purchase Agreement, it was not one that could be --

12    that remained subject to rejection in the Chapter 11 case.

13    Likewise, it was not subject to rejection in the Chapter 11

14    case because it had already been assigned based on the parties'

15    understanding which is reflected in paragraph 36 of the sale

16    order that was entered by this Court.

17           THE COURT:  Thank you.

18           MR. GOLDSTEIN:  Thank you.

19           THE COURT:  Does the committee wish to be heard?  You

20    did file a joinder, so I asked.

21           MR. MANNAL:  Yes, Your Honor.  We don't wish to be

22    heard on this issue other than to support the debtors in their

23    position.

24           THE COURT:  All right.  Thank you.  Briefly, Mr.

25    Huston.

29

1          MR. HUSTON:  Extremely briefly, Your Honor.  Joseph

2    Huston, again, on behalf of Allied.  Just to go back to what

3    Mr. Hale said in talking about the dichotomy between the world

4    of bankruptcy and the real world of contract drafting.  I would

5    say that he had a pretty good argument there, were it not for

6    the fact that the language here talks about:  "Everything

7    required to be cured under the bankruptcy code, such that the

8    assumed contracts and assumed leases may be assumed by sellers

9    and assigned to purchaser in accordance with the provisions of

10   Section 365 of the bankruptcy code".  And it talks about the

11   contracts continuing to be subject to rejection in the Chapter

12   11 cases.  So this is not a provision that suffers from any

13   lack of vision to the specific language of the bankruptcy code.

14          THE COURT:  Thank you.  All right.  I'm going to

15   write on this.  So you can expect a decision in short order.

16   Mr. Remming, who's sitting to my right, has committed to

17   putting something together quickly.  So I expect that you'll

18   have something before the scheduled confirmation hearing.

19   Thank you all.

20          MR. SPEAKER:  Thank you.

21          MR. HIGGINS:  Your Honor, that brings us to item

22   number 12 which was the Atwood working capital adjustment

23   settlement.  I understand that that order was signed and hit

24   the docket just before the hearing.  That would then allow us

25   to turn to item number 13, which is Mr. Korth's Pro Se motion

30

1    for administrative expenses.  And I would yield the podium to

2    Mr. Korth.

3            THE COURT:  Very well.

4            MR. KORTH:  Good morning.

5            THE COURT:  Good morning.

6            MR. KORTH:  I'd like to deal with both motions, if

7    possible at the same time.  Is that realistic or?

8            THE COURT:  That's fine, sure.

9            MR. KORTH:  I filed two motions, one is to extend the

10   confirmation of the revised plan and also extend the date for

11   objections; and simultaneously I filed for our expenses.  And

12   they're both related.  The reason we're asking for our

13   expenses, basically is we've brought up at least five major

14   issues that not one of the objections, at least the way I read

15   them, really addressed.

16           THE COURT:  Actually, are you talking about the

17   request for administrative expenses status?

18           MR. KORTH:  Yes.

19           THE COURT:  All of the objections addressed it,

20   pointing correctly to the applicable standards, and one of them

21   pointed to my relatively recent decision at Summit Metals,

22   which was pretty detailed and covered many of the sections,

23   some of which might arguably apply to your situation.  And I

24   don't know whether you had a chance to consult those

25   authorities, but --

31

1          MR. KORTH:  No, I didn't, Judge.

2          THE COURT:  -- but I will tell you, the objectors are

3     right.  As a matter of procedure --

4          MR. KORTH:  Um-hum.

5          THE COURT:  -- a Court normally would not make a

6     determination that you're asking to make until the end of the

7     case, or at least until the conclusion of the applicant's

8     involvement, and at such point at which the applicant can say

9     I've made my substantial contribution to the case and here's

10    why.  So I tend to agree that the request is premature.  It's

11    not to say that you couldn't make it at some point, but I'm

12    unaware -- let's put it this way, I've never done it, and I'm

13    unaware of any other court that's approved, in advance, a

14    request for the things that you're asking for here.  And I see

15    nothing in your motion which would tell me that even if I had

16    the authority to do that, and I'm very doubtful of it, why I

17    would do it here.

18         MR. KORTH:  Well, all around me are people being paid

19    by this debtor.

20         THE COURT:  I'm sure that's a fact of which the

21    debtor is painfully aware.

22         MR. KORTH:  I understand that and I'm not asking for

23    very much compared to what they've already been paid, quite

24    honestly.  And all of them are making, I guess, substantial

25    contributions today.  I don't exactly know why, from a legal

32

1    theory, that they're able to stand in here today, know they're

2    going to be paid, and I'm standing in here today on my own

3    nickel.

4          THE COURT:  Well, there actually, that's a really

5    simple -- there's a really simple answer to that very pertinent

6    question.  And the short answer is, they're employed as estate

7    professionals under specific provisions of the bankruptcy code

8    which provide exactly that.  You fall into a different

9    category, and as you gleaned from the objections that have been

10   made --

11         MR. KORTH:  Right.

12         THE COURT:  -- you're treated very differently in

13   that respect.  And there's a primary reason for that.  And the

14   primary reason is that one of the functions that the Bankruptcy

15   Court serves is as gatekeeper of estate resources.  And

16   Congress decided when it passed that section, that as part of

17   its gatekeeping function, certain types of entities or persons

18   who weren't employed as estate professionals or committee

19   professionals, could apply for compensation if they made a

20   substantial contribution.  But they made the bar much higher,

21   and the case law in this circuit pretty much makes that clear

22   that the bar is indeed much higher than that which the other

23   professionals must meet in order to be entitled to

24   compensation.  You may disagree with that, but that's the

25   scheme that Congress created.

33

1          MR. KORTH:  Well, I think the bottom line really is,

2    do you feel like you need a qualified independent third party

3    here to evaluate the things I brought up?  If you do, the only

4    way I can provide it, quite honestly, is to know that the

5    professionals I hire and the depositions I take are going to be

6    paid for.  If they're not -- if you don't need it, and I

7    haven't shown enough that you do need it, then obviously you

8    can turn down my motions, or at least the expense motion.  I'm

9    going to tell you that there's going to be an objection and

10   it's going to be fairly extensive.  And I guess, the real crux

11   of the matter is, the objection's going to just point to a

12   whole bunch of holes rather than have any real explanation of

13   filling those holes.

14          THE COURT:  Well, and --

15          MR. KORTH:  And I --

16          THE COURT:  -- there are litigation strategies which

17   involve doing exactly that, rather than, for whatever reason,

18   whether it's lack of resources or other reasons, bringing in

19   your own bevy of experts to challenge that which others are

20   proposing.  And you're perfectly free to approach it that way.

21   But the Court wouldn't normally assist a party in accomplishing

22   that end.  Typically the way the courts work is the parties

23   raise issues; they bring to the Court what they think is

24   pertinent; and ultimately the burden rests on the debtor or any

25   proponent of a plan to demonstrate that it's met the

34

1    confirmation criteria which are set forth in the bankruptcy

2    code.  And it may be through poking holes, even if you don't

3    fill them --

4              MR. KORTH:  Right.

5              THE COURT:  -- that, you know, I might be convinced

6    that the burden hasn't been met.  But I may be convinced that

7    the burden's met, and I won't know until I actually hear the

8    evidence --

9              MR. KORTH:  Oh, I understand that.

10             THE COURT:  -- and consider all the objections.

11             MR. KORTH:  That goes to the time.  We have eleven

12   days basically according to the schedule right now to file our

13   objections.  We have received a voluminous amount of

14   information since Saturday.  And basically I got to the office

15   on Monday and I had seven or eight hundred pages more of

16   balance sheets and income statements and whatever.

17             THE COURT:  Yeah.  In fact, the debtor says in its

18   response to your request for more time and more information

19   that by the time of today's hearing it will have delivered to

20   you everything to which you were entitled.  Do you agree with

21   that or do you think you should have some more?

22             MR. KORTH:  I want to stay open on that, quite

23   honestly, because you know, looking at 700 pages of balance

24   sheets and income statements, I didn't have time, quite

25   honestly.

35

1          THE COURT:  Well, let me put it this way to you, for

2    today's purpose, I take it then, that there's nothing else that

3    you're asking me to order that the debtor turn over to you, but

4    that's without prejudice for you to come back at some time and

5    say --

6          MR. KORTH:  Well, I would like to ask for one thing.

7          THE COURT:  -- and say I didn't get everything I

8    should have gotten.

9          MR. KORTH:  And unfortunately I didn't finish my

10   conversation with the attorneys for the debtor yesterday, but

11   we would certainly like the analysis that I was told by a phone

12   message that was done by AlixPartners, behind the liquidation

13   analysis on the disclosure statement.  We'd like a copy of

14   AlixPartners evaluation.  And we haven't received that.  We

15   hadn't asked for it until just today.  There is several items

16   that I could ask for regarding just the numbers themselves and

17   how inter-company receivables go back and forth and all types

18   of basic, you know, how they handled these books.  And I don't

19   know exactly how you would like me to go ahead and ask for

20   that.  I don't know how much time I've got.  Eleven days --

21         THE COURT:  Well --

22         MR. KORTH:  -- is, you know, very short.

23         THE COURT:  Well, as you've discovered, requests are

24   made by written motion.  That's how.

25         MR. KORTH:  And I've been accused of filing too many.

36

1        THE COURT:  We don't keep score on that one --

2        MR. KORTH:  Okay.

3        THE COURT:  -- Mr. Korth, one way or the other.  At

4    least the Court doesn't.  Look, the debtor, in its response to

5    your request for information and for more time, was very

6    detailed, taking point by point that which you'd asked for and

7    that which had been delivered.  The point of today's exercise

8    was a consequence, really, of an earlier request for things.

9    And the purpose today is not to have you add to the menu, but

10   to determine whether the debtor has turned over that which I've

11   ordered be turned over.  If there are new or additional

12   requests, you'll have to make them by motion.  But you're

13   right, time is short.

14        I don't see any reason, frankly, to postpone

15   confirmation at this point.  As the replies indicate, the

16   committee is doing its job, and you can always argue that it's

17   not.  I've made a determination that it is.  The process has

18   moved forward.  You've been, according to the papers,

19   integrally involved with the debtor for a year in --

20        MR. KORTH:  More than a year.  Quite --

21        THE COURT:  -- more than a year.  And so the point

22   that's made by the debtor in response to that other motion for

23   information is, you know, you've gotten lots of things over the

24   course of time, in fact, more than any other creditor got.  I

25   don't know whether that's true, but that's what the debtor

37

1   says.  And in any event, whatever the volume is, it's perfectly

2   sufficient in order for your purposes, which would be to draft

3   and file an objection to confirmation.

4         MR. KORTH:  The 45,000 pages, Judge, we went over

5   that in the first communications with the debtor, and most of

6   that 45,000 pages were public documents, all of which I already

7   had.  There was most -- most of that information was not

8   aimed -- I had sixteen items on the original 2004 motion.

9   Ninety percent of it was not part of that 45,000 pages.  We

10  tried to bring these objections forth in the fall.  The

11  attorneys that were -- that I was really a peripheral part of,

12  Tom Kurack's (ph.) effort, I was just there in name only.  I

13  really wasn't part -- I tried to get those attorneys to bring

14  that forward; they would not do it.  I'm not going to go into

15  why.  I then waited, basically, for -- to see if some sense

16  would come out of this.  I really felt like Pacific Corp. was

17  pretty much to be in the driver's seat all through the fall.

18  And we only were quite lucky, quite honestly, that they did get

19  their financing.

20        And I thought perhaps, by the time we got to here

21  that -- or at least in March when they filed the revised plan,

22  there might be some new thinking.  There was not any new

23  thinking.  The thinking actually was the same or worse, and in

24  my view, that's why I stepped forward then.  I watched it.  I

25  watched it very closely.  I was involved with it.  I attempted

38

1    to make objections.  They didn't -- they didn't come forth.

2    And I waited for a revised plan.  The revised plan came out and

3    it was basically worse than the plan I saw before.  And that's

4    why we stepped forward then.  And we'll continue to step

5    forward now.  With that, I guess, I rest.

6             THE COURT:  All right.  Thank you.  Does anyone else

7    care to be heard in connection with either of Mr. Korth's

8    motions?  I'll hear the debtor first.

9             MR. HIGGINS:  Your Honor, Roger Higgins for the

10   debtors.  I just wanted to assure the Court that the last of

11   the items set forth in our objection, which was a letter to Mr.

12   Korth regarding the intellectual properties, Mr. Korth was sent

13   and received yesterday by e-mail, a letter addressing that

14   issue.

15            THE COURT:  And what about the J. Alix analysis that

16   Mr. Korth mentioned this morning?

17            MR. HIGGINS:  Your Honor, that is, as you I think

18   pointed out, a new item.  And I would point Mr. Korth to the

19   liquidation analysis, that report, which is set forth as an

20   exhibit to the disclosure statement.  If Mr. Korth wishes to

21   take further depositions or request further production of

22   documents, he'll have to file a motion to do so.

23            THE COURT:  Well, let me ask this.  Despite the

24   tensions that might exist between the debtor and Mr. Korth, is

25   there a reason why the debtor would be reluctant to turn over

39

1    that which he's requested, that one item, on a voluntary basis?

2        MR. HIGGINS:  Your Honor, the report that they --

3    that Mr. Korth is referring to is the liquidation analysis.

4    Whether there is an expert report that might ultimately be

5    produced, to the extent to which we do so, we would be happy,

6    as with the valuation, if we intend to go forward with that, we

7    would furnish that document to Mr. Korth.

8        THE COURT:  Okay.  When is the confirmation objection

9    deadline?

10       MR. HIGGINS:  The confirmation is May 13th, Your

11   Honor.  May 2nd, which is a week from Friday, if I'm not

12   mistaken, is the objection deadline.  I think, Mr. Korth has

13   adequate time to file his objection prior to then, and we can

14   make documents available as the requests are made.

15       THE COURT:  Well, it's, I guess, technically

16   impossible to tell.  Do you anticipate other objections to

17   confirmation?

18       MR. HIGGINS:  Your Honor, we do not.  Let's put it

19   this way.  Technically, you don't know.  We don't know of any

20   other parties who would be likely to object.

21       THE COURT:  All right.  What I'd ask that each of you

22   do, meaning the debtor and Mr. Korth, assuming Mr. Korth, that

23   you do file a written objection to confirmation of a plan.

24   Deadline's May 2nd.  By May 9th, I would like you each to

25   exchange a list of witnesses either of you intends to call, or

40

1    if the debtor intends to offer its evidence by declaration or

2    proffer, you need to identify that in the list, and to have

3    those witnesses available for cross examination.  And to, with

4    that, provide a list of any documentary evidence you intend to

5    introduce.  And that applies to each of you.  And that the

6    exhibits or proposed documents be exchanged at that time as

7    well, so each party has in hand any documentary evidence that

8    either intends to submit to the Court in connection with

9    confirmation.

10         MR. HIGGINS:  Your Honor, we will be happy to comply

11   with that.

12         THE COURT:  Okay.

13         MR. HIGGINS:  And we will work with Mr. Korth to put

14   a form of order together reflecting that and submit that to

15   chambers under a certificate of counsel.

16         THE COURT:  All right.  Thank you.  Does anyone else

17   care to be heard in connection with either of these motions?

18   All right.  We'll get to you.

19         MR. MANNAL:  Your Honor, Doug Mannal on behalf of the

20   creditors' committee.  As we had indicated in our papers, Your

21   Honor, in an effort to resolve Mr. Korth's issues regarding the

22   proposed plan, the committee has agreed to share with Mr. Korth

23   its analysis regarding the debtor's value.  However, because

24   that analysis contains confidential information, and because

25   it's being provided in the context of a settlement, Mr. Korth

41

1   has agreed to enter into a confidentiality agreement.  I'd like

2   to hand that confidentiality agreement up to be approved by

3   this Court?

4         THE COURT:  All right.  Thank you.  Has the agreement

5   been e-filed?

6         MR. MANNAL:  No, Your Honor.  The agreement was just

7   signed before today's hearing, and we can send it to chambers.

8   Your Honor, Mr. Korth has reviewed the confidentiality

9   agreement.  Mr. Korth is able to comprehend the meaning of the

10  confidentiality agreement.  Mr. Korth has stated that the does

11  not require a lawyer to review the confidentiality agreement.

12  Mr. Korth agrees by signing the confidentiality agreement, that

13  he will not disclose the analysis to any party other than

14  parties to the agreement, including the debtors.  And Mr. Korth

15  understands the analysis may not be presented as evidence in

16  any proceeding in these Chapter 11 cases, consistent with the

17  Federal Rule of Evidence 408.

18        THE COURT:  All right.  Mr. Korth, will you just

19  stand and confirm for the record that you agree with what

20  committee counsel has just indicated?

21        MR. KORTH:  I agree and understand what he said.

22        THE COURT:  All right.  Thank you.  With that then, I

23  will sign the order that's been submitted.  All right.  Does

24  anyone else care to be heard in connection with either of these

25  two motions?

42

1          MR. LEZANIC:  Hi, Your Honor.  Mark Lezanic.  I own

2     the nine percent bonds of '09.  And I'm just -- I'm here.  My

3     mother owns them as well, and she's sitting -- she drove five

4     hours today to be here at this hearing.  And my role here is to

5     support what Mr. Korth wants, is an independent valuation of

6     Dura.  And you know, on Wall Street, for every winner there's a

7     loser.  And if you look at the -- at what the company was

8     valued before they became insolvent, it was north of 1.5

9     billion dollars.  And you look at the units, you look at --

10    they have eighty, ninety independent units all over the world.

11    It looks like those units overseas are doing very well.  And

12    you look at the value of the dollar since they became

13    insolvent, and we all know what the value of the dollar is.

14    And I just have a hard time believing this company's not

15    worth -- if you -- the breakup value of this company, a lot

16    more than what is actually in the plan here, than what the

17    current valuation is.

18          So you know, my thing is, you know, you look at Wall

19    Street, you look at hedge funds, you look at Pacific Corp., you

20    look at Lazard, who are involved here, and kind of

21    hypothetically, let's say, they reemerge with the current

22    valuation, and they break the company up, and they sell it for

23    2.5 billion dollars, which could happen if the company is truly

24    worth that much.  And I don't know.  But we want an independent

25    valuation to make sure we know what it is before you approve

43

1    this.  So --

2              THE COURT:  And you're free to obtain one, of course.

3              MR. LEZANIC:  -- right.  Right.  And the problem is

4    though, the problem is this, is that it costs so much money.

5    And for, you know, if we had -- if we had an attorney here,

6    they would throw information on top of information that we

7    would have to respond to, it'd be millions and millions of

8    dollars in legal fees.  We can't afford to do that.  So this

9    is -- I know it's a little different than what you see, it's

10   probably a lot different, but I mean, if you look at -- if they

11   do -- if they do sell for 2.5 billion dollars, and you look --

12   and people say, okay, why does this hedge fund manager make two

13   hundred, three hundred million dollars in a given year, well

14   there's got to be value somewhere for them to make a percentage

15   of what they sell things for.  I would like --

16             THE COURT:  Or --

17             MR. LEZANIC:  -- I would like to see --

18             THE COURT:  -- or a perceived value, anyway.

19             MR. LEZANIC:  -- exactly, exactly.  And you know, my

20   mother, for example, she's a retiree.  She bought the bonds at

21   close to par.  When we looked at the value of the company we

22   said man, this is a really good company, they sell not only to

23   GM, but they sell to most all the auto makers across the world.

24   A lot of their -- a lot of their units are overseas.  We knew

25   that -- we assumed the value of the dollar -- we thought it was

44

1    a great investment for her for retirement.  So she didn't --

2    you know, she didn't buy it for pennies on the dollar, you

3    know, she bought it at -- and some of her friends did, at very

4    close to par.

5            So like I said, on Wall Street and everything,

6    there's winners and losers.  If this company's truly not valued

7    correctly, then -- or if it's undervalued, then who's going to

8    lose?  Because somebody -- the management, the hedge funds that

9    are involved, they're going to make a ton of money, and she's

10   going to end up with how much?  Zero, right?  I mean, she owns

11   nine percent in zero, right?  What I would like to see -- and

12   if you do a proper valuation and things are broken up before,

13   what happens?  What happens?  They're still going to make

14   money.  The hedge funds are still going to make money.  The

15   creditors are going get paid something.  So now everybody makes

16   a little money.  All I'm saying is, if you could do an

17   independent valuation, support what he has to say, and it costs

18   money to do it.  And I don't know how the whole system works,

19   but he needs -- he needs some financial support to be able to

20   do a valuation on how many -- how many units does this company

21   have?  Eighty?  Ninety?

22           THE COURT:  As I explained to Mr. Korth, the way the

23   system usually works is that individual litigants bear their

24   own expenses.  Now, as he pointed out, it's correct, certain of

25   the professionals are being compensated by the estate.  But

45

1    that's a function of the bankruptcy overlay.  But with respect

2    to litigation generally, the U.S. rule is each litigant bears

3    its own costs.  I did not interpret Mr. Korth's motion to be a

4    request that the Court appoint an expert under the rules.  And

5    I won't -- and even if I were to consider it that way, I'm not

6    inclined to grant such a request.  But I've heard you --

7                MR. LEZANIC:  Thank you.

8                THE COURT:  -- and I understand your position, and I

9    understand the position of your mother as an investor, and

10    many, many others.  And it's not the first time I've heard that

11    story, and not the last, and it doesn't get any happier.

12                MR. LEZANIC:  Right.  Right.

13                THE COURT:  Thank you.

14                MR. LEZANIC:  And you know, it's just -- it's hard to

15    fight it as an individual.  The way the system works, it's hard

16    to hire counsel and fight this because it's just too expensive

17    to do.

18                THE COURT:  But here you are.

19                MR. LEZANIC:  But yeah, but I'm doing it on my own

20    nickel.  I'm not -- I'm not hiring -- you know what I'm saying?

21    So it's hard to -- that's the fallacy in the whole thing, is

22    that -- is that if you don't hire somebody to make sure that

23    valuation is correct, then at the end of the day, when this

24    thing breaks up, if you do approve this at confirmation and

25    they sell for 2.5 billion, well that's money out of -- out of a

46

1    retiree's pocket.

2          THE COURT:  Then I would say get on the horn to your

3    elected representatives and tell them the bankruptcy code needs

4    to be changed.

5          MR. LEZANIC:  Yeah.  Thank you.

6          THE COURT:  All right.  Thank you, sir.  All right.

7    Anyone who's not yet been heard care to be heard on either of

8    those two motions?  All right.  Well, for the reasons I've

9    already stated, I intend to deny both of them, and ask debtor's

10   counsel to take the lead in preparing an order subject to the

11   committee's agreement, denying the motions for the reasons I've

12   stated on the record here today.

13         MR. HIGGINS:  Your Honor, we will be happy to prepare

14   such an order and circulate it to the parties.

15         THE COURT:  All right.

16         MR. HIGGINS:  There are no other items on the agenda

17   for today.

18         THE COURT:  All right.  Thank you, then.  That

19   concludes this hearing.  Court will stand in recess.

20         (Proceedings concluded at: 10:56 AM)

21

22

23

24

25

47

1

2                         I N D E X

3

4                            RULINGS

5                         Page      Line

6   Both of J.W. Korth's Pro   46       9

7   Se Motions Denied

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

48

1

2                    C E R T I F I C A T I O N

3

4      I Penina Wolicki, court approved transcriber, certify that the

5      foregoing is a correct transcript from the official electronic

6      sound recording of the proceedings in the above-entitled

7      matter.

8      **Penina Wolicki**  Digitally signed by Penina Wolicki
                            DN: cn=Penina Wolicki, c=US
                            Reason: I am the author of this document
9      _____  ___April 29, 2008___
                            Date: 2008.06.02 16:17:28 -04'00'

10     Signature of Transcriber              Date

11

12     ___PENINA WOLICKI_____

13     typed or printed name

14

15

16

17

18

19

20

21

22

23

24

25

## Exhibit E

May 12, 2008, Hearing Transcript

1

1

2   UNITED STATES BANKRUPTCY COURT

3   FOR THE DISTRICT OF DELAWARE

4   Case No. 06-11202

5   - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   DURA AUTOMOTIVE SYSTEMS, INC.,

9

10          Debtor.

11

12   - - - - - - - - - - - - - - - - - - - -x

13

14               U.S. Bankruptcy Court

15               824 North Market Street

16               Wilmington, Delaware

17

18               May 12, 2008

19               11:48 a.m.

20

21   B E F O R E:

22   HON. KEVIN J. CAREY

23   U.S. BANKRUPTCY JUDGE

24

25   TELEPHONIC HEARING

2

```
 1    A P P E A R A N C E S :

 2    (TELEPHONICALLY)

 3    KIRKLAND & ELLIS, LLP

 4         Attorneys for Debtor

 5         200 East Randolph Drive

 6         Chicago, Illinois 60601

 7

 8    BY:   ROGER HIGGINS, ESQ.

 9          MICHAEL SLADE, ESQ.

10          MARC KIESELSTEIN, ESQ.

11          RYAN BENNETT, ESQ.

12          JOY LYU MONAHAN, ESQ.

13

14

15    DEWEY & LEBOEUF, LLP

16         Attorneys for GE Capital Corp.

17         1301 Avenue of the Americas

18         New York, New York 10019

19

20    BY:   CAREY D. SCHREIBER, ESQ.

21

22

23    JAMES E. KORTH

24    Bond Holder

25
```

3

1    TOGUT SEGAL & SEGAL, ESQ.

2         Attorneys for Debtor

3         One Penn Plaza

4         New York, New York 10119

5

6    BY:  NEAL BERGER, ESQ.

7

8

9    BUCHANAN INGERSOLL & ROONEY

10        Attorneys for Abelco Finance

11        1000 West Street

12        Wilmington, Delaware 19801

13

14   BY:  TERESA CURRIER, ESQ.

15

16

17   HONIGMAN MILLER SCHWARTZ & COHN

18        Attorneys for GM Corporation

19        2290 First National Building

20        Detroit, Michigan 48226

21

22   BY:  SETH DRUCKER, ESQ.

23

24

25

4

1    U.S. DEPARTMENT OF JUSTICE

2    OFFICE OF THE U.S. TRUSTEE

3         844 King Street

4         Wilmington, Delaware 19801

5

6    BY:   WILLIAM K. HARRINGTON, ESQ.

7

8

9    YOUNG CONAWAY STARGATT & TAYLOR

10        Attorneys for Official Committee of

11         Unsecured Creditors

12        1000 West Street

13        Wilmington, Delaware 19801

14

15   BY:   EDMON MORTON, ESQ.

16        BLAKE CLEARY, ESQ.

17

18

19   KELLEY DRYE & WARREN, LLP

20        Attorneys for HSBC Bank

21        101 Park Avenue

22        New York, New York 10178

23

24   BY:   JENNIFER CHRISTIAN, ESQ.

25        HOWARD STEEL, ESQ.

5

1    LANDIS ROTH & COBB, LLP

2          Attorneys for JPMorgan Chase

3          919 Market Street

4          Wilmington, Delaware 19899

5

6    BY:    RICHARD S. COBB, ESQ.

7          REBECCA BUTCHER, ESQ.

8

9

10   MILLER CANFIELD PADDOCK & STONE, PLC

11         Attorneys for Second Lien Committee

12         150 West Jefferson

13         Detroit, Michigan 48226

14

15   BY:    STEPHEN S. LAPLANTE, ESQ.

16

17

18   POTTER ANDERSON & CORROON, LLP

19         Attorneys for Second Lien Committee

20         1313 North Market Street

21         Wilmington, Delaware 198091

22

23   BY:    TERRI BROWN-EDWARDS, ESQ.

24

25

6

1    PHILLIPS GOLDMAN & SPENCE, P.A.

2         Attorneys for Jessica Helfenbein

3         1200 North Broom Street

4         Wilmington, Delaware 19806

5

6    BY:   LISA MCLAUGHLIN, ESQ.

7

8

9    KRAMER LEVIN NAFTALIS & FRANKEL, LLP

10         Attorneys for Official Committee of

11          Unsecured Creditors

12         1177 Avenue of the Americas

13         New York, New York 10036

14

15   BY:   DOUGLAS H. MANNAL, ESQ.

16

17

18   BRACEWELL & GIULIANI, LLP

19         Attorneys for Second Lien Committee

20         225 Asylum Street

21         Hartford, Connecticut 06103

22

23   BY:   KURT MAYR, ESQ.

24

25

```
                                                              7
 1    RICHARDS LAYTON & FINGER, P.A.

 2          Attorneys for Debtor

 3          920 North King Street

 4          Wilmington, Delaware 19801

 5

 6    BY:   JASON M. MADRON, ESQ.

 7          DANIEL DEFRANCESCHI, ESQ.

 8

 9

10    CHANIN CAPITAL PARTNERS

11          Financial Advisor

12          55 East 52nd Street

13          New York, New York 10055

14

15    BY:   DAVID MACGREEVEY, CPA, CIRA

16

17

18    MCCLAIN & PATCHIN, P.C.

19          Attorneys for Axis Specialty Insurance

20          711 Louisiana

21          Houston, Texas 77002

22

23    BY:   TONY DRAPER, ESQ.

24

25
```

8

1    SCHULTE ROTH & ZABEL

2         Attorneys for Abelco Finance

3         919 Third Avenue

4         New York, New York 10022

5

6    BY:   LAWRENCE GELBER, ESQ.

7

8

9    RYMER MOORE JACKSON & ECHOLS

10        Attorneys for Admiral Insurance Company

11        2801 Post Oak Boulevard

12        Houston, Texas 77056

13

14   BY:   DEBRA MAYFIELD, ESQ.

15

16

17   WILLKIE FARR & GALLAGHER, LLP

18        Attorneys for Bank of New York Trust

19        787 Seventh Avenue

20        New York, New York 10019

21

22

23   BY:   TONNY HO, ESQ.

24

25

9

1    MOSES & SINGER

2            Attorneys for Johnson Electric

3            405 Lexington Avenue

4            New York, New York 10174

5

6    BY:    STEPHEN N. WEISS, ESQ.

7            MARK N. PARRY, ESQ.

8

9

10    FOX ROTHSCHILD, LLP

11            Attorneys for Magna Donnelly Corp.

12            919 North Market Street

13            Wilmington, Delaware 19801

14

15    BY:    DANIEL ASTIN, ESQ.

16            ANTHONY M. SACCULLO, ESQ.

17

18

19    MILLER BUCKFIRE & CO., LLC

20            250 Park Avenue

21            New York, New York 10177

22

23    BY:    DURC SAVINI

24

25

10

1   EDWARDS ANGELL PALMER DODGE, LLP

2          Attorneys for GECC

3          919 North Market Street

4          Wilmington, Delaware 19801

5

6   BY:   WILLIAM E. CHIPMAN, ESQ.

7

8

9   DURA AUTOMOTIVE SYSTEMS, INC.

10          Debtor

11          2791 Research Drive

12          Rochester Hills, Michigan 48309

13

14   BY:   THERESA SKOTAK

15          LAWRENCE DENTON

16

17

18   JPMORGAN CHASE & CO.

19          Creditor

20   BY:   ALEX SHAYEVSKY

21

22

23   DOW JONES NEWS WIRES

24   BY:   PEG BRICKLEY

25

11

1                    P R O C E E D I N G S

2          THE CLERK:  All rise.

3          THE COURT:  Good morning, this is Judge Carey.  We're

4     on the record in Dura Automotive, case number 06-11202.  This

5     conference call was precipitated as a result of a request by

6     the debtor to, I guess, give a preview, at least, in some

7     limited respect in connection with tomorrow's scheduled

8     confirmation hearing.

9          Apparently, there's been widespread interest in

10    joining this call.  In addition to that, two individuals showed

11    up in the courtroom.  So I decided to have this call on the

12    record, which I know was not the debtor's initial request.

13         That having been said, let me turn to debtor's

14    counsel who's requested this conference.

15         MR. HIGGINS:  Good morning, Your Honor.  Roger

16    Higgins for the debtors.  We're very happy to have this on the

17    record.  And we're very happy to report, Your Honor, that we

18    have very good news in that we are ready in all respects to go

19    forward with tomorrow's hearing.

20         I wanted to report, very briefly, that after a very

21    difficult process in which the company and Miller Buckfire &

22    Co., LLC did absolutely superb work putting together an exit

23    financing package that will allow the company to confirm this

24    plan, move forward with the plan confirmation, and then be able

25    to exit soon thereafter as possible.

12

1          Your Honor, we will be filing the remaining documents

2    with respect to the plan supplment this afternoon.  We have

3    been working very diligently with the various creditor

4    constituencies and parties-in-interest in resovling a couple of

5    remainign issues.  And I'm happy to report that those are all

6    resolved.

7          I did want to bring to the Corut's attention an item

8    regarding the selection of the new board.  We are filing our

9    Section 1129(a)(5) disclosure as part of the plan supplement.

10   That will show that the board will consist of seven members.

11   The (a)(5) disclosure identifies three of those members, one of

12   whom is the company's chief executive officer.  The two others

13   are two members that have already been identfiied by the

14   creditor constitutencies.

15         The creditor constituencies will be working over the

16   next few days to identify the remaining candidates from a list

17   of approximately forty or so candidates that have been

18   identified by Korn/Ferry, the international search firm that

19   the debtors have retained to identify potential board

20   candidates.  I'm happy to report that all the creditor

21   constituencies representatives from both the senior notes, the

22   second lien, and certain crossover holders will be working

23   collaboratively to identify those additional four members.  And

24   we will propose to file our disclosure as soon as they are

25   identified.

13

1          And so what we would ask the Court to do is to be

2     able to proceed tomorrow, and if the Court sees fit, to enter

3     the confirmation order to do so.  And that we would then,

4     without need for further order of the Court, file our revised

5     1129(a)(5) disclosure prior to going effective.

6          THE COURT:  Mr. Higgins, what does the debtor have

7     planned in the way of evidentiary presentation both in the way

8     of witnesses and documents?

9          MR. HIGGINS:  Your Honor, I will yield to my partner,

10    Mr. Mike Slade, who is going to be handling that portion of the

11    hearing.

12         MR. SLADE:  Your Honor, we have four witnesses that

13    we may call tomorrow.  They're all here and they're prepared to

14    testify on direct and be cross examined.  We've also submitted

15    declarations from all four of the witnesses, those were

16    exchanged last week per Your Honor's earlier order.  So we're

17    happy to proceed however Your Honor wants.  We can call them

18    for direct testimony and have them be cross examined.  We could

19    just offer their declarations as their direct testimony and

20    have them be cross examined.  Either way is fine with the

21    debtors.

22         THE COURT:  What would you estimate, if called as

23    live witnesses, would be the time required for your direct

24    examination of the witnesses, together?

25         MR. SLADE:  I think what I would suggest, if we went

14

1    that way, Your Honor, is that we offer their declarations and

2    then provide supplemental brief direct testimony to kind of hit

3    the highlights and directly respond to the objections.  I think

4    that would be very brief.  I think for the four witnesses I

5    wouldn't anticipate more than -- well, certainly, not more than

6    ninety minutes on direct.

7              THE COURT:  All right.

8              MR. KORTH:  Judge, this is James Korth.

9              THE COURT:  Good morning.

10             MR. KORTH:  I have not had a chance to look at 4,000

11   pieces of paper of that were delivered here on Friday.

12             THE COURT:  Mr. Korth --

13             MR. KORTH:  I have not had a chance to read anything

14   regarding what's going to happen tomorrow and any response to

15   our objections.  And I really need this thing continued.

16             THE COURT:  Mr. Korth, it's the Court's intention to

17   deny your motion for a continuance.  I will elaborate on those

18   reasons at greater length at tomorrow's hearing at the outset.

19   I'm also --

20             MR. KORTH:  I won't be at the hearing, Judge.  I'm

21   sorry to interrupt you --

22             THE COURT:  Well, Mr. Korth, that's the time for

23   hearing, if you wish to participate in support of your

24   objection I suggest that you attend.  Secondly, the debtor is

25   correct, what you styled as a motion for summary judgment

15

1    should be considered as part of your objection to confirmation.

2    Third, with respect to the debtor's motion to shorten time with

3    respect to file certain exhibits under seal, I have signed the

4    order fixing the hearing for tomorrow at 10 o'clock.  However,

5    I modified the proposed order to provide that parties may raise

6    objections, if any, at the time of hearing, given the

7    shortening of the notice.

8            I also wanted to, at least, offer a preliminary view.

9    It is not the Court's intention to close the courtroom for any

10   part of the evidentiary presentations.  So while some exhibits

11   may very well be taken in under seal, the debtor will have to

12   design its evidentiary presentation accordingly.

13           MR. SLADE:  That's our plan, Your Honor.

14           THE COURT:  All right.  Is there anything further for

15   today?

16           MR. SCHREIBER:  Yes, Your Honor.  This is Carey

17   Schreiber from Winston & Strawn on behalf of GE Capital

18   Corporation, administrative agent, the revolving DIP lenders.

19   And I just wanted to note for the record, that while we

20   certainly understand and appreciate Mr. Higgins' comments

21   earlier on in the record, and don't intend in any way to

22   disagree as a matter of substance, I did just want to note that

23   we received proposed commitment letters from the debtors late

24   Thursday evening, early Friday morning.  We had not yet

25   received prior drafts of those commitment letters with respect

16

1    to the exit financing.  And, accordingly, we have not yet

2    determined whether those commitment letters satisfy the

3    revolving DIP agreement requirements benchmark set forth in

4    Section 5.16(c).  We are working closely with our client in

5    view of the timing, obviously.  We understand the timing and

6    the urgency and are working closely with our client to review

7    all of those documents today and try and -- obviously, we'll be

8    reach out to the debtors to seek any clarification that we need

9    on those as well.

10            THE COURT:  All right.  Anything further?

11            MR. HIGGINS:  Your Honor, this is Roger Higgins for

12    the debtor.  We have nothing further for this morning.

13            THE COURT:  All right.  Mr. Korth, I'll just simply

14    close by advising you that while we frequently permit parties,

15    especially those located in other places of the country to

16    participate by telephone, I typically do not permit any

17    extensive argument by phone, that has to take place in person.

18    And the reason is technology makes it inconvenient and

19    inefficient to do so by telephone because of the delay that

20    exists on the telephone line.  But, secondly, especially given

21    the magnitude and breadth of your objection to confirmation, I

22    would require anyone, represented or not, to be present to

23    argue in support of that objection, if, in fact, you are

24    pressing it.  I also advise you that parties who do not appear

25    in support of their pleadings, I routinely, as a matter of

17

1  course, deny the relief requested for failure to prosecute.  I

2  expect that if somebody files a pleading in this Court they

3  will appear and argue or present evidence in support of it.

4  Or, at least, in opposition to the relief that's been

5  requested, and which is the subject of any such objection.  And

6  this is a practice I have followed ever since I've been on the

7  bench in whatever geographical location.

8          Anything further for today?

9          MR. KORTH:  Judge, it's Jim Korth, again.  How can I

10  possibly respond to everything that they've said when I've only

11  read it this morning?  I got 3,000/4,000 pieces of paper here

12  that I need to go through and analyze?

13          THE COURT:  Mr. Korth, I'm not going to respond to

14  you in today's telephone call.  If you wish to have a debate

15  about that you may do so at the time and place scheduled for

16  confirmation.

17          MR. KORTH:  I'll be there.

18          THE COURT:  All right.

19          MR. KORTH:  Bye.

20          THE COURT:  Anything further for today?

21          MR. HIGGINS:  No, Your Honor.

22          THE COURT:  Thank you.  That concludes this

23  conference call.  Court will stand adjourned.

24      (Proceedings concluded at 11:58 a.m.)

25

18

1

2                         C E R T I F I C A T I O N

3

4      I, Esther Accardi, court approved transcriber, certify that the

5      foregoing is a correct transcript from the official electronic

6      sound recording of the proceedings in the above-entitled

7      matter.

8      Esther Accardi  Digitally signed by Esther Accardi
                        DN: cn=Esther Accardi, c=US
                        Reason: I am the author of this document
9      _____  Date: 2008.05.20 14:04:28 -04'00'  __May 19, 2008_____

10     Signature of Transcriber              Date

11

12     _ESTHER ACCARDI_____

13     typed or printed name

14

15

16

17

18

19

20

21

22

23

24

25

## Exhibit F

May 13, 2008, Hearing Transcript

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                                    .    Chapter 11
                                          .
DURA AUTOMOTIVE SYSTEMS, INC., .    Case No. 06-11202(KJC)
et al.,                                   .    (Jointly Administered)
                                          .
            Debtors.                      .    May 13, 2008 (10:05 a.m.)
                                          .    (Wilmington)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

INDEX

DEBTORS' EVIDENCE

|                    | Direct | Cross | Redirect | Recross |
|--------------------|--------|-------|----------|---------|
| WITNESS:           |        |       |          |         |
| Lawrence Denton    | 17     |       |          |         |
| Anthony Flanagan   | 21     |       |          |         |
| Dirk Savini        | 32     |       |          |         |

```
1              THE CLERK: All rise.

2              THE COURT: Good morning, all.

3              MR. KIESELSTEIN: Good morning, Your Honor.  Marc

4     Kieselstein, Roger Higgins, and Michael Slade on behalf of

5     the debtors.  Your Honor, just a couple of brief remarks

6     before we launch into the agenda.  Your Honor, today's a

7     pivotal day in the history of Dura Automotive Systems and its

8     debtor and non-debtor affiliates.  We stand before the Court

9     with an almost entirely consensual plan of reorganization.

10    One that if confirmed and consummated will unleash the

11    potential and pent up energy of Dura for the benefit of all

12    of its constituents.  Your Honor, on day one of this case, I

13    noted that automotive cases don't get better with time, and

14    there's no doubt, Your Honor, that the passage of more time

15    than we would have liked has exacted a toll.  At the same

16    time, Your Honor, the debtor has used the time in Chapter 11

17    productively to overhaul its operational footprint and to

18    create a balance sheet which will situate it very well to

19    compete in this difficult industry for the long term.  And,

20    Your Honor, the work that's been done to reach today is a

21    tribute to a number of parties.  First and foremost, it's a

22    tribute to the company's employees from top to bottom.  Their

23    tireless efforts have sustained the debtors' business and its

24    reputation for quality throughout all the zigs and zags of

25    this process.  It's a tribute to the creditor constituencies
```

1    who have been tough but fair and stood with the company

2    throughout this process.  In particular, the Unsecured

3    Creditors Committee and the Second Lien Committee have been

4    skeptical but open-minded in dealing with the company and had

5    they afford to the type of difficult consensus the Chapter 11

6    was designed to foster -

7        THE COURT: Will whoever owns that PDA please step

8    forward and -

9        MR. KIESELSTEIN: That was me.

10       THE COURT:  - surrender it to our ECRO.  You'll be

11   able to retrieve it at the end of the day.

12       MR. KIESELSTEIN: Your Honor, again, the work of the

13   Creditors Committee and the Second Lien Committee has allowed

14   us to forge the type of difficult consensus a Chapter 11 was

15   designed to foster in the first instance, and we thank their

16   principals and their professionals.  Your Honor, it's also a

17   tribute to our customers who still viewed us as synonymous

18   with quality and value and reliability, and who have stood

19   with the company throughout this process.  Their patience is

20   running low, Your Honor, and some of them are sitting on the

21   fence, but they nonetheless stand ready in many cases to open

22   their order books wider once the cloud of Chapter 11 has been

23   dispelled.  And finally, Your Honor, whatever today's

24   outcome, we wanted to thank the Court and its staff who has

25   borne our many impositions with equanimity and unflagging

 1    attention, and we hope today is one of the last of those

 2    impositions, Your Honor.  Your Honor, in keeping with our

 3    regular practice throughout the case, it's time for

 4    substance, so I'll cede the podium to Mr. Higgins, Your

 5    Honor, and he'll take us through the agenda.

 6              THE COURT: Very well.

 7              MR. KIESELSTEIN: Thank you.

 8              THE COURT: Thank you.  Do you make him say that?

 9              MR. HIGGINS: Yes, Your Honor, it was - there was a

10    lot of arm twisting there.  But, good morning, Your Honor.

11    Roger Higgins for the debtors.  We basically have two items

12    on the agenda.  The first one is the debtors' application for

13    an order expanding the scope of employment of Assessment

14    Technologies, Ltd., Your Honor.  A certificate of counsel was

15    filed shortly before the hearing started, and it should be

16    wending its way to chambers.

17              THE COURT: Actually, I did receive it moments

18    before taking the bench this morning.  I have reviewed it.

19    Does anyone else care to be heard in connection with this

20    matter?  I hear no response.  I have no questions.  I've

21    signed the order.

22              MR. HIGGINS: All right.  Thank you, Your Honor, and

23    that brings us to the main event of the day, Your Honor,

24    confirming the debtors' revised Chapter 11 plan of

25    reorganization.  What I would suggest is, Your Honor, we deal

1    with the debtors' motion to seal and the shortened time

2    motion, and I'll get to that in just a moment, and then we do

3    have two motions filed by Mr. Korth on Friday, and then we

4    have the debtors' Chapter 11 plan confirmation and the

5    objections, and I would propose to handle them in that order.

6              THE COURT: Very well.

7              MR. HIGGINS: Your Honor, with respect to the motion

8    to seal, we would like to leave that to the end.  We have

9    been in discussions with the United States Trustee and to the

10   extent to which we do not need the revised business plan and

11   the expert report at this point, we believe that we do not,

12   then we will withdraw the motion.  That brings us, Your

13   Honor, to Mr. Korth's two motions, his motion to delay and

14   his motion for summary judgment.  We are prepared to argue

15   those now, however, we believe that the motion to delay

16   should be overruled.  This is covering ground that the Court

17   has already ruled on.

18             THE COURT: Well, let me just refer to yesterday's

19   on-the-record telephone conference at which I did address

20   both of those motions.  I indicated that it was my intention

21   not to deny the motion for summary judgment but to consider

22   the substance of the motion as part of Mr. Korth's objection

23   to confirmation.  Procedurally, it just did not make sense to

24   treat it separately.  In any event, the time for confirmation

25   was the day after, meaning today.  So, that seemed the most

1    judicially economical way to address it.  With respect to the

2    motion for a continuance, Mr. Korth had indicated he needed

3    more time to prepare for confirmation.  I indicated to him

4    that it was my intention to deny that request.  We've come

5    too far.  There are too many parties posed and ready for

6    today's hearing, and I did not find and do not find that the

7    request had sufficient merit to grant it.  I then had some

8    discussion with Mr. Korth on the phone and indicated to him

9    that if he wished to press his confirmation objection because

10   it was so extensive and it would involve extensive argument

11   and participation on his part, I told him that he needed to

12   be present today.  He indicated to me on the phone initially

13   that he wouldn't be, hadn't planned to be, and then at the

14   end said that he would be.  What followed that, I am told is

15   a call that he made to my courtroom deputy, Ms. Hunt, in

16   which he indicated that he would not be appearing today,

17   after all, and I don't see him in the courtroom, he is on the

18   telephone sign-up sheet, for the limited purpose of making a

19   brief statement on the record, and I authorized my courtroom

20   deputy to tell Mr. Korth that I would authorize his telephone

21   appearance for that limited purpose.  So, I think at this

22   point, I'll ask Mr. Korth to make whatever brief statement it

23   is he wished to make.  Mr. Korth?  He's on the telephone

24   sign-up sheet.  Mr. Korth, are you on the line?

25            MR. KORTH (TELEPHONIC): Oh, I'm sorry, I had my

1    mute button on.

2             THE COURT: Okay.

3             MR. KORTH (TELEPHONIC): This is James Korth.  You

4    can hear me now, right, Judge?

5             THE COURT: Yes, I can.

6             MR. KORTH (TELEPHONIC): Okay.  I wanted to just

7    make a statement here and I filed this yesterday in writing,

8    and it probably will percolate its way up to the docket this

9    afternoon, but basically it's a notice of reason for a

10   limited appearance at hearing for confirmation of the revised

11   plan of reorganization.  And this is my statement: "I, James

12   Korth, having properly filed eleven objections to

13   confirmation of the revised plan of reorganization in an

14   amendment and not attending the confirmation hearing other

15   than to read this notice because I believe I have been denied

16   the ability to prepare.  This belief comes from the fact that

17   less than one business day ago, I received 3,000 sheets of

18   paper from the debtor containing numerous statements and

19   experts' opinions which counter my objections.  I've also

20   been informed that numerous witnesses will be appearing today

21   to put forth testimony regarding these 3,000 sheets of paper.

22   Further, only yesterday morning, did I receive the responses

23   to my objections.  Post-receipt of all this information, I

24   have not had any reasonable opportunity to read these new

25   opinions and arguments and to make any discovery or test the

1   accuracy of their statements.  Friday, May 9th, prior to the

2   receipt of this information, this Court was put on notice of

3   this pending problem with my motion to continue the

4   confirmation hearing.  This Court stated at the status

5   conference yesterday, May 12th, that it intended to deny my

6   motion to continue today.  Therefore, without the proper time

7   to understand and prepare arguments, it is not reasonable

8   that I should travel over 1,000 miles to simply say at the

9   appropriate times, open quotations, 'I have not had a chance

10  to review the debtors' arguments regarding my objections to

11  the revised plan of reorganization and to prepare any

12  rebuttals, and therefore, I believe I've been denied due

13  process of law,' close quotations.  Please accept this

14  quotation above as my blanket statement at this confirmation

15  hearing regarding any assertions made by the debtor or its

16  experts regarding my objections.  I will respond to the

17  debtors' color arguments when I've been given reasonable time

18  to read, understand, and question them pursuant to the

19  Bankruptcy Rules and the related rules, Federal Rules of

20  Civil Procedure for adversary proceedings and contested

21  matters.  Respectfully submitted, James W. Korth."  Thank

22  you, Judge.

23          THE COURT: You're welcome, Mr. Korth.  Mr. Higgins,

24  you may proceed.

25          MR. HIGGINS: Thank you, Your Honor.  That brings us

1    to the plan of reorganization, and I must say, Your Honor,

2    this is a revised plan of reorganization.  As Mr. Kieselstein

3    mentioned, we, since December engaged in a process of

4    negotiation with all creditor constituencies including the

5    Committee, the Second Lien Group, major constituents, and

6    holders of second lien debt as well as the senior notes, and,

7    Your Honor, the good news is, we have a - other than Mr.

8    Korth's objection and a couple of other minor objections,

9    commercially dispute-related objections that I will address

10   in a few moments, that this is a consensual plan.  We have

11   resolved all issues with the constituents.  We stand ready to

12   have this plan confirmed which we will ask the Court to do,

13   and in particular, this plan was born of a great deal of

14   negotiation over the last four months.  We started putting

15   this plan together in January after presenting the revised

16   business plan to the various constituents.  We were able to

17   file that plan in early March.  We have since revised it very

18   slightly.  It went out to solicitation since then, and I will

19   go through the technical amendments to the plan.  There were

20   a couple of minor adjustments made to conform to the

21   constituent documents, organizational documents as they've

22   been filed over the last several weeks up through yesterday

23   afternoon.  Your Honor, I would like to say also that the

24   creditors have voted overwhelmingly to accept the revised

25   plan.  Each and every class has voted both in number and in

1    an amount of claims in far more than the margins required by

2    the Bankruptcy Code to accept the plan.  Thus, as to those

3    classes, clearly accept under § 1129(a)(8), and we will

4    discuss, Your Honor, and show that the plan treats the other

5    classes fairly and equitably under § 1129(b).  That brings

6    us, Your Honor, to the revised plan, technical amendments,

7    and I would refer to those very quickly, and I'll go through

8    those.  It's at the end - or, correction, I'll go through

9    those now, Your Honor.  Just a moment.  Your Honor, I do have

10   a plan redlined to the plan as solicited, and if I may

11   approach, I can -

12          THE COURT: I have it in the binder under Tab X, if

13   we're talking about the same document.

14          MR. HIGGINS: I believe so, Your Honor.

15          THE COURT: Okay.

16          MR. HIGGINS: There are, Your Honor, eight changes

17   or amendments that I would draw your attention to.  The major

18   one is the definition of convertible preferred stock.

19   Originally, the convertible preferred stock had a number of

20   terms to it and a period of ten years to its life before

21   mandatory conversion.  That definition was greatly simplified

22   and now converts mandatorily on the third anniversary into 94

23   percent of the fully diluted new common stock.  That

24   percentage was the subject of some negotiation among the

25   parties to reflect dilution for a commitment fee and the

1    management equity program.  Your Honor, the request of the

2    United States Trustee, the second definitional change of the

3    subordinated notes indenture trustee and the convertible

4    subordinated indenture trustee removed from the definition

5    releases.  That means the debtors release and the third-party

6    release will not apply to those two parties.  We know of no

7    actions that the debtor would have against those trustees nor

8    that any other party would have against them.  We believe

9    that to be – and we did that at the request of the United

10   States Trustee.  The third change, Your Honor, is to Article

11   4(b)(2).  We had some description of the taxable sale

12   transaction under § 1123 – excuse me, § 1125 of the

13   Bankruptcy Code.  The plan supplement now lists in somewhat

14   greater detail the transactions that will be consummated upon

15   the effective date.  We felt that that was a better and more

16   full description.  Your Honor, also related to that § 4(e)(2)

17   refers to the issuance of new plan securities and related to

18   the taxable sale transaction, and again, that was simplified.

19   The fifth change was some language that was added related to

20   benefit programs and worker's compensation programs at the

21   behest of the Michigan Worker's Compensation Agency.  There

22   was a parenthetical added and some other language.  I'm happy

23   to discuss that if you would require that.  The next change

24   to the revised plan is that at the request of Pacificor, the

25   plan now specifies that securities issued thereunder shall be

1    issued on the effective date as opposed to on or after the

2    effective date.  We will be doing so, a minor clerical

3    change.  At the request of the United States Trustee, we have

4    added an affirmative defense exception to the injunction

5    provided in Article 9(f).  And finally, Your Honor, the last

6    change requested by the United States Trustee, Article 11(d)

7    now makes it clear that any modifications of the plan after

8    the entry of the confirmation order will be made in

9    accordance with § 1127(b) by removing the language according

10   or remedy any defect or omission or reconcile any consistency

11   with the plan in such manner as may be necessary to carry out

12   the purpose and intent of the plan.  And we were happy to

13   make that change.  Your Honor, in sum, these technical

14   amendments have no effect on recoveries for either the second

15   lien claims, the senior notes, or the general unsecured

16   claims of Class 5(a) or the general unsecured claims against

17   the Canadian debtor of Class 5(b).  And we would argue, Your

18   Honor, that and cs to the Court that Rule 3019 is simply not

19   implicated by these changes.  Your Honor, at this point I

20   would turn to the objections.  We have two objections arising

21   from commercial disputes.  One by ACH the other one by Magna

22   Donnelly.  Those objections have been resolved by including

23   some protective language in the confirmation order reserving

24   certain rights for those parties.  The objections weren't

25   withdrawn, but my understanding is they're resolved and that

1   they no longer are going to be prosecuted.

2           THE COURT: All right.  I've seen everybody's

3   language.

4           MR. HIGGINS: Yeah.  We also have several informal

5   letter objections, Your Honor.  Most of those do not propose

6   any legal objection or legal or factual objection to the

7   plan.  We would ask that they be overruled, understanding

8   that they are sentiments held by holders mainly of the out-

9   of-the-money subordinated notes and convertible preferred

10  securities.

11          THE COURT: Well, let me ask whether any of those

12  parties are present or on the telephone and wish to be heard.

13  I hear no response.  I agree with the debtors'

14  characterization of those objections.  While understandable,

15  they have no merit which goes directly to the confirmation

16  standards.

17          MR. HIGGINS: Thank you, Your Honor.  Also wanted to

18  highlight that we have been working with a great number of

19  entities including governmental agencies and various

20  creditors, including the PBGC, the EPA, the IRS, the United

21  States Trustee, as we've referred to, the Securities &

22  Exchange Commission, the Michigan Attorney General's Office,

23  Toyota, Leer, and a number of other commercial creditors, and

24  we have resolved each one of their informal

25  objections/comments.  They've all be incorporated either into

1   the plan supplement, the confirmation order, or the revised

2   plan with technical amendments as I've referred to earlier.

3   That leaves two remaining objections, Your Honor.  One by

4   Johnson Electric.  Conflicts counsel, Foley Lardner will

5   address that after we've concluded with addressing the

6   standards and entering the evidence into evidence regarding

7   the § 1129 standards, and that also leaves us with Mr.

8   Korth's objection.  Based upon what the Court said on the

9   record yesterday that you would be prepared to overrule Mr.

10  Korth's objection for a failure to prosecute, to the extent

11  to which the Court still is inclined to do that, we would

12  also ask the Court to overrule each and every one of those

13  objections on the merits.  We plan to present the evidence to

14  rebut those objections and give the Court grounds to overrule

15  them on the merits.

16           THE COURT: I'll say two things about that: One, the

17  controlling law in this jurisdiction is that the Bankruptcy

18  Court has an independent duty to make a determination about

19  whether the confirmation standards have been met even absent

20  objection.  And secondly, with respect to the Korth objection

21  specifically, I see that the debtor by its written

22  submissions has addressed each of the objections that have

23  been made either through its brief and argument or the

24  various declarations and affidavits that have been submitted

25  in support of confirmation.  So I will hear that evidence and

1    will make the appropriate rulings after the record has been

2    made.

3           MR. HIGGINS: All right.  Thank you, Your Honor.  At

4    this time I would yield the podium to my partner, Mr. Slade,

5    who can deal with entering the various exhibits into evidence

6    and presenting the various witnesses.

7           THE COURT: Very well.

8           MR. SLADE: Good morning, Your Honor.  Michael Slade

9    on behalf of the debtors.  Your Honor, in light of the events

10   of the last 24 hours, our plan is a very, very brief

11   evidentiary presentation to supplement the documents that

12   we're planning on admitting into evidence and which you've

13   already been provided with copies of many of them.  So, we're

14   going to present three witnesses to testify for approximately

15   20 minutes total, and that's our plan.

16          THE COURT: Very well.

17          MR. SLADE: So, first, Your Honor, I would formally

18   submit the documents that we've provided and the witness and

19   exhibit list that have been submitted to the Court, Exhibits

20   1 through 14, 16, 17, and 19 through 21.  I would formally

21   offer those into evidence.

22          THE COURT: All right, one moment.  Say that again.

23          MR. SLADE: I apologize, Your Honor.

24          THE COURT: That's all right.

25          MR. SLADE: It's all the exhibits on our list with

1    the exception of Exhibits 15 and 18.  We're withdrawing those

2    —

3              THE COURT: Not 15 and what else?

4              MR. SLADE: Eighteen, Your Honor.

5              THE COURT: Eighteen.  All right.  Is there any

6    objection to the admission of those exhibits?  I hear no

7    response, they're admitted without objection.

8              MR. SLADE: Thank you, Your Honor.  Your Honor, our

9    first witness, we'd like to call Larry Denton.

10              THE COURT: Very well.  I know Mr. Denton knows the

11   way.

12                        LAWRENCE A. DENTON

13   having been duly sworn testifies as follows:

14              THE CLERK: Please state your full name and spell

15   your last name for the record.

16              THE WITNESS: Lawrence A. Denton, D-e-n-t-o-n.

17              MR. SLADE: Your Honor, may I proceed?

18              THE COURT: You may.

19                        DIRECT EXAMINATION

20   BY MR. SLADE:

21   Q.   Good morning, Mr. Denton.  What is your position at Dura?

22   A.   CEO and chairman.

23   Q.   And why did Dura file for Chapter 11?

24   A.   Well, we had two major issues.  The first was the amount

25   of debt, being a product of a roll-up company of the

1    nineties.  We had approximately $1.2 billion worth of debt

2    and $110 million in interest expense.

3    Q.  And what was the company trying to accomplish in Chapter

4    11?

5    A.  We were trying to restructure operationally to become

6    more competitive, and to get a financial structure in place

7    that would allow sustain-ability in the future.

8    Q.  Has the company succeeded?

9    A.  Yes, I believe it has.

10   Q.  Can you describe for the Court what you've accomplished

11   within the confines of Chapter 11.

12   A.  Well, within Chapter 11, we closed 14 facilities.  We

13   sold 12 facilities.  We've improved our utilization rates

14   almost by a factor of 2.  We've moved 2,600 jobs to lower

15   cost countries.  In the process, we launched new facilities

16   in China, India, and Romania and doubled our operations in

17   the Czech Republic and in Brazil.  At the same time, we

18   strengthened our management team, and we did this all with no

19   disruptions from the customer's point of view, and what they

20   call spills or missed vehicles on line, and we expect to exit

21   with about less than one-quarter of the debt we had two years

22   ago and about 20 percent of the interest expense we had in

23   the past.

24   Q.  Mr. Denton, do you feel some sense of urgency in getting

25   the plan confirmed here today?

1    A.  Yeah, very much so.  In the auto industry the orders you

2    receive today are produced usually three to five years in the

3    future.  There's always that type of lead time from when you

4    get the order and you go through the design process until you

5    actually go to production where the revenue starts to come

6    in.  So, because of that lead time, the customer needs to be

7    convinced that in fact the company they're giving the order

8    to has good stability, sustain-ability, and literally is

9    going to be there three to five years out to be able to

10   produce this product when the vehicles start going down the

11   assembly line.  In 2007, which I'll refer to as our year,

12   calendar year of bankruptcy, we tried to be as transparent as

13   possible with all of our costumers and in doing so we've

14   prepared a time line for exit and we would review on a

15   monthly basis at the high executive level, myself or either

16   the COO, would visit every costumer on a monthly basis and

17   review our progress and our status.  In doing that, we

18   received about $270 million worth of orders in '07.  Now,

19   that's about 80 to 90 percent of what we receive in a normal

20   year, but it's a pretty good effort while in bankruptcy.

21   After we failed to get out in December, primarily due to the

22   state of the U.S. credit market, the order book significantly

23   dried up, and we've had a really difficult first quarter as

24   far as obtaining new orders.  Now, what we've done, is we did

25   the same thing again.  We prepared a time line.  Today's date

 1    is on that time line, May 13th for confirmation.  Every one of

 2    our customers is aware of the significance of today's date,

 3    and we've managed to convince some of the customers to delay

 4    placing an order or at least hold an order, okay, until we

 5    got through today's date.  Failure to exit, okay, today, in

 6    my estimation would significantly reduce our chances of

 7    achieving and getting these orders.  I'm prepared today to

 8    fly to Europe tomorrow.  I have meetings scheduled with high

 9    levels at our five largest customers in Europe, both in

10    France and in Germany, to review our progress, what we've

11    accomplished in bankruptcy, and to try to salvage and save as

12    many of these orders as we can in order so that we don't dig

13    our self a hole three to five years out.

14    Q.  Thank you.

15            MR. SLADE: Your Honor, I don't have any further

16    questions for Mr. Denton.

17            THE COURT: Does anyone wish to cross-examine Mr.

18    Denton?  I hear no response.  Thank you, sir.  You may step

19    down.

20            MR. SLADE: Your Honor, the debtors would call Tony

21    Flanagan.

22                          ANTHONY FLANAGAN

23    having been duly sworn testifies as follows:

24            THE CLERK: Please state your full name spelling

25    your last name.

1          THE WITNESS: Anthony C. Flanagan, F-l-a-n-a-g-a-n.

2          MR. SLADE: Your Honor, may I proceed?

3          THE COURT: You may.

4          MR. SLADE:  I have a subset of our exhibits that

5    I'm planning on walking through the witness with that I would

6    like to present to the Court so you can follow up?

7          THE COURT: All right.

8          MR. SLADE: May I approach?

9          THE COURT: Yes.  Thank you.

10                        DIRECT EXAMINATION

11   BY MR. SLADE:

12   Q.   Good morning, Mr. Flanagan.

13   A.   Good morning.

14   Q.   Mr. Flanagan, where do you work?

15   A.   I work for Alex Partners.

16   Q.   And what do you do?

17   A.   I'm a managing director there.

18   Q.   What are your job responsibilities?

19   A.   My job responsibilities are to oversee engagements and

20   particularly with troubled companies, working with a variety

21   of personnel and helping the companies to restructure.

22   Q.   Can you describe for the Court your educational

23   background.

24   A.   Yes.  I have a bachelors from Michigan State University

25   in accounting, and I have an MBA from the University of

1    Michigan.

2    Q.  Are you a CPA?

3    A.  I am a CPA.

4    Q.  Where did you start your career after you finished

5    business school?

6    A.  I started my career at Pricewaterhouse.

7    Q.  And what did you do at PWC?

8    A.  I was an auditor in Pricewaterhouse.  I was there for a

9    little over six years and was a manager within

10   Pricewaterhouse when I left.

11   Q.  What did you do when you left Pricewaterhouse?

12   A.  I went to work for an automotive supplier and was there

13   as - my direct job title was the manager of financial

14   reporting.  Effectively, I was the corporate controller in

15   that role.

16   Q.  What did you do after you left the supplier?

17   A.  I joined Alex Partners and that was in June of 1998.

18   Q.  What kind of companies have you typically worked with

19   while you've been at Alex Partners?

20   A.  I've worked with a variety of companies, but a heavy

21   amount of my work has been in the automotive industry,

22   particularly with automotive suppliers, both in and out of

23   bankruptcy but companies that are experiencing financial and

24   operational difficulties.

25   Q.  What are your typical functions for those automotive

Flanagan - Direct                                          23

1   clients?

2   A.   We work in a variety of areas.   In particular, our

3   business plan development, cashflow management, cashflow

4   modeling, assessment of profitability of parts, working with

5   them in developing plans, various alternative plans via the

6   sale, liquidation analysis, or just restructuring and

7   reorganization.

8   Q.   What kind of things have you done for Dura since you've

9   been retained?

10  A.   We have been involved in a variety of areas.   Some of

11  them include the business plan development, a very detailed,

12  thorough business plan development that we did in conjunction

13  with the management team.   We also have been involved in

14  cashflow modeling and management of the cashflow within the

15  organization.   We've been involved in customer profitability

16  and par-profitability analysis which also led us to be

17  involved in negotiations with various customers for pricing

18  and other accommodations.   We've been involved in helping the

19  company with the plan of reorganization and disclosure

20  statement, in particular, as it relates to the liquidation

21  analysis and the business plan projections within the

22  disclosure statement, and we've also been involved in a lot

23  of the claims analysis and working through those objections.

24        MR. SLADE: Your Honor, at this point, I would

25  proffer Mr. Flanagan as an expert in finance in the auto

Flanagan - Direct                                    24

1    industry.

2            THE COURT: Is there any objection?  Hearing none

3    you may proceed on that basis.

4            MR. SLADE: Thank you, Your Honor.

5    BY MR. SLADE:

6    Q.  Mr. Flanagan, are you familiar with the debtors' plan of

7    reorganization?

8    A.  I am.

9    Q.  And based on your knowledge of the debtors' business plan

10   and the plan of reorganization, do you have an opinion about

11   whether the debtors will be able to meet their obligations

12   under the plan?

13   A.  Yes, I do.

14   Q.  What is your opinion?

15   A.  I believe that the debtors will be able to meet their

16   obligations under the plan.

17   Q.  What do you base that opinion on?

18   A.  I base that opinion upon the thoroughness and detail that

19   was gone into developing and building the business plan, the

20   company's operations to date in relationship to that business

21   plan, and the overall liquidity within the organization as a

22   result from emerging from bankruptcy.

23   Q.  Mr. Flanagan, have you reviewed the potential

24   administrative and cure claims that have been asserted

25   against the company?

1   A.  I have.

2   Q.  Do you have any doubt that the company will have the

3   ability to pay those claims when they become due?

4   A.  No, I do not.  I believe the claims will be able to be

5   paid as they come due.

6   Q.  Mr. Flanagan, I have a few questions for you related to

7   the fixed charge coverage ratio.

8   A.  Sure.

9   Q.  Are you familiar with the earnings to fixed charges

10  ration calculation that's published by the SEC?

11  A.  I am familiar with that.

12  Q.  What is that calculation?

13  A.  It's a calculation that essentially takes net income

14  that's back a few items and basically calculates a ratio, if

15  you will, of ability of a company to meet interest

16  obligations.

17  Q.  Are you familiar with a fixed charge coverage ratio

18  that's defined by the 9 percent subordinated note indenture?

19  A.  I am familiar with that.

20  Q.  Now, is that the same calculation as the SEC earnings to

21  fixed charges ratio?

22  A.  No, it is not.

23  Q.  How do the calculations differ?

24  A.  The primary difference in the calculations is that in the

25  company's 9 percent notes calculation you are able to add

1   back depreciation and amortization in determining what the

2   consolidated cashflow is.

3   Q.  Have you calculated what the fixed charge coverage ratio

4   was at the time the senior notes were issued in 2002?

5   A.  I have.

6   Q.  And is it your understanding that the company performed

7   the same calculation both at the time that the fixed charge

8   coverage rate - both at the time the senior notes were issued

9   in 2002 and when additional senior notes were issued in 2003?

10  A.  That is my understanding.

11  Q.  And can you take a look in your pamphlet at Exhibit No.

12  16.

13  A.  Okay.

14  Q.  Is it your understanding that Exhibit No. 16 is the

15  calculation of fixed charge coverage ratio performed by the

16  debtors both in 2002 and 2003?

17  A.  Yes, it is.

18  Q.  Have you performed your own independent calculation of

19  what the fixed charge coverage ratio was in 2002?

20  A.  Yes, I have.

21  Q.  Okay.  Now, I want to take you through the calculation -

22  A.  Sure.

23  Q.  - and to do that, let's take a look at Exhibit A to your

24  declaration, which, Your Honor, is Exhibit A to the Debtors'

25  Exhibit 1 in the pamphlet I sent you.  Now, what is the

1    numerator and what is the denominator in the fixed charge

2    coverage ratio?

3    A.   What is a numerator?  It's - the numerator is comprised

4    of five or six items.  Would you like me to go through and -

5    Q.   Sure.  The numerator is consolidated cash -

6    A.   I'm sorry, the numerator is consolidated cash for which

7    is comprised of five or six items.  The denominator is the

8    fixed charges.

9    Q.   Okay.  Now, take a look at page 9 of the indenture -

10   actually, I'm sorry, if you could turn to page 4 of the

11   indenture and take the Court through the various items that

12   go into consolidated cashflow which is the numerator on the

13   fixed charge coverage ratio.

14   A.   Which, I'm sorry, Mike, which -

15   Q.   I'll ask it again.

16   A.   Which exhibit?

17   Q.   Exhibit A to your declaration, which is Exhibit 1.

18   A.   Okay.

19   Q.   What are the items that are incorporated into the

20   numerator in the equation which is consolidated cashflow?

21   A.   Sure.  The consolidated cashflow is the items

22   incorporated in there.  It begins with net income, and then

23   there is an add-back for any loss on the sale of assets.

24   There's an additional add-back for income tax expense.

25   There's an additional add-back for interest expense.  There's

1    an additional add-back for depreciation and amortization.

2    And then there is a reduction for cashflow generated from

3    divested operations.

4    Q.   Have you calculated what all those figures were at the

5    time the senior notes were issued in 2002?

6    A.   I have.

7    Q.   And what data did you use to perform that calculation?

8    A.   I used public information, the 10K as well as internal

9    company financial information.

10   Q.   Okay.  Now, I want to go through for the Court the

11   calculations using that data.  Can you return to page -

12   Exhibit 17 in your booklet.

13   A.   Uh-huh.

14   Q.   What is Exhibit 17?

15   A.   It is the 10K from 2001.

16   Q.   Okay.  Can you turn to the page that's Bates stamped Dura

17   21565?

18   A.   Okay.

19   Q.   Can you describe for the Court where we can find the

20   input into the fixed charge coverage ratio within that . . .

21   (microphone not recording).

22   A.   Sure on 1565 there is a line item approximately a third

23   of the way down which shows an income to be $11.2 million for

24   December 31st, 2001.

25   Q.   What about the tax . . . (microphone not recording).

1   A.   Right above that is a provision for income taxes of

2   8,450,000 or 8.5 million.

3   Q.   What about the interest expense?

4   A.   The interest expense is also included there right above

5   the provision for income taxes, and it's 100.8 million.

6   Q.   What about depreciation and amortization?

7   A.   Depreciation and amortization is not on that page.  We

8   would need to go to the Bates Stamp No. 201567, which is the

9   consolidated statement of cashflows.  And there -

10  Q.   What is the depreciation and amortization?

11  A.   The amount is 94.6 million.

12  Q.   During the tax year that's described in Exhibit 17, did

13  the company have any losses on assets sales?

14  A.   They did.

15  Q.   Can you describe those for the Court and point the Court

16  to the part of the 10K which describes them.

17  A.   Sure, there were three asset sales that the company

18  entered into during fiscal 2001 for which they reported a

19  loss on the sale of the assets.  Note 4 to the 10K walks

20  through what those losses are.  And it is on - It begins on

21  the Bates Stamp 201573, and the first divestiture relates to

22  an Australian operation, and there's a loss of approximately

23  $7.5 million.  On the next page, Bates Stamp 201574, there

24  was a loss recorded on the sale of a business called BioTech.

25  And that charge was approximately 5.2 million.  And then

1    there was one more divestiture during the year, and that was

2    the very next paragraph, a company called Plastics Products,

3    and there was a charge of approximately $7.4 million.

4    Q.   Was there any consolidated cashflow from those assets

5    that were sold during the tax year?

6    A.   Yes, there was.

7    Q.   How much was that?

8    A.   That was approximately $8.5 million.

9    Q.   So you have your calculator with you.  What is the total

10   consolidated cashflow that's the numerator of the fixed

11   charge cover ratio as of the time the senior notes were

12   issued?

13   A.   226.7 million.

14   Q.   Have you calculated the denominator of the equation,

15   which is the fixed charges?

16   A.   Yes, I have.

17   Q.   What is included in those?

18   A.   That is - what's included in there is interest expense,

19   the pro forma impact of the company's new debt structure,

20   including any hedging, and then any dividends paid for the

21   convertible preferred stock.

22   Q.   And what were those at the time that the company issued

23   the senior notes in 2002?

24   A.   The interest expense was the same as what's showing here,

25   100.8 million.  The pro forma interest adjustment was $2

1   million, and the dividend on the preferred stock, I believe,

2   was 4.2 million.

3   Q.  So, all told, what was the denominator on the fixed

4   charge coverage ratio, the fixed charges at the time the

5   senior notes were issued?

6   A.  107 million.

7   Q.  So, once you do the calculation, the consolidated

8   cashflow divided by fixed charges, what is the fixed charge

9   coverage ratio at the company at the time the senior notes

10  were issued in 2002?

11  A.  That's that right there, the 2.12 is what the fixed

12  charge coverage ratio was.

13  Q.  Okay.

14          MR. SLADE: Your Honor, I don't have any further

15  questions for Mr. Flanagan.

16          THE COURT: Does anyone wish to cross-examine Mr.

17  Flanagan?  All right, let me ask one question.  Mr. Flanagan,

18  you testified earlier that the debtor would be in a position

19  to pay as they became due any cure amounts if they're assumed

20  executory contracts.  Do you recall that?

21          THE WITNESS: Yes, I did, yes.

22          THE COURT: Did that include any cure amount which

23  would be owed, if any, to Johnson Electric?

24          THE WITNESS: My understanding, Your Honor, is that

25  the Johnson Electric claim is between - the maximum claim is

1   between $2 and $2 1/2 million, and I do believe the company

2   would have the ability to pay that.

3              THE COURT: All right.  Any followup on what I've

4   asked?

5              MR. SLADE: No, Your Honor.

6              THE COURT: All right.  Thank you, sir, you may step

7   down.

8              MR. SLADE: Your Honor, the debtors would call Dirk

9   Savini.

10                          DIRK SAVINI

11  having been duly sworn testifies as follows:

12             THE CLERK: Please state your full name spelling

13  your last name for the Court.

14             THE WITNESS: Dirk A. Savini, S-a-v-i-n-I.

15             MR. SLADE: Your Honor, may I proceed?

16             THE COURT: You may.

17                       DIRECT EXAMINATION

18  BY MR. SLADE:

19  Q.  Mr. Savini, where do you work?

20  A.  Miller Buckfire.

21  Q.  And what do you do?

22  A.  I'm a managing director in the restructuring business

23  there.

24  Q.  What's your relationship to the debtors?

25  A.  Miller Buckfire is the investment banker and financial

1    advisor for the company.

2    Q.  And have you been primarily responsible for securing the

3    exit financing packages for the company?

4    A.  We have.

5    Q.  Can you describe for the Court the nature of the exit

6    financing that Dura has obtained?

7    A.  Dura's recently obtained commitments for more than $300

8    million worth of financing in connection with its exit from

9    bankruptcy.  Of that, the company anticipates using slightly

10   more than $200 million of those commitments to effectuate its

11   emergence, and so it will be - the difference between those

12   two numbers will be working capital financing available to

13   finance the company's operations together with significant

14   cash resources the company currently has.

15   Q.  Mr. Savini, are the terms of that exit financing fair and

16   reasonable in your opinion under the circumstances of this

17   case?

18   A.  They are indeed.

19   Q.  And is that exit financing going to be sufficient to meet

20   the debtors' needs going forward?

21   A.  We believe so, yes.

22          MR. SLADE: Your Honor, I don't have any further

23   questions for Mr. Savini.

24          THE COURT: Does anyone care to cross-examine Mr.

25   Savini?  I hear no response.  Thank you, sir, you may step

1    down.

2         MR. SLADE: Your Honor, based upon the exhibits that

3    have been admitted into evidence and the testimony of our

4    three witnesses, the debtors rest.

5         THE COURT: Very well.  Does anyone else care to be

6    heard in connection with confirmation?

7         MR. MAYER: Your Honor, Thomas Morse Mayer from

8    Kramer Levin Natalis & Frankel as counsel to the Official

9    Committee of Unsecured Creditors.  The Committee supports

10   with the debtors and supports confirmation of the plan.

11   Thank you.

12        MR. MAYR: Good morning, Your Honor.  Kurt Mayr,

13   Bracewell & Giuliani, on behalf of the Second Lien Lender

14   Group.  We similarly support confirmation.  As Mr.

15   Kieselstein stated, we have had a zig-zag path between credit

16   market crashes and plane crashes and at points wondered

17   whether or not we would get here today, but we're very happy

18   to be here today and pleased to support confirmation.

19        THE COURT: Very well.

20        MR. HO: Good morning, Your Honor.  Tonny Ho from

21   Willkie Farr & Gallagher on behalf of the Bank of New York as

22   indenture trustee for the senior noteholders.  We also very

23   much support confirmation of this plan.  We believe that this

24   has been a very long and difficult case.  The plan was

25   heavily negotiated, and we think it is fair for the senior

1    noteholders.  As you've heard, there is a sense of urgency

2    here, so we support entry of a confirmation order today.

3    Thank you, Your Honor.

4            MR. HIGGINS: Your Honor, Roger Higgins for the

5    debtors.  We note that the Court may confirm the revised plan

6    if it meets all the standards and requirements set forth in

7    § 1129(a) and 1129(b) by a preponderance of the evidence.

8    The debtors respectfully submit that the evidence today, the

9    testimony, the declarations, and the plan itself go far

10   beyond the mere preponderance of evidence, and we would

11   respectfully submit that the plan meets all of the

12   requirements of § 1129.  I'm happy to go through them, but I

13   believe and hope that the papers themselves detail why this

14   plan should be confirmed.

15           THE COURT: Well, shall we deal with the Johnson

16   Electric objection?

17           MR. HIGGINS: Your Honor, I think we should, and

18   also to the extent necessary with the Korth objection but I

19   yield the podium to Judy O'Neill of the Foley Lardner firm to

20   deal with the Johnson Electric objection.

21           THE COURT: Very well.

22           UNIDENTIFIED SPEAKER: Your Honor, do you want to

23   hear the objection first or . . . (microphone not recording).

24           THE COURT: Well, let's hear from the objector

25   first.

1          UNIDENTIFIED SPEAKER: Thank you, Your Honor.

2          MR. WEISS:  Good morning, Your Honor.  It's Steven

3    Weiss of Moses & Singer along with Mark Parry for Johnson

4    Electric.  It's not really Johnson's desire to object to

5    confirmation.  There's been a longstanding relationship

6    between Johnson and Dura, but in this particular case, Dura

7    has elected to assume a requirements contract for the supply

8    of motors for seat adjusters, and there's a pre-petition debt

9    of approximately $2.1 million.  The debt is undisputed.

10   Prior to bankruptcy, Dura wanted to withhold this $2.1

11   million from Johnson, alleging that there was some warranty

12   repairs that were being made on motors supplied by Johnson.

13   They went to the Michigan District Court.  The Michigan

14   District Court looked at a contract between Johnson and Dura

15   and concluded that there was no right to withhold any

16   payments.  There was no right to setoff on the theory that

17   maybe someday there would be a debt due Dura for this alleged

18   breach of warranty.  And then Dura filed the bankruptcy

19   petition and everything stopped, but now that they want to

20   assume the contract and continue to get Johnson motors, it's

21   their obligation to pay this undisputed pre-petition debt.

22          THE COURT: Well, is it their obligation to pay it

23   or to give you adequate insurance of a prompt cure of this

24   default?

25          MR. WEISS:  Well, what's adequate assurance of

1    payment of a sum of cash?  I mean, what would be adequate

2    assurance?  Depositing it in escrow, maybe; but otherwise,

3    what's adequate assurance?

4              THE COURT: Well, some cases say that a firm

5    commitment to make all payments and at least a reasonably

6    demonstrable capability to make such payments may be

7    sufficient to demonstrate adequate assurance.  What do you

8    think?

9              MR. WEISS: Well, I think that in this case there's

10   no guaranty that Dura will be around - I mean, I hope they

11   will be, five years from now when this credits liability case

12   may or may not go to trial.

13             THE COURT: Well, another way to approach it, I

14   guess, is to say, if I conclude that the plan is feasible,

15   under these circumstances, given the size of the company and

16   its resources, don't you think that would be sufficient to

17   demonstrate the capability to make such a payment?

18             MR. WEISS: Perhaps, but the thing is, if there's an

19   option of either adequate assurance or making this cash

20   payment, and it's a situation where Johnson's going to have

21   to supply these motors for years, and -

22             THE COURT: Well, but I understand from the

23   submissions and actually from earlier in the case when I

24   first became aware of the three-party or four-party dispute

25   that this is a component of, was that but for - I'll call it

```
 1    the disputed amount, even though you've characterized it as

 2    undisputed, I'll call it the disputed amount, Dura has been

 3    paying for that which it has ordered and received from

 4    Johnson.

 5             MR. WEISS: Yes, that's correct.

 6             THE COURT: Okay.

 7             MR. WEISS: It's been paying for current delivery of

 8    motors.

 9             THE COURT: Right.

10             MR. WEISS: But once –

11             THE COURT: In fact that was one of the concerns

12    that the Court had when it declined to issue a TRO.  It said

13    – I don't know what – It took no evidence.  It took argument,

14    I gather, from the transcript that was submitted to this

15    Court in connection with confirmation that Dura was at that

16    point known to be headed for bankruptcy and at least one of

17    the reasons the Court gave for not granting the relief that

18    had been requested was that Johnson would unfairly face the

19    uncertainty of not being paid for that which Dura was seeking

20    that it be required to ship, even with no payment.  The

21    circumstances seem to me to be different now.

22             MR. WEISS: Well, one thing that hasn't changed is

23    it did take evidence of the contract in dispute and it read –

24             THE COURT: A documentary of it –

25             MR. WEISS: It read the contract, and the question
```

```
 1   of what the contract means is a question of law.  There was
 2   no parol evidence, they didn't have to go outside the
 3   contract, and the U.S. District Judge in Michigan, after
 4   reading the contract and Your Honor has the transcript,
 5   turned to counsel and said, There is nothing in this contract
 6   that gives you, Dura, the right to withhold payment to
 7   Johnson because someday Johnson may or may not be liable on a
 8   warranty claim.  The contract -
 9            THE COURT: Well, I think what more fairly
10   characterized what the Court said was, Until such time as
11   Dura demonstrates there's been a breach of warranty, it has
12   no indemnification or setoff rights.  Isn't that really more
13   specifically and accurately what the Court said?
14            MR. WEISS: That may be, but it still hasn't done
15   that.  There is still no -
16            THE COURT: There's litigation pending.
17            MR. WEISS: Litigation doesn't - litigation has a
18   winner and a loser if it goes all the way, and it's -
19            THE COURT: And that's why a lot of matters gets
20   settled.
21            MR. WEISS: Right, and if it gets settled then that
22   will end it, but it hasn't been settled and the terms of the
23   contract haven't changed.  If this Judge construed in the
24   Michigan District Court, construed the contract correctly,
25   that there is no right of setoff of a potential warranty
```

1    claim, if that is a correct construction of the contract,

2    then that construction stays with the contract.

3         THE COURT: Well, it's not for me to say whether

4    it's correct or it isn't correct, but it does strike me that

5    the ruling that the District Court made doesn't bear on the

6    issue that's before me today, and that is, whether ultimately

7    Dura will be able to prove a breach of warranty, and if it

8    does, it may be that it may not owe any of the 2 million

9    plus.  It may owe some of it.  It may owe all of it.  I don't

10   know, but that's for judicial determination at some future

11   point.  Now, I know, based on the submissions, there's been

12   an objection to the claim filed, but I take it that it's not

13   this Court ultimately that will resolve that matter,

14   although, the parties didn't definitively say.

15        MR. WEISS: But it's before this Court today and

16   there is a section that provides that if the want to -

17   Originally - I don't recall, it's in the record, originally

18   we weren't even listed as a contract to be assumed.  We came

19   to this Court and asked the Court to make a determination as

20   to whether or not this was an executory contract where Dura

21   would have to make an election.  And then subsequently Dura

22   made the election and said, We're going to assume the

23   contract, and we're going to hold Johnson to selling at the

24   contract prices for the requirements of this company.

25        THE COURT: So we've come full circle again, and

1    isn't the question that has to be answered today is whether

2    in the absence of a payment, the debtor has offered, based on

3    this record, adequate assurance.

4            MR. WEISS: I feel if they deposit the money in

5    escrow, perhaps, but without that, no.  They have not.

6            THE COURT: All right, thank you.  Anything

7    further?

8            MR. WEISS: No, Your Honor.

9            THE COURT: Thank you.

10           MS. O'NEILL:   Your Honor, Judy O'Neill from Foley

11   & Lardner on behalf of Dura.  Your Honor correctly focuses on

12   the premise of the argument today by Johnson Electric.  Their

13   premise is that their claim is non-disputed.  That's not the

14   case.  In fact, it is disputed.  What they're trying to do

15   here, Your Honor, is an end-run around the litigation in

16   Michigan.  Your Honor, that litigation disputes this claim,

17   always has.  In fact, the fact that it is so related to this

18   proof of claim was indeed the basis of a Michigan District

19   Court's decision not to withdraw the reference as Johnson

20   asked it to do.  In fact the Court said the litigation was

21   critical to the allowance of that claim process.  Your Honor,

22   we did file an objection here in this Court only

23   precautionarily and to make this Court aware of the fact that

24   that litigation will resolve the amount of this claim.  It

25   will do so in June of 2009.  Now, to go to your second point,

1    Your Honor, which I agree is very important.  That is that
2    the statute says that either the debtor must cure or provide
3    adequate assurance that it will promptly cure a default under
4    an executory contract.  First, Your Honor, as we've
5    discussed, the issue is, is there a default?  And I'd like to
6    address a couple of things that counsel says for JE in that.
7    First, Your Honor, he goes back to the fact that in a TRO
8    that was argued, Your Honor, on an emergency basis with one
9    hour's worth of argument, absolutely no evidence, not a
10   preliminary injunction, which was never later scheduled
11   because the bankruptcy was filed shortly thereafter, only one
12   limited issue was discussed and that was whether there was an
13   immediate right of setoff under the contract.  Not whether
14   there was a setoff, not whether there was recoupment, which
15   really is probably the theory that will ultimately win here,
16   none of that was even argued.  One limited issue was
17   insufficient to give a TRO.  Just to speak about recoupment
18   for a second, Your Honor, as I'm sure this Court is aware,
19   recoupment unlike setoff is the concept that when you have
20   one transaction, when you have disputes that arise under that
21   one transaction, such as two people may owe each other money,
22   that a recoupment creates the nettings (phonetical).  Under
23   the UCC which governs these contracts, 2717, specifically
24   talks about that the buyer has the right to deduct from
25   amounts - excuse me, that the seller has the right to deduct

1    from amounts owed properly employed setoff rights.  The

2    concept is recoupment arising out of one transaction or

3    occurrence.  This TRO did not resolve that issue.  So, Your

4    Honor, that's still open and that indeed is what will be

5    decided in Michigan.  Now, to turn to the second prong,

6    adequate assurance of the prompt cure.  This Court heard

7    evidence that this plan is feasible.  Mr. Flanagan testified

8    to that.  Not only did he say it's feasible, he said that it

9    is his opinion that this debtor will be able to meet its

10   expenses as they become due.  And when this Court drilled

11   down on that question, he was clear.  Executory contracts,

12   when the cure amounts are decided, he believes this debtor

13   will be able to meet those payments.  We heard no cross-

14   examination on that.  We had no counter testimony to that.

15   So the evidence is clear today that there is adequate

16   assurance of the ability of this debtor to promptly cure when

17   this claim is adjudicated.  Now, Your Honor, let's just deal

18   a minute with that statutory section, it's not a guaranty.

19   It's just more probable than not, is the standard that the

20   debtor will be able to cure.  Why is that standard even

21   there?  Why is it an or?  Why did Congress see fit to say,

22   cure or provide prompt assurance - or excuse me, adequate

23   assurance of prompt cure for situations like this?  So, that

24   one assuming creditor can't queer a confirmation of a plan.

25   Your Honor, I would suggest that there's no way that this

1    confirmation should be denied on the basis of one cure claim

2    that will be paid in the future if it ultimately is ever

3    owed.  However, should this Court be so inclined, the statute

4    even allows for that.  It says that a debtor may assume a

5    contract by the time of confirmation.  However, it does allow

6    for the Court to set another time, a specified time for

7    assumption.  So were this Court concerned, although it should

8    not be, that adequate assurance was not provided here today

9    by the evidence, then this Court could set a later time for

10   assumption and then the parties would continue on performing

11   until the cure was decided and assume at the time the cure

12   was decided.  For those reasons though, Your Honor, we

13   believe this Court should not derail confirmation for one

14   creditor trying to do an end-run around some litigation that

15   will resolve whether or not it's ever owed any money.

16            THE COURT: Thank you.

17            MR. WEISS: (Microphone not recording.)

18            THE COURT: Briefly, yes.

19            MR. WEISS: Your Honor, I believe that the plan

20   provides for payment of the cure amount upon the effective

21   date of the plan, and Dura is quite capable of paying the

22   cure amount on the effective date of the plan.  Johnson will

23   be required to ship the motors at this reduced price for the

24   life of this requirements contract, and Dura is just trying

25   to re-litigate a contractual clause that has been construed

1    by a District Court, which specifically said that there is no

2    right of setoff unless there is a specific debt due from the

3    seller to the buyer.  I mean the contract is quoted in the

4    papers, and Your Honor has it, but it says, setoff and

5    assignment, it's quoted in the papers, "Buyer shall be

6    entitled at all times to setoff any amount owing from

7    seller."  There's no amount currently owing from the seller

8    to the buyer, and the plan calls for payment of the cure

9    amount upon the effective date, and unless this Court would

10    construe the contract differently from the way it was

11    construed by the District Court Judge, then there is no right

12    of setoff at this time.

13            THE COURT: Thank you.

14            MR. WEISS: Thank you, Your Honor.

15            THE COURT: Very briefly.

16            MS. O'NEILL: Very briefly, Your Honor.  Only to

17    correct the statements of counsel.  The plan does provide for

18    disputed claims, that the cure payment shall be made

19    following the entry of a final order resolving the dispute.

20            THE COURT: All right, thank you.  All right, let's

21    address the Korth objection.

22            MR. HIGGINS: Your Honor, very briefly, we believe

23    that the testimony and evidence adduced gives the Court a

24    basis to overrule each and every one of Mr. Korth's

25    objections.  I'm happy to go through each of them at some

1     lengths, but would respectfully submit that as to the items
2     raised regarding the liquidation analysis, the Flanagan
3     declaration directly addresses those points, particularly as
4     to Mr. Korth's objections regarding the value of the European
5     subsidiaries, SG&A and the value of the intellectual
6     property.  Today, Mr. Flanagan testified at length as to the
7     fixed charge coverage ratio.  That testimony is uncontested
8     and shows that Mr. Korth's objection is simply without merit.
9     Timothy Trinari (phonetical) the company's CFO submitted a
10    declaration which has been submitted into evidence regarding
11    the net operating losses and as to why Mr. Korth's objection
12    is without merit.  From a factual standpoint, there is
13    extensive legal argument in the papers regarding that.  We
14    would submit respectfully that that is also without merit.
15    As to Mr. Korth's assertions regarding a lack of good faith,
16    Your Honor, we believe that the record is replete with
17    evidence that the debtors have proposed this plan in good
18    faith including the consensual nature and also we would
19    respectfully request that the Court deny Mr. Korth's motion
20    such as it is for appointment of a trustee under § 1104.
21            THE COURT: All right.  I will note that I have
22    reviewed the debtors' brief in support of confirmation as
23    well as all of the declarations that have been submitted in
24    support, and I will say the debtor has gone to, I think, very
25    extensive and complete lengths to address each and every one

1    of the objections that Mr. Korth has raised, some of which

2    can be grouped.    For example, there are a series of

3    objections raised concerning the classification of claims.    I

4    think the debtor adequately and correctly responds to these

5    by pointing to the state law subordination provisions which

6    govern the various classes of debt and the debtors'

7    classification scheme does not, I conclude, unfairly

8    discriminate, rather it provides appropriately for that which

9    both the state law subordination, which the Bankruptcy Code

10    respects, and the classification scheme that the Bankruptcy

11    Code sets forth.    So I find no fault there.    The debtor has

12    also responded directly and I forget which declaration deals

13    with this, but concerning the objection, the Korth objection

14    that alleges that the preferred stock allows the second lien

15    lenders to receive more than a hundred percent of their

16    claim.    It does not.    The terms are set forth, the value's

17    fixed as of the effective date, and the plan does not so

18    provide.    With respect to the various objections concerning

19    the liquidation analysis, you've just addressed them.    The

20    NOL issue has been addressed.    The valuation issue has been

21    addressed.    The intellectual property rights have been

22    addressed.    Specifically, there the debtors indicated that

23    these have not been separately valued.    They have value only

24    in connection with the respect to businesses to which they

25    are licensed, and that value has been included in the various

1   subs that hold the licenses and in the parent as it's been

2   appropriate.  Mr. Korth takes objection to the up to 10

3   percent of stock having been reserved for some future

4   possible management plan.  There is no specific plan, the

5   record indicates.  That may have been Mr. Denton's

6   declaration, I -

7           MR. HIGGINS: That was Mr. Denton's declaration,

8   yes, Your Honor.

9           THE COURT: All right, and it's not a number that

10  is, at least in my experience, anywhere out of the ordinary

11  to be reserved for management, although I certainly

12  understand why it might be questioned.  I do not see in this

13  record that any insiders are voting on the plan.  That also

14  was addressed in the submissions and to the extent I have not

15  specifically mentioned any of the specific objections that

16  Mr. Korth raised, I will tell you, I reviewed and considered

17  each and every one of them and the debtors' responses both in

18  its brief and with respect to the various declarations that

19  have been submitted and the testimony given today and find no

20  merit in any of them, and therefore, I will overrule them.

21  Now, with respect to what Mr. Korth included as part of his

22  objection, which I guess, fairly should be considered a

23  motion to appoint a trustee, it seems to me, by confirmation

24  of the plan, the motion becomes moot.  In any event, even

25  were that not the case, no evidence whatsoever has been

1    submitted in support of that motion.  Neither does anything

2    in the record give me a basis to draw any inference that

3    there's any reason for appointment of a trustee.  This is a

4    plan that has received overwhelming creditor support and

5    that's reflected in the submissions, including the - I think

6    four declarations that have something to do one way or

7    another with respect to plan voting and voting tabulation and

8    the like.  The record demonstrates to me clearly that this

9    plan passes what is a relatively low threshold of

10   feasibility.  The record demonstrates that should at some

11   point, Dura be obligated by either agreement or judicial

12   decision to pay the cure amount to Johnson Electric, it will

13   be able to do so, and I find that since there is litigation

14   pending that will result under the terms in these

15   circumstances of the Bankruptcy Code of a prompt cure.  So,

16   therefore, I will overrule the Johnson Electric objection.

17   What remains to be considered?

18           MR. HIGGINS: Your Honor, we do have a form of

19   confirmation order.  There was a revised form that was filed

20   yesterday evening as compared to the one that was filed, I

21   believe it was on Thursday.  There are a number of minor non-

22   substantive changes primarily comments from the United States

23   Trustee and certain other constituencies including but

24   limited to the DIP lenders, the second lien lenders, and the

25   Committee, a number of ministerial changes we made moving a

1    couple of paragraphs about and correcting typographical and

2    other similar errors.  We had a couple of very minor

3    additional comments made by the DIP lenders and an agreement

4    with the U.S. Trustee to withdraw one clause that related to

5    the extent of applicable law, and we now have a clean that

6    we're prepared to hand up at this time to be entered.

7         THE COURT: All right.  You may hand it up.  Let me

8    just ask for the record, has anyone who wishes to had a

9    chance to review the latest revisions to the proposed

10   confirmation order and are there any comments?

11        MR. VERA: Thank you, Your Honor.  May it please the

12   Court, Andy Vera for the Office of the U.S. Trustee.

13        THE COURT: So nice to see you in the courtroom, Mr.

14   Vera.

15        MR. VERA: it's good to be here, Your Honor, thank

16   you.  Just for the record to indicate that we have reviewed

17   the form of order and changes were made to satisfy our

18   concerns, and we have no objection to the confirmation order

19   being entered.  There is one point to make for the record in

20   the amended plan supplement submitted by the debtor in

21   support.  Point 3 deals with two claim settlements for

22   administrative claims of Bennett Management and Wilford

23   Aubrey LLC.  I think those are the subject of pending

24   requests, and we'll just reserve any right - I don't know

25   that we've reviewed those yet but may wish to comment on

1    their acceptability in accordance with the Code.  Thank you,

2    Your Honor.

3            MR. HIGGINS: Your Honor, with respect to those two

4    pending administrative requests, we understand the U.S.

5    Trustee is reserving its rights.  I believe that doesn't

6    impact the order in any way.

7            THE COURT: All right.  Does anyone else care to be

8    heard in connection with the proposed order?  I hear no

9    response.  That order has been signed.

10           MR. HIGGINS: Thank you, Your Honor.  Just one last

11   housekeeping detail.  The motion to seal those two exhibits,

12   the debtors are withdrawing that motion at this time.

13           THE COURT: Very well.  There is one remaining

14   agenda item.

15           MR. HIGGINS: Your Honor, I believe you may be

16   addressing the Helfenbein -

17           THE COURT: I am.

18           MR. HIGGINS:  - matter.  We did submit under

19   certificate of counsel several days ago the form of order.

20   My apologies for not addressing that, and if Your Honor has

21   any questions at this time, we're prepared to answer them,

22   but we believe that all the parties agreed that the claim

23   should be allowed as a late-filed claim.

24           THE COURT: All right, now I understand that the

25   Axis objection is to be set for an evidentiary hearing at

1   some point and today we were to discuss that, but I take it

2   that there is no objection to my entering the order that's

3   been submitted.

4           MR. HIGGINS: Oh, that is my understanding, yes,

5   Your Honor.

6           THE COURT: All right.

7           MR. DRAPER (TELEPHONIC): Your Honor -

8           THE COURT: Yes.

9           MR. DRAPER (TELEPHONIC): Apologies, Tony Draper on

10  behalf of Axis Specialty Insurance.  The developments

11  yesterday speaking with counsel for the Helfenbeins, was that

12  the order would not yet be entered.  The request would be

13  that the Court would set the hearing to resolve the motion

14  and the objection.  So, the agreement between the parties was

15  that no order would be entered today, that a later hearing

16  would be set to address the matter.

17          MR. HIGGINS: Your Honor, we are happy to have that

18  set for a hearing at a later date.

19          THE COURT: Okay.  What is the parties' request?

20          MR. HIGGINS: Your Honor, we have two omnibus

21  hearings.  One is a week from today.  I suspect that that's

22  probably too soon, although we defer to the other parties on

23  that.  We also have a hearing, I believe, in June, on or

24  about June 18th, if my memory is serving correctly.

25          THE COURT: Well, how much time do you need?

1        MR. HIGGINS: I don't believe we need much time at

2    all, Your Honor.  We would be ready to proceed next week.

3        THE COURT: Well, I mean, for the hearing itself.

4        MR. HIGGINS: I would believe not long.  I would

5    imagine 30 minutes, probably, 45 minutes at the absolute

6    outside.

7        THE COURT: Let me hear from opposing counsel.

8        MR. DRAPER (TELEPHONIC): Your Honor, Tony Draper on

9    behalf of Axis.  If I understand correctly, the alternatives

10   were May 20th and/or June 18th?  But based on the proximity,

11   the preference would certainly be the 18th of June, but if

12   that wasn't a workable solution, then obviously I would make

13   the 20th work, although I do prefer June 18th.

14       THE COURT: Nancy, my vcal is going haywire.  Tell

15   me what June 18th looks like.

16       THE CLERK: June 18th has one other matter in the

17   morning and . . . (microphone not recording).

18       THE COURT: Okay.  Let's make it the 18th.  Anything

19   further on this matter?

20       MS. McLAUGHLIN: No, Your Honor.  Lisa McLaughlin

21   for the Helfenbein Estate.  That date's fine for us.  Thank

22   you.

23       THE COURT: All right.  Anything further for today?

24       MR. HIGGINS: Your Honor, I believe that concludes

25   everything on the agenda for today.

1           THE COURT: All right, that concludes this hearing.

2    Court will stand in recess.

3           (Whereupon at 11:23 a.m., the hearing in this

4    matter was concluded for this date.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18           I, Elaine M. Ryan, approved transcriber for the

19    United States Courts, certify that the foregoing is a correct

20    transcript from the electronic sound recording of the

21    proceedings in the above-entitled matter.

22

23    /s/ Elaine M. Ryan_____May 16, 2008
      Elaine M. Ryan
      2801 Faulkland Road
      Wilmington, DE 19808
      (302) 683-0221

## Exhibit G

June 5, 2008, Hearing Transcript

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                            .    Chapter 11
                                  .
DURA AUTOMOTIVE SYSTEMS, INC., .    Case No. 06-11202(KJC)
et al.,                           .    (Jointly Administered)
                                  .
          Debtors.                .    June 5, 2008 (11:02 a.m.)
                                  .    (Wilmington)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1              THE CLERK: All rise.  Please be seated.

2              THE COURT: Good morning, all.

3              ALL: Good morning.

4              MR. HIGGINS: Good morning, Your Honor.  Roger

5    Higgins for the debtors.  There is just one item on the

6    agenda today.  That is Mr. Korth's motion to stay the

7    confirmation order.  He filed an amended motion yesterday.

8    It is our understanding that Mr. Korth is appearing by

9    telephone today.

10             THE COURT: All right.  Mr. Korth, can you hear me?

11             MR. KORTH (TELEPHONIC): Yes, I can.  Can you hear

12   me?

13             THE COURT: I can, clearly.  It's your motion, sir,

14   you may proceed.

15             MR. KORTH (TELEPHONIC): Good morning.  Thank you

16   for allowing me to appear by telephone.  I have made a motion

17   to stay pending our appeal - or my appeal, mainly because I'm

18   trying to protect the interest of the subordinated

19   bondholders should any part of my appeal be successful and

20   find that there should be some common stock moved toward the

21   subordinated bondholders.  I think my appeal has merit.  I

22   believe the basic reasonable man test, as I didn't get a

23   chance to really ask any questions or do anything in the

24   confirmation hearing.  I think that irreparable harm may be

25   imminent if the Court goes through and wipes out the

1    interests of the subordinated bondholders without letting me

2    at least investigate a few more of those things that I

3    brought up.  I think it's in the public interest mainly

4    because there's so many people watching this especially lots

5    of foreigners.  I've got emails from all over the world

6    saying, you know, What's going on with your bankruptcy

7    system?  And I think following through and letting the whole

8    process go through the way it should and fully investigate

9    things is probably the way to go.  So, I think the public

10   interest really for both the United States and its citizens

11   and the view of the rest of the world should be to let this

12   thing proceed and to protect the interest of these people

13   until such time as, you know, we've covered every base,

14   basically.  The last thing though, I have responded, this new

15   amendment to my motion.  Reading the debtors' response, I

16   realized I did not consider as fully as I probably should the

17   interest of the debtor in getting, you know, this thing out

18   of bankruptcy and back into business and doing business as a

19   firm again and not under the supervision of the Court, and

20   with that thought, I basically said, The common stock of this

21   company is - and who gets it, is really what the issues are

22   at this point.  I think the revised plan works all the way to

23   the point of distribution of the common stock to the senior

24   noteholders and then, obviously, I'm arguing that there may

25   be reasons to move some of the common stock to the

1    subordinated bondholders for various reasons, one of which

2    is, I really think this 8 and 5/8ths percent note issue may

3    have been forced - forced in an investment banker's way.  I

4    mean, even the Kirkland opinion on the issuance of the 8 and

5    5/8ths percent notes in their legal opinion did not address

6    indenture for the 9 percent notes, which I think is highly

7    unusual, quite honestly, that anything that was so pertinent

8    to an issue of bonds that they should have covered it, but

9    with that said, I think that if - I'm asking for a limited

10   stay here, basically, and I'd like to see the common stock

11   effectively credited to the senior noteholders but then have

12   some limit, a restriction - I believe the Court can order it,

13   that would keep them from selling that common stock or

14   receiving any kind of distribution.  They could vote the

15   stock.  They could put the Board in place.  They could do all

16   the things that need to be done to get the company moving,

17   but at the same time, hold up any distributions or sales of

18   their stock until the appeal is completed.  I think that

19   meets the needs of both sides to the extent that the company

20   can move forward.  It can get out of bankruptcy.  It can get

21   its contracts.  It's really - the only issue is, you know,

22   who ultimately owns it and in what percentages.  And with

23   that said, I'm hoping that the Court will agree with me and

24   simply put on limited stay and say, you know, let's get out

25   of bankruptcy, let's go forward with this whole thing, but

1    you common stockholders have to sit for a little while to see

2    how this appeal works out, and that's where I'm at.

3         THE COURT: Thank you, Mr. Korth.  Let me now hear

4    from the objectors.

5         MR. HIGGINS: Your Honor, we have two witnesses who

6    are prepared to testify, Mr. Larry Denton, who is the

7    company's chief executive officer, and Mr. Jeffrey Finger,

8    who is a director at Miller Buckfire.  I would propose, in

9    view of Mr. Korth not being here in the courtroom to perform

10   a cross-examination and I don't believe there are any other

11   parties who are planning to ask any questions of these

12   witnesses, that we would introduce the two declarations into

13   evidence as the direct testimony for these two witnesses and

14   then make them available for any questioning by anybody in

15   the courtroom.

16        THE COURT: Is there any objection?

17        MR. KORTH (TELEPHONIC): Could I ask him a question?

18        THE COURT: Well -

19        MR. KORTH (TELEPHONIC): Or am I back in the same

20   position that I was before?

21        THE COURT: Mr. Korth, the proposal was that the

22   declarations be admitted as evidence with the opportunity to

23   ask questions.  So, do you have any objection to that

24   proposition?

25        MR. KORTH (TELEPHONIC): No.

1           THE COURT: Okay.  They're admitted as offered.

2    Now, in answer to your question, Mr. Korth, you run up now

3    against the same problem that we had with confirmation, and

4    that is, the Court's procedures, which are clearly set forth

5    on our website, require appearances in person.  There are

6    circumstances under which the Court's policy permits parties

7    to participate by telephone with the permission of the Court

8    provided sufficiently - a request has been made sufficiently

9    in advance of the hearing but there are exceptions to that

10   and specifically there are exceptions with respect to

11   evidentiary hearings, which this is in part.  There are

12   exceptions with respect to Chapter 11 confirmation hearings,

13   which my ruling was consistent with when you asked to appear

14   by telephone, and thirdly, basically in any other situation

15   in which the Court thinks it's more appropriate that a party

16   appear in person.  Now, you asked for permission to

17   participate by telephone today, and I gave it, but you have

18   to understand, you put yourself really in a very difficult

19   position, as well as the Court to some extent, when you

20   insist that you can only participate by telephone yet

21   complain that you're not permitted to participate in

22   violation of what the Court's policies are.  So, under these

23   circumstances, what I will permit, if you want, is a very

24   brief questioning by you of one or both of the witnesses that

25   have been proffered, but when I say brief, I mean brief.

1          MR. KORTH (TELEPHONIC): Thank you, Judge. As I sit

2   here, I really don't have any questions, and I apologize for

3   putting you in that position just now. Both of their

4   declarations basically say that the company needs to get out

5   of bankruptcy, in so many words, and I agree with them, and

6   that's why I filed the amendment basically to - my request

7   for a stay, to simply make it related to the common stock,

8   and with that, I don't really need to ask any questions

9   because basically I agree with them.

10         THE COURT: All right, thank you. Does the debtor

11  have anything further in support of its objection?

12         MR. HIGGINS: Your Honor, I would just point to the

13  revised or amended motion that Mr. Korth filed to say that

14  his proposal to sequester or escrow or do whatever it is with

15  the stock that he's proposing would result in a fundamentally

16  different plan than the creditors voted on back in April and

17  May and in fact, Your Honor, is unworkable on a variety of

18  levels.  I'm happy to spend some time talking about that.

19         THE COURT: I think you need to elaborate, yes.

20         MR. HIGGINS: Yeah. Your Honor, I mean, it's a

21  threshold matter.  Not distributing the stock on or about the

22  effective date to the senior noteholders and to the other

23  general unsecured claims holders would result in a

24  fundamentally different economic result for those creditors

25  than is contemplated by the revised plan. As the Court may

1    recall, the common stock, there is a three-year period in

2    which the company may redeem the convertible preferred stock

3    if the new common stock is not issued.  We're not sure how

4    that three-year period would work.  It either starts on the

5    effective date as contemplated by the revised plan in which

6    case the rights of the senior noteholders/new common

7    stockholders would be severely compromised or you start that

8    three-year window when Mr. Korth's appeal is over, which

9    would severely compromise the rights of the convertible

10   preferred securities holders and second lien lenders, neither

11   of which are palatable alternatives as a threshold matter.

12   Second, and I think even more importantly is, if Mr. Korth

13   were to be successful on this appeal and then successful as a

14   substantive matter on whatever issue there may be there - we

15   obviously don't think there are any, and the subordinated

16   noteholders were seen as being pari passu with the senior

17   noteholders, and that is a fundamental change to the

18   assumptions underlying and the legal conclusions underlying

19   the revised plan that there would have to be essentially a

20   new plan, at least in part, a major part, that would have to

21   be again solicited at the very least to the senior

22   noteholders and maybe to the second lien holders.  I mean,

23   it's impossible to tell at this point.  In other words, you

24   can't go effective on part of a plan and then go back and re-

25   solicit.  I mean, there's just no capacity for that in the

1    Bankruptcy Code, and we would suggest that Mr. Korth's

2    amended motion, therefore, makes absolutely no difference in

3    terms of the stay.  It's either a stay of the confirmation

4    order or there isn't a stay, and I think for the reasons that

5    we set forth at some length in our papers and as the

6    Committee and the second lien lenders joined is that that

7    stay on a variety of levels simply does not work and would be

8    absolutely inimical to the interests of the debtors, their

9    creditors, and inimical to the public interest as a whole.

10         THE COURT: Thank you.  All right.  I'll follow the

11   order of the agenda and hear from the objectors in the order

12   in which their filings are listed.  Does the Committee wish

13   to be heard?

14         MR. MANNAL: Your Honor, Doug Mannal for the

15   Creditors Committee from the law firm of Kramer Levin.  As

16   more fully stated in our objection and joinder, Your Honor,

17   Mr. Korth has failed to meet the requirements necessary for

18   any stay, modified or not.  The restrictions requested by Mr.

19   Korth on the equity would significantly decrease the value of

20   the equity going to unsecured creditors and would be a

21   fundamental change to the revised plan.  As articulated by my

22   colleague, Mr. Higgins, the Committee supports the debtors'

23   objection, and I believe is also supported by the Bank of New

24   York.  Thank you, Your Honor.

25         THE COURT: Thank you.  Would the Second Lien Group

1    care to be heard?

2           MR. ALBALAH (TELEPHONIC): Very, very briefly, Your

3    Honor.  David Albalah, of Bracewell & Giuliani.  We support

4    fully the statements of counsel for the debtor and the

5    Committee.

6           THE COURT: All right.  Does the Bank of New York

7    care to be heard?

8           MR. KORTH (TELEPHONIC): I didn't hear you, Judge.

9    This is Jim Korth.

10          THE COURT: I asked if the Bank of New York cared to

11   be heard and counsel is coming to the podium and Mr. Korth,

12   so that you know, is once I've heard from others, I will give

13   you an opportunity for rebuttal.

14          MR. SZANZER: Good morning, Your Honor.  Steven

15   Szanzer from Wilkie, Farr & Gallagher, counsel to the Bank of

16   New York Trust Company, indenture trustee for the senior

17   notes.  The indenture trustee agrees with and supports the

18   debtors and the Committee in their opposition to Mr. Korth's

19   original and amended motion for a stay pending appeal.

20   Accordingly, the indenture trustee respectfully submits that

21   the Court should deny Mr. Korth's motions and allow the

22   debtors to proceed to consummating the confirmed plan of

23   reorganization.  Thank you.

24          THE COURT: Thank you.  Does anyone else care to be

25   heard?  I hear no further response.  Mr. Korth, you have the

1    opportunity now to have the last word.

2        MR. KORTH (TELEPHONIC): I believe that if you can

3    issue this common stock, distribute it to the people, give it

4    to the senior noteholders but simply put a restriction on it

5    until such time the appeal is over.  I don't think it stops

6    anybody from doing anything.  In the long run, that common

7    stock will have its value as to what it is, and I don't think

8    there's any reason to not go ahead that way, let them vote

9    the stock, let them elect a Board of Directors, let them go

10   forward with everything but just simply not sell it and not

11   receive a distribution of cash from this company until such

12   time as the appeal is over.  I think that's very reasonable,

13   and that's what I have to say.

14       THE COURT: All right, thank you, sir.  I am

15   prepared to make my ruling on this motion as modified and,

16   Mr. Korth, because you are not represented by counsel, I am

17   going to read into the record to some extent, greater extent

18   then I might normally do so, the standards under which I am

19   evaluating and deciding your motion and the objections to it.

20   So, let me proceed.  In determining whether to grant the stay

21   pending appeal, Courts should consider: (1) Whether the stay

22   applicant has made a strong showing that he is likely to

23   succeed on the merits.  (2) Whether the applicant will be

24   irreparably injured absent a stay.  (3) Whether issuance of

25   the stay will substantially injure the other parties

1    interested in the proceeding, and (4) Where the public

2    interest lies.  The Court may deny a motion for a stay if the

3    movant fails to make a showing on any of the above factors.

4    However, none of the factors are determinative and Courts

5    must balance all of the factors in order to decide whether or

6    not to grant the stay.  These statements I've quoted from

7    Judge Walsh's 2007 decision in <u>Genesis Health Ventures</u>,

8    relying in large measure on well-established Third Circuit

9    law in its <u>Republic of Philippines</u> case which was decided in

10   1991.  Let me turn to a treatise which summarizes some of how

11   the Court is to weigh and balance these factors.  It requires

12   the balancing of the equities as they affect the parties and

13   the public.  For example, a stay may be denied even though it

14   is assumed that the applicant may suffer irreparable injury

15   without the stay if the applicant does not make a showing

16   related to the other three requirements.  Moreover, the

17   public interest may warrant denial of the stay.  To justify

18   the granting of the stay, the movant need not always

19   establish a high or mathematical probability of success on

20   the merits.  In fact, it is unlikely that a Court will find

21   that there is a certainty that the appeal will be successful

22   since such a finding implies that the Court erred.

23   Consequently, some Courts have held that a movant may also

24   have a motion granted upon a lesser showing of a substantial

25   case on the merits when the balance of the equities of the

1    other factors weighs heavily in favor of granting the stay.

2    Other Courts have held that the showing of probability of

3    success on the merits is inversely proportional to the degree

4    of irreparable injury evidenced and that a stay may be

5    granted with either a high probability of success and some

6    injury or vice versa.  Simply stated, more of one excuses

7    less of the other, however, the movant is always required to

8    demonstrate more than the mere possibility of success on the

9    merits, and as Judge Lifland said in his Calpine decision of

10   earlier this year, the moving party carries a heavy burden in

11   that all four criteria must be satisfied to some extent

12   before a stay is granted.  Let me address briefly the issue

13   of whether a bond would be posted.  Even if the movant is

14   entitled to a stay, if the stay pending appeal is likely to

15   cause harm by diminishing the value of an estate or endanger

16   interest in the ultimate recovery, which is being alleged

17   here, there is no good reason not to require the posting of a

18   bond at which point the Court should set a bond at or near

19   the full amount of the potential harm to the non-moving

20   parties.  As such, the movant here would be required to post

21   a substantial bond that is commensurate with the threatened

22   loss to the non-moving parties.  That's from the Adelphia

23   decision decided in '07 by the District Court in the Southern

24   District of New York.  Let me address one by one the factors

25   by which I am bound in determining whether relief should be

1    granted here.  First, whether the movant here is likely to
2    succeed on appeal.  As the debtor points out in its
3    objection, Mr. Korth's appeal is based primarily on two
4    things: one is the Court's requiring him to attend personally
5    the confirmation hearing in accordance with the Court's
6    posted policies and my order, and secondly, the consequence
7    of which was to bar him from cross-examining a witness.  As I
8    mentioned earlier, chambers procedures which have been in
9    effect for some time along with the telephonic appearance
10   policy of the Court require in Chapter 11 confirmation
11   hearings specifically that the debtor, debtor's counsel, and
12   all objecting parties must appear in person.  In addition,
13   appearances are required with respect to all evidentiary
14   hearings and any other matter designated by the Court as one
15   requiring a personal appearance.  This is why I required the
16   personal appearance of Mr. Korth in confirmation.  He
17   complained that the Court gave him too little notice to be
18   able to appear in person.  I think that puts it backwards.
19   Rather, personal appearances are ordinarily expected.
20   Telephone appearances are the exception and given at the
21   discretion of the Court, and in a situation in which there is
22   a substantial objection, particularly to confirmation of a
23   plan - and I did consider your objection substantial, Mr.
24   Korth, personal appearance is absolutely necessary especially
25   when witnesses were to be examined in person.  And the fact

1    that you are a *pro se* litigant does not excuse you from

2    complying with the Court's well-established available

3    procedures.  You also indicate that you had not enough time

4    to prepare for the hearing.  Well, according to the

5    disclosures made by counsel who at one time represented you,

6    you've been at least represented actively in this case since

7    November of last year.  The record at confirmation and with

8    respect to the pre-confirmation activity reflects, I think

9    pretty clearly, the debtors' and others' efforts, including

10   the Committee which represents your interests officially

11   along with others, undertook if not extraordinary lengths

12   then I would say considerable efforts to respond to your

13   various requests which were made actually very late in the

14   process, and much of the information which you wanted to have

15   available to you has actually been out there for some period

16   of time as the debtor sets out in its objection including the

17   liquidation analysis, the valuation analysis, issues

18   regarding fixed charge coverage ratio, and I know I'm just

19   touching on some of the things that were the subject of your

20   request.  I will tell you, Mr. Korth, it's my impression that

21   what happened here was that you came fully immersed in the

22   process just too late but not certainly without sufficient

23   notice of what was moving forward.  The debtor goes into

24   extensive arguments in its submission about how in connection

25   with the earlier failed effort to reach confirmation there

1    was involvement, much discovery offered and given to your

2    counsel.  So, I find the arguments about timing unavailing,

3    but let me turn to whether you might suffer irreparable harm.

4    Frankly, you've offered no evidence of this, and the case law

5    is clear that the moving party has the burden to offer

6    evidence of irreparable harm.  Now the debtor raises on your

7    behalf an argument that you might have made called "equitable

8    mootness".  That is, by the time the appeal may be

9    considered, because of how things would have been permitted

10   to progress without the benefit of a stay, a Bankruptcy

11   Court, even if you were successful on appeal with the

12   appellate court, would be unable to order effective relief,

13   but the cases also say that using that as a basis for

14   obtaining a stay is insufficient and with that I agree.  Also

15   not unlike the parties that were involved in the Calpine

16   decision, Mr. Korth, you're a sophisticated investor.  The

17   Bankruptcy Rule 2019 statement shows that the purchases made

18   by your company, all but one were made after the filing of

19   the bankruptcy petition.  I've yet to find the investor, the

20   unsophisticated investor, who's made such a purchase.

21          MR. KORTH (TELEPHONIC): Judge, I -

22          THE COURT: Now, Mr. Korth, I'm reading my ruling.

23   It is not for you to speak at this point.

24          MR. KORTH (TELEPHONIC): Sorry.

25          THE COURT: And with respect to your late entry and

1   emerging into the confirmation process, I will note that you

2   basically bought yourself individual standing which you did

3   not previously have.  I think it was on the eve of the

4   disclosure statement hearing.  I could stand corrected on

5   that, but it was late in the process.  Before then you didn't

6   even have individual standing, and with respect to every

7   motion that you filed, whether you requested it or not, the

8   Court heard it on an expedited basis and relieved you, I

9   think, in almost every instance if not every instance of the

10  otherwise applicable rules which would require you to give

11  certain notices in connection with the filing of those

12  motions including this one.  The Court directed the debtor to

13  give the appropriate notice, and the debtor in its objection

14  tracks a further history of the opportunities that you would

15  have had to participate in the case.  So, again, timing,

16  because of your failure to take advantage of the

17  opportunities that were afforded you in the process until

18  very late, do not strike me as putting you in a position to

19  claim that failure to give a stay causes irreparable injury.

20  Let me turn to the third factor.  I am convinced on this

21  record that issuance of a stay would put the plan at the risk

22  of failure and just to use a couple of examples, the debtor

23  has pointed out, and this is apparently not disputed, that on

24  June 20th a default under its DIP loan will be triggered if

25  the plan has not gone effective.  In addition to that, based

1    upon the record that's made here, the debtor has asserted
2    that there will be additional expenses, $6 million a month in
3    professional fees and post-petition interest, lost customer
4    commitments, and possibly tens of millions of dollars if
5    sales decrease in part related to the fact that in this
6    industry it takes so long to generate a sale with respect to
7    a product that it takes a period of years, really, to bring
8    it to fruition, and if the debtor cannot begin on that now
9    because it says it is unlikely to get such orders, it will
10   further - it will make more remote the possibility that the
11   plan will be successful.  Let me turn now to just a brief
12   discussion of where the public interest lies.  As the Judge
13   said in Calpine, there is a strong public need for finality
14   of decisions especially in bankruptcy proceedings.  The
15   public interest requires Bankruptcy Courts to consider the
16   good of the case as a whole and not individual investment
17   concerns.  The public interest cannot tolerate any scenario
18   under which private agendas can fort the maximization of
19   value.  Having determined that, Mr. Korth, you're unlikely to
20   succeed on appeal here, I find that the public interest is
21   better served by allowing distributions under the plan, and
22   the public interest, I think under these circumstances in the
23   expeditious administration of this bankruptcy case as well as
24   in the preservation of the estate's assets for purposes of
25   distributions to creditors rather than litigation of claims

1    lacking a substantial possibility of success, outweighs any

2    interest that you might have individually in obtaining a

3    stay.  Even if I were to determine that you were entitled to

4    a stay, I would require a bond.  The debtors suggest in its

5    papers a minimum of a $380 million bond be posted based upon

6    the following elements: The one year of professional fees and

7    expenses at $72 million; loss of senior noteholder claims at

8    nearly $80 million; and the value of the second lien claims

9    at about $228 million.  You offered here no evidence to the

10   contrary, Mr. Korth, and because of that, I don't think it's

11   necessary for me to determine what the precise figure of a

12   bond that would be required, but it certainly seems to me

13   that based upon the record that's been made, even if I were

14   to determine you were entitled to a stay, I would required a

15   posting of a bond in the hundreds of millions of dollars, and

16   there's no evidence that you would be either able or willing

17   to post such a bond.  So, for all of these reasons, the

18   motion will be denied.  Is there anything further for today?

19           MR. HIGGINS: Your Honor, this is Roger Higgins for

20   the debtors.  There are no further items for today.

21           THE COURT: Then I would ask that counsel confer and

22   submit a form of order which denies the motion but without

23   repeating them, referring to the reasons for the decision

24   having been read into the record today by the Court.

25           MR. HIGGINS: We will do so and circulate that to

1    Mr. Korth as soon as we can, Your Honor.

2         THE COURT: All right, thank you.  That concludes

3    this hearing.  Court is adjourned.

4         (Whereupon at 11:33 a.m., the hearing in this

5    matter was concluded for this date.)

6

7

8

9

10

11

12

13

14

15

16

17

18         I, Elaine M. Ryan, approved transcriber for the

19   United States Courts, certify that the foregoing is a correct

20   transcript from the electronic sound recording of the

21   proceedings in the above-entitled matter.

22

23   /s/ Elaine M. Ryan_____June 10, 2008
     Elaine M. Ryan
     2801 Faulkland Road
     Wilmington, DE 19808
     (302) 683-0221

# **Exhibit H**

Chambers Procedures for the Bankruptcy Court

Effective 4/3/06

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF DELAWARE

## GENERAL CHAMBERS PROCEDURES

Unless otherwise ordered, the following procedures apply to all Judges and are to be followed when practicing in this Court. For additional guidelines, consult the individual Judge's chambers page, the chapter 13 procedures and/or the general order regarding preference adversaries.

1.  General Provisions:

    a.  The Local Rules for the United States Bankruptcy Court for the District of Delaware will govern all procedural aspects of the case.

    b.  Any deliveries to chambers must be made during normal business hours.

    c.  All orders submitted to chambers following a hearing shall be accompanied by a certification of counsel (see Del. Bankr. LR 9013-1(k)) and promptly filed. No bare orders or letters will be considered. If orders are not submitted promptly after the hearing, there may be a delay in entry of the order.

    d.  The Clerk's office will correct the docket by designating document as "Entered in Error" only if the Clerk's office entered it in the wrong case. If a document is erroneously filed electronically and needs to be removed, a notice of withdrawal must be filed.

2.  Pleadings:

    a.  General

        i.  All documents delivered to chambers shall have the docket number and date of filing in the bottom right-hand corner of the first page. Do not attach the notice of electronic filing.

     ii.  All motions (except those filed in adversary proceedings) and stipulations requiring notice under Fed. Rule Bankr. Proc. 9019 must be filed with a hearing date and objection deadline. (See Del. Bankr. LR 9006-1(c)).

     iii.  Stipulations must have a separate proposed order attached. "So Ordered" clauses are not permitted.

     iv.  All proposed orders shall reference the motion and the docket number of the motion in the caption.

     v.  Certificates of no objection (CNO) shall be filed no sooner than two business days after the objection deadline has passed to allow for any paper filings to be entered on the docket.

     vi.  All briefs and memoranda (in main bankruptcy cases and in adversary proceedings) must comply with Del. Bankr. LR 7007-2 (form and content of briefs). No objection to, or briefs or memoranda in support of, confirmation shall exceed 40 pages.

  b.  First Day Pleadings

     i.  Do not deliver drafts of first day motions to the Clerk's office or chambers. They are to be delivered in final form only after those motions have been filed.

     ii.  No retention applications will be considered on the first day (except regarding a claims agent). Such applications must be noticed for a scheduled omnibus hearing date.

     iii.  A proposed budget must be included in the first day hearing binder.

     iv.  No motion seeking authority to pay pre-petition obligations will be considered unless the motion and attached order include the maximum amount sought to satisfy these pre-petition obligations.

3.  Agendas and Binders:

  a.  Please refer to the "Hearing Binder Guide" on the Court's website regarding agendas and hearing binders.

b.   A notice of agenda, which shall include the docket
     number and filing date of each document listed, shall
     be filed by 12:00 noon, two business days prior to the
     hearing date in accordance with Del. Bankr. LR 9029-3.

c.   Local counsel for the debtor or trustee is responsible
     for the timely filing, delivery, correctness and
     completeness of the notice of agenda and the related
     hearing binder.  Piecemeal delivery of the notice of
     agenda and the relevant pleadings is not appropriate.
     Absent compelling circumstances, only those items
     listed on the notice of agenda and the relevant
     pleadings timely delivered to chambers will be
     considered.  If the notice of agenda and related
     pleadings are not delivered within the prescribed time
     limit, local counsel for the debtor or trustee may be
     assessed a $100 fine.

d.   Counsel is required to inform the Judge's chambers
     immediately if the status of a matter listed on the
     notice of agenda as going forward has changed (e.g.,
     settled or continued).

e.   Counsel cannot reschedule or cancel a hearing without
     consent of all interested parties and the courtroom
     deputy.  This includes hearings where all matters have
     certificates of no objection filed.  The Court must
     review those matters with certificates of no objection
     and determine if a hearing is necessary.  Chambers will
     then notify counsel to file an amended agenda
     cancelling the hearing.

f.   Hearing binders shall contain the notice of agenda, and
     unbound copies of all documents listed as "going
     forward", with each document tabbed in accordance with
     the notice of agenda.

g.   Hearing binders shall contain only the substantive
     documents necessary for the hearing (e.g., motions and
     responses going forward).  Do not include in the binder
     certificates of service or the service lists filed with
     each pleading unless an issue has been raised about
     sufficiency of service, in which case only the
     appropriate portion of the service list shall be
     included.

h.   A separate CNO binder shall be filed by the debtor or
     trustee with the hearing binder and notice of agenda

3

containing any uncontested matters where certificates of no objection have been timely filed.  Do not send loose copies of the certificates of no objection and related motions; inclusion in the CNO binder is sufficient.

i.   Hearing binders are to be delivered directly to chambers by 12:00 noon, two business days prior to the hearing date.  A late hearing binder may result in a $100 fine for debtor's local counsel.

j.   Generally, binders will be available for firms to pick up in the lobby outside the courtroom after the hearing.  Please remove them promptly.

4.   Hearings:

a.   General

i.   A first day hearing will be scheduled no sooner than 24 hours after receipt of the first day binder.

ii.  If requesting an expedited hearing, a motion for expedited hearing shall be filed and a hard copy, together with a copy of the underlying motion to be heard, shall be delivered to chambers for review.  The Court will then determine the appropriate hearing date.

b.   Telephone and Video Conferencing Requests

i.   All requests for telephonic participation must be made through the Court-approved teleconferencing facilitator.  Please visit the Court's website for information, instructions and fees.

ii.  Video conferencing requests shall be made to the courtroom deputy no later than one business day prior to the scheduled hearing.

c.   Proposed Orders

i.   Counsel presenting matters at a hearing shall bring to the scheduled hearing one unstapled copy of each proposed order with the related document number to be handed up for signature.  The copy is

4

to be the same as the proposed order filed with
the motion and in the hearing binder.  If the
proposed order has been revised, counsel shall
also present to the Court a blacklined copy
showing the changes made and shall make available
additional copies of both the proposed order and
blacklined copy for parties in interest.

5.   Matters Not Requiring a Hearing

   a.   The following documents that seek Court approval
        without a hearing shall be delivered directly to
        chambers immediately upon filing.

        i.    Motions for Admission Pro Hac Vice

        ii.   Motions to Shorten Notice, along with any
              referenced motion

        iii.  Stipulations (with a separate order attached) that
              do not require notice under Fed. Rules Bankr.
              Proc. 9019, along with any referenced motion

        iv.   Certifications of Counsel, along with the
              referenced motion and other relevant documents

   b.   All documents shall have the docket number and date
        filed in the bottom right-hand corner.  If the
        documents are not delivered to chambers, they will not
        be considered.

6.   Adversary Proceedings

   a.   All motions filed in adversary proceedings shall be
        subject to Del. Bankr. LR 7007-1 (briefs and schedule).
        No hearing will be scheduled unless the Court directs.

   b.   Once briefing is completed, the movant shall file a
        notice of completion of briefing, which shall include a
        list of all relevant pleadings and related docket
        numbers.  Counsel shall then deliver a binder with the
        relevant pleadings to chambers.

   c.   Motions to approve a settlement of an adversary
        proceeding shall be filed in the main bankruptcy case
        and the related adversary proceeding.  The Judge

assigned to the main bankruptcy case is responsible for approving settlement motions.  Upon entry of an order approving a settlement, the adversary proceeding will be closed.

7.   Fee Applications

a.   All fee applications will be considered in accordance with the Local Rules and the respective administrative order entered in each case.

b.   Certificates of no objection to monthly statements shall be filed but not delivered to chambers.  When fee applications are scheduled on a quarterly basis, copies of the certificates of no objection and their respective fee applications shall be included in the hearing binders.

c.   Interim fee applications will be scheduled on omnibus hearing dates on a quarterly basis and shall be designated on the proposed order scheduling omnibus hearings.

d.   A representative for each applicant personally familiar with the services rendered and costs incurred that are the subject of the application shall appear in person at the hearing in support of the application.  If such person is not local counsel, then arrangements may be made through the Court-approved teleconferencing facilitator to appear telephonically.

e.   Fee applications must be in a separate hearing binder containing an index and delivered to chambers one week prior to the scheduled fee hearing.  Please do not submit a separate fee binder for each professional.

f.   Fee application binders will be returned if matters do not go forward and shall be resubmitted at the appropriate time for the rescheduled hearing.

g.   Cases with $100 million or more in assets and/or liabilities may have fee auditors appointed by the Court.

h.   Counsel responsible for the agenda must prepare a chart of fees requested by all Court-approved professional firms.  Such chart shall be submitted to chambers at

the time the fee application binders are delivered (one week prior to the hearing). The chart shall include the following information for each firm:

i.    The firm's role in the case (e.g., Debtor's counsel, Committee counsel);

ii.   The fee period during which such firm was retained;

iii.  Total fees and expenses requested in the case;

iv.   Amounts approved to date;

v.    Amounts outstanding; and

vi.   Amounts of any voluntary reductions.

i.  In addition, the chart shall include a grand total of all professional fees and expenses in the case.

j.  Refer to Del. Bankr. LR 2016-2 for additional information regarding fee applications.

8.  Objections to Claims

a.  Declarations must be filed in support of all claim objections, including non-substantive objections. Counsel cannot certify whether claims are duplicative, amended or late-filed unless they have personally reviewed those claims.

b.  In the event a portion of a particular claim objection is continued to a future hearing date, only the claims/responses that are the subject of that hearing shall be listed on the subsequent notice of agenda. A chart showing the status of all remaining claims/responses shall also be attached.

c.  Claims binders shall be delivered to chambers two weeks prior to the scheduled hearing. The omnibus objection to claims and the declaration shall be included with any claims going forward in the binders.

d.  Claims binders will be returned if matters do not go forward and shall be resubmitted at the appropriate time for the rescheduled hearing.

## **Exhibit I**

Instructions for Telephonic Appearances in the Bankruptcy Court

INSTRUCTIONS FOR TELEPHONIC APPEARANCES
EFFECTIVE JANUARY 5, 2005

The United States Bankruptcy Court for the District of Delaware has arranged for parties to participate by telephonic appearance in hearings using CourtCall, an independent conference call company.

**Under no circumstances may any participant record or broadcast the proceedings conducted by the Bankruptcy Court.**

I.    POLICY GOVERNING TELEPHONIC APPEARANCES
      **Local counsel must appear in person in all matters before the Court.**

Telephonic appearances are allowed in all matters before the Court except the following:

1. Trials and evidentiary hearings - all counsel and all witnesses must appear in person;

2. Chapter 11 status conferences - debtor and debtor's counsel must appear in person, other parties in interest may appear telephonically;

3. Chapter 11 confirmation hearings - debtor, debtor's counsel, and all objecting parties must appear in person;

4. Hearings on reaffirmation agreements - debtor must appear in person;

5. Any matter designated by the Court as one requiring a personal appearance.

No telephonic appearance will be allowed unless it is made through CourtCall pursuant to the procedures set forth in Section II.

Parties filing a motion, application or other pleading, including, without limitation, an objection or response thereto, may participate by telephonic appearance. Any party not submitting a pleading, but interested in monitoring the Court's proceedings, may participate by telephonic appearance in "listen-only" mode.

If an individual schedules a telephonic appearance and then fails to respond to the call of a matter on the calendar, the Court may pass the matter or may treat the failure to respond as a failure to appear. Individuals making use of the conference call service are cautioned that they do so at their own risk.

To ensure the quality of the record, the use of car phones, cellular phones, speaker phones, or phones in other public places is prohibited. Each time you speak, you must identify yourself for the record. Do not place the call on hold at any time. When the Judge informs the participants that the hearing is completed, you may disconnect.

II.    SCHEDULING A TELEPHONIC APPEARANCE

1. Participants must notify CourtCall toll free by phone (866-582-6878) or by facsimile (866-533-2946) no later than 12:00 p.m. two business days prior to the hearing.

2. Participants must provide the following information:

      a. Case name and number
      b. Name of Judge
      c. Hearing date and time
      d. Name, address, phone number of participant
      e. Party whom participant represents
      f. Matter on which the participant wishes to be heard or whether the participant intends to monitor the proceeding in "listen-only" mode.

3. Participants intending to be heard by the Bankruptcy Court must send written notification to debtor's counsel and/or opposing counsel providing same information as above.

4. Participants will receive fax confirmation and instructions for telephonic appearance from CourtCall.  It is the participant's responsibility to dial into the call not later than 10 minutes prior to the scheduled hearing.

5. Any questions about telephonic appearances should be directed to CourtCall at 866-582-6878.

III.    FEES

The fee for the telephonic appearance is fixed by CourtCall depending on the length of time the participant is on the call, regardless of whether the participant is actually heard by the Bankruptcy Court or is in "listen only" mode.  Each participant will be charged or billed an initial fee of $50.00 at the time of reservation with CourtCall, with appropriate increments, if any, to be charged or billed based upon the Fee Rate.

The Fee Rate for telephonic appearances is as follows:

| Call length | Fee |
| --- | --- |
| 0-90 minutes | $ 50.00 |
| 91-180 minutes | $ 80.00 |
| 181-270 minutes | $120.00 |
| 271-360 minutes | $160.00 |
| 361 minutes and above | $ 40.00 per each additional 90 minute increment |

There are no subscription fees and no special equipment is required to use the service.

**Exhibit J**

Debtors' Response to the Korth Motion to Stay

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DURA AUTOMOTIVE SYSTEMS, INC., | ) | Case No. 06-11202 (KJC) |
| et al.,[1] | ) | |
| | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | **Re: Docket No. 3383** |

---

## DEBTORS' OBJECTION TO J W KORTH'S MOTION FOR STAY PENDING APPEAL

---

Mr. Korth's motion (the "Motion to Stay") for a stay of the Confirmation Order pending his appeal of that order fails to meet any of the criteria for such a stay:[2]

- *No Substantial Likelihood of Mr. Korth's Appeal Succeeding on the Merits.* The sole basis for Mr. Korth's appeal of the Confirmation Order is an alleged failure of procedural due process: he asserts that he lacked sufficient notice of the confirmation hearing to attend in person and had insufficient time to prepare for the hearing. The well-established facts of these chapter 11 cases contradict both contentions. Moreover, this Court's confirmation timetable allowed more than sufficient opportunity for parties to make themselves heard prior to, and at, the Confirmation Hearing.

- *No Risk of Harm to Mr. Korth's Interests.* Although consummating the Revised Plan may well render Mr. Korth's appeal equitably moot, that consequence does not, in and of itself, present a risk of irreparable harm to an appellant's interests. In any case, Mr. Korth has had more than ample opportunity to pursue his investigation. Yet he only now is seeking more time. Mr. Korth cannot plead "irreparable harm" resulting from his own many months of inaction. In any event, there is no indication that permitting the Revised Plan to be consummated will cause Mr. Korth any harm, let alone irreparable harm. The Subordinated Notes are out of the money in any conceivable scenario, and the Senior Notes held by Mr. Korth will be helped—not harmed—by this Court permitting the Revised Plan to become effective.

---

[1] The "Debtors" comprise the entities set forth in the *Order Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure Directing Joint Administration of the Debtors' Chapter 11 Cases*, entered on October 31, 2006 [Docket No. 68].

[2] The "Confirmation Order" is the *Order Confirming Debtors' Revised Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Docket No. 3332], entered May 13, 2008. Capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the *Debtors' Memorandum of Law in Support of Confirmation of the Reorganized Debtors' Revised Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (with Technical Amendments)* [Docket No. 3277] (the "Brief in Support of Confirmation").

- ***A Stay Would Irreparably Harm the Debtors - and Creditor Recoveries***.  By contrast, any failure by the Debtors to promptly consummate the Revised Plan would almost certainly damage the Debtors' future business prospects.  And any damage to the Debtors' future business prospects will only harm their creditors, the vast majority of whom will receive their recoveries in the form of equity in the Reorganized Debtors.  Moreover, any significant delay long enough to resolve an appeal would almost certainly destroy the Debtors' exit financing arrangements and lead to default under the Debtors' DIP financing facilities.

- ***Denying the Motion to Stay is in the Public Interest***.  The Revised Plan is a product of negotiation and compromise among all of the Debtors' creditor constituencies.[3]  Public interest would be, to say the least, ill-served if Mr. Korth's appeal were to delay consummating the Revised Plan.  And such a delay—on these facts—would potentially set a terrible precedent; for, if Mr. Korth's objection and appeal were able to delay the Debtors' consummating the Revised Plan—a chapter 11 plan which is unreservedly supported by the Committee and Senior Notes Indenture Trustee (each of whom represents the interests of creditors similarly situated to Mr. Korth), not only would such a delay harm *all* parties-in-interest in these chapter 11 cases (including Mr. Korth himself), but *pro se* creditors in other chapter 11 cases could be empowered to seek a similarly powerful "veto power" by indefinitely delaying confirmation—and consummation—of otherwise fully consensual chapter 11 plans.

The Motion to Stay should be denied because there is no legal or factual basis for staying the Confirmation Order.

But, even if the Court were to find grounds to grant the Motion to Stay, any such stay of the Confirmation Order would require Mr. Korth post a bond sufficient to cover the damage inflicted upon the Debtors and each of their creditor constituencies—particularly those who are junior in priority (such as the Senior Notes holders and Other General Unsecured Creditors). The Debtors therefore demand that any such stay be accompanied by a bond equal to or exceeding the value of out-of-pocket costs, as well as creditor recoveries—an amount that will have to be many hundreds of millions of dollars.

---

[3] Indeed, the Creditors' Committee, Second Lien Group and Senior Notes Indenture Trustee each will be filing papers supporting the Debtors' Objection.

I.    **The Motion to Stay Fails to Meet Any of the Criteria Necessary to Stay the Confirmation Order Pending Appeal**

1.    To prevail on his Motion to Stay, Mr. Korth must carry the "heavy burden" of showing that: (1) he is likely to succeed on the merits; (2) that he will be irreparably injured absent a stay; (3) issuing the stay will not substantially injure the other parties interested in the proceeding; and (4) public interest favors issuance of the stay. *In re Genesis Health Ventures, Inc.*, 367 B.R. 516, 519 (Bankr. D. Del. 2007) (citing *Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 658 (3d Cir. 1991); *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) (listing "general standards governing stays of civil judgments")); *In re Calpine Corp.*, 2008 WL 207841 at *4 (Bankr. S.D.N.Y., Jan. 24, 2008) ("A party seeking a stay [under Rule 8005] has a heavy burden" in seeking to stay a confirmation order).

2.    As Judge Walsh observed:

> A court may deny a motion for a stay if the movant *fails to make a showing on any of the above factors* ... However, none of the factors are determinative and courts must balance all of the factors in order to decide whether to grant a stay.

*Genesis Health Ventures*, 367 B.R. at 519  (Court considered "each of the factors individually") (omitting citations) (emphasis added); *see also Hertz Corp. v. ANC Rental Corp. (In re ANC Rental Corp.)*, 2002 WL 1058196 at *2 (Bankr. D. Del. May 22, 2002); *Fox v. Mandiri (In re Perry H. Koplik & Sons, Inc.)*, 2007 WL 781905, at *2 (Bankr. S.D.N.Y. Mar. 13, 2007) ("The test for granting a stay under Bankruptcy Rule 8005 is conjunctive—as noted by the word "and" between the third and fourth factors. Thus, each of the four requirements must be satisfied").

3.    On its face, Mr. Korth's Motion to Stay fails because Mr. Korth has failed completely to make any showing on *any* of these factors. He has presented *no evidence of any kind* to carry his "heavy burden" of proof as to any of the factors—whether in the form of witnesses, "affidavits, declarations, or other appropriate evidence." *See Calpine*, 2008 WL

3

207841 at *5 (listing types of evidence). Based upon this failure alone—without more—the Court should deny Mr. Korth's Motion to Stay. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (the party moving for summary judgment need only show that the party who bears the burden of proof has adduced no evidence to support an element essential to its case); *Genesis Health Ventures*, 367 B.R. at 519 (omitting citations) (motion may be denied if movant fails to make requisite showing on any single factor); *see also, e.g.*, *In re Tubular Technologies, LLC*, 348 B.R. 699, 712 (Bankr. D.S.C. 2006) (motion to stay denied because appellant failed to present evidence of likelihood of success on the merits).

4.     But even if Mr. Korth had attempted to carry his "heavy burden" of proof as to these factors, he would have nonetheless failed. The well-established facts of these chapter 11 cases vitiate any effort to justify staying the Confirmation Order.

(a)     *Mr. Korth is Not Likely To Succeed on Appeal*

5.     Mr. Korth's sole basis for appeal is his bald assertion of a failure of procedural due process: that the Court erred in not providing Mr. Korth with:

> Sufficient notice to attend [the confirmation hearing physically] and then barring [him] from telephonically cross-examining witnesses at the Confirmation Hearing.
>
> . . .
>
> Reasonable time to prepare for the confirmation hearing and call or cross-examine witnesses.

Motion to Stay at 2. Mr. Korth also asserts that the Court erred in not giving Mr. Korth more time to prepare to cross examine the Debtors' witnesses after receiving the Debtors' exhibits (all of which consisted of materials previously received by Mr. Korth in discovery). *Id.*

6.     Mr. Korth's appeal will fail both as a matter of law and as a matter of fact. First, Mr. Korth's Motion to Stay must fail as a matter of law because he neither presents any cogent

4

legal argument as to why the confirmation timetable was in any way procedurally deficient nor asserts any other significant judicial error. *Jarboe v. Yukon National Bank (In re Porter)*, 54 B.R. 81, 82 (Bankr. N.D. Okla. 1985) (likelihood of appellate success on merits not established when applicant did not identify significant judicial errors or present any argument not previously raised). Indeed, Mr. Korth merely reiterates in the Motion to Stay the position he took at the confirmation hearing that he believes has "been denied the ability to prepare." *See In re Dura Automotive Systems, Inc.*, Case No. 06-11202 (KJC) (Bankr. D. Del. May 13, 2008), Hrg. Tr. at pp. 8:6-9:22. Merely rehashing arguments previously rejected by this Court cannot present any likelihood of success, let alone a substantial likelihood. *See In re Calpine Corp.*, 2008 WL 207841 at *5-*6 (Bankr. S.D.N.Y., Jan. 24, 2008).

7.    In any event, it is a matter of well-established fact that the central point of Mr. Korth's appeal—that he did not have sufficient time to investigate the Debtors and prepare for the confirmation—is completely false. To the contrary, the facts in these chapter 11 cases demonstrate that Mr. Korth—at first through counsel and then later pro se—had many extensive opportunities to examine every aspect of the Debtors' business and the Original Plan and Revised Plan. As this Court may recall, Mr. Korth was originally part of a group of "Certain 9% Holders" who participated extensively in connection with these chapter 11 cases. *See Supplemental Verified Statement of Ballard Spahr Andrews & Ingersoll, LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019* [Docket No. 2203]. These "Certain 9% Holders" took extensive discovery of the Debtors both in connection with their entry into a certain Backstop Rights Purchase Agreement and the Original Plan.

8.    The Original Plan did not provide for any Subordinated Notes recoveries (that is, all of their recoveries went to holders of Senior Notes under the subordination provisions in the

5

applicable indentures). To protect their interests, counsel for Mr. Korth and the other Certain 9%

Holders demanded the production of extensive information, including all valuation reports, all

budgets and projections since 2003, all financial statements, income statements and balance

sheets since 2003, all FAS 142 goodwill impairment reports, and all similar financial information

on an entity-by-entity basis. *See* **Exhibit A** (Responses to Certain 9% Holders' Requests for

Production in connection with Backstop Agreement); **Exhibit B** (Responses to Certain 9%

Holders' Request for Production in Connection with Original Plan). All told, the Debtors

produced over 45,000 pages of historical financial information about the Debtors, along with

communications between the Debtors and their advisors about that information.

9.      The Debtors and the Certain 9% Holders (including Mr. Korth) prepared for trial

on the Debtors' Original Plan. They completed discovery and filed with the Court a joint pretrial

order, documenting the parties' disagreements. *See Joint Pretrial Memorandum Related to the*

*Confirmation of the Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy*

*Code* [Docket No. 2383]. None of those disagreements related to any alleged missing

information. *Id.* Neither Mr. Korth nor any other party filed a motion to compel any unproduced

information. Neither Mr. Korth nor any other party sought to depose any of the Debtors'

witnesses in preparation for the planned December confirmation hearing. There was never a

hint, let alone any suggestion, that any information related to the Debtors had not been produced.

To the contrary: the Debtors did everything possible to accommodate and satisfy all reasonable

requests for information.

10.     The Debtors did the exact same thing when it came to discovery regarding the

Revised Plan. As the Court recalls, Mr. Korth filed a request for a Rule 2004 examination of the

Debtors, seeking extensive information about the Debtors' finances. *See J. W. Korth Ad Hoc*

6

*Committee of Creditors Pro Se Motion for Inspection of Books and Records Under Federal Bankruptcy Rule 2004* [Docket No. 2998]. The Debtors objected to the examination, but took pains to give Mr. Korth—on an expedited basis—all the information he believed that he needed. *See Debtors' Objection to J.W. Korth Pro Se Motion to Extend the Date for the Confirmation Hearing on the Revised Plan of Reorganization Along With the Date to Submit Objections* [Docket No. 3167] (the "Confirmation Extension Objection"); *See also In re Dura Automotive Systems, Inc.,* Case No. 06-11202 (KJC) (Bankr. D. Del. Apr. 23, 2008), Hrg. Tr. at pp. 36:3-37:3.

11.     Specifically, Debtors' counsel had a lengthy telephone call with Mr. Korth on April 8, 2008, in which they went through each and every one of Mr. Korth's requests and informed Mr. Korth what information the Debtors had and would be produced. *See* **Exhibit C,** Slade 4/8/08 Letter to Korth. The Debtors sent the information described in their April 8, 2008, letter to Mr. Korth *immediately* after he signed, and the Court entered, a Confidentiality Agreement and Protective Order (the "Confidentiality Agreement") prohibiting further dissemination of the Debtors' confidential information. *See Order Entering Stipulated Confidentiality Agreement and Protective Order* [Docket No. 3103]; *See* **Exhibit D,** Slade 4/10/08 Letter to Korth.[4]

12.     On April 10, 2008, the Court held a hearing on Mr. Korth's information requests. At the Court's suggestion, the Debtors agreed to produce several additional pieces of information to Mr. Korth—including a discussion of how the value of the Debtors' patents was included in the valuations (both enterprise value and liquidation analysis) described in the Disclosure

---

4   In addition to the correspondence specifically referenced herein, the Debtors have repeatedly corresponded with Mr. Korth in an effort to satisfy his requests for information. A sample of such correspondence, including the Confidentiality Agreement, is attached hereto as **Exhibit H.**

Statement, a discussion of how the "sale bonus" of the Debtors' CEO was calculated, and a description of the Debtors' historical investment in their foreign, non-debtor subsidiaries. The Court denied all of Mr. Korth's other requests. The Debtors subsequently provided—prior to the April 23, 2008 hearing—all of that information. *See* Confirmation Extension Objection at p. 9; *In re Dura Automotive Systems, Inc.*, Case No. 06-11202 (KJC) (Bankr. D. Del. Apr. 23, 2008), Hrg. Tr. at p. 38:10-14. At the hearing, the Court confirmed on the record with Mr. Korth that he, Mr. Korth, did not need any additional information to draft his objection. *See In re Dura Automotive Systems, Inc.*, Case No. 06-11202 (KJC) (Bankr. D. Del. Apr. 23, 2008), Hrg. Tr. at pp. 36:21-37:3. In response to the Court, Mr. Korth did not identify any such additional information. *Id.* Mr. Korth thereafter never filed a motion to compel further production, nor did he thereafter complain about any "missing" information. Moreover, Mr. Korth never attempted to depose the Debtors, under Federal Rule 30(b)(6), to explain any of the information supplied to him. Instead, Mr. Korth himself believed that the information provided was sufficient for him to draft an objection. *In re Dura Automotive Systems, Inc.*, Case No. 06-11202 (KJC) (Bankr. D. Del. Apr. 23, 2008), Hrg. Tr. at pp. 37:4-38:5.

13.     Despite the Court's suggestion on April 23 that he promptly file an objection to the Revised Plan, Mr. Korth did not file his objection or his motion to delay the confirmation hearing until the day of the long-established objection deadline of May 2, 2008. *See Objection by J. W. Korth to the Confirmation of the Revised Plan of Reorganization* [Docket No. 3238]; *See also Motion for Summary Judgment on Section II of Objection by J. W. Korth to the Confirmation of the Revised Plan of Reorganization* [Docket No. 3299]. Immediately upon reviewing Mr. Korth's objection, the Debtors began trying to assist Mr. Korth in understanding the mistakes in that objection. Specifically, the Debtors promptly provided Mr. Korth with

8

additional documentation related to his new objections, and even offered to have someone call Mr. Korth to explain the infirmities in certain of his technical arguments. *See* Confirmation Brief at pp. 86-87; *see also* **Exhibit E** hereto, May 6, 2008, E-mail to Mr. Korth. The Debtors constantly made clear to Mr. Korth that they needed to go forward with the confirmation hearing on May 13, and would do everything possible to provide him the information relevant to his objection. And that is exactly what the Debtors did.[5]

14.    The crux of the matter is Mr. Korth's claim that he did not receive the Debtors "expert reports," which he claims consisted of "4000 pages," until the day before the confirmation hearing. That claim, in all relevant respects, is demonstratively false. All of the substantive documents introduced into evidence were provided to Mr. Korth either immediately upon request, or as soon as the relevant documentation became available. As a result, he had all of them well prior to the hearing. And, the opinions expressed in the Debtors' expert reports were also provided well in advance of the hearing—and prior to the Court's May 9 deadline for producing those opinions:

- The Debtors' *liquidation analysis*—the key opinion expressed in the expert report of Anthony Flanagan—was attached to the Debtors' Disclosure Statement and filed on October 4, 2007. *See* Docket No. 1971, at Ex. I. Mr. Flanagan's report added little to what Mr. Korth had already seen in the disclosure statement, except to confirm the intellectual property analysis that Mr. Korth had received prior to April 23. Nothing in Mr. Flanagan's expert report was "new" to Mr. Korth, and he does not claim to have been surprised by the expert opinions expressed in that report.

- The Debtors' *valuation analysis*, the key point of the expert report of Durc Savini, was described in detail in the Debtors' Disclosure Statement, *see* Docket No. 1971 at Ex. H, and provided in intimate detail to Mr. Korth on May 6, 2008. The only part of Mr. Savini's report that had not been in the record for months was his discussion of the Second Lien Recovery. Mr. Korth does not appear to be complaining about a "late" production of that information, nor could he given that the Debtors' report was issued only several days after

---

[5] In addition, the Debtors fully complied with every deadline set forth by the Court in the *Order Denying J. W. Korth Pro Se Motion to Extend the Date for the Confirmation hearing on the Revised Plan of Reorganization Along With the Date to Submit Objections* [Docket No. 3216].

Mr. Korth raised the argument for the first time. In any event, that argument was based on a complete misreading of the Debtors' Revised Plan.

- The Debtors calculation of the Fixed Charge Coverage Ratio described in the 9% Indenture was not—as Mr. Korth claims in his motion—originally provided on May 9, 2008. To the contrary, it was provided three days earlier—one business day after Mr. Korth originally raised the argument. *See* **Exhibit E**, May 6, 2008, E-mail to Mr. Korth. In fact, Mr. Korth himself noted that the document disproved his theory later that day. *See* **Exhibit F**, May 6, 2008 E-mail from Mr. Korth. Moreover, as the Court may recall from Mr. Flanagan's trial testimony, the document and the calculation of the Fixed Charge Coverage Ratio is not difficult to figure out. In almost all respects, the only thing one needs to do to calculate the ratio is to apply publicly available information—from the Debtors' 10-K—to the clear formula provided on the face of the Indenture.

The bottom line is that Mr. Korth had the overwhelming majority—if not all—of the information presented at the May 13, 2008, confirmation hearing well in advance of the hearing. To the extent that new information was provided shortly before the hearing, it was because Mr. Korth did not raise the argument until the last minute, and even then the Debtors went to great lengths to immediately provide Mr. Korth with the relevant data.

15.    The Debtors did not limit their openness merely to providing documents. To the contrary, the Debtors identified their witnesses to Mr. Korth well before the May 9, 2008, deadline—by telephone call on May 5, 2008, and again by e-mail on May 6, 2008. The Debtors also offered to make their witnesses available on May 8 and 9, 2008, for Mr. Korth to depose on any subjects he wanted to discuss with them. *See* **Exhibit G**, May 6 E-mail to Mr. Korth. Mr. Korth did not take the Debtors up on these offers, nor did he request that the Debtors' witnesses be available on a different date for deposition. It was Mr. Korth's *choice* not to depose the Debtors' witnesses prior to the hearing.

16.    The bottom line? The factual underpinning for Mr. Korth's motion—that he supposedly had one day to review 4,000 pages of expert information—is flatly untrue.

10

Mr. Korth could easily have attended the confirmation hearing and presented his arguments, all of which lacked merit. He chose not to, and should not be rewarded for making that choice.[6]

### (b)    Mr. Korth Will Not Be Irreparably Injured if his Motion to Stay is Denied

17.    "A showing of irreparable harm is the 'principal prerequisite for the issuance' of a stay under Bankruptcy Rule 8005." *In re Calpine*, 2008 WL 207841 at *4. To satisfy this prong, Mr. Korth must show that he risks irreparable harm that is "neither remote nor speculative, but actual and imminent" if a stay is not granted. *In re Calpine*, 2008 WL 207841 at *4 (quoting *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2nd Cir. 2005)). Mr. Korth fails to satisfy this prong. He merely argues that he will be harmed if the Revised Plan is allowed to become effective without "sufficient" investigation of the assertions in his objections to the Revised Plan. Motion to Stay at 3. He has presented no evidence of any harm that he would suffer if the Revised Plan were to be consummated.

18.    But even if Mr. Korth had attempted to present such evidence, he would fail because the facts in these chapter 11 cases tell a much different story.

---

[6] In addition, as the Debtors described in their Opposition to Mr. Korth's motion to delay the confirmation hearing, the expert disclosure rules of Rule 26 do not apply to contested matters. Therefore, the Debtors did not have to provide expert reports or opinions prior to trial *at all*. *See* Fed. R. Bankr. P. 9014(c); *In re Khachikyan*, 335 B.R. 121, 126 (B.A.P. 9th Cir. 2005) ("There are two differences between contested matters and adversary proceedings with respect to discovery. First, the portions of Civil Rule 26 regarding disclosures (including mandatory disclosure), discovery plans, and conferences do not ordinarily apply in contested matters. Second, less time is ordinarily available in which to conduct discovery in a contested matter than in an adversary proceeding") (internal citation and footnote omitted); *In re FV Steel & Wire Co.*, 372 B.R. 446, 452 (Bankr. E.D. Wis. 2007) ("In contested matters, unless the court orders otherwise, Fed.R.Civ.P. 26(a)(2) (disclosures regarding expert testimony) 'shall not apply.' Fed. R. Bankr.P. 9014(c). Since no court order exists directing that Rule 26(a)(2) shall apply to this contested matter, the alleged failure of the Debtor's expert to comply with the disclosure requirements of the Rule is of no consequence"). The fact that the Debtors gave Mr. Korth advance notice of the evidence they intended to introduce at the hearing should have been looked at as a blessing, not a curse. The Debtors' notice certainly did not deprive Mr. Korth of "due process" —if anything, it gave him more due process than he was otherwise entitled to.

### (i)    Invoking Equitable Mootness Does Not Demonstrate Irreparable Harm to Mr. Korth

19.    Equitable mootness is "a risk that is present in any post-confirmation appeal of a chapter 11 plan". *Calpine*, 2008 WL 207841 at *4 (citing *In re Bd. of Directors of Multicanal S.A.*, 2005 Bankr. LEXIS 1865, at *6 (Bankr. S.D.N.Y. Jan. 6, 2005). Most courts have therefore held that "merely invoking equitable mootness ... is not sufficient to demonstrate irreparable harm" when a stay of a confirmation order is being sought. *Id.*; *In re Baker*, 2005 WL 2105802 at *9 (E.D.N.Y. Aug. 31, 2005) ("As other courts have noted, the possibility that an appeal will be rendered moot by a denial of stay does not, in and of itself, constitute irreparable harm"). Therefore, Mr. Korth must fail on this prong because he has not adduced evidence whatsoever of any risk of harm.

20.    But even if, as a minority of courts have held, concerns of equitable mootness could constitute a form of "irreparable harm", Mr. Korth would nonetheless still fail to carry his burden on this prong. *Cf. ACC Bondholders v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R. 337, 347-48 (S.D.N.Y. 2007). Equitable mootness can constitute a form of "irreparable harm" *only if* "the denial of a stay pending appeal risks mooting *any* appeal of *significant* claims of error". *Id.* (emphasis in the original). In other words, equitably mooting a frivolous appeal or an appeal without real prospect of success cannot harm the appellant. *In re Country Squire Associates of Carle Place, L.P.*, 203 B.R. 182, 183 (2nd Cir. BAP 1996). Here, as discussed above, Mr. Korth has not asserted any colorable—let alone significant—claim of error. *See supra*, at 5-6. Thus he cannot be harmed if the Confirmation Order is not stayed because his appeal has no chance of success. *Adelphia Commc'ns Corp.*, 361 B.R. at 349 & n.51 (explaining inverse interrelationship between the substantial likelihood of success on the merits and irreparable harm—the higher the likelihood of success on a significant claim of error, the

more that equitable mootness can constitute an irreparable harm—and vice versa) (citing *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953) (on a motion for preliminary injunction, stating that if "the balance of hardships tips decidedly toward plaintiff," the movant plaintiff will meet its burden on the merits if "the plaintiff has *raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation.*" (emphasis added))).

21. But the issue of equitable mootness would still be of no moment even if Mr. Korth could assert a significant claim of error on appeal—which he cannot. That is because, even though "the loss of appellate rights" may be a "quintessential form of prejudice", there can be no such prejudice if the appeal itself would not potentially improve the appellant's rights or recoveries. *In re St. Johnsbury Trucking Co., Inc.*, 185 B.R. 687, 690 n.1 (S.D.N.Y. 1995) ("It is ... [the] threatened loss [another substantive right] rather than the loss of the right to appeal *vel non* that gives rise to the Court's irreparable injury finding"). In other words, Mr. Korth must show that his appeal—if successful—could improve his position.[7]

22. Here, in these chapter 11 cases, Mr. Korth's position would not improve if his appeal were to succeed. As both the Creditors' Committee and the Senior Notes Indenture Trustee (each of whom represents Mr. Korth's interests as a Senior Noteholder) have stated, the Revised Plan provides the best deal possible for Senior Noteholders. *See Statement of the Official Committee of Unsecured Creditors in Support of Confirmation of the Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Docket No. 3272]; *See also*

---

[7] *See, e.g., St Johnsbury Trucking Co., Inc.*, 185 B.R. at 690 n.1 ("if the government's appeal here is mooted, it will be precluded from challenging the contested aspect of the release and thus lose the ability to enforce some provisions of CERCLA and the Internal Revenue Code"); *In re Country Squire Associates of Carle Place, L.P.*, 203 B.R. 182, 183 (2nd Cir. BAP 1996) (foreclosure in absence of stay is "quintessential prejudice"); *In re Advanced Min. Systems, Inc.*, 173 B.R. 467, 469 (S.D.N.Y. 1994) (appellant would be denied a recovery if appeal were to be mooted); *Adelphia Commc'ns Corp.*, 361 B.R. 337 (appellant would receive no recovery if plan were to be consummated).

*Joinder of the Bank of New York Trust Company, N.A. in the Statement of the Official Committee of Unsecured Creditors in Support of Confirmation of the Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Docket Nos. 3023 and 3272]* [Docket No. 3279]. And nothing raised by Mr. Korth on appeal would improve this deal. Indeed, as a Senior Noteholder, Mr. Korth's interests would almost certainly be worse off if the Revised Plan were not to be consummated.

23.    As a Subordinated Noteholder, Mr. Korth was again represented by the Creditors' Committee, as well as by the Subordinated Notes Trustee. Moreover, he was further represented by the Ballard Spahr firm as counsel for the Certain 9% Holders. Through their efforts, and those of the Debtors, this Court settled the question of the Subordinated Notes' subordination to the Senior Notes: there can be no distribution on account of Subordinated Notes Claims until the Senior Note Claims have been satisfied in full. *Kurak v. Dura Automotive Systems, Inc.*, 379 B.R. 257 (Bankr. D. Del. 2007) (upholding enforceability of subordination provisions contained in the Subordinated Notes Indentures). Although that decision was appealed, the appeal was ultimately withdrawn, and the Court's decision became the law of these chapter 11 cases. *In re Martin's Aquarium, Inc.*, 98 Fed. Appx. 911 (3rd Cir. 2004) ("[O]nce an issue has been decided, parties may not relitigate that issue in the same case") (quoting *Waldorf v. Shuta*, 142 F.3d 601, 616 n. 4 (3d Cir.1998)).

24.    Again, Mr. Korth has not raised any issue on appeal that would change this outcome. Thus, Mr. Korth does not risk anything of his own with his appeal—he gambles only with the Debtors' chances of successfully consummating the Revised Plan.

RLF1-3288594-1

(ii)    **Mr. Korth's Failure to Investigate His Assertions Earlier in These Chapter 11 Cases Does Not Warrant Staying the Confirmation Order to Allow Him Time to Investigate Now**

25.    In any case, any harm that Mr. Korth could now conceivably face is of his own making. He has had, as this Court is keenly aware, much time to investigate the allegations made in his confirmation objection. Yet he chose not to do so. Such dilatory conduct cannot constitute grounds for a finding of "irreparable harm". *See In re Calpine Corp.*, 2008 WL 207841 (Bankr. S.D.N.Y., Jan. 24, 2008) (citing cases).

26.    The facts are clear and well-known. Prior to the Revised Plan even being filed, Mr. Korth had every opportunity to investigate the assertions raised in his confirmation objection. That he did not do so was not for any lack of opportunity:

- *Mr. Korth Has Reported on the Subordinated Notes For More Than Three Years.* Mr. Korth's company claims to have researched and drafted a report on the Subordinated Notes in January 2005. *See Report of J.W. Korth & Co. of Subordinated Notes*, dated January 19, 2005, attached to the *Response to Disclosure Statement by James W. Korth*, filed October 1, 2007 [Docket No. 1949] (attached as Exhibit B to Confirmation Extension Objection. Mr. Korth's company also appears to have held Subordinated Notes as long ago as late 2004. See http://all-about-bonds.typepad.com/all_about_bonds/corp_analysis/index.html, dated October 23, 2006 ("Two years ago we analyzed Dura and chose to recommend this company over several other auto suppliers because it had a diverse client base, a diverse product base, and many non-unionized workers. While it had a substantial amount of debt, we also noted that it had many subsidiaries operating in several parts of the world that it could sell to meet liquidity needs"), attached to the Confirmation Extension Objection as Exhibit C.

- *Mr. Korth's September 2007 Objection to the Original Disclosure Statement.* On September 28, 2007, Mr. Korth filed a pro se objection to the Original Disclosure Statement. *See Response to Disclosure Statement by James W. Korth* [Docket No. 1949]. Mr. Korth raised some of the same assertions in that objection that he did in his confirmation objection. Yet, in the intervening seven months, Mr. Korth did nothing to investigate those assertions.

- *Mr. Korth Received Extensive Discovery Approximately Six Months Prior to Confirmation.* As discussed above, in October and November 2007, the Ballard Spahr firm received more than 45,000 pages of discovery materials on behalf of the Subordinated Notes Ad Hoc Committee. *See supra*, ¶¶ 7-9.

15

*(c)*    *Any Stay of the Confirmation Order Will Irreparably Harm the Debtors,*
*Their Creditors, and, Indeed, All Parties-in-Interest—Including Mr. Korth*

27.    The Revised Plan provides the Debtors with a clear path to exit bankruptcy. But,
the success of the Revised Plan depends upon the Debtors expeditiously exiting chapter 11. Any
delay sufficient for Mr. Korth to prosecute his appeal would, at the very least put the Revised
Plan at grave risk of failure. For this reason alone, the Court should deny the Motion to Stay, as
courts have found that "the possible failure of any plan of reorganization as a consequence of a
stay [would be] a significant injury to appellees" such as the Debtors in these chapter 11 cases.
*See, e.g., In re Public Service Company of New Hampshire*, 116 B.R. 347, 350 (Bankr. D. N.H.
1990) (irreparable harm to the debtor based upon likely failure of exit financing if the
confirmation order were stayed); *Matter of Baldwin United Corp.*, 45 B.R. 385, 387 (Bankr. S.D.
Ohio 1984) ("delay would result in the collapse of the Ameritrust transaction ... [and] an
indefinite delay in developing a plan of reorganization"); *In re Charter Co.*, 72 B.R. 70, 72
(M.D. Fla.1987) ("the Debtors' inability to consummate the Settlement Agreement may impede
consummation of the Debtors' joint plan of reorganization").

28.    As a threshold matter, if the Revised Plan is not consummated by June 20, 2008,
the Debtors would be in default under their DIP Facilities. *See Senior Secured Super-Priority
Debtor in Possession Term Loan and Guaranty Agreement* [Docket 2692], at § 5.15(f);
*Amendment No. 5 to Revolving DIP Credit Agreement* [Docket 2690], at § 5.16(f). Presently, the
Debtors believe that they are on track to meet the June 20, 2008, deadline. Their principal
remaining task is to complete documenting their exit financing credit facilities—and they have
made substantial progress in completing that task. *See Declaration of Jeffrey E. Finger in
Support of Debtors' Objection to J. W. Korth's Motion for Stay Pending Appeal* (the "Finger
Declaration") at ¶ 8. But, if Mr. Korth's Motion to Stay were granted, this progress could be

16

placed in great jeopardy because their exit financing commitments each have a termination date within a matter of a few weeks from now—long before any appeal could be heard. *Id.* The potential of such a collapse of exit financing is compelling evidence of irreparable harm to the Debtors. *Public Service Company of New Hampshire*, 116 B.R. at 350.

29.    Moreover, delay in exiting would burden the Debtors with additional expenses of up to $6 million per month (including up to approximately $4 million per month in additional professionals' fees and approximately $1.9 million in additional monthly post-petition interest), all of which must be paid in cash before the Effective Date. *See Declaration of Lawrence A. Denton, President and Chief Executive Officer of Dura Automotive Systems, Inc. in Support of Debtors' Objection to J. W. Korth's Motion for Stay Pending Appeal* (the "Denton Declaration") at ¶ 2. In addition, the Debtors believe that each additional month they spend in chapter 11 after mid-June would result in significant lost customer commitments. *See* Denton Declaration at ¶ 3. As the Debtors' Chief Executive Officer explained in uncontroverted testimony at the May 13, 2008, hearing:

> In the auto industry the orders you receive today are produced usually three to five years in the future. There's always that type of lead time from when you get the order and you go through the design process until you actually go to production where the revenue starts to come in. So, because of that lead time, the customer needs to be convinced that in fact the company they're giving the order to has good stability, sustain-ability, and literally is going to be there three to five years out to be able to produce this product when the vehicles start going down the assembly line. In 2007 ... we tried to be as transparent as possible with all of our customers and in doing so we've prepared a timeline for exit and we would review on a monthly basis ... our progress and our status. In doing that, we received [orders of] ... about 80 to 90 percent of what we receive in a normal year ... After we failed to get out [of chapter 11] in December, primarily due to the state of the U.S. credit market, the order book significantly dried up, and we've had a really difficult first quarter as far as obtaining new orders. Now, what we've done, is we ... prepared a timeline

17

> [again] ... Failure to exit [on May 13, 2008] ... in my estimation
> would significantly reduce our changes of achieving and getting
> these orders.

*In re Dura Automotive Systems, Inc.*, Case No. 06-11202 (KJC) (Bankr. D. Del. May 13, 2008),

Hrg. Tr. at pp. 19:1-20:7.

30.     Indeed, since the Confirmation Order was entered, the Company has begun to

reap the reward—in the form of new customer commitments—of the Debtors departing chapter

11. *See* Denton Declaration at ¶ 4. Many, if not all of those and other commitments could be

lost if the Debtors' stay in chapter 11 were to be prolonged. *Id.* Although it is difficult to

estimate the magnitude of such potential lost commitments, it is likely that annual sales could

decrease by potentially as much as several tens of millions of dollars if the Debtors were not to

consummate their Revised Plan forthwith. *Id.*

31.     Such a loss of future business would potentially decrease the value of the Debtors

upon exit. Such a loss of value would directly—and adversely—impact Senior Notes and Other

General Unsecured Claims recoveries—which are in the form of New Common Stock, the value

of which depends directly upon the Reorganized Debtors' going concern value. Such an adverse

impact would irreparably harm creditors, and is by itself sufficient grounds to deny the Motion to

Stay. *Public Service Company of New Hampshire*, 116 B.R. at 350.

(d)     **The Public Interest Lies in Favor of Denying the Motion to Stay**

32.     One of the fundamental public policy tenets of the Bankruptcy Code is the

equality of distribution to similarly situated creditors consistent with the Bankruptcy Code's

priorities—*within a reasonable time*. *See Begier v. I.R.S.*, 496 U.S. 53, 58 (1990). It follows,

then, that:

> [t]he public interest requires bankruptcy courts to consider the
> good of the case as a whole, and not individual [ ... ] investment

concerns .... the public interest cannot tolerate any scenario under which private agendas can thwart the maximization of value.

*In re Calpine*, 2008 WL 207841, at *7 (internal citation omitted).

33.    Mr. Korth's Motion to Stay attempts to thwart consummation of the Revised Plan, which all major creditor constituencies agree is the best opportunity available in these chapter 11 cases to maximize value and creditor recoveries. *See In re Dura Automotive Systems, Inc.*, Case No. 06-11202 (KJC) (Bankr. D. Del. May 13, 2008), Hrg. Tr. at p. 34:7-11 (statement in support of Plan made by the Official Committee of Unsecured Creditors); *See also Statement of the Official Committee of Unsecured Creditors in Support of Confirmation of the Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Docket No. 3272]; *In re Dura Automotive Systems, Inc.*, Case No. 06-11202 (KJC) (Bankr. D. Del. May 13, 2008), Hrg. Tr. at p. 34:12-18 (statement in support of Plan made by the Second Lien Lender Group); *In re Dura Automotive Systems, Inc.*, Case No. 06-11202 (KJC) (Bankr. D. Del. May 13, 2008), Hrg. Tr. at pp. 34:20-35:3 (statement in support of Plan made by the Indenture Trustee for the Senior Noteholders); *Joinder of the Bank of New York Trust Company, N.A. in the Statement of the Official Committee of Unsecured Creditors in Support of Confirmation of the Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code [Docket Nos. 3023 and 3272]* [Docket No. 3279]; *In re Dura Automotive Systems, Inc.*, Case No. 06-11202 (KJC) (Bankr. D. Del. May 13, 2008), Hrg. Tr. at pp. 50:15-51:2 (statement in support of Plan made by the United States Trustee)(together, the "Plan Support Statements"). As the Court is aware, the Revised Plan is the product of over 18 months of exhaustive due diligence, negotiations, and compromises. The result? Each and every major creditor constituency in these chapter 11 cases supported its confirmation, and each and every voting class of creditors voted overwhelmingly in to accept it. *See Brief in Support of Confirmation.*

19

34.    Mr. Korth is, quite literally, the only party-in-interest voicing any opposition whatsoever to the Revised Plan. Were he to successfully derail the Revised Plan, value would be destroyed and creditor recoveries harmed—for all the reasons discussed above. *See In re Trans World Airlines, Inc.*, 2001 WL 1820326 (Bankr. D. Del. Apr. 2, 2001), at *14 (holding that public interest weighed in favor of denying motion to issue stay pending appeal where stay would undermine preservation of value of debtor as going concern, including preservation of jobs for debtor's employees, of debtor's continued economic presence in its business locations, and of customer confidence in general). Such a turn of events would be inimical to the public policy foundations of the Bankruptcy Code.

35.    Moreover, also as discussed above, Mr. Korth seeks to stay consummating the Revised Plan when he has had many months to investigate his assertions. *See supra*, ¶¶ 7-10. This, too, is contrary to the public interest, as the "public interest does not support favoring the interests of those who idly sit on their rights." *In re Calpine*, 2008 WL 207841, at *7.

36.    The specter of Mr. Korth delaying consummation of the Revised Plan is precisely the type of scenario that the public interest cannot tolerate. The Court should therefore deny the Motion to Stay as being contrary to the public interest.

## II.    Even if the Court Were to Stay the Confirmation Order, Mr. Korth Have to Post a Bond Sufficient to Protect the Interests of All Parties-in-Interest

37.    Even if the Motion to Stay were to somehow meet the requirements for issuance of a stay pending Mr. Korth's appeal of the Confirmation Order, Mr. Korth would be required to post a substantial bond to protect the Debtors and their creditors—indeed, all parties-in-interest—from the large scale losses that could well be occasioned by such a stay:

> if a stay pending appeal is likely to cause harm by diminishing the value of an estate or "endanger [the non-moving parties'] interest in the ultimate recovery," and there is no good reason not to require the posting of a bond, then the court should set a bond at or

20

> near the full amount of the potential harm to the non-moving
> parties. As such, Appellants must post a substantial bond that is
> commensurate with the threatened loss to the non-moving parties.

*In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 368 (S.D.N.Y. 2007) (requiring appellants to post a bond in the amount of $1.3 billion, based upon estimation of additional post-petition interest, costs that would be incurred in connection with an initial public offering that was required if the confirmed plan was not consummated by a certain date, continuing professional fees, and the risk that the confirmed plan would fall apart) (citing *Burlington Indus., Inc. v. Edelman*, 666 F.Supp. 799 (M.D.N.C.1987) ($500 million bond enjoining a tender offer); *Texaco, Inc. v. Pennzoil Co.*, 626 F.Supp. 250 (S.D.N.Y.1986) ($1 billion appeal bond), *rev'd on other grounds*, 481 U.S. 1 (1987); *Price v. Philip Morris, Inc.*, No. 00-112, 2003 WL 22597608 (Ill. Cir. Ct. Mar. 21, 2003) ($12 billion appeal bond), *rev'd on other grounds*, 848 N.E.2d 1 (2005)); *see also In re Calpine*, 2008 WL 207841 (noting that if the motion to stay were granted (which it was not), court would require a bond "in the range of $900 million to $1 billion" to compensate for aggregate additional interest the debtors would incur if they were unable to close on their existing exit financing).

38.     As discussed above, were the Court to stay consummation of the Revised Plan pending appeal, there is every likelihood that its ultimate consummation would be endangered. *See supra*, ¶¶ 27-31. If the Revised Plan were not to be consummated, the Debtors and their creditor constituencies likely lose their best available opportunity for maximizing value and creditor recoveries. *See* Plan Support Statements.

39.     As in *Public Service Company of New Hampshire*, any bond "would have to cover massive amounts of accruing interest and other delay costs accruing monthly" that were detailed above. *Public Service Company of New Hampshire*, 116 B.R. at 350; *see also supra* ¶ 26. But the potential costs of irreparable harm must also take into account potential creditor

21

losses. *Adelphia*, 361 B.R. at 368 (stating that if there is "no good reason not to require the posting of a bond," the court should "set a bond at or near the full amount of the potential harm to the non-moving parties").

40.    One of the principal harms of a stay in this circumstance is the loss of unsecured creditor recovery. The record is replete with the well-documented concerns of all major constituents that any likely alternative to these chapter 11 cases is likely to devastate Senior Notes and other General Unsecured Claims' Recoveries. *See, e.g., Letters from the Creditors Committee in Support of the Revised Plan*, attached as Exhibit C to the *Disclosure Statement for the Debtors' Revised Plan of Reorganization Under Chapter 11 of the Bankruptcy Code*, filed April 4, 2008 [Docket No. 3071] (the "Revised Disclosure Statement"); *see also* Plan Support Statements. In addition, Second Lien Claims' recoveries could also be at risk—particularly in a liquidation scenario—where risks to all creditors are manifold. *See Declaration and Expert Report of Anthony C. Flanagan in Support of Confirmation of Revised Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code With Technical Amendments for Debtors and Debtors-in-Possession*, Appendix E to Brief in Support of Confirmation at ¶¶ 8, 11. If all creditor losses were to be taken into account, the size of the bond could conceivably be as much as the full plan value of $495 million because all creditors—even DIP Lenders and other secured lenders—could be placed at risk. *Id.* The Debtors believe that, at a minimum, the bond amount should be approximately $380 million, which would take into account one year of added professional fees and interest expenses ($72 million, as described in ¶ 26 herein), as well as the potential losses to holders of Senior Note Claims ($79.5 million) and Second Lien Facility Claims ($228.1 million). *See* Revised Disclosure Statement at p. vi; *Declaration and Expert Report of Durc Savini in Support of Confirmation of the Debtors' Revised Joint Plan of*

22

*Reorganization Under Chapter 11 of the Bankruptcy Code*, Appendix D to Brief in Support of Confirmation at ¶¶ 23, 28.

41.    Mr. Korth has presented no evidence as to why he should not be required to post a bond. Therefore, if the Court were to grant the Motion to Stay, Mr. Korth would be required to post a bond of some $380 million-$495 million to proceed with his appeal. *See In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 350 (S.D.N.Y. 2007) ("Because a supersedeas bond is designed to protect the appellee, the party seeking a stay without bond has the burden of providing specific reasons why the court should depart from the standard requirement of granting a stay only after posting of a supersedeas bond in the full amount of the judgment").

23

WHEREFORE, the Debtors respectfully request that this Court deny the Motion to stay

and grant such other and further relief as is just and proper.

Dated: June 2, 2008
       Wilmington, Delaware

Respectfully submitted,

Daniel J. DeFranceschi (Bar No. 2732)
Jason M. Madron (Bar No. 4431)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:   (302) 651–7700

–and–

KIRKLAND & ELLIS LLP
Marc Kieselstein, P.C.
Roger J. Higgins
Ryan Blaine Bennett
200 East Randolph Drive
Chicago, Illinois 60601
Telephone:   (312) 861–2000

COUNSEL FOR THE DEBTORS AND
DEBTORS–IN–POSSESSION

**Exhibit A**

**Responses to Certain 9% Holders' Requests for Production in Connection with Backstop Agreement**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| DURA AUTOMOTIVE SYSTEMS, INC., | ) | Case No. 06-11202 (KJC) |
| et al.,[1] | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | **Hearing Date: August 15, 2007, at 1:30 p.m. ET** |

### DEBTORS' OBJECTIONS AND RESPONSES TO CERTAIN 9% HOLDERS' FIRST AND SECOND REQUESTS FOR PRODUCTION OF DOCUMENTS

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, made applicable to this proceeding by Rules 7026 and 7034 of the Federal Rules of Bankruptcy Procedure (collectively, the "Federal Rules"), and the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules"), the Debtors hereby object and respond, as set forth below, to Certain Holders of 9% Senior Subordinated Notes' ("Certain 9% Holders") letter and Document List dated August 8, 2007 (the "First Document Request") and document request received via e-mail August 8, 2007 at 4:44 p.m. (the "Second Document Request") (collectively referred to as the "Document Requests").

### GENERAL RESPONSES

1. The Debtors' responses and objections to the Document Requests are based on documents presently known to the Debtors and/or their attorneys in this matter. The Debtors reserve the right to supplement, amend and/or modify these responses and objections in the event and to the extent future discovery so justifies. Should the Debtors at any time supplement or

---

[1]    The "Debtors" comprise the entities set forth in the *Order Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure Directing Joint Administration of the Debtors' Chapter 11 Cases*, entered on October 31, 2006 [Docket No. 68].

amend their responses and/or objections to any document request (collectively, the "Requests" and each a "Request") the Debtors reserve the right to assert any available privilege or other protection as to any response that might otherwise be discoverable in connection with the Debtors' supplementation or amendment.

2. These responses are made without waiver of: (i) any objections as to competency, relevancy, materiality, privilege and admissibility of each response, or any other proper grounds, including documents produced and the subject matter thereof, in any further proceeding in this action; (ii) the right to object to the use of any particular response or documents provided pursuant to such response, or the subject matter thereof, on any ground in any further proceeding in this proceeding; and (iii) the right, at any time, to revise, correct, supplement or clarify any of these responses.

3. Due to the informal nature of your Document Requests and the short time frame prior to the Hearing on Debtors' Motion, you should not assume the Debtors' production is the result of an exhaustive search or that it contains every possible responsive document in the Debtors' possession. Rather, the documents produced represent the relevant, non-privileged documents that Debtors were able to obtain and produce in a reasonable manner in the time allotted.

4. The inadvertent production of any document that is subject to the attorney-client privilege, work-product doctrine, or any other privilege or immunity from disclosure shall not be deemed a waiver in whole or in part of the claim of privilege or protection, either as to the specific document disclosed or as to any other document.

5. The Debtors expressly reserve the right to rely at any time, including in any further proceedings in this proceeding, on documents that are subsequently discovered or were omitted from these responses as a result of mistake, error, oversight or inadvertence.

2

6. These responses and any further responses or documents produced therein are made without any acknowledgement or concession that the documents are relevant to the subject matter of this action.

## GENERAL OBJECTIONS

1. The Debtors object to each of the Requests to the extent that they seek documents that are neither relevant nor reasonably calculated to lead to the discovery of relevant, admissible evidence.

2. In addition to the General Objection set forth above, which are incorporated by reference into each response below, the Debtors will also state other specific objections where appropriate. By setting forth such specific objections, the Debtors do not intend to limit, restrict or waive the General Objection set forth above. To the extent that the Debtors respond to a Request, the General Objection and/or specific objections are not waived by such response. In addition, the inadvertent disclosure of privileged information or release of privileged documents shall not constitute a waiver of any applicable privilege.

## SPECIFIC OBJECTIONS AND RESPONSES

**Request No. 1**: All of the analyses and supporting documentation the Debtor relied upon in concluding that the Debtor should enter into the Backstop Agreement.

**Objection and Response**: The Debtors object to Request No. 1 on the grounds that it is vague, ambiguous and overly broad. Notwithstanding the foregoing, the Debtors will produce responsive, non-privileged documents, if any, in their possession.

**Request No. 2**: All documents related to any other reorganization alternative(s) the Debtor has evaluated other than the Backstop Agreement.

**Objection and Response**: The Debtors object to Request No. 2 on the grounds that it is vague, ambiguous and overly broad. Notwithstanding the foregoing, the Debtors will produce responsive, non-privileged documents, if any, in their possession.

3

**Request No. 3**: All valuation reports the Debtor prepared, or had prepared, in connection with this bankruptcy proceeding and during the period 2 year prior to the filing date.

**Objection and Response**: The Debtors object to Request No. 3 on the grounds that it is vague, ambiguous, overly broad and not reasonably limited in scope or time. The Debtors further object to the "2 year period prior to the filing date" as overly broad and not reasonably limited in scope or time. Notwithstanding the foregoing, the Debtors will produce responsive, non-privileged documents, if any, in their possession.

**Request No. 4**: Any and all documents referenced in any and all valuation reports responsive to Document Request No. 3 above.

**Objection and Response**: The Debtors object to Request No. 4 on the grounds that it is vague, ambiguous, overly broad and unduly burdensome. Notwithstanding the foregoing, the Debtors will produce responsive, non-privileged documents, if any, in their possession.

**Request No. 5**: All documents provided to any and all person(s) or entities that provided a valuation report to the Debtor in connection with the bankruptcy proceeding and during the 2 year period prior to the filing date.

**Objection and Response**: The Debtors object to Request No. 5 on the grounds that it is vague, ambiguous, overly broad and unduly burdensome, and not reasonably limited in scope or time. The Debtors specifically object to the use of the phrase "any and all person(s) or entities" as vague and ambiguous, and overly broad. The Debtors further object to the Request on the grounds that it seeks documents that are protected from disclosure by the attorney-client privilege and/or work product doctrine. The Debtors further object to the "2 year period prior to the filing date" as overly broad and not reasonably limited in scope or time. Notwithstanding the foregoing, the Debtors will produce responsive, non-privileged documents, if any, in their possession.

**Request No. 6**: All of the Debtor's projections and/or budgets, on a consolidated and consolidating basis, that were prepared in connection with this bankruptcy proceeding and the 2 year prior the filing date, including, but not limited to the projections/budgets prepared in

4

connection with the Backstop Agreement.

**Objection and Response**: The Debtors object to Request No. 6 on the grounds that it is vague, ambiguous, overly broad and not reasonably limited in scope or time. The Debtors further object to the "2 year period prior to the filing date" as overly broad and not reasonably limited in scope or time. Notwithstanding the foregoing, the Debtors will produce responsive, non-privileged documents, if any, in their possession.

**Request No. 7**: All Annual or other periodic Budget Reports or Presentations for the Debtor during the period January 1, 2003 to the Present.

**Objection and Responses**: The Debtors object to Request No. 7 on the grounds that it is vague, ambiguous, overly broad and not reasonably limited in scope or time. Notwithstanding the foregoing, the Debtors will produce responsive, non-privileged documents, if any, in their possession.

**Request No. 8**: All documents the Debtor used to prepare the projections and budgets responsive to Document Request No. 5 above.

**Objection and Response**: The Debtors object to Request No. 8 on the grounds that it is vague, ambiguous, overly broad and unduly burdensome. Notwithstanding the foregoing, the Debtors will produce responsive, non-privileged documents, if any, in their possession.

**Request No. 9**: The Debtor's consolidated and consolidating financial statements (income statement, balance sheets, cash flow statements) on a monthly, quarterly and annual basis for the period January 1, 2003 to date.

**Objection and Response**: The Debtors object to Request No. 9 on the grounds that it is vague, ambiguous, overly broad, unduly burdensome and not reasonably limited in scope or time. Notwithstanding the foregoing, the Debtors will produce responsive, non-privileged documents, if any, in their possession.

**Request No. 10**: FAS 142 (goodwill impairment) reports or analyses that were prepared by or for the Debtor for the years ending December 31, 2003, 2004, 2005 and 2006.

**Objection and Response**: The Debtors object to Request No. 10 on the grounds that it is vague, ambiguous, overly broad, unduly burdensome and not reasonably limited in scope or time. Notwithstanding the foregoing, the Debtors will produce responsive, non-privileged documents, if any, in their possession.

**Request No. 11**: A current corporate organizational chart (to the extent it has changed since the October 30, 2006 version that was attached to Keith R. Marchiando's affidavit), including debtors and non-debtors, domestic and international entities, and any historical charts back to 2003.

**Objection and Response**: The Debtors object to Request No. 11 as overly broad and not reasonably limited in scope or time. The Debtors further object to this Request on the ground that it seeks documents that are neither relevant to the subject matter of this proceeding, nor reasonably calculated to lead to the discovery of admissible evidence.

**Request No. 12**: A current personnel organizational chart; and any historical charts back to 2003.

**Objection and Response**: The Debtors object to Request No. 12 on the grounds that it is vague, ambiguous, overly broad and not reasonably limited in scope or time. The Debtors specifically object to the term "any historical charts" as vague and ambiguous. The Debtors further object to this Request on the ground that it seeks documents that are neither relevant to the subject matter of this proceeding, nor reasonably calculated to lead to the discovery of admissible evidence.

**Request No. 13**: All reports or presentations made by or on behalf of the Debtor to any official or ad hoc committee in connection with this bankruptcy proceeding.

**Objection and Response**: The Debtors object to Request No. 13 on the grounds that it is vague, ambiguous, overly broad and unduly burdensome. The Debtors further object to the Request on the grounds that it seeks documents that are protected from disclosure by the attorney-client privilege and/or work product doctrine. The Debtors further object to this

6

Request on the ground that it seeks documents that are neither relevant to the subject matter of this proceeding, nor reasonably calculated to lead to the discovery of admissible evidence. The Debtors further object to the Request on the grounds that it seeks documents already in the possession, custody or control of Certain 9% Holders. Notwithstanding the foregoing, the Debtors will produce responsive, non-privileged documents, if any, in their possession.

**Request No. 14**: All reports or presentations made by or on behalf of the Debtor to any official or ad hoc committee in connection with the Backstop Agreement.

**Objection and Response**: The Debtors object to Request No. 14 on the grounds that it is vague, ambiguous, overly broad and unduly burdensome. The Debtors further object to the Request on the grounds that it seeks documents that are protected from disclosure by the attorney-client privilege and/or work product doctrine. The Debtors further object to this Request on the ground that it seeks documents that are neither relevant to the subject matter of this proceeding, nor reasonably calculated to lead to the discovery of admissible evidence. The Debtors further object to the Request on the grounds that it seeks documents already in the possession, custody or control of Certain 9% Holders. Notwithstanding the foregoing, the Debtors will produce responsive, non-privileged documents, if any, in their possession.

**Request No. 15**: All reports or presentations made by or on behalf of the Debtor to any lenders, investment bankers, or credit rating agencies during the period January 1, 2003 to date.

**Objection and Response**: The Debtors object to Request No. 15 on the grounds that it is vague, ambiguous, overly broad, unduly burdensome and not reasonably limited in scope or time. The Debtors further object to the Request on the grounds that it seeks documents that are protected from disclosure by the attorney-client privilege and/or work product doctrine. The Debtors further object to this Request on the ground that it seeks documents that are neither relevant to the subject matter of this proceeding, nor reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding the foregoing, the Debtors will produce

7

responsive, non-privileged documents, if any, in their possession.

**Request No. 16**: All documents provided to (a) any lender and (b) to any investment banker or other interested purchaser of any of the Debtor's businesses during the period January 1, 2003 to date.

**Objection and Response**: The Debtors object to Request No. 16 on the grounds that it is vague, ambiguous, overly broad, unduly burdensome and not reasonably limited in scope or time. The Debtors further object to this Request on the ground that it seeks documents that are neither relevant to the subject matter of this proceeding, nor reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding the foregoing, the Debtors will produce responsive, non-privileged documents, if any, in their possession.

**Request No. 17**: All reports provided to the Board of Directors during the period 2003 to date.

**Objection and Response**: The Debtors object to Request No. 17 on the grounds that it is overly broad and not reasonably limited in scope or time. The Debtors further object to this Request on the ground that it seeks documents that are neither relevant to the subject matter of this proceeding, nor reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding the foregoing, the Debtors will produce responsive, non-privileged documents, if any, in their possession.

**Request No. 18**: All monthly management reports, including narratives analyzing the Debtor's performance, including, but not limited to, analyses of the Debtor's actual performance:

   (i)    Compared to budget on monthly and year to date basis, including Net New Business gains or losses, and explanations for the variance between actual performance and budget;

   (ii)   On a divisional basis compared to budget for the three product-based divisions, Control Systems, Body and Glass Systems and Atwood Mobile Products, including EBITDA performance on a divisional basis, and explanations of variances to budget;

   (iii)  On a Debtor and Non-Debtor basis; and

   (iv)   On a guarantor/Non guarantor basis.

8

**Objection and Response**: The Debtors object to Request No. 18 on the grounds that it is vague, ambiguous, overly broad and unduly burdensome. Notwithstanding the foregoing, the Debtors will produce responsive, non-privileged documents, if any, in their possession.

**Request No. 19**: All liquidation analyses prepared by the Debtor in connection with this bankruptcy proceeding.

**Objection and Response**: The Debtors will produce responsive, non-privileged documents, if any, in their possession.

**Request No. 20**: Any and all reconciliations between the Debtor's Monthly Operating Reports and the Debtor's GAAP basis financial books and records.

**Objection and Response**: The Debtors will produce responsive, non-privileged documents, if any, in their possession.

<div align="center">

**Second Document Request**

</div>

**Request No. 1**: In follow up to this afternoon's letter, please provide us with copies of all documents provided to the Official Committee of Unsecured Creditors or any other interested party in the context of the Backstop Motion.

**Objection and Response**: The Debtors object to Request No. 1 of the Second Document Request on the grounds that it is vague, ambiguous and overly broad. The Debtors specifically object to the term "any other interested party" as it is vague and ambiguous. To the extent that the Debtors have objections to the Document Requests of the Official Committee of Unsecured Creditors (Creditors' Committee), those objections apply with equal force in Debtors' response to your request. Notwithstanding the foregoing, the Debtors will produce responsive, non-privileged documents, if any, in their possession.

<div align="center">

9

</div>

Dated: August 13, 2007

_Stephanie R. Dykeman_

Roger J. Higgins
Andrew R. McGaan, P.C.
Stephanie R. Dykeman
KIRKLAND & ELLIS LLP
200 East Randolph
Chicago, IL 60601-6636
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

*Counsel to the Debtors*

10

**Exhibit B**

**Responses to Certain 9% Holders' Request for Production in Connection with the Original Plan**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| DURA AUTOMOTIVE SYSTEMS, INC., et. al., | Case No. 06-11202-KJC |
| Debtors. | Jointly Administered |

## DEBTORS' RESPONSES AND OBJECTIONS TO THE FIRST SET OF REQUESTS BY CERTAIN HOLDERS OF 9% SUBORDINATED NOTES FOR PRODUCTION OF DOCUMENTS "IN CONNECTION WITH PLAN CONFIRMATION"

Dura Automotive Systems, Inc., and its affiliated debtors and debtors-in-possession (the "Debtors"), subject to the General Objections that follow these responses (each of which is incorporated into the Debtors' response to each document request) and the specific objections listed after each request, hereby respond to the First Requests for Production "In Connection With Plan Confirmation" (the "Requests") of Certain Holders of 9% Subordinated Notes ("Sub-Note Holders").

### PRELIMINARY STATEMENT

Most of the document requests made here, purportedly "in connection with plan confirmation," are identical to (or substantially overlap with) requests made by the Sub-Note Holders on August 8, 2007 in connection with the Backstop Agreement (the "Backstop Document Requests"). Debtors responded to the Backstop Document Requests on August 13, 2007, and provided voluminous materials to the Sub-Note Holders in response to those requests (the "August Production"). Debtors will again provide access to the August Production, but will not re-perform searches for documents requested in the Backstop Document Requests. Debtors will make a good faith effort to provide documents created or modified since the August Production, subject to their General Objections and the objections listed in each response below.

1

## RESPONSES AND OBJECTIONS

**Request No. 1:**    All of the Debtors' projections and/or budgets, on a consolidated and consolidating basis, that were prepared during the Debtors' bankruptcy cases or during the 2 year period preceding the Petition Date, including, but not limited to, the projections and budgets prepared in connection with the Backstop Rights Purchase Agreement, the Disclosure Statement, or the Debtors' Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code (the "Plan").

**Objection and Response:**    Debtors object to this request as unnecessarily duplicative

of Backstop Document Request No. 6.    Debtors direct the Sub-Note Holders to the documents

produced in response to that request.    Further, Debtors object to the request for documents from

"the 2 year period preceding the Petition Date" as overly broad, unduly burdensome and not

reasonably calculated to lead to the discovery of admissible evidence.    Subject to their General

Objections and these objections, Debtors will provide an updated, business group level business

plan.

**Request No. 2:**    All documents the Debtors (or their advisors) used to prepare the projections and/or budgets responsive to request 1 above.

**Objection and Response:**    Debtors object to this request as unnecessarily duplicative

of Backstop Document Request No. 8.    Debtors direct the Sub-Note Holders to the documents

produced in response to that request.    Further, Debtors object to the request for "all documents"

related to the preparation of the projections and/or budgets because it is overly broad, unduly

burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

Read literally, this request could apply to every document in the Debtors' possession.    Subject to

and without waiving their General Objections and these objections, the Debtors will produce the

core documents upon which the business plan was based.

**Request No. 3:**    The Debtors' consolidated and consolidating financial statements (income statement, balance sheets, cash flow statements) on a monthly, quarterly and annual basis for the period January 1, 2003 to date.

2

**Objection and Response:**    Debtors object to this request as unnecessarily duplicative of Backstop Document Request No. 9.   Debtors direct the Sub-Note Holders to the documents produced in response to that request.    Subject to their General Objections and this objection, Debtors state that monthly operating reports for the period since the August Production are publicly available on the Court's docket or at http://dura.kccllc.net, and Debtors direct the Sub-Note Holders to those locations.

**Request No. 4:**    FAS 142 (goodwill impairment) reports or analysis that were prepared by or for the Debtors for the years ending December 31, 2003, 2004, 2005, and 2006.

**Objection and Response:**    Debtors object to this request as unnecessarily duplicative of Backstop Document Request No. 10.   Debtors direct the Sub-Note Holders to the documents produced in response to that request.

**Request No. 5:**    All valuation reports and all appraisals that the Debtors prepared, or had prepared, in connection with the Debtors' bankruptcy cases or during the 2 year period preceding the Petition Date.

**Objection and Response:**    Debtors object to this request as unnecessarily duplicative of Backstop Document Request No. 3.   Debtors direct the Sub-Note Holders to the documents produced in response to that request.   Further, Debtors object to the request for documents from "the 2 year period preceding the Petition Date" as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.   Subject to their General Objections and these objections, Debtors will provide documents responsive to this request.

**Request No. 6:**    All documents provided to any and all person(s) or entities that provided a valuation report or appraisal to the Debtors in connection with the Debtors' bankruptcy cases or during the 2 year period preceding the Petition Date.

**Objection and Response:**    Debtors object to this request as unnecessarily duplicative of Backstop Document Request No. 5.   Debtors direct the Sub-Note Holders to the documents

produced in response to that request. Further, Debtors object to the request for "all documents" provided to those who prepared valuation reports for "the 2 year period preceding the Petition Date" because it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Subject to their General Objections and these objections, Debtors will provide documents responsive to this request.

**Request No. 7:** The liquidation analysis prepared for each of the legal entities in Chapter 11 referenced in Exhibit I of the Disclosure Statement.

**Objection and Response:** Debtors object to this request as unnecessarily duplicative of Backstop Document Request No. 19. Debtors direct the Sub-Note Holders to the documents produced in response to that request. Subject to their General Objections and this objection, Debtors will provide documents responsive to this request.

**Request No. 8:** All documents reviewed, analyzed, or considered by the Debtors (or their advisors) in preparing the liquidation analysis prepared for each of the legal entities in Chapter 11 referenced Exhibit I of the Disclosure Statement.

**Objection and Response:** Debtors object to the request for "all documents" considered in the preparation of liquidation analyses because it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Subject to their General Objections and this objection, Debtors will provide the core documents upon which the liquidation analyses were based.

**Request No. 9:** All documents constituting the valuation of the Reorganized Debtors as a going concern post-confirmation referenced in Section XVI of the Disclosure Statement.

**Objection and Response:** Debtors object to this request as unnecessarily duplicative of Backstop Document Request Nos. 3, 4, and 5. Debtors direct the Sub-Note Holders to the documents produced in response to those requests. Further, Debtors object to this request

4

because it is overbroad and unduly burdensome in seeking "all documents" constituting the

valuation of Reorganized Debtors post-confirmation.  Subject to their General Objections and

these objections, Debtors will provide documents responsive to this request.

**Request No. 10:**  All documents reviewed, analyzed, or considered by the Debtors (or their advisors) in preparing the valuation of the Reorganized Debtors as a going concern post-confirmation referenced in Section XVI of the Disclosure Statement

**Objection and Response:**  Debtors object to this request as unnecessarily duplicative

of Backstop Document Request Nos. 3, 4, and 5.   Debtors direct the Sub-Note Holders to the

documents produced in response to those requests.   Further, Debtors object to the request

seeking "all documents" concerning the valuation of Reorganized Debtors post-confirmation

because it is overly broad, unduly burdensome, and not reasonably calculated to lead to the

discovery of admissible evidence.  Subject to their General Objections and these objections,

Debtors will provide documents responsive to this request.

**Request No. 11:**  All appraisals or valuation reports evidencing, concerning, describing, or relating to the Debtors' equity interests in the Foreign Affiliates.

**Objection and Response:**  Debtors object to this request as unnecessarily duplicative

of Backstop Document Request Nos. 3, 4, and 5.   Debtors direct the Sub-Note Holders to the

documents produced in response to those requests.  Subject to their General Objections and this

objection, Debtors will provide documents responsive to this request.

**Request No. 12:**  For each Foreign Affiliate, such affiliate's financial statements (income statement, balance sheets, cash flow statements) on a monthly, quarterly and annual basis for the period January 1, 2003 to date.

**Objection and Response:**  Debtors object to this request as unnecessarily duplicative

of Backstop Document Request No. 9. Debtors direct the Sub-Note Holders to the documents

produced in response to that request.  Further, Debtors object to the request for four years of

"financial statements" of "each Foreign Affiliate" as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.   Subject to their General Objections and these objections, Debtors will provide annual financial statements for its "Foreign Affiliates."

**Request No. 13:**   For each Foreign Affiliate, such affiliate's projections and/or budgets that were prepared during the Debtors' bankruptcy cases or during the 2 year period preceding the Petition Date, including, but not limited to, the projections and budgets prepared in connection with the Backstop Rights Purchase Agreement, the Disclosure Statement, or the Plan.

**Objection and Response:**   Debtors object to this request as unnecessarily duplicative of Backstop Document Request No. 6.  Debtors direct the Sub-Note Holders to the documents produced in response to that request.  Further, Debtors object to the request for "projections and/or budgets" of each "Foreign Affiliate" during the bankruptcy or "during the 2 year period preceding the Petition Date" as overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.   Subject to their General Objections and these objections, Debtors will provide an updated, business group level business plan.

**Request No. 14:**   All documents the applicable Foreign Affiliate or the Debtors (or their respective advisors) used to prepare the projections and/or budgets responsive to request 13 above.

**Objection and Response:**   Debtors object to this request as unnecessarily duplicative of Backstop Document Request No. 8.  Debtors direct the Sub-Note Holders to the documents produced in response to that request.   Further, Debtors object to the request for "all documents" related to the preparation of the "projections and/or budgets" because it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Read literally, this request could apply to every document in the Debtors' possession.

6

**Request No. 15:** All documents evidencing, concerning, describing, or relating to communications you have had with any person regarding the funding of all or part of the Exit Credit Facility.

**Objection and Response:** Debtors object to this request as unnecessarily duplicative of Backstop Document Request Nos. 15 and 16. Debtors direct the Sub-Note Holders to the documents produced in response to those requests. Further, Debtors object to the request for "all documents" relating to communications with "any person" in any way related to the Exit Credit Facility because it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Subject to their General Objections and these objections, Debtors will provide documents responsive to this request.

**Request No. 16:** All documents evidencing, concerning, describing, or relating to your efforts to obtain the Exit Credit Facility and the present status of those efforts.

**Objection and Response:** Debtors object to this request as unnecessarily duplicative of Backstop Document Request Nos. 15 and 16. Debtors direct the Sub-Note Holders to the documents produced in response to those requests. Further, Debtors object to the request for "all documents" relating to any efforts to obtain the Exit Credit Facility because it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Subject to their General Objections and these objections, Debtors will provide documents responsive to this request.

**Request No. 17:** All documents evidencing, concerning, describing, or relating to a commitment by any person or entity to provide funds to the Debtors or reorganized Debtors as part of the Exit Credit Facility.

**Objection and Response:** Debtors object to this request as unnecessarily duplicative of Backstop Document Request Nos. 15 and 16. Debtors direct the Sub-Note Holders to the documents produced in response to those requests. Further, Debtors object to the request for "all

7

documents" relating to any commitments regarding the Exit Credit Facility because it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Subject to their General Objections and these objections, Debtors will provide documents responsive to this request.

**Request No. 18:** All documents evidencing, concerning, describing, or relating to the terms or proposed terms and conditions of the Exit Credit Facility.

**Objection and Response:** Debtors object to this request as unnecessarily duplicative of Backstop Document Request Nos. 15 and 16. Debtors direct the Sub-Note Holders to the documents produced in response to those requests. Further, Debtors object to the request for "all documents" relating in any way to terms or conditions of the Exit Credit Facility because it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Subject to their General Objections and these objections, Debtors will provide documents responsive to this request.

**Request No. 19:** All documents evidencing, concerning, describing, or relating to the Debtors' conclusion, stated in the Disclosure Statement, that substantive consolidation of the Debtors' estates "is the best option currently available for the Debtors and their creditors as a whole."

**Objection and Response:** Debtors object to the request for "all documents" relating to Debtor's conclusion that substantive consolidation is the best option currently available for Debtors and creditors as a whole because it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Subject to their General Objections and these objections, Debtors state that this conclusion is based on the information currently available to Debtors and their advisors. The Sub-Note Holders have requested and Debtors have produced much (if not all) of this information.

**Request No. 20:** All documents evidencing, concerning, describing, or relating to the Debtors disregarding, prior to the Petition Date, their separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one legal entity.

**Objection and Response:** Debtors object to this request because it is vague and ambiguous. Debtors simply do not know what specific documents the Sub-Note Holders seek to show that Debtors "disregard[ed] . . . their separateness so significantly that their creditors . . . treated them as one legal entity." Subject to their General Objections and these objections, Debtors state that many of the documents that have been produced and will be produced may bear on the inquiry described in Request No. 20.

**Request No. 21:** All documents evidencing, concerning, describing, or relating to the Debtors' assets and liabilities being so scrambled post-petition that separating them is prohibitive and hurts all creditors.

**Objection and Response:** Debtors object to this request because it is vague and ambiguous. Debtors simply do not know what specific documents the Sub-Note Holders seek to show that Debtors' assets and liabilities will be "so scrambled post-petition that separating them is prohibitive and hurts all creditors." Subject to their General Objections and these objections, Debtors state that many of the documents that have been produced and will be produced may bear on the inquiry described in Request No. 21.

**Request No. 22:** All documents reviewed by the Debtors in determining whether Pacificor, LLC, has the financial ability to fund all amounts it may be required to fund under the Backstop Rights Purchase Agreement.

**Objection and Response:** Debtors object to this request because it is overbroad and unduly burdensome in seeking "all documents" reviewed by Debtors relating to whether Pacificor, LLC has the ability to fund the amounts it may be required to fund under the Backstop Rights Purchase Agreement. Subject to their General Objections and these objections, Debtors will provide documents responsive to this request.

9

**Request No. 23:** Fully executed copies of the Convertible Subordinated Indenture and the Senior Notes Indenture, including, without limitation, all amendments and supplements thereto and all guaranties thereof.

**Objection and Response:** Debtors object to this request because these documents were already provided to the Sub-Note Holders.

## GENERAL OBJECTIONS

1. Debtors assert their General Objections with respect to each and every one of the Requests.

2. Debtors do not believe that the Sub-Note Holders have standing to raise many (or perhaps all) of the issues related to the confirmation of the Plan that are suggested by the Requests. By responding to the Requests and producing these materials to the Sub-Note Holders, Debtors do not waive, but rather expressly preserve, all arguments against the Sub-Note Holders' standing to raise any and all objections to the Plan that they might decide to raise.

3. Debtors object generally to the Requests, Instructions and Definitions to the extent that they are overbroad, unduly burdensome, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. In particular, Debtors object to the extent the Requests seek "all documents" related to wide ranging subject matter areas; such requests are unduly burdensome and completely unnecessary given the tangential (if any) relevance of such materials to the issues at hand. Debtors will perform a good faith search for responsive documents and will produce the materials listed below each request.

4. Debtors object to the unnecessarily duplicative nature of these requests, which are identical to (or substantially overlap with) requests made in August 2007 by the Sub-Note Holders in connection with the Backstop Purchase Agreement ("Backstop Document Requests"). Debtors already produced a huge quantity of documents to the Sub-Note Holders in response to

the Backstop Document Requests. Debtors will not undertake the time and expense necessary to search for email communications that may have occurred in the two months since the last production because such an effort would be unduly burdensome and unlikely to lead to the discovery of admissible, non-duplicative evidence. Nonetheless, in an effort to be accommodating to the Sub-Note Holders, Debtors will search the emails of their investment banker, Miller Buckfire LLP, in response to Request No. 15, which specifically seeks communications relating to the Exit Credit Facility. That is the only request to which material new information might be available since the time of the Backstop Document Requests, and Miller Buckfire is the entity most likely to have communications responsive to that request. Debtors will not search for any other email.

5. Debtors object to requests concerning the Exit Credit Facility because the bidding process for this loan is ongoing. Revealing proposals by potential lenders could cause material commercial harm to the Debtors, and those proposals are completely irrelevant to the issues at bar and not likely to lead to the discovery of admissible evidence. Accordingly, the Debtors will not produce documents concerning proposals received from potential lenders. But, Debtors will produce the final agreement reflecting the Exit Credit Facility when that agreement is entered.

6. Debtors are performing and will continue to perform a reasonable, good faith search for documents responsive to the Requests. Debtors reserve their rights to supplement these responses or their production if additional documents are located during discovery.

7. Debtors' responses to the Requests should not be read to assume that documents responsive to each and every request actually exist. Rather, Debtors' responses

11

indicate a willingness to make a good faith search for relevant and responsive materials and to produce them, if they exist, in accordance with the objections and responses to each request.

        8. Debtors object to the Requests to the extent that the information sought is protected by the attorney-client privilege, work-product doctrine, or other applicable privileges. The provision of any documents or information in response to the Requests should not be construed as a waiver of any applicable privilege. If any privileged documents are produced inadvertently, Debtors demand that they be returned immediately and all copies destroyed.

        9. Debtors object to the Requests to the extent they are vague and ambiguous. Debtors are responding to the Requests based upon their interpretation and understanding of each request. Should the Sub-Note Holders assert a different interpretation of any request, then Debtors reserve the right to add to, supplement, or modify their response and/or objection to the request.

        10. Debtors object to the Definitions, Instructions and Requests to the extent that they seek the production of documents from entities other than Debtors. Debtors can and will only produce documents in their possession, not in the possession of third parties. Subject to the other General Objections and this objection, in the interest of efficiency and in the spirit of cooperation, Debtors will conduct a reasonable, good faith search for responsive, nonprivileged documents from Miller Buckfire & Co. LLC and AlixPartners.

        11. Debtors object to the Instructions and Definitions to the extent they purport impose any obligations other than those imposed by the Federal Rules of Civil and Bankruptcy Procedure.

12. Debtors object to these requests to the extent they seek documents obtainable by the Sub-Note Holders in a less burdensome or less expensive way. Debtors will not produce documents readily obtainable from the publicly accessible docket in this case.

13. These responses are made without waiver of any objections as to competency, relevancy, materiality, privilege and admissibility (or any other proper objection) of any response, including documents produced and the subject matter thereof.

DATE: October 28, 2007

Respectfully submitted,

Marc Kieselstein
Paul Basta
Roger J. Higgins
Michael B. Slade
Daniel R. Lombard
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL 60601
(312) 861-2000 (telephone)
(312) 861-2200 (facsimile)

Counsel for the Debtors and Debtors in Possession

13

**Exhibit C**

**Letter dated April 8, 2008, to Mr. Korth**

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois 60601

Michael B. Slade
To Call Writer Directly:
312 861-3348
mslade@kirkland.com

(312) 861-2000

www.kirkland.com

Facsimile:
(312) 861-2200
Dir. Fax: 312 861-2200

April 8, 2008

Via E-mail

James W. Korth
J W Korth/Shop4Bonds - SIPC
3339 Virginia, #104
Coconut Grove, Florida 33133

Re:     Dura Automotive

Dear Jim:

This letter confirms our discussion today about the items requested in your Motion for Rule 2004 Examination (the "Motion"). As discussed in the Debtors' objection, the Motion is inappropriate for a variety of reasons. Nevertheless, in an effort to be cooperative, we have agreed to produce to you certain documents and records that can be collected and produced without an undue burden on the Debtors. You will need to execute a confidentiality agreement before any of these documents are produced.

As we discussed this morning, the Debtors reserve all of their objections to each of your requests, but have agreed to produce the documents described below. The Debtors object to producing any documents other than those described below.

> 1.     The monthly income statements and balance sheets of each subsidiary of Dura Automotive Systems or, subsidiaries of subsidiaries and, subsidiaries of subsidiaries of subsidiaries of Dura Automotive Systems, for the past two years up until the end of February 2008.

Debtors are in possession of certain draft financial statements of Dura Automotive Systems and its subsidiaries for the last two years, which have not been audited. Such documents will be produced.

> 2.     The general ledger for each above mentioned subsidiary for the past two years up until the end of February 2008.

Debtors will not produce the general ledgers because the collection and production of the same is unduly burdensome and not likely to lead to the production of admissible evidence. This information is also duplicative of that requested in Request No. 1.

Hong Kong     London     Los Angeles     Munich     New York     San Francisco     Washington, D.C.

James W. Korth
April 8, 2008
Page 2

3.    The detail of the analysis of the goodwill of each above mentioned subsidiary whereby the debtor last certified this goodwill and then wrote off such goodwill in November of 2006.

Debtors are in possession of two FAS142 goodwill impairment analysis reports completed by Stout Rissius Ross that served as the basis for that goodwill write-off. Those reports will be produced.

4.    The notes and aggregation statements that form the basis for all the Monthly Operating Reports filed in this court.

As I mentioned on our call, we do not understand what you are looking for with this request, but the information sought should be contained in the documents produced responsive to Request No. 1.

5.    A specific written statement, line by line, from the debtor on how the planned Fresh Start balance sheet will differ from the balance sheet put forth in the Monthly Operating Reports and justification for the differences.

As I mentioned, the Debtors have no such written statement because they have not yet performed their fresh start accounting and do not expect to do so until they emerge from Chapter 11 protection. No documents will be produced responsive to this request.

6.    The contracts and any amendments with the Debtors and Alix Partners and Miller Buckfire and Kirkland Ellis.

Debtors will produce these agreements.

7.    All the background notes and compilations that went into creating the latest Disclosure Statement.

As I mentioned on our call, I do not know what you are looking for this request. Debtors' business plan was filed as an exhibit to the Disclosure Statement. The assumptions and support for that plan are provided in the presentation sought in Request No. 9, which we will produce.

8.    Copies of the presentation to potential lenders for the failed Exit Financing in December 2007.

Debtors will produce this presentation.

James W. Korth
April 8, 2008
Page 3

9.      Copies of the presentation to potential lenders for the successful refinancing of the DIP Loan.

Debtors will produce this presentation.

10.     Any reports or evaluations regarding foreign currency translations as they affected any report or the various balance sheets of subsidiaries or the Disclosure Statement.

As I mentioned on our call, we do not understand what you are seeking with this request, but there are no "reports" regarding how currency exchanges affected the Debtors' various balance sheets or the Disclosure Statement.

11.     The original underwriting files for the bonds including all notes regarding the creation of each issue's indenture and the original proposals by the underwriters for such issues along with the underwriting agreements.

On our call, I suggested that this request sought irrelevant information, and you agreed. We agreed that you would withdraw this request, reserving the right to seek the information in the future should it for some reason become relevant.

12.     Any statements or notes regarding who currently owns the senior and subordinated bonds, and the second lien securities, especially those tendered for the previous first Plan of Reorganizations execution.

The Debtors' notice and service agent, KCC, is collecting some information on this topic, and I agreed that we would produce it to you. However, for the sake of clarity, that information is not likely to identify the percentage of ownership of these securities or to be a complete list of holders.

13.     All presentations and notes to the Committee of Unsecured Creditors and the Second Lien Note Holders.

As I mentioned on our call, there has been one such presentation since October 2007, and we will produce it to you.

14.     Any notes and contracts regarding the severance of all chief financial officers and executive suite level executives since the filing of the Chapter 11 in October of 2006.

James W. Korth
April 8, 2008
Page 4

As I mentioned on our call, there have been several motions regarding severance for executive officers that left the company during the bankruptcy, and I will produce the pleadings and ultimate severance agreements that have been approved by the Bankruptcy Court.

15.     The detailed analysis behind the income projections for the next three years as stated in the current Disclosure Statement.

Debtors' business plan (which contains these income projections) was filed as an exhibit to the Disclosure Statement. The assumptions and support for that plan are provided in the presentation sought in Request No. 9, which we will also produce.

16.     Invoices and or notes from the Trustees for the senior or subordinated bonds.

Debtors are not in possession of any such "invoices" so no such documents will be produced.

17.     Other items we deem appropriate as they relate to the items above.

Debtors do not know what you are seeking with this request, and object to it.

\* \* \* \* \*

In light of our good faith discussions, and the Debtors' agreement to produce the documents described above, I suggested on our call that you withdraw the Motion. You agreed to consider that request. Please let me know if you will agree to withdraw the Motion so that we can inform Judge Carey.

Please give me a call if you have any questions.

Sincerely,

Michael B. Slade

MBS

cc:     Roger Higgins
        Dan DeFranceschi

**Exhibit D**

**Letter dated April 10, 2008, to Mr. Korth**

# KIRKLAND & ELLIS LLP

#### AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois 60601

Michael B. Slade
To Call Writer Directly:
312 861-3348
mslade@kirkland.com

(312) 861-2000

www.kirkland.com

Facsimile:
(312) 861-2200
Dir. Fax: 312 861-2200

April 10, 2008

Via UPS

James W. Korth
J W Korth/Shop4Bonds - SIPC
3339 Virginia, #104
Coconut Grove, FL  33133

Re:    Dura Automotive

Dear Jim:

Further to my letter of April 8, 2008, enclosed with this letter is a CD containing documents Bates-stamped DURA2 00001-01271.  These documents have been marked "Confidential" under the Confidentiality Agreement and Protective Order previously signed by you and entered by the Court, and should be treated as such.

If you have any questions, feel free to give me a call.

Sincerely,

Michael B. Slade

MBS

Enclosure (CD)

cc:    Roger Higgins (letter only)
       Doug Mannal (letter and CD)

Hong Kong       London       Los Angeles       Munich       New York       San Francisco       Washington, D.C.

**Exhibit E**

**E-Mail dated May 6, 2008, to Mr. Korth**

**Michael**
Slade/Chicago/Kirkland-Ellis
05/06/2008 09:53 AM

To    "James W Korth" <jwkorth@jwkorth.com>

cc    Roger Higgins/Chicago/Kirkland-Ellis@K&E

bcc

Subject    Documents

| Who | Date | Time | WS | CS | Su |
|---|---|---|---|---|---|
| James W Korth | 05/05/2008 | 03:37 PM | | | RE |
| James W Korth | 05/06/2008 | 09:57 AM | | | RE\Discove |
| James W Korth | 05/06/2008 | 09:53 AM | | | Documents |

Jim -- Attached are a couple of documents that I mentioned on our call yesterday -- a valuation report prepared by Miller Buckfire and a document about the fixed charge coverage ratio calculated as provided in the 9% indenture. I am happy to have someone walk you through the materials if that would be helpful to you.

Both of these documents are marked confidential under the protective order and should be treated as such.

Regards, Mike

Dura Valuation Report_DURA2 01508-01538.pdf

Dura -- Bond Indenture Fixed Charge Ratio.pdf

Michael B. Slade
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL  60601
(312) 861-3348 (tel)
(312) 861-2200 (fax)

| | LTM 6/98 | LTM 9/98 | LTM 12/98 | LTM 3/99 | LTM 6/99 | LTM 9/99 | LTM 12/99 | LTM 3/01 | LTM 6/01 | LTM 9/01 | LTM 12/01 | LTM 3/02 | LTM 6/02 | LTM 9/02 | LTM 12/02 | LTM 3/03 | LTM 6/03 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cons Cash Flow as defined | | | | | | | | | | | | | | | | | |
| Net Income | | | | | | | | | | | | | | | | | |
| Provision for Income Taxes | | | | | | | | | | | | | | | | | |
| Net Interest | | | | | | | | | | | | | | | | | |
| Minority Int - Div Conv Pref Securities | | | | | | | | | | | | | | | | | |
| Depreciation Expense - US Accounts | | | | | | | | | | | | | | | | | |
| Amortization Expense | | | | | | | | | | | | | | | | | |
| Extra Ordinary Loss (net) | | | | | | | | | | | | | | | | | |
| Goodwill Impairment | | | | | | | | | | | | | | | | | |
| Asset Disp G/L (net) [Plastics / Mech, El | | | | | | | | | | | | | | | | | |
| Discontinued Operations (Mech, Elec) | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| Cash Flow from continuing ops | | | | | | | | | | | | | | | | | |
| Add'l Interest Expense | | | | | | | | | | | | | | | | | |
| Reliche | | | | | | | | | | | | | | | | | |
| Cons Cash Flow as adjusted | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| Fixed Charges As Defined | | | | | | | | | | | | | | | | | |
| Interest Expense | | | | | | | | | | | | | | | | | |
| Proforma Interest | | | | | | | | | | | | | | | | | |
| Net Interest - Preferred | | | | | | | | | | | | | | | | | |
| Total Fixed Charges | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| Fixed Charge Ratio | | | | | | | | | | | | | | | | | |

DURA2 01539
CONFIDENTIAL

**Exhibit F**

**E-Mail dated May 6, 2008, from Mr. Korth**

Michael
Slade/Chicago/Kirkland-Ellis
05/06/2008 05:46 PM

To    "James W Korth" <jwkorth@jwkorth.com>

cc    Roger Higgins/Chicago/Kirkland-Ellis@K&E

bcc

Subject    RE: Discovery Prior to Confirmation



Jim: I understand your position. We will be going forward on May 13. We will also follow Judge Carey's orders with respect to our response to your Objection and our provision of expert reports and declarations. I provided you with a list of our likely witnesses early merely to be helpful, and tried to give you the opportunity to take their depositions this week because you requested that information.

My best wishes to your dad for a speedy recovery. I am around tomorrow and thursday at 312-861-3348 if you would like to discuss Dura matters.

Regards, Mike

"James W Korth" <jwkorth@jwkorth.com>



"James W Korth"
<jwkorth@jwkorth.com>
05/06/2008 12:28 PM

To    "Michael Slade" <mslade@kirkland.com>

cc

Subject    RE: Discovery Prior to Confirmation

Here is the deal. Judge Carey's order says we do not need to exchange anything especially witness names until Friday. To the extent that you give me a response to my objections and new valuations reports I am going to need to have time to digest them and then formulate questions about them. Right now I am not interested in helping you force this thing into a hearing on Tuesday next for Confirmation. I am interested in doing things right. Just regarding the Fixed Charges we now have two documents that say completely different things. Analyzing the correctness of one over the other will take at least one or two days. Friday according to the Judges Order I will try to give you a list of which witnesses I care to deal with subject to receiving your responses to my objections by tomorrow. On Friday my 83 year old father is being operated on and I will be out of the office the entire day.

**From:** Michael Slade [mailto:mslade@kirkland.com]
**Sent:** Tuesday, May 06, 2008 10:58 AM
**To:** James W Korth
**Cc:** Roger Higgins; dmannal@kramerlevin.com
**Subject:** RE: Discovery Prior to Confirmation

Jim:  In our call yesterday I told you that we might call witnesses to testify at the confirmation hearing, on the following topics:

    - Tony Flanagan (AlixPartners):  Liquidation analysis/best interests test, feasibility, substantive consolidation, potentially other financial topics.

    - Durc Savini (Miller Buckfire): Plan negotiation, valuation. exit financing, good faith, claim classification, second lien recovery, potentially other related topics.

I also told you that we might call company witnesses on various topics.  Right now, we believe that we might call:

    - Larry Denton (CEO of Dura): Overview of reorganization, good faith, management equity plan, feasibility, potentially other related topics.

    - Tim Trenary (CFO of Dura):  NOLs, Fixed Charge Coverage Ratio, other financial topics.

    - potentially other witnesses.

I told you that we could make these individuals available for deposition at the end of the week, if you wanted to take the depositions.  You said that you would call me back once you had discussed the matter internally, but you have not called me back as of yet.

To confirm, I can make the witnesses available at these times and places:

Thursday 5/8 in Detroit:

    9-11      Larry Denton
    11-1      Tony Flanagan
    2-4       Tim Trenary

Friday 5/9 in New York

    3-5       Durc Savini

If you want to take these depositions, please let me know ASAP so that I can confirm the arrangements and make my own travel plans.  Also, if you decide to take the depositions, you will need to make the arrangements for a court reporter.  Call me if you have any additional questions.

Regards, Mike

---
Michael B. Slade
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL  60601
(312) 861-3348 (tel)
(312) 861-2200 (fax)

"James W Korth" <jwkorth@jwkorth.com>

05/05/2008 03:37 PM

To "Michael Slade" <mslade@kirkland.com>
cc
Subject RE: Discovery Prior to Confirmation

I believe that our objection creates a contested matter and that we need to see the reports and qualification etc of your experts and who else you intend to call along with your filed response to our objections before we can determine the level of discovery we intend to pursue. I am checking over various rules now.

**From:** Michael Slade [mailto:mslade@kirkland.com]
**Sent:** Monday, May 05, 2008 3:23 PM
**To:** James W Korth
**Cc:** Holly Macdonald-Korth; rhiggins@kirkland.com
**Subject:** Re: Discovery Prior to Confirmation

Jim -- Per our discussion, you are going to call me back to tell me whether you want to depose the potential witnesses that I identified for you during our call a few minutes ago. In addition, you are going to let me know whether you intend to call any witnesses. I look forward to our discussion later today.

Regards, Mike

"James W Korth" <jwkorth@jwkorth.com>

05/05/2008 10:23 AM

To "Michael Slade" <mslade@kirkland.com>, <rhiggins@kirkland.com>
cc "Holly Macdonald-Korth" <hkorth@jwkorth.com>
Subject Discovery Prior to Confirmation

Good Morning.

I have some basic questions. According to Judge Carey's order we are to exchange witness lists by Friday, May 9. Can you please answer the following questions as soon as possible?

1.    Do you expect to get a commitment for the Exit Financing before Friday? If not everything else below is moot.
2.    Do you plan on calling witnesses on Tuesday to counter our objections?
3.    If you plan to call witnesses, we would like to depose them before they testify. Do you have any plan for this with the hearing for Confirmation on the following Tuesday?
4.    We want to call certain people in the accounting department of Dura both who worked there on or about 5-21-2002 and currently. Will you cooperate with us identifying these people or do we have to get formal with an Interrogatory.


James W. Korth
J W Korth/Shop4Bonds - SIPC
Founded 1982
3339 Virginia
Number 104
Coconut Grove, Miami, Florida 33133
305 668 8485

*********************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
*********************************************************

*********************************************************
The information contained in this communication
is confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
*********************************************************

**Exhibit G**

**E-Mail dated May 6, 2008, to Mr. Korth**

**Michael**
**Slade/Chicago/Kirkland-Ellis**
05/06/2008 09:57 AM

To  "James W Korth" <jwkorth@jwkorth.com>

cc  Roger Higgins/Chicago/Kirkland-Ellis@K&E,
     dmannal@kramerlevin.com

bcc

Subject  RE: Discovery Prior to Confirmation



Jim: In our call yesterday I told you that we might call witnesses to testify at the confirmation hearing, on the following topics:

- Tony Flanagan (AlixPartners): Liquidation analysis/best interests test, feasibility, substantive consolidation, potentially other financial topics.

- Durc Savini (Miller Buckfire): Plan negotiation, valuation. exit financing, good faith, claim classification, second lien recovery, potentially other related topics.

I also told you that we might call company witnesses on various topics. Right now, we believe that we might call:

- Larry Denton (CEO of Dura): Overview of reorganization, good faith, management equity plan, feasibility, potentially other related topics.

- Tim Trenary (CFO of Dura): NOLs, Fixed Charge Coverage Ratio, other financial topics.

- potentially other witnesses.

I told you that we could make these individuals available for deposition at the end of the week, if you wanted to take the depositions. You said that you would call me back once you had discussed the matter internally, but you have not called me back as of yet.

To confirm, I can make the witnesses available at these times and places:

Thursday 5/8 in Detroit:

     9-11    Larry Denton
     11-1    Tony Flanagan
     2-4     Tim Trenary

Friday 5/9 in New York

     3-5     Durc Savini

If you want to take these depositions, please let me know ASAP so that I can confirm the arrangements and make my own travel plans. Also, if you decide to take the depositions, you will need to make the arrangements for a court reporter. Call me if you have any additional questions.

Regards, Mike

_____

Michael B. Slade
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601
(312) 861-3348 (tel)
(312) 861-2200 (fax)

"James W Korth" <jwkorth@jwkorth.com>



"James W Korth"
<jwkorth@jwkorth.com>          To    "Michael Slade" <mslade@kirkland.com>
05/05/2008 03:37 PM            cc                        ʼ

                               Subject   RE: Discovery Prior to Confirmation


 I believe that our objection creates a contested matter and that we need to see the reports and
qualification etc of your experts and who else you intend to call along with your filed response to our
objections before we can determine the level of discovery we intend to pursue. I am checking over various
rules now.

**From:** Michael Slade [mailto:mslade@kirkland.com]
**Sent:** Monday, May 05, 2008 3:23 PM
**To:** James W Korth
**Cc:** Holly Macdonald-Korth; rhiggins@kirkland.com
**Subject:** Re: Discovery Prior to Confirmation

Jim -- Per our discussion, you are going to call me back to tell me whether you want to depose the
potential witnesses that I identified for you during our call a few minutes ago. In addition, you are going to
let me know whether you intend to call any witnesses. I look forward to our discussion later today.

Regards, Mike

"James W Korth" <jwkorth@jwkorth.com>              To"Michael Slade" <mslade@kirkland.com>, <rhiggins@kirkland.com>
                                                  cc"Holly Macdonald-Korth" <hkorth@jwkorth.com>
05/05/2008 10:23 AM                               SubjectDiscovery Prior to Confirmation


Good Morning.

I have some basic questions. According to Judge Carey's order we are to exchange witness lists by Friday, May 9. Can you please answer the following questions as soon as possible?

1.    Do you expect to get a commitment for the Exit Financing before Friday? If not everything else below is moot.
2.    Do you plan on calling witnesses on Tuesday to counter our objections?
3.    If you plan to call witnesses, we would like to depose them before they testify. Do you have any plan for this with the hearing for Confirmation on the following Tuesday?
4.    We want to call certain people in the accounting department of Dura both who worked there on or about 5-21-2002 and currently. Will you cooperate with us identifying these people or do we have to get formal with an Interrogatory.


James W. Korth
J W Korth/Shop4Bonds - SIPC
Founded 1982
3339 Virginia
Number 104
Coconut Grove, Miami, Florida 33133
305 668 8485


```
************************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
************************************************************
```

**Exhibit H**

**Additional Correspondence With Mr. Korth**

**Michael**
**Slade/Chicago/Kirkland-Ellis**

04/06/2008 05:23 PM

To  "James W Korth" <jwkorth@jwkorth.com>

cc  Roger Higgins/Chicago/Kirkland-Ellis@K&E

bcc

Subject  Dura Automotive



Mr. Korth: Hello. I am litigation counsel for Dura Automotive, and the company has asked me to work with you related to your request for information about Dura.

I am talking with the company on Monday afternoon regarding what documents the company has and is willing to provide to you related to your discovery request. I would like to set up a time to talk with you after I speak with Dura, to see if we can come to an agreement.

Are you free either early Monday evening (say, 6 PM Central), or Tuesday morning, for a teleconference? Please let me know.

If you want to talk to me directly, my number is 312-861-3348.

Regards,

Michael B. Slade
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL  60601

| | | |
|---|---|---|
| **Michael**<br>**Slade/Chicago/Kirkland-Ellis**<br>04/08/2008 03:25 PM | To | "James W Korth" <jwkorth@jwkorth.com> |
| | cc | Roger Higgins/Chicago/Kirkland-Ellis@K&E, "DeFranceschi,<br>Daniel J." <defranceschi@RLF.com>,<br>dmannal@kramerlevin.com |
| | bcc | |
| | Subject | RE: Dura Automotive |

| Who | Date | Time | WS | CS | Su |
|---|---|---|---|---|---|
| James W Korth | 04/08/2008 | 02:57 PM | | | RE |
| James W Korth | 04/08/2008 | 03:25 PM | 2 | | RE: Dura A |

Jim: As we discussed, I am attaching a letter confirming our discussion from this morning. Let me know if you are willing to withdraw your Rule 2004 motion in light of the documents that we have agreed to voluntarily provide to you upon execution of a confidentiality agreement.

With respect to your below e-mail, there is no basis under the law for you to seek "Administrative Expenses," or the "expenses of an attorney and an accounting firm." You are free to retain counsel and/or a financial consultant, but you need to bear those expenses yourself. If you file such a motion, we will certainly oppose it because it is baseless. If you want to seek expedited treatment, please send us a copy of the motion and we will consider your request that it be heard on an expedited basis.

In addition to my co-counsel, I am also copying counsel for the Creditors' Committee on this e-mail.

Please give me a call once you have reviewed this letter to discuss how you would like to proceed on Thursday.

Best regards, Mike



4-8-08 Letter to J. Korth.pdf

---

Michael B. Slade
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601
(312) 861-3348 (tel)
(312) 861-2200 (fax)

"James W Korth" <jwkorth@jwkorth.com>

| | | | |
|---|---|---|---|
| | **"James W Korth"**<br><jwkorth@jwkorth.com><br>04/08/2008 02:57 PM | To | "Michael Slade" <mslade@kirkland.com> |
| | | cc | |
| | | Subject | RE: Dura Automotive |

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re

DURA AUTOMOTIVE SYSTEMS, INC.,
et al.,

Debtors.

)
)
)
)
)
)
)
)

Chapter 11

Case No. 06-11202 (KJC)

Jointly Administered

## ORDER ENTERING STIPULATED CONFIDENTIALITY
## AGREEMENT AND PROTECTIVE ORDER

At Wilmington this 10th day of April, 2008, IT IS HEREBY ORDERED
that:

1.      The Stipulated Confidentiality Agreement and Protective Order
(Dkt. No. ___ ) (the "Agreement") is entered as an order of this Court.

2.      Pursuant to Del. Bankr. LR 9018-1(c), the Parties are authorized to
file Confidential Information[2] under seal without the requirement of filing a separate
motion to that effect.

3.      This Court shall retain jurisdiction over all matters arising from or
related to the interpretation or implementation of this Order.

THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

---

[2] Capitalized terms not otherwise defined herein shall have the same meaning as set forth in the
Agreement.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| DURA AUTOMOTIVE SYSTEMS, INC., | ) | Case No. 06-11202 (KJC) |
| et al., | ) |  |
|  | ) | Jointly Administered |
| Debtors. | ) |  |

### STIPULATED CONFIDENTIALITY
### AGREEMENT AND PROTECTIVE ORDER

**WHEREAS**, the Debtors and Debtors in possession in the above-captioned case have filed their Amended Plan of Reorganization (the "Plan");

**WHEREAS**, James W. Korth ("Korth" and together with the Debtors and the Official Committee of Unsecured Creditors in the above-captioned cases the "Parties") has indicated that he may object to confirmation of the Plan;

**WHEREAS**, Korth has sought discovery of the Debtors in connection with the Debtors' motion to confirm the Plan (the "Action");

**WHEREAS**, the Debtors have been asked to produce certain documents and/or information ("Discovery Material") which they believe contains private, confidential, proprietary and/or commercially sensitive information ("Confidential Information");

**WHEREAS**, although the Debtors do not concede that the Confidential Information is relevant to confirmation of the Plan, they are willing to produce some of the information sought by Korth subject to the restrictions provided herein; and

**WHEREAS**, the Parties have agreed to enter into this Stipulated Confidentiality Agreement and Protective Order ("Agreement").

**IT IS HEREBY STIPULATED AND AGREED**, subject to the approval of the Bankruptcy Court, as follows:

1.    Confidential Information, as defined herein, disclosed by any of the Parties or a third-party (hereinafter a "Producing Party") to any other Party pursuant to discovery in this Action, shall be used solely for purposes of this Action. Confidential Information shall not be used or disclosed in any other proceeding or for any other purpose, including, but not limited to, any business or commercial purpose.

2.    As used herein, Confidential Information refers to all documents and/or information revealed or produced by the Producing Party during the course of discovery in this Action (whether in response to a document request, interrogatory, deposition, other discovery device or otherwise) and designated as "Confidential." Such designation shall, without more, subject the designated material or information to the provisions of this Agreement and such Confidential Information shall be protected, used and disposed of in accordance with the provisions of this Agreement.

3.    Any Producing Party may designate any Discovery Material as "Confidential" under the terms of this Agreement if the Producing Party in good faith reasonably believes that such Discovery Material contains non-public, confidential, proprietary or commercially sensitive information, that requires the protections provided in this Agreement (hereinafter "Confidential Discovery Material"). For purposes of this Agreement, Discovery Material considered to be Confidential Discovery Material includes all non-public materials containing information related, but not limited to: (i) financial or business plans or projections; (ii) proposed strategic transactions and other business combinations, negotiations, inquiries or agreements including, but not limited to, joint ventures, mergers, purchases, buy-outs, consolidations, transfers of interests and partnerships; (iii) trade secrets and proprietary technical information; (iv) studies or

2

analyses by internal or outside experts or consultants; (v) financial or accounting results or data; (vi) business, management and marketing plans and strategies; (vii) acquisition offers and expressions of interest; and (viii) contracts or agreements with affiliates or partners.

     4.    The designation of material or information as Confidential Discovery Material shall be made as follows:

     a.    with respect to documents or other materials (apart from depositions or other pretrial testimony), by affixing the legend "Confidential" to each page of the Discovery Material containing any Confidential Discovery Material;

     b.    with respect to information set forth in responses to discovery requests, by affixing the legend "Confidential" on the pages in the specific response or responses subject to such designation appear;

     c.    with respect to testimony given during a deposition, by

     (i)    indicating on the record or in writing at the time the deposition is taken or prior to the preparation of the transcript, those portions of the deposition that contain Confidential Discovery Material and instructing the court reporter prior to the preparation of the transcript to indicate on the face page of the deposition that it contains Confidential Discovery Material; or

     (ii)    notifying opposing counsel in writing within five (5) business days after the Producing Party's receipt of the transcript of the deposition by page and line number of any portion of the transcript of the deposition that contains Confidential Discovery Material.

     5.    A Party receiving Confidential Information (hereinafter "Receiving Party")

shall use such information solely for purposes of the Action, and shall permit access to such Confidential Information only to persons specified in this Agreement. Confidential Discovery Material may be disclosed, summarized, described, characterized or otherwise communicated or made available in whole or in part by a Receiving Party only to the following persons:

        a.     the Parties, and their outside counsel of record in the Action, as well as stenographic, clerical, and legal assistant employees of any such outside counsel whose functions require access to Confidential Discovery Material;

        b.     outside experts or consultants for the Receiving Party whose advice and consultation are being or will be used by the Receiving Party solely in connection with the Action, including their clerical personnel; provided that Parties desiring to disclose Confidential Discovery Material to such experts or consultants and their clerical personnel shall first obtain a signed Agreement To Abide By Stipulated Confidentiality Agreement and Protective Order in the form of Exhibit A attached hereto from each such expert or consultant and each of his/her personnel who would require access to Confidential Discovery Material, and counsel shall retain in his/her file the original of each such signed Agreement To Abide By Stipulated Confidentiality Agreement and Protective Order; and

        c.     the Court and its authorized staff, including official and freelance court reporters and videotape operators hired by any Party;

        6.     The Receiving Party shall use the Confidential Information only for the prosecution, defense or settlement of the Action. Confidential Information shall not be made public by the Receiving Party, shall be used only by persons permitted access to it

under Paragraph 5, and shall be disclosed only to persons specified in Paragraph 5.

7.    Nothing herein shall restrict the manner in which the Producing Party may use or disclose its own Confidential Information.

8.    The Bankruptcy Court's entry of an order approving this Agreement shall constitute authority pursuant to Del. Bankr. LR 9018-1(c) for the Parties to file future documents under seal without the necessity of filing a separate motion. As set forth in Del. Bankr. LR 9018-1(b) and (c), if Confidential Information is to be filed with the Bankruptcy Court, it shall be filed in a prominently marked envelope with a cover sheet attached containing the caption, title of the document to be filed under seal, docket number of the order entered by the Bankruptcy Court approving this Agreement, and the legend "CONFIDENTIAL TO BE KEPT UNDER SEAL."

9.    Confidential Information only may be used in testimony at trial, at any motion, hearing, and at depositions, and only may be offered in evidence at trial or at any motion, hearing, and at depositions, subject to this Agreement and to any further Order regarding confidentiality as this Court may enter, and may be used to prepare for and conduct discovery, to prepare for trial and to support or oppose any motion, all subject to Paragraph 5, but may not be used for any other purpose except as expressly provided herein or by further order of the Court.

10.    Nothing in this Agreement shall require disclosure of information that counsel contends is protected from disclosure by the attorney-client privilege, the work-product immunity, or any other legally cognizable privilege. If information subject to a claim of attorney-client privilege, work product immunity, or any other applicable privilege is inadvertently or mistakenly produced, such production shall in no way

prejudice or otherwise constitute a waiver of, or estoppel as to, any claim of privilege or work-product immunity for such information. If a Party has inadvertently or mistakenly produced a document subject to a claim of immunity or privilege, upon request by the Producing Party within three (3) business days of discovery of such inadvertent or mistaken production, the document for which a claim of inadvertent production is made shall be returned within three (3) business days of such request and all copies of that document that may have been made shall be destroyed to the extent reasonably practicable, and the Receiving Party shall not use such information for any purpose other than in connection with a motion to compel. The Party returning such material may then move the Court for an order compelling production of the material, but said motion shall not assert as a ground for entering such an order the fact or circumstance of the inadvertent production.

11.     This Agreement shall not prevent any Party from applying to the Court for relief therefrom, or from applying to the Court for further or additional protective orders.

12.     Nothing in this Agreement shall prevent any Party from producing documents in his, her or its possession to another person in response to a subpoena or other compulsory process. When possible, at least ten (10) days written notice before production or other disclosure shall be given. In no event shall production or other disclosure be made before reasonable notice is given.

13.     If any Party to this Agreement objects to the designation of any documents or information as "Confidential", the Party shall first state the objection by letter to the other Party. The Parties agree to confer in good faith to attempt to resolve any dispute regarding any such designation. If the Parties are unable to resolve such dispute, either

6

Party may seek appropriate relief from the Court; provided, however, that all documents and/or information to which an objection is made shall be treated as Confidential Information by the Parties until such objection is resolved.

14.    In the event that any Party appeals from any decision of the trial court relating to the Action, the Parties hereto agree to file a joint application to the appropriate appellate court, within three (3) business days of the filing of the notice of appeal, to maintain under seal the documents filed with the trial court which contain or disclose Confidential Information. In the event that any losing Party decides not to appeal, any Party who seeks the continued sealing of any filed document containing Confidential Information may petition the Court for continued sealing pursuant to the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure or any similar body of law, as appropriate. The provisions of this paragraph may be waived only with the written consent of the Producing Party.

15.    In the event that any Confidential Information is used in any court proceeding relating to the Action, said Confidential Information shall not lose its status as Confidential Information through such use. Counsel shall confer on such procedures as are necessary to protect the confidentiality of any documents, information and transcripts used in the course of any court proceedings.

16.    Korth acknowledges that by receiving the Confidential Information: (i) he may receive material non-public information about the Debtors; and (ii) there exist securities laws that may restrict or eliminate his ability to sell or purchase securities of the Debtors. Korth will indemnify and hold harmless the Debtors and each of their representatives (including the Debtors' financial, investment banking, and legal advisors)

7

from and against any claim, liability, damage or obligation incurred by the Debtors or any of their representatives (including the above-mentioned advisors) arising out of any violation of applicable law, including without limitation federal securities laws, relating to Korth's transactions in the securities of the Debtors while in possession of material non-public information (including violations relating to Korth directly or indirectly effecting any transaction in Instruments or any other securities of the Debtors, or in any derivatives, swaps, options or other instruments conveying the economic benefit of a transaction in any such instruments or securities).

17.    This Agreement shall survive the termination of this Action, whether by dismissal, final judgment, settlement or otherwise, and shall continue in full force and effect.

18.    After final disposition of the Action, the individuals designated in Paragraph 5(a) hereof for the Receiving Party may retain archival copies of deposition exhibits, Court exhibits, documents and other materials submitted to the Court, deposition transcripts and transcripts of court proceedings, one copy or sample of the Confidential Information produced by opposing counsel, and any summaries, notes, abstracts or compilations of Confidential Information, solely for reference in the event of a dispute over the use or dissemination of information. Such material shall continue to be treated as Confidential Information under this Agreement. After final disposition of the Action, counsel for the Receiving Party promptly either shall return all additional Confidential Information in his/her possession, custody or control or in the custody of any authorized agents, outside experts and consultants retained or utilized by counsel for the Receiving Party to counsel for the Producing Party who has provided such Confidential Information

8

in discovery or shall certify destruction thereof to such counsel. Counsel for the Receiving Party shall inform any other person identified in Paragraph 5 who received Confidential Information from the Receiving Party of its obligation to return any such Confidential Information as provided for herein or certify destruction thereof to such counsel.

19.    If a third-party provides discovery in connection with the Action, and if the third-party so elects, then the provisions of this Agreement shall apply to such discovery as if such discovery were being provided by a Party.    Under such circumstances, the third-party shall have the same rights and obligations under this Agreement.

20.    No modification of this Agreement shall be binding or enforceable unless in writing and signed by the Parties.

21.    This Agreement may be executed in one or more counterparts, including by facsimile, each of which shall be deemed an original, but all of which together constitute one and the same instrument.

Dated: April 9, 2008
   Wilmington, Delaware

_____
James W. Korth
*pro se*

STIPULATED AND AGREED:

_____
Daniel J. DeFranceschi (Bar No. 2732)
Jason M. Madron (Bar No. 4431)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware  19801
Telephone: (302) 651-7700

-and-

KIRKLAND & ELLIS LLP
Richard M. Cieri
Marc Kieselstein, P.C.
Michael B. Slade
Roger J. Higgins
Ryan Blaine Bennett
200 East Randolph Drive
Chicago, Illinois  60601
Telephone: (312) 861-2000

COUNSEL FOR THE DEBTORS AND
DEBTORS-IN-POSSESSION

10

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| DURA AUTOMOTIVE SYSTEMS, INC., et al., | Case No. 06-11202 (KJC) |
| Debtors. | Jointly Administered |

## AGREEMENT TO ABIDE BY STIPULATED
## CONFIDENTIALITY AGREEMENT AND PROTECTIVE ORDER

I have read the Stipulated Confidentiality Agreement and Protective Order ("Agreement") applicable to the Action.[1] I understand the Agreement's terms and agree to be fully bound by them, and hereby submit to the jurisdiction of the United States Bankruptcy Court for the District of Delaware, for purposes of the enforcement of the Agreement. I understand, in particular, that any Confidential Information, and any copies, excerpts or summaries thereof and materials containing Confidential Information derived therefrom, as well as any knowledge or information derived from any of the aforementioned items, may be used only for purposes of the Action and may not be used for any other purpose, including, without limitation, any business or commercial purpose.

I further understand that failure to abide fully by the terms of the Agreement may result in legal action against me, such as for contempt of court and liability for monetary damages.

Dated: *April 10 2008*          Agreed: *[signature]*

---

[1] Capitalized terms not otherwise defined herein shall have the same meaning as set forth in the Agreement.

Michael
Slade/Chicago/Kirkland-Ellis
04/16/2008 06:27 PM

To  "James W Korth" <jwkorth@jwkorth.com>

cc  "DeFranceschi, Daniel J." <defranceschi@RLF.com>, Roger Higgins/Chicago/Kirkland-Ellis@K&E, dmannal@kramerlevin.com

bcc  Cara Malcolm/Chicago/Kirkland-Ellis@K&E, Sandra Gentile/Chicago/Kirkland-Ellis@K&E, Yeong-Seon Ko/Chicago/Kirkland-Ellis@K&E

Subject  Dura: Investment in Non-Debtor Subsidiaries



Jim: Attached is a Bates-stamped copy of the most recent Monthly Operating Report and a list of which subsidiaries the $790,647,000 investments were made in. This is the breakdown of the "Investment in Non-Debtor Subsidiaries" line on page 3 of the Monthly Operating Report, per your request.

If you have any questions about these materials, please give me a call.

Regards, Mike

---------------------------------------

Michael B. Slade
200 East Randolph Drive
Chicago, IL 60601
(312) 861-3348 (tel)
(312) 861-2200 (fax)


DURA2 01272 - 01286.pdf


DURA2 01287.pdf

|  | Michael | To | "James W Korth" <jwkorth@jwkorth.com> |
|--|---------|----|--------------------------------------|
|  | Slade/Chicago/Kirkland-Ellis | cc | "DeFranceschi, Daniel J." <defranceschi@RLF.com>, Roger |
|  | 04/19/2008 12:47 PM | | Higgins/Chicago/Kirkland-Ellis@K&E, |
|  | | | dmannal@kramerlevin.com, Kathryn |
|  | | bcc | Cara Malcolm/Chicago/Kirkland-Ellis@K&E, Sandra |
|  | | | Gentile/Chicago/Kirkland-Ellis@K&E |
|  | | Subject | Dura Automotive |



Jim: In reviewing your motion to delay, it appears that you are not understanding the financial statements and balance sheets provided, or perhaps that you are confused by the way the Excel files look when they are printed out on paper and converted to a PDF file. In an effort to be helpful, I am producing you the files in their native format, which is Microsoft Excel.

These files should be all treated as "CONFIDENTIAL" under the Confidentiality Agreement and Protective Order that has been signed by you and entered by the Court. If you have any objection to treating them as confidential, please let me know immediately.

Feel free to call me if you have any questions.

Best regards, Mike

---

Michael B. Slade
200 East Randolph Drive
Chicago, IL 60601
(312) 861-3348 (tel)
(312) 861-2200 (fax)

  

Debtor 06 ISBS DIP Guarantors 040708.xls   Debtor 07 ISBS DIP Guarantors 040708.xls   Non-Debtor IS Trend 2006 101707.xls

  

Non-Debtor IS Trend 2007 101707.xls   Non-Debtor 2008 IS   LE Val.xls   Non-Debtors 2006 BS Non Guarantors 101707.xls



Non-Debtors 2007 BS Non Guarantors 101707.xls   Non-Debtor 2008 IS   LE Val.xls   Debtor 08 ISBS DIP Guarantors 040708.xls

**Michael**
Slade/Chicago/Kirkland-Ellis
04/20/2008 03:03 PM

To  jwkorth@jwkorth.com

cc  "DeFranceschi, Daniel J." <defranceschi@RLF.com>, Roger
    Higgins/Chicago/Kirkland-Ellis@K&E,
    dmannal@kramerlevin.com, Kathryn

bcc

Subject  Dura Automotive:  Incentive Payment For Company Sale



Jim:  Attached is a letter providing the information you requested on how the target for the company sale
incentive payment was arrived at.  If you have any further questions, please give me a call to discuss.

Best regards, Mike

Michael B. Slade
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL  60601
(312) 861-3348 (tel)
(312) 861-2200 (fax)



Letter to Korth 4-20-08.pdf

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois 60601

Michael B. Slade
To Call Writer Directly:
312 861-3348
mslade@kirkland.com

(312) 861-2000

www.kirkland.com

Facsimile:
(312) 861-2200
Dir. Fax: 312 861-2200

April 20, 2008

Via E-Mail

James W. Korth
J W Korth/Shop4Bonds - SIPC
3339 Virginia, #104
Coconut Grove, FL 33133

Re:    Dura Automotive

Dear Jim:

I write to respond to your request for additional information about the calculation of the "Company Sale TEV" that would trigger payment of the "Company Sale Incentive Amount" to Larry Denton and Theresa Skotak under their prepetition Change-of-Control Agreements ("CoC Agreements") as they are to be amended and assumed on the effective date of the Revised Plan.[1] Here is the information you requested.

The purpose of CoC Agreements, in general and in this particular case, is to give management financial incentives to maximize the value of the company in a sale scenario in the best interests of a company's shareholders. The original Plan of Reorganization (the "Original Plan") provided for assumption of the prepetition CoC Agreements, as amended to reflect certain modifications that were negotiated between the Debtors and their constituencies, primarily the Official Committee of Unsecured Creditors ("OCUC"). The terms of the amended CoC Agreements were documented in the Original Plan's disclosure statement, which the Court approved on October 3, 2007. The CoC Agreements themselves were contained in the plan supplement filed in support of the Original Plan. Those documents are publicly available, but if you need additional copies, let me know and I will provide them.

The Revised Plan contemplates assuming the same amended CoC Agreements—with one change to the triggering of payment of the "Company Sale Incentive Amount" as discussed below in this letter. The Revised Disclosure Statement describes the amended CoC Agreements

---

[1]    Capitalized terms are defined in the disclosure statement (the "Revised Disclosure Statement"), approved by the Court on April 3, 2008, for revised Chapter 11 Plan of Reorganization (the "Revised Plan").

James W. Korth
April 20, 2008
Page 2

at pp. 56-60. The amended CoC Agreements themselves will be included in the plan supplement for the Revised Plan, which the Debtors expect to file on or before April 28, 2008.

At the time the amended CoC Agreements were originally negotiated in September 2007 to be assumed under the Original Plan, the parties discussed providing an incentive to management in the event of a change of control triggered by a sale of the company to maximize the value of any such sale. In particular, any increase in the sale price of the company would redound to the benefit of Senior Notes holders and Other General Unsecured Claims holders who would have received common stock of Reorganized Dura had the Original Plan been confirmed and then consummated. The negotiations thus resulted in agreement over a graduated bonus (the "Company Sale Incentive Amount") that would be payable in the event of such a sale. The Company Sale Incentive Amount was to increase as a function of the amount by which the sale price for Reorganized Dura (the "Company Sale TEV") exceeded the midpoint in the range of the company's estimated Total Enterprise Value (or "TEV") at the time of confirmation of the Original Plan.

The midpoint TEV as of August 16, 2007, as calculated by Miller Buckfire, was approximately $600M. That was the figure provided in the Debtors' original Disclosure Statement and Plan of Reorganization. A report describing how the approximately $600M midpoint TEV was arrived at was provided to your counsel, Ballard Spahr, in discovery. *See* DPC 006643-6673. If you need another copy of this document, please let me know and I will provide it, subject to the confidentiality order to which you have already agreed.

As you know, the Debtors were unable to obtain in December 2007 sufficient exit financing on favorable terms to allow the company to consummate the transactions contemplated by the Original Plan. In the following weeks, the Debtors therefore developed, in consultation and negotiation with the ad hoc group of Second Lien Claims holders and the OCUC, a Revised Plan contemplating equity recoveries for Second Lien Claims holders in the form of Convertible Preferred Stock convertible into New Common Stock instead of the cash payments contemplated under the Original Plan. Senior Notes holders and Other General Unsecured Claims holders are to receive New Common Stock.

In connection with developing the Revised Plan, Miller Buckfire performed a refreshed valuation, which estimated Reorganized Dura's TEV at a midpoint of $495M. Miller Buckfire used the identical methodology to calculate the current TEV of Reorganized Dura as it did to calculate TEV as of August 16, 2007, but used more current financial information. The Revised Disclosure Statement discusses this methodology at pp. 73-74.

The change in the amended CoC Agreements referred to above is the amount of the Company Sale TEV, which now starts at the $495M midpoint TEV instead of the Original Plan's midpoint TEV ($600M) for purposes of determining the Company Sale Incentive Amount in the

James W. Korth
April 20, 2008
Page 3

event of a sale of Reorganized Dura.  The Company Sale Incentive Amount increases as a function of the increase in Company Sale TEV from $495M.

As was stated on the record at the April 10, 2008, hearing, no such sale is currently planned or otherwise contemplated.

If you have any questions, feel free to give me a call.

Sincerely,

Michael B. Slade

MBS

cc:    Roger Higgins
       Douglas Mannal
       Thomas Moers Mayer
       Marc Kieselstein

**Michael**
**Slade/Chicago/Kirkland-Ellis**
04/21/2008 11:12 AM

To  "James W Korth" <jwkorth@jwkorth.com>

cc  "DeFranceschi, Daniel J." <defranceschi@RLF.com>, Roger Higgins/Chicago/Kirkland-Ellis@K&E, dmannal@kramerlevin.com, Kathryn

bcc  Cara Malcolm/Chicago/Kirkland-Ellis@K&E, Sandra Gentile/Chicago/Kirkland-Ellis@K&E

Subject  Dura Automotive



Jim: I am attaching a couple of additional spreadsheets that we have located. I am attaching them both in PDF and in Microsoft Excel formats. The bates range is DURA2 01288-01507.

These documents are all "CONFIDENTIAL" under the Confidentiality Agreement and Protective Order that you have signed and that has been entered by the Court, and should be treated as such. If you have any objections to treating the documents as Confidential, please let me know immediately. Otherwise, please give me a call if you have any questions about these materials.

Regards, Mike

---

Michael B. Slade
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601
(312) 861-3348 (tel)
(312) 861-2200 (fax)

 

DURA2 1288-1331.pdf    DURA2 1332-1507.pdf

  

2007 IS Non-Debtor YTD Dec.xls  2007 BS Non-Debtor YTD Dec.xls  Non-Debtor 2008 BS LE Val.xls

**Michael**
**Slade/Chicago/Kirkland-Ellis**
04/22/2008 02:38 PM

To "James W Korth" <jwkorth@jwkorth.com>

cc "DeFranceschi, Daniel J." <defranceschi@RLF.com>, Roger Higgins/Chicago/Kirkland-Ellis@K&E, dmannal@kramerlevin.com, Kathryn

bcc Cara Malcolm/Chicago/Kirkland-Ellis@K&E, Sandra Gentile/Chicago/Kirkland-Ellis@K&E

Subject Dura Automotive:  Letter re Patents



Jim:  Attached is a letter relating to the patent issue that was discussed with the Court at the April 10 hearing.  Please note that this letter has been marked "Confidential" under the Protective Order and should be treated as such.  This letter completes our production of the materials that we have agreed to produce and the materials that the Court ordered us to produce.

If you have any questions, please give me a call.

Regards, Mike

_____
Michael B. Slade
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL  60601
(312) 861-3348 (tel)
(312) 861-2200 (fax)



Letter to Korth re Patents.pdf

**Michael**
Slade/Chicago/Kirkland-Ellis
05/05/2008 02:22 PM

To  "James W Korth" <jwkorth@jwkorth.com>

cc  "Holly Macdonald-Korth" <hkorth@jwkorth.com>,
rhiggins@kirkland.com

bcc

Subject  Re: Discovery Prior to Confirmation

| Who | Date | Time | WS | Su |
|---|---|---|---|---|
| James W Korth | 05/05/2008 | 10:23 AM | | Dis |
| James W Korth | 05/05/2008 | 02:22 PM | | Re: Discove |
| James W Korth | 05/05/2008 | 01:20 PM | | Re: Discove |

Jim -- Per our discussion, you are going to call me back to tell me whether you want to depose the potential witnesses that I identified for you during our call a few minutes ago. In addition, you are going to let me know whether you intend to call any witnesses. I look forward to our discussion later today.

Regards, Mike

"James W Korth" <jwkorth@jwkorth.com>



**"James W Korth"**
<jwkorth@jwkorth.com>
05/05/2008 10:23 AM

To  "Michael Slade" <mslade@kirkland.com>,
<rhiggins@kirkland.com>

cc  "Holly Macdonald-Korth" <hkorth@jwkorth.com>

Subject  Discovery Prior to Confirmation

Good Morning.

I have some basic questions. According to Judge Carey's order we are to exchange witness lists by Friday, May 9. Can you please answer the following questions as soon as possible?

1. Do you expect to get a commitment for the Exit Financing before Friday? If not everything else below is moot.
2. Do you plan on calling witnesses on Tuesday to counter our objections?
3. If you plan to call witnesses, we would like to depose them before they testify. Do you have any plan for this with the hearing for Confirmation on the following Tuesday?
4. We want to call certain people in the accounting department of Dura both who worked there on or about 5-21-2002 and currently. Will you cooperate with us identifying these people or do we have to get formal with an Interrogatory.

James W. Korth
J W Korth/Shop4Bonds - SIPC
Founded 1982
3339 Virginia

**Michael**
**Slade/Chicago/Kirkland-Ellis**
05/08/2008 09:11 AM

To   jwkorth@jwkorth.com

cc

bcc

Subject   Dura

| Who | Date | Time | | WS | S | SU |
|---|---|---|---|---|---|---|
| jwkorth | 05/08/2008 | 09:11 AM | | | | Du |

Jim:  Attached is a Bates-stamped copy of Dura's 2001 10(K), which we may use at the confirmation hearing.

Regards, Mike

2001 10(K)_DURA2 01540-01595.pdf

**Michael**
Slade/Chicago/Kirkland-Ellis
05/07/2008 02:30 PM

To  "James W Korth" <jwkorth@jwkorth.com>

cc  "Holly Macdonald-Korth" <hkorth@jwkorth.com>

bcc  Roger Higgins/Chicago/Kirkland-Ellis@K&E

Subject  RE: Discovery Prior to Confirmation

| Who | Date | Time | WS | CS | SU |
|-----|------|------|-----|-----|-----|
| James W Korth | 05/07/2008 | 11:05 AM | | | RE |
| James W Korth | 05/07/2008 | 02:30 PM | | RE: Discov | |

Jim: I appreciate the heads up on your motion to extend the confirmation hearing. We, as I'm sure you anticipate, will oppose the motion. We must go forward next week for a variety of reasons.

As for the 9% holders, I'd suggest that you be careful. I know that you have never filed a Rule 2019 statement indicating that you represent others, and Judge Carey has already entered an order related to that subject. I will pass along your suggestion about settlement, but the 9% holders are out of the money by a substantial margin and we are unlikely to be able to accommodate any recovery for them. If you have a specific proposal, feel free to pass it along.

Best regards, Mike

"James W Korth" <jwkorth@jwkorth.com>



"James W Korth"
<jwkorth@jwkorth.com>
05/07/2008 11:05 AM

To  "Michael Slade" <mslade@kirkland.com>

cc  "Holly Macdonald-Korth" <hkorth@jwkorth.com>

Subject  RE: Discovery Prior to Confirmation

Michael,

I am going to have to file a Motion to Extend the Confirmation Hearing under 9014 and related rules of Civil Procedure Thursday afternoon as I will have no time to prepare or analyze, take discovery or form responses to anything regarding the Debtor's responses to my objections or we need to settle this for our clients and ourselves and withdraw my objections.

I am willing to let the clients who own 8 5/8s bonds take their common stock. Through me, we need to make some reasonable accommodation for our clients who own the 9s plus recapturing our expenses. If you care to try to work something out, please let me know and we can make a reasonable offer.

Sincerely,

Jim

**From:** Michael Slade [mailto:mslade@kirkland.com]
**Sent:** Tuesday, May 06, 2008 6:47 PM
**To:** James W Korth
**Cc:** Roger Higgins
**Subject:** RE: Discovery Prior to Confirmation

Jim: I understand your position. We will be going forward on May 13. We will also follow Judge Carey's orders with respect to our response to your Objection and our provision of expert reports and declarations. I provided you with a list of our likely witnesses early merely to be helpful, and tried to give you the opportunity to take their depositions this week because you requested that information.

My best wishes to your dad for a speedy recovery. I am around tomorrow and thursday at 312-861-3348 if you would like to discuss Dura matters.

Regards, Mike

"James W Korth" <jwkorth@jwkorth.com>

05/06/2008 12:28 PM

To "Michael Slade" <mslade@kirkland.com>
cc
Subject RE: Discovery Prior to Confirmation

Here is the deal. Judge Carey's order says we do not need to exchange anything especially witness names until Friday. To the extent that you give me a response to my objections and new valuations reports I am going to need to have time to digest them and then formulate questions about them. Right now I am not interested in helping you force this thing into a hearing on Tuesday next for Confirmation. I am interested in doing things right. Just regarding the Fixed Charges we now have two documents that say completely different things. Analyzing the correctness of one over the other will take at least one or two days. Friday according to the Judges Order I will try to give you a list of which witnesses I care to deal with subject to receiving your responses to my objections by tomorrow. On Friday my 83 year old father is being operated on and I will be out of the office the entire day.

**From:** Michael Slade [mailto:mslade@kirkland.com]
**Sent:** Tuesday, May 06, 2008 10:58 AM
**To:** James W Korth
**Cc:** Roger Higgins; dmannal@kramerlevin.com
**Subject:** RE: Discovery Prior to Confirmation

Jim: In our call yesterday I told you that we might call witnesses to testify at the confirmation hearing, on the following topics:

 - Tony Flanagan (AlixPartners): Liquidation analysis/best interests test, feasibility, substantive

consolidation, potentially other financial topics.

   - Durc Savini (Miller Buckfire): Plan negotiation, valuation. exit financing, good faith, claim classification, second lien recovery, potentially other related topics.

I also told you that we might call company witnesses on various topics. Right now, we believe that we might call:

   - Larry Denton (CEO of Dura): Overview of reorganization, good faith, management equity plan, feasibility, potentially other related topics.

   - Tim Trenary (CFO of Dura): NOLs, Fixed Charge Coverage Ratio, other financial topics.

   - potentially other witnesses.

I told you that we could make these individuals available for deposition at the end of the week, if you wanted to take the depositions. You said that you would call me back once you had discussed the matter internally, but you have not called me back as of yet.

To confirm, I can make the witnesses available at these times and places:

Thursday 5/8 in Detroit:

| | |
|---|---|
| 9-11 | Larry Denton |
| 11-1 | Tony Flanagan |
| 2-4 | Tim Trenary |

Friday 5/9 in New York

| | |
|---|---|
| 3-5 | Durc Savini |

If you want to take these depositions, please let me know ASAP so that I can confirm the arrangements and make my own travel plans. Also, if you decide to take the depositions, you will need to make the arrangements for a court reporter. Call me if you have any additional questions.

Regards, Mike

_____

Michael B. Slade
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601
(312) 861-3348 (tel)
(312) 861-2200 (fax)

"James W Korth" <jwkorth@jwkorth.com>

05/05/2008 03:37 PM

To"Michael Slade" <mslade@kirkland.com>
cc
SubjectRE: Discovery Prior to Confirmation

I believe that our objection creates a contested matter and that we need to see the reports and qualification etc of your experts and who else you intend to call along with your filed response to our objections before we can determine the level of discovery we intend to pursue. I am checking over various rules now.

---

**From:** Michael Slade [mailto:mslade@kirkland.com]
**Sent:** Monday, May 05, 2008 3:23 PM
**To:** James W Korth
**Cc:** Holly Macdonald-Korth; rhiggins@kirkland.com
**Subject:** Re: Discovery Prior to Confirmation

Jim -- Per our discussion, you are going to call me back to tell me whether you want to depose the potential witnesses that I identified for you during our call a few minutes ago. In addition, you are going to let me know whether you intend to call any witnesses. I look forward to our discussion later today.

Regards, Mike

"James W Korth" <jwkorth@jwkorth.com>

05/05/2008 10:23 AM

> To "Michael Slade" <mslade@kirkland.com>, <rhiggins@kirkland.com>
> cc "Holly Macdonald-Korth" <hkorth@jwkorth.com>
> Subject Discovery Prior to Confirmation

Good Morning.

I have some basic questions. According to Judge Carey's order we are to exchange witness lists by Friday, May 9. Can you please answer the following questions as soon as possible?

1.    Do you expect to get a commitment for the Exit Financing before Friday? If not everything else below is moot.
2.    Do you plan on calling witnesses on Tuesday to counter our objections?
3.    If you plan to call witnesses, we would like to depose them before they testify. Do you have any plan for this with the hearing for Confirmation on the following Tuesday?
4.    We want to call certain people in the accounting department of Dura both who worked there on or about 5-21-2002 and currently. Will you cooperate with us identifying these people or do we have to get formal with an Interrogatory.


James W. Korth
J W Korth/Shop4Bonds - SIPC
Founded 1982
3339 Virginia
Number 104
Coconut Grove, Miami, Florida 33133
305 668 8485

```
*********************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
*********************************************************
```

```
*********************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
*********************************************************
```

```
*********************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
```

and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
**********************************************************

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois 60601

Michael B. Slade
To Call Writer Directly:
312 861-3348
mslade@kirkland.com

(312) 861-2000

www.kirkland.com

Facsimile:
(312) 861-2200
Dir. Fax: 312 861-2200

May 8, 2008

Via Overnight Mail

James W. Korth
J W Korth/Shop4Bonds - SIPC
3339 Virginia, #104
Coconut Grove, FL 33133

Re:    Dura Automotive

Dear Jim:

Pursuant to the Court's Order denying your motion to extend the date for the confirmation hearing (Docket No. 3216), I am attaching the Debtors' current Witness and Exhibit Lists, along with copies of the exhibits that the Debtors intend to introduce at the hearing. If there are any updates to the Debtors' witness and exhibit lists between now and tomorrow, I will let you know by e-mail.

Some of these materials are marked Confidential under the protective order and should be treated as such. I look forward to receiving your witness and exhibit list, if any. Please let me know if you have any questions.

Sincerely,

Michael B. Slade

cc:    Doug Mannal

Hong Kong        London        Los Angeles        Munich        New York        San Francisco        Washington, D.C.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DURA AUTOMOTIVE SYSTEMS, INC., et al., | ) | Case No. 06-11202 (KJC) |
| | ) | |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |

---

### DEBTORS' WITNESS AND EXHIBIT LISTS FOR THE HEARING ON CONFIRMATION OF THE DEBTORS' REVISED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

---

The Debtors[1] in the above-captioned case respectfully submit this witness and exhibit list in support of the confirmation of the Debtors' Revised Plan.

### WITNESS LIST

The Debtors may call the following witnesses to testify at the confirmation hearing, either live or *via* declaration:

1. Lawrence Denton

2. Timothy Trenary

3. Tony Flanagan (Expert)

4. Durc Savini (Expert)

5. Allison Tearnen

6. Adam Sanderson

7. Jane Sullivan

---

[1]  The "Debtors" comprise the entities set forth in the Order Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure Directing Joint Administration of the Debtors' Chapter 11 Cases, entered on October 31, 2006 [Docket No. 68].

8.    Dennis Myers

The Debtors reserve their rights to add additional witnesses, if necessary, for purposes of rebuttal, or based on the circumstances of the case.

## EXHIBIT LIST

The Debtors proffer the following exhibits in support of confirmation of the Revised Plan. The Debtors will ask the Court to admit them at the outset of the confirmation hearing. All such exhibits will be provided to counsel for the Committee and to objector J.W. Korth on or before May 9, 2008, pursuant to the Court's Order denying Mr. Korth's motion to delay the confirmation hearing. *See* Docket No. 3216

| Exhibit No. | Document Title | Bates Number/Other Location |
|---|---|---|
| 1 | Declaration and Expert Report of Tony Flanagan | Appendix E to Memorandum of Law in Support of Confirmation of the Debtors' Revised Plan |
| 2 | Declaration and Expert Report of Durc Savini | Appendix D to Memorandum of Law in Support of Confirmation of the Debtors' Revised Plan |
| 3 | Declaration of Lawrence Denton | Appendix C to Memorandum of Law in Support of Confirmation of the Debtors' Revised Plan |
| 4 | Declaration of C. Timothy Trenary | Appendix J to Memorandum of Law in Support of Confirmation of the Debtors' Revised Plan |
| 5 | Financial Projections of the Debtors: Significant Business and Economic Assumptions | Exhibit H to Disclosure Statement |
| 6 | Liquidation Analysis | Exhibit I to Disclosure Statement |
| 7 | Canadian Information Officer's Report | Exhibit G to Disclosure Statement |
| 8 | Declaration and Expert Report of Nick Bubnovich, Senior Consultant at | Exhibit D to Debtors' 2007 Confirmation |

| | Watson Wyatt Worldwide, in Support of the Debtors' Management Equity Program Contained in the Plan of Reorganization | Memorandum |
|---|---|---|
| 9 | Affidavit of Alison M. Tearnen Regarding Votes Accepting or Rejecting The Debtors' Revised Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code | Appendix G to Memorandum of Law in Support of Confirmation of the Debtors' Revised Plan |
| 10 | Declaration of Adam Sanderson Regarding Votes Accepting or Rejecting the Debtors' Revised Joint Plan or Reorganization Under Chapter 11 of the Bankruptcy Code | Appendix G to Memorandum of Law in Support of Confirmation of the Debtors' Revised Plan |
| 11 | Affidavits of Service | Appendix F to Memorandum of Law in Support of Confirmation of the Debtors' Revised Plan |
| 12 | Revised Joint Plan of Reorganization | Docket No. 3023 |
| 13 | Plan Supplement | Docket No. 3213 |
| 14 | Certificates of Publication | Docket Nos. 3240-43 |
| 15 | Valuation Report* | DURA2 1508-38 |
| 16 | Calculation of Fixed Charge Coverage Ratio* | DURA2 1539 |
| 17 | DURA 2001 10-K | DURA2 1540 |
| 18 | February 2008 Revised Business Plan Presentation* | DURA2 00754-825 |
| 19 | February 2008 Monthly Operating Report | DURA2 1272-86 |
| 20 | Dura Automotive Systems, Inc. Summary of Investment in Non-Debtor Subsidiaries | DURA2 1287 |

---

* Documents marked with * are confidential and proprietary, and are not to be made public. The Debtors are filing a
motion to file such Exhibits under seal to protect the proprietary information contained therein.

| 21 | Extracts from Company 10-Ks from 1999, 2004, and 2006 | Appendix I to Memorandum of Law in Support of Confirmation of the Debtors' Revised Plan |

The Debtors reserve the right to add exhibits to this list or to seek to introduce additional

exhibits for purposes of completeness, cross-examination, or impeachment.

Dated: May 9, 2008
         Wilmington, Delaware

                                        _____
                                        Daniel J. DeFranceschi (Bar No. 2732)
                                        Jason M. Madron (Bar No. 4431)
                                        RICHARDS, LAYTON & FINGER, P.A.
                                        One Rodney Square
                                        920 North King Street
                                        Wilmington, Delaware  19801
                                        Telephone:  (302) 651-7700
                                        Facsimile:  (302) 651-7701

                                        - and -

                                        Richard M. Cieri
                                        Marc Kieselstein, P.C.
                                        Roger J. Higgins
                                        Michael B. Slade
                                        Ryan Blaine Bennett
                                        KIRKLAND & ELLIS LLP
                                        200 East Randolph Drive
                                        Chicago, Illinois  60601
                                        Telephone:  (312) 861-2000
                                        Facsimile:  (312) 861-2200

                                        *Counsel for the Debtors and Debtors-in-Possession*



**"UPS Quantum View"**
<auto-notify@ups.com>

05/09/2008 09:45 AM

Please respond to
auto-notify@ups.com

To  mslade@kirkland.com

cc

bcc

Subject  UPS Delivery Notification, Tracking Number
1Z6109640152141796





***Do not reply to this e-mail. UPS and Kirkland & Ellis LLP. will not receive your reply.

**At the request of Kirkland & Ellis LLP., this notice is to confirm that the following
shipment has been delivered.**

**Important Delivery Information**

**Delivery Date / Time:** 09-May-2008 / 10:08 AM
**Delivery Location:** RESIDENTIAL
**Signed by:** KORTH

## Shipment Detail

**Ship To:**
James W. Korth
J W Korth/Shop4Bonds - SIPC
3339 Virginia
# 104
Coconut Grove
FL
33133
US

**UPS Service:**                                    NEXT DAY AIR

| Weight: | 14.0 LBS |
| Tracking Number: | 1Z61096401152141796 |
| Reference Number 1: | 3355000092 |
| Reference Number 2: | 23595 |

_____2I2II2B8FQv4LodFqsk2@7Z-9@G2iohsFR_____



Discover more about UPS:
Visit www.ups.com
Learn About UPS Companies
Sign Up For Additional E-Mail From UPS
Read Compass Online

© 2008 United Parcel Service of America, Inc. UPS, the UPS brandmark, and the color brown are trademarks of United Parcel Service of America, Inc. All rights reserved.
For more information on UPS's privacy practices, refer to the UPS Privacy Policy.
Please do not reply directly to this email. UPS will not receive any reply message.
For questions or comments, visit Contact UPS.

This communication contains proprietary information and may be confidential. If you are not the intended recipient, the reading, copying, disclosure or other use of the contents of this email is strictly prohibited and you are instructed to please delete this email immediately.
Privacy Policy
Contact UPS



☒Close Window

# Tracking Summary

**Tracking Numbers**

| | |
|---|---|
| **Tracking Number:** | 1Z 610 964 01 5214 179 6 |
| Type: | Package |
| Status: | **Delivered** |
| Delivered On: | 05/09/2008<br>10:08 A.M. |
| Delivered To: | MIAMI, FL, US |
| Signed By: | KORTH |
| Service: | NEXT DAY AIR |

Tracking results provided by UPS:  05/09/2008 10:40 A.M.  ET

**NOTICE:** UPS authorizes you to use UPS tracking systems solely to track shipments tendered by or for you to UPS for delivery and for no other purpose. Any other use of UPS tracking systems and information is strictly prohibited.

☒Close Window

Copyright © 1994-2008 United Parcel Service of America, Inc. All rights reserved.

## **Exhibit K**

Order Confirming Debtors' Revised Joint Plan of Reorganization
Under Chapter 11 of the Bankruptcy Code

# ORIGINAL

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| Dura Automotive Systems, Inc., et al.,[1] | ) | Case No. 06-11202 (KJC) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | **Re: Docket No. 3317** |

## ORDER CONFIRMING DEBTORS' REVISED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

The above-captioned Debtors having:

- filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on October 30, 2006 (the "Petition Date");

- filed on May 12, 2008, *The Debtors' Revised Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code (with Further Technical Amendments)* (the "Plan") [Docket No. 3319], and on March 31, 2008, the *Disclosure Statement for the Debtors' Revised Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code* [Docket No. 3025] (the "Disclosure Statement"), approved by this Court on April 4, 2008 [Docket No. 3069];[2]

- distributed solicitation materials on or before April 11, 2008, pursuant to and consistent with the *Order (A) Approving Revised Disclosure Statement, (B) Fixing the Voting Record Date, (C) Scheduling Certain Hearing Dates and Deadlines in Connection with the Proposed Confirmation of the Debtors' Joint Revised Plan of Reorganization, and (D) Approving the Revised Solicitation Package and Notices* [Docket No. 3069] (the "Scheduling and Disclosure Statement Order");

- filed on April 28, 2008, the *Plan Supplement in Support of Revised Plan of Reorganization* [Docket No. 3213], and on May 12, 2008, the *Amended Plan Supplement in Support of Revised Plan of Reorganization* (the "Plan Supplement"); and

- filed on May 8, 2008, the *Debtors' Memorandum of Law in Support of Confirmation of the Debtors' Revised Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code (with Technical Amendments)* (the "Confirmation Brief") [Docket No. 3277]; and

---

[1] The "Debtors" comprise the entities set forth in the *Order Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure Directing Joint Administration of the Debtors' Chapter 11 Cases*, entered on October 31, 2006 [Docket No. 68].

[2] Capitalized terms not defined herein shall have the meanings assigned to them in the Plan or Disclosure Statement, as applicable.

This Court having:

- set May 13, 2008, at 10:00 a.m. Eastern Time as the date and time of a hearing pursuant to Fed.R.Bankr.P. 3017 and Fed.R.Bankr.P. 3018 and sections 1126, 1128 and 1129 of the Bankruptcy Code to consider the Confirmation of the Plan (the "Confirmation Hearing");

- reviewed the Plan and Disclosure Statement;

- considered the *Declaration of Lawrence A. Denton In Support of Confirmation of the Debtors' Revised Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* and *Declaration of C. Timothy Trenary, Chief Financial Officer of Dura Automotive Systems, Inc., in Support of Confirmation of the Debtors' Revised Plan,* each filed as appendices to the Confirmation Brief;

- considered the *Declaration and Expert Report of Durc Savini Supporting the Debtors' Memorandum of Law in Support of Confirmation of the Debtors' Revised Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (the "Savini Report"), and the *Declaration and Expert Report of Anthony C. Flanagan Supporting the Debtors' Memorandum of Law in Support of Confirmation of the Debtors' Revised Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (the "Flanagan Report," and, collectively with the Savini Report, the "Expert Reports"), each filed as appendices to the Confirmation Brief;

- considered the *Affidavit of Service of Kurtzman Carson Consultants LLC,* filed on April 16, 2008 [Docket No. 3157], and *Affidavit of Service of Financial Balloting Group LLC of Solicitation Packages and Non-Voting Notices on Holders of Public Securities,* filed on April 18, 2008 [Docket No. 3162] (collectively, the "Affidavits of Service");

- considered the *Affidavit of Alison M. Tearnen Regarding Votes Accepting or Rejecting the Debtors' Revised Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code,* the *Affidavit of Adam Sanderson Regarding Votes Accepting or Rejecting the Debtors' Revised Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code,* and the *Certification of Jane Sullivan With Respect to the Tabulation of Votes on the Debtors' Joint Plan by Holders of Noteholder Claims in Class 3,* each filed as appendices to the Confirmation Brief (collectively, the "Voting Affidavits");

- considered all other pleadings, exhibits, statements, documents and filings regarding confirmation of the Plan ("Confirmation"); and

- heard and considered the statements of counsel and all other testimony and evidence proffered and/or adduced at the Confirmation Hearing, and in respect of, Confirmation of the Plan.

After due deliberation thereon and good cause appearing therefor, this Court hereby makes and issues the following findings of fact, conclusions of law and orders:[3]

## I.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### *Jurisdiction and Venue*

a) On the Petition Date, each Debtor commenced a chapter 11 case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors were and are qualified to be debtors under section 109 of the Bankruptcy Code. Venue in the District of Delaware was proper as of the Petition Date and continues to be proper. Confirmation of the Plan is a core proceeding under 28 U.S.C. § 157(b)(2)(L). This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

b) Since the Petition Date, the Debtors have operated their businesses and managed their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Cases.

### *Judicial Notice*

c) The Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the clerk of this Court and/or its duly appointed agent (the "Docket"), including, without limitation, all pleadings and other documents on file, all orders entered, and the transcripts of,

---

[3] This Confirmation Order constitutes this Court's findings of fact and conclusions of law under Fed.R.Civ.P. 52, as made applicable by Fed.R.Bankr.P. 7052 and 9014. Any and all findings of fact shall constitute findings of fact even if they are stated as conclusions of law, and any and all conclusions of law shall constitute conclusions of law even if they are stated as findings of fact. Further, any findings of fact and conclusions of law announced on the record in open court are incorporated by reference herein.

and all evidence (that was not subsequently withdrawn) and arguments made, proffered or adduced at, the hearings held before this Court during the pendency of the Chapter 11 Cases.

***Burden of Proof***

      d)      The Debtors, as the Plan proponents, have met their burden of proving the elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard in this Court. The Court also finds that the Debtors have satisfied the elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by clear and convincing evidence.

***Solicitation Procedures Authorization***

      e)      On April 4, 2008, this Court entered the Scheduling and Disclosure Statement Order that, among other things: (a) approved the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code and Fed.R.Bankr.P. 3017; (b) fixed time for voting to accept or reject the Plan; (c) fixed the date and time for the commencement of the Confirmation Hearing; (d) established the objection deadline and procedures for objecting to the Plan; (e) approved the form and method of notice of the Confirmation Hearing (the "Confirmation Hearing Notice"); and (f) established the record date and certain procedures for soliciting and tabulating votes with respect to the Plan.

***Service of Solicitation Materials***

      f)      As evidenced in the Voting Affidavits, the Debtors complied with the service requirements and procedures approved in the Scheduling and Disclosure Statement Order.

***Publication of Confirmation Hearing Notice***

      g)      As evidenced in affidavits of publication filed with this Court, the Debtors published the Confirmation Hearing Notice in the publications and on the dates indicated below: *The Wall Street Journal* on April 16, 2008 [Docket No. 3245]; *The New York Times* on April 16,

4

2008 [Docket No. 3244]; *The National Post* on April 16, 2008 [Docket No. 3243]; *The Detroit News and Detroit Free Press* on April 16, 2008 [Docket No. 3242]; *Automotive News* on April 21, 2008 [Docket No. 3241]; and *The Globe and Mail* on April 16, 2008 [Docket No. 3240].

*Voting Affidavits and Solicitation*

      h)      On May 8, 2008, the Debtors filed with this Court the Voting Affidavits certifying the method and results of the ballot tabulation for each of the Voting Classes to accept or reject the Plan.

      i)      Based upon the Voting Affidavits, all procedures used to provide notice and distribute solicitation materials to the applicable holders of Claims and Equity Interests and to tabulate the ballots were fair and conducted in accordance with the Scheduling and Disclosure Statement Order, Bankruptcy Code, Federal Rules of Bankruptcy Procedure, local rules of the Bankruptcy Court for the District of Delaware, and all other applicable rules, laws and regulations.

      j)      As evidenced by the Voting Affidavits, all ballots were properly tabulated. Pursuant to sections 1124 and 1126 of the Bankruptcy Code, all Impaired Classes entitled to vote on the Plan have voted to accept the Plan.

      k)      Based upon the Voting Affidavits, votes for acceptance and rejection of the Plan were solicited in good faith and complied with sections 1125 and 1126 of the Bankruptcy Code, Fed.R.Bankr.P. 3017 and 3018, the Scheduling and Disclosure Statement Order, all applicable provisions of the Bankruptcy Code, and all other applicable rules, laws and regulations.

      l)      Each of the Debtors and their respective directors, officers, agents, affiliates, representatives, attorneys and advisors have solicited votes on the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and the Scheduling and Disclosure Statement Order.

K&E 12234346.25
RLF1-3282747-1

*Plan Supplement Notice*

m)    The documents identified in the Plan Supplement were filed as required and notice of such documents was good and sufficient under the circumstances and no other or further notice is or shall be required.

*Plan Modifications*

n)    The technical modifications to the Plan (reflected in the Plan as filed on May 8, 2008, and May 12, 2008) constitute non-material changes, and/or changes with respect to particular Claims or Equity Interests by agreement with holders of such Claims or Equity Interests, and/or changes with respect to particular Claims or Equity Interests that do not materially adversely affect or change the treatment of any Claims or Equity Interests and require no additional or further solicitation of votes on the Plan. Such modifications do not materially negatively impact the treatment of, and/or distributions to, holders of Allowed Claims under the Plan. Accordingly, pursuant to section 1127 of the Bankruptcy Code and Fed.R.Bankr.P. 3019, these modifications do not require additional disclosure pursuant to section 1125 of the Bankruptcy Code or re-solicitation of votes pursuant to section 1126 of the Bankruptcy Code, nor do they require that holders of Claims or Equity Interests be afforded an opportunity to change any previously cast acceptances or rejections.

*New Credit Facilities*

o)    The Exit Credit Facility and New Money Second Lien Loan (collectively, the "New Credit Facilities") are essential elements of the Plan, and entry into the New Credit Facilities is in the best interests of the Debtors' Estates and the Reorganized Debtors. The Reorganized Debtors have exercised reasonable business judgment in determining to enter into the New Credit Facilities, and the Debtors have provided adequate notice thereof. The New Credit Facilities have been negotiated in good faith and at arm's-length, and any credit extended,

6

letters of credit issued for the account of, and loans made to the Reorganized Debtors pursuant to the New Credit Facilities shall be deemed to have been extended, issued, and made in good faith.

### *Compliance with the Requirements of Section 1129 of the Bankruptcy Code*

<u>Section 1129(a)(1) – Compliance of the Plan with Applicable Provisions of the Bankruptcy Code</u>

p)    The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including, without limitation, sections 1122 and 1123. Pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Article III of the Plan designates Classes of Claims and Equity Interests, other than Administrative Claims, DIP Facility Claims and Priority Tax Claims.[4]   As required by section 1122(a) of the Bankruptcy Code, each Class of Claims and Equity Interests contains only Claims or Equity Interests that are substantially similar to the other Claims or Equity Interests within that Class.  Valid reasons exist for separately classifying the various Classes of Claims and Equity Interests created under the Plan, and such Classes do not unfairly discriminate between holders of Claims and Equity Interests.  The Plan therefore satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

q)    Pursuant to sections 1123(a)(2) and 1123(a)(3) of the Bankruptcy Code, Article III of the Plan specifies all Claims that are not Impaired and specifies the treatment of all Claims and Equity Interests that are Impaired.  Pursuant to section 1123(a)(4) of the Bankruptcy Code, Article III of the Plan also provides the same treatment for each Claim or Equity Interest within a particular Class.

r)    Pursuant to section 1123(a)(5) of the Bankruptcy Code, the Plan provides adequate and proper means for the Plan's implementation.  Based upon the evidence proffered in

---

[4]    The Administrative Claims, DIP Facility Claims and the Priority Tax Claims are not required to be designated pursuant to section 1123(a)(1) of the Bankruptcy Code.

7

the Expert Reports, the Debtors will have, upon consummating the New Credit Facilities on the Effective Date of the Plan, sufficient Cash to make all payments required to be made on the Effective Date or otherwise prescribed pursuant to the terms of the Plan. Moreover, Article IV and various other provisions of the Plan specifically provide adequate means for implementing the Plan, including, without limitation: (a) continuing the corporate existence of and vesting assets in the Reorganized Debtors; (b) canceling all debt instruments and equity interests outstanding on the Petition Date; (c) issuing new securities and executing related documents; (d) creating a professional escrow account; (e) providing for corporate governance, directors and officers, and corporate action of and by the Reorganized Debtors; and (f) establishing the sources of Cash for distributions under the Plan.

s)    The Debtors' New Organizational Documents, as contained or otherwise referenced in the Plan Supplement, satisfy the requirements set forth in sections 1123(a)(6) and 1123(a)(7) of the Bankruptcy Code.

t)    The other provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1123(b) of the Bankruptcy Code.

u)    The Plan is dated and identifies the Plan's proponents, thereby satisfying Fed.R.Bankr.P. 3016(a).

Section 1129(a)(2) – Debtors' Compliance with Applicable Provisions of the Bankruptcy Code

v)    The Debtors, as Plan proponents, have complied with all applicable provisions of the Bankruptcy Code, as required by section 1129(a)(2) of the Bankruptcy Code, including, without limitation, sections 1125 and 1126 and Fed.R.Bankr.P. 3017, 3018 and 3019. In particular, the Debtors are proper debtors under section 109 of the Bankruptcy Code and proper Plan proponents under section 1121(a) of the Bankruptcy Code. Furthermore, the solicitation of acceptances or rejections of the Plan: (i) complied with the Scheduling and Disclosure Statement

8

Order; (ii) complied with all applicable laws, rules and regulations governing the adequacy of disclosure in connection with such solicitation; and (iii) occurred only after disclosing "adequate information" to holders of Claims or Equity Interests, as section 1125(a) of the Bankruptcy Code defines that term. Accordingly, the Debtors and the Creditors' Committee, and their respective directors, officers, employees, agents, members, affiliates and Representatives have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code.

Section 1129(a)(3) – Proposal of Plan in Good Faith

w)     The Debtors have proposed the Plan in good faith and not by any means forbidden by law, as required by section 1129(a)(3) of the Bankruptcy Code. In so determining, this Court has examined the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the Plan itself, and the process leading to its formulation. The Chapter 11 Cases were filed, and the Plan was proposed, with the legitimate purpose of allowing the Debtors to reorganize and emerge from bankruptcy with a capital structure that will allow them to satisfy their obligations with sufficient liquidity and capital resources.

Section 1129(a)(4) – Bankruptcy Court Approval of Certain Payments as Reasonable

x)     Pursuant to section 1129(a)(4) of the Bankruptcy Code, the payments to be made by the Debtors for services or for costs in connection with the Chapter 11 Cases or the Plan, as described in the Plan, or as disclosed in the Plan Supplement, have been approved by, or are subject to the approval of, this Court as reasonable.

y)     In addition, fees and expenses incurred by professionals retained by the Debtors, Creditors' Committee, Second Lien Group and Second Lien Agents (including their counsel) shall be payable according to the orders approving such firms' retention and this Confirmation Order.

9

Section 1129(a)(5) – Disclosure of Identity of Proposed Management, Compensation of Insiders and Consistency of Management Proposals with the Interests of Creditors and Public Policy

z)    The Debtors provided requisite disclosures regarding proposed directors and officers of the Reorganized Debtors following Confirmation, as required by section 1129(a)(5)(A) of the Bankruptcy Code, and have also disclosed the nature of compensation of insiders who will be employed or retained by the Reorganized Debtors, as required by section 1129(a)(5)(B) of the Bankruptcy Code.

Section 1129(a)(6) – Approval of Rate Changes

aa)    The Debtors' current businesses do not involve the establishment of rates over which any regulatory commission has or will have jurisdiction after Confirmation. Section 1129(a)(6) of the Bankruptcy Code thus does not apply in these Chapter 11 Cases.

Section 1129(a)(7) – Best Interests of Creditors and Equity Interest Holders

bb)    The Plan satisfies section 1129(a)(7) of the Bankruptcy Code. The liquidation analysis annexed to the Disclosure Statement and the other evidence related thereto that was proffered or adduced at or prior to, or in affidavits filed in connection with, the Confirmation Hearing, are persuasive and credible. The methodology used and assumptions made in the liquidation analysis, as supplemented by the evidence proffered or adduced at or prior to, or in affidavits filed in connection with, the Confirmation Hearing, are reasonable.

cc)    With respect to each Impaired Class, each holder of an Allowed Claim or Equity Interest, as the case may be, in an Impaired Class has accepted the Plan or will receive under the Plan on account of its respective Claim or Equity Interest, as the case may be, property of a value, as of the Effective Date, that is not less than the amount that each such holder would have received if the Debtors were to have liquidated on the Effective Date under Chapter 7 of the Bankruptcy Code.

10

Section 1129(a)(8) – Acceptance of the Plan by Each Impaired Class

dd)    As indicated in Article III of the Plan, the following Classes are Unimpaired and are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code:

| Class Description | Class Designation |
|---|---|
| Other Secured Claims | 1 |

ee)    As indicated in the Voting Affidavits, every Impaired Class that was entitled to vote has voted to accept the Plan. Each of the following Impaired Classes voted in favor of the Plan:

| Class Description | Class Designation |
|---|---|
| Second Lien Facility Claims | 2 |
| Senior Notes Claims | 3 |
| Other General Unsecured Claims | 5A (U.S. Other General Unsecured Claims), 5B (Canadian General Unsecured Claims) |

ff)    The Plan provides that the following Classes will not receive any distribution or retain any property on account of holders' Claims or Equity Interests, and these Classes are therefore deemed to have rejected the Plan (the "Deemed to Reject Classes") pursuant to section 1126(g) of the Bankruptcy Code:

| Claims Description | Class Designation |
|---|---|
| Subordinated Notes Claims | 4 |
| Convertible Subordinated Debentures Claims | 6 |
| Section 510 Subordinated Claims | 7 |
| Equity Interests | 8 |

Section 1129(a)(9) – Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code

gg)    The treatment of Administrative, DIP Facility, Priority Tax, and Other Priority Claims under Plan Articles II.A, II.B, II.C and II.D, respectively, satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

Section 1129(a)(10) – Acceptance By At Least One Impaired Class

hh)    As set forth in the Voting Affidavits and above, each Impaired Class, other than the Deemed to Reject Classes, has voted to accept the Plan. Accordingly, section 1129(a)(10) of the Bankruptcy Code is satisfied.

Section 1129(a)(11) – Feasibility of the Plan

ii)    The Plan satisfies section 1129(a)(11) of the Bankruptcy Code. Based upon the evidence proffered or adduced at, or prior to, or in affidavits filed in connection with, the Confirmation Hearing, the Plan is feasible and Confirmation of the Plan is not likely to be followed by any of the Debtors, the Reorganized Debtors or any successor to the Reorganized Debtors under the Plan either liquidating or requiring further financial reorganization. Furthermore, the Reorganized Debtors will have adequate capital to meet their ongoing obligations.

Section 1129(a)(12) – Payment of Bankruptcy Fees

jj)    In accordance with section 1129(a)(12) of the Bankruptcy Code, Article XI.C of the Plan provides for the payment of all fees payable under 28 U.S.C. § 1930(a). The Reorganized Debtors will have adequate means to pay all such fees.

Section 1129(a)(13) – Retiree Benefits

kk)    In satisfaction of section 1129(a)(13) of the Bankruptcy Code, Article V.F.3 of the Plan provides for the timely payment post-Confirmation of retiree benefits (as that term is

12

defined in section 1114 of the Bankruptcy Code), if any, to the extent such retiree benefits are payable by the Reorganized Debtors.

Sections 1129(a)(14), (15) and (16)

ll)    The Debtors owe no domestic support obligations, are not individuals, and are not nonprofit corporations. Sections 1129(a)(14), (15) and (16) of the Bankruptcy Code thus do not apply in these Chapter 11 Cases.

Section 1129(b) – Classification of Claims and Confirmation of Plan Over Nonacceptance of Impaired Class

mm)    The classification and treatment of Claims in the Plan is proper pursuant to section 1122 of the Bankruptcy Code and does not discriminate unfairly pursuant to section 1129(b)(1) of the Bankruptcy Code.

nn)    Pursuant to section 1129(b)(1) of the Bankruptcy Code, the Plan may be confirmed notwithstanding the fact that not all Impaired Classes have voted to accept the Plan - if all of the requirements of section 1129(a) of the Bankruptcy Code other than section 1129(a)(8) have been met. All Classes of Impaired Claims have voted to accept the Plan other than the Deemed to Reject Classes.

oo)    There is no Class of creditors or Equity Interests junior to the holders of Claims or Equity Interests in the Deemed to Reject Classes that will receive or retain any property under the Plan on account of their Claims or Equity Interests. Accordingly the requirements of sections 1129(b)(2) of the Bankruptcy Code are satisfied with respect to the Deemed to Reject Classes, and the Plan does not violate the absolute priority rule, does not discriminate unfairly, and is fair and equitable with respect to such Classes.

pp)    Based upon the foregoing, the Plan satisfies the requirements for confirmation set forth in section 1129(b) of the Bankruptcy Code.

K&E 12254346.25
RLF1-3282747-1

### *Principal Purpose of the Plan Is Not Avoidance of Taxes*

qq)    In accordance with section 1129(d) of the Bankruptcy Code, the principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933 (15 U.S.C. § 77e).

### *Limited Substantive Consolidation*

rr)    The substantive consolidation of the U.S. Debtors for the limited purposes of Plan voting, confirmation and distributions contemplated by Article IV.A of the Plan will result in:

- the payment of Allowed Claims against U.S. Debtors in all Classes receiving recoveries from a single, common pool of assets;

- each holder of an Allowed Claim against U.S. Debtors having a single Allowed Claim when such holder's Claims against U.S. Debtors arise from or are related to the same underlying debt, regardless of whether that holder filed or will file multiple Claims against one or more of the U.S. Debtors; and

- the priority of the classes of claims and equity interests set forth in the Plan being consistent with the "absolute priority rule" of section 1129(b)(2) of the Bankruptcy Code.

ss)    The mergers and transactions set forth in the Plan Supplement (including the taxable sale transaction), and contemplated by Article IV.B.2 of the Plan, will:

- restructure - and simplify - the legal and corporate structures of the Reorganized Debtors as compared to the Debtors' corporate structure on the Petition Date; and

- comply with sections 1123(a)(5)(C) and (D) and all other requirements of the Bankruptcy Code.

### *Issuance and Distribution of the New Securities*

tt)    The Debtors (and each of their respective affiliates, agents, directors, officers, employees, advisors, and attorneys) have, and upon Confirmation of the Plan are deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the distribution of the New Common Stock and Convertible Preferred Stock under the Plan, and therefore are not, and on account of such distributions will

not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. The offering, issuance and distribution of the New Common Stock and Convertible Preferred Stock is in exchange for Claims against the Debtors, or principally in such exchange and partly for cash or property, within the meaning of section 1145(a)(1) of the Bankruptcy Code.

*Executory Contracts and Unexpired Leases*

uu) The Debtors' decision to reject all executory contracts and unexpired leases that (i) have not expired by their own terms on or prior to the Effective Date, (ii) the Debtors have not assumed or rejected during the pendency of the Chapter 11 Cases, (iii) are not assumed pursuant to the Plan or the subject of a motion pending as of the Effective Date to assume the same, or (iv) are not listed in the Plan Supplement as executory contracts or unexpired leases to be assumed (collectively, with those executory contracts and unexpired leases specifically set forth in the Plan Supplement as certain of those to be rejected, the "Rejected Contracts") represents a valid and well-considered exercise of the Debtors' business judgment, and is in the best interests of the Debtors, their Estates, and their creditors.

vv) Further, the Debtors' decision to assume certain executory contracts and unexpired leases pursuant to the terms of the Plan, including those set forth in the Plan Supplement (collectively, the "Assumed Contracts") represents a valid and well-considered exercise of the Debtors' business judgment, and is in the best interests of the Debtors, their Estates, and their creditors.

ww) The cure amounts for the Assumed Contracts (the "Cure Amounts") and procedure for objecting thereto are set forth in the Plan Supplement, with such notice and procedure being proper under the circumstances.

15

*Approval of Settlements and Compromises*

xx)    Pursuant to Fed.R.Bankr.P. 9019 and any applicable state law, and as consideration for the distributions and other benefits provided under the Plan, all settlements and compromises of Claims, Causes of Action and objections to Claims that are embodied in the Plan, including but not limited to those settlements embodied at Article IX.A of the Plan, constitute good faith compromises and settlements of Claims, Causes of Action and objections to Claims, which compromises and settlements are hereby approved as fair, equitable, reasonable, and appropriate in light of the relevant facts and circumstances underlying such compromise and settlement, and are in the best interests of the Debtors and their Estates and creditors.

*Transfers by Debtors*

yy)    The revesting, on the Effective Date, of the property of the Debtors' estates: (a) vests the Reorganized Debtors or their successors or assigns, as the case may be, with good title to such property, free and clear of all Claims and Equity Interests, except as expressly provided in the Plan, this Confirmation Order or the New Credit Facilities; and (b) does not constitute a voidable transfer under the Bankruptcy Code or applicable non-bankruptcy law.

*Releases, Discharges and Exculpations*

zz)    The releases and discharges of Claims and Causes of Action described in Article IX of the Plan and this Confirmation Order, including, but not limited to, the releases by the Debtors set forth at Article IX.B.1 of the Plan, the third party release set forth at Article IX.B.2 of the Plan, and the exculpation provisions set forth at Article IX.C of the Plan, constitute good faith compromises and settlements of the matters covered thereby and are consensual. Such compromises and settlements are made in exchange for adequate consideration and are in the best interests of holders of Claims, are fair, necessary, equitable, and reasonable, and are integral elements of the resolution of the Chapter 11 Cases in accordance with the Plan. Each of

16

K&E 12254146 25
RLF1-3282747-1

the discharge, release and exculpation provisions set forth in the Plan and this Confirmation Order is: (i) within the jurisdiction of this Court under 28 U.S.C. §§ 1334(a), 1334(b) and 1334(d); (ii) an essential means of implementing the Plan pursuant to section 1123(a)(5) of the Bankruptcy Code; (iii) an integral element of the transactions incorporated into the Plan; (iv) conferring material benefit on, and is in the best interests of, the Debtors, their estates and their creditors; (v) important to the overall objectives of the Plan to finally resolve all Claims among or against the parties-in-interest in the Chapter 11 Cases with respect to the Debtors, their organization, capitalization, operation and reorganization; and (vi) consistent with sections 105, 1123, 1129 and other applicable provisions of the Bankruptcy Code.

aaa)    The failure to effect the discharge, release, indemnification, and exculpation provisions described in Article IX of the Plan would seriously impair the Debtors' ability to confirm the Plan.

bbb)    The agreements of each of the Debtors, Releasees and Releasing Parties, including (a) the discharge of debt and all other good and valuable consideration paid pursuant to the Plan or otherwise; (b) the services of the Debtors' present and former officers and directors as of the Petition Date and thereafter in facilitating the expeditious implementation of the restructuring contemplated by the Plan; and (c) good faith settlement and compromise of the claims released by the third party release, constitute good and valuable consideration for, and justify the releases granted to the Releasees under Article IX of the Plan. Such compromises and settlements are made in exchange for adequate consideration and are in the best interest of holders of Claims, are fair, necessary, equitable, and reasonable, and are integral elements of the resolution of the Chapter 11 Cases in accordance with the Plan.

17

*Good Faith Negotiation, Implementation and Consummation*

ccc) The Exculpated Parties participated in negotiating in good faith and at arm's length the Plan and each of the settlements and agreements embodied therein (including each exhibit of the Plan Supplement). Each of the Exculpated Parties participated in good faith in each of the actions taken to bring about, and in satisfying each of the conditions precedent to, Confirmation. In so determining, this Court has examined, among other things, the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the record of this proceeding, the Plan, the Expert Reports and all other related affidavits, pleadings, exhibits, and statements in open Court regarding Plan Confirmation.

*Satisfaction of Conditions Precedent to Effective Date*

ddd) Based on the Expert Reports, statements of the parties in open court, and all other related pleadings, exhibits and other relevant documents, each of the conditions precedent to the Effective Date, as set forth in Article VIII of the Plan, is reasonably likely to be satisfied.

*Retention of Jurisdiction*

eee) The Court may properly retain jurisdiction over the matters set forth in Article X of the Plan.

\*    \*    \*    \*    \*

Based on the foregoing, it is hereby ORDERED:

## II.

## ORDER

### A.    Confirmation of the Plan

1. The Plan (including the Plan Supplement), substantially in the form as amended through the date hereof, and each of its provisions are approved and confirmed in each and every respect pursuant to section 1129 of the Bankruptcy Code. The terms of the Plan, the Plan

18

Supplement, all exhibits and addenda thereto, the Docket, and any exhibits to this Confirmation Order are incorporated by reference into, and are an integral part of, this Confirmation Order. The terms of the Plan, the Plan Supplement, all exhibits and addenda thereto, and all other relevant and necessary documents, shall be effective and binding as of the Effective Date of the Plan. Notwithstanding the foregoing, if there is any direct conflict between the terms of the Plan or the Plan Supplement exhibits and the terms of this Confirmation Order, the terms of this Confirmation Order shall control.

**B.      Objections to Plan Overruled**

2.      Except as provided in this Confirmation Order, all objections and responses to and statements and comments regarding the Plan, and all reservation of rights included therein, to the extent not already withdrawn, waived, or settled, shall be, and hereby are, overruled on the merits.

**C.      Provisions of Plan and Confirmation Order Nonseverable and Mutually Dependent**

3.      The provisions of the Plan and this Confirmation Order, including the findings of fact and conclusions of law set forth herein, are nonseverable and mutually dependent.

**D.      Record Closed**

4.      The record of the Confirmation Hearing is closed.

**E.      Notice**

5.      Good and sufficient notice has been provided of the Confirmation Hearing, the deadline for filing and serving objections to the Plan, cure claim estimates, injunctions and third party releases, bar dates, and other hearings described in the Scheduling and Disclosure Statement Order and the Plan, which notice has been and is hereby approved.

19

**F.**     **Plan Classification Controlling**

6.     The terms of the Plan shall solely govern the classification of Claims and Equity Interests for purposes of the distributions to be made thereunder. The classifications set forth on the ballots tendered to or returned by the Debtors' creditors in connection with voting on the Plan: (a) were set forth on the ballots solely for purposes of voting to accept or reject the Plan; (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of such Claims under the Plan for distribution purposes; (c) may not be relied upon by any creditor as representing the actual classification of such Claims under the Plan for distribution purposes; and (d) shall not bind the Debtors or the Reorganized Debtors.

**G.**     **Executory Contracts and Unexpired Leases**

7.     The executory contract and unexpired lease provisions of Article V of the Plan shall be, and hereby are, approved.

8.     Executory contracts and unexpired leases (including Compensation and Benefits Programs) that are rejected pursuant to the Plan (the "Rejected Contracts") are deemed rejected by the Debtors as of immediately prior to the Petition Date, and the entry of this Confirmation Order constitutes approval of each such rejection pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

9.     All proofs of claim arising from the rejection of the Rejected Contracts (the "Rejection Claims") must be filed with the Voting Agent within thirty (30) days after the earlier of: (a) the date of entry of an order of this Court, which order may be this Confirmation Order, approving any such rejection; and (b) the Effective Date. Any Claims arising from the rejection of the Rejected Contracts for which proofs of claim are not timely filed within that time period will be forever barred from assertion against the Debtors or the Reorganized Debtors, their Estates and property unless otherwise ordered by this Court or as otherwise provided herein.

20

Except as otherwise provided in this paragraph, all Rejection Claims shall, as of the Effective Date, be subject to the discharge and permanent injunction set forth in Article IX of the Plan.

10.    Executory contracts and unexpired leases (including Compensation and Benefits Programs) that are assumed pursuant to the Plan (the "Assumed Contracts") are hereby deemed assumed by the Debtors as of immediately prior to the Effective Date, and the entry of this Confirmation Order constitutes approval of all such assumptions pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

11.    The Debtors shall pay the Cure Amounts in Cash as set forth in the Plan or on such other terms as the parties to each such Assumed Contract may otherwise agree. Payment of the Cure Amounts shall satisfy, in full, the Debtors obligations pursuant to section 365(b)(1) of the Bankruptcy Code. A counterparty to an Assumed Contract may file an objection to a Cure Amount by filing a proof of claim with the Voting Agent thirty (30) days after the earlier of: (a) the date of entry of an order of this Court, which may be this Confirmation Order, approving any such assumption; and (b) the Effective Date.

12.    As of the Effective Date, all Assumed Contracts, shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Reorganized Debtors, subject to the liens provided in connection with the New Credit Facilities, notwithstanding the payment of, or dispute with respect to, any Cure Amount, or provision in any such Assumed Contract (including those described in sections 365(b)(2) and 365(f) of the Bankruptcy Code) that prohibits such assignment or transfer or that enables or requires termination of such contract or lease. Other than any applicable cure payment, the Reorganized Debtors' remaining obligations arising from each such Assumed Contract shall therefore be limited solely to, from the Effective Date and thereafter, any future performance thereunder and obligations arising therefrom.

K&E 1225434625
RLF1-3282747-1

**H.    Plan Settlements**

13.    Pursuant to Article IX.A of the Plan, entry of this Confirmation Order shall be deemed entry of an order approving all of the Plan settlements pursuant to Fed.R.Bankr.P. 9019.

**I.    Exemption from Registration**

14.    The issuance and distribution of all of the New Common Stock and Convertible Preferred Stock when issued or distributed as provided in the Plan, will be duly authorized, validly issued and, as applicable, fully paid and nonassessable. The issuance of the New Common Stock and Convertible Preferred Stock is in exchange for Claims against or Equity Interests in the Debtors, or principally in such exchange and partly for cash or property, within the meaning of section 1145(a)(1) of the Bankruptcy Code. In addition, under section 1145 of the Bankruptcy Code, to the extent, if any, that the above-listed items constitute "securities": (i) the offering of such items is exempt and the issuance and distribution of such items will be exempt from Section 5 of the Securities Act and any state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities; and (ii) all of the above-described items will be freely tradeable by the recipients thereof, subject to (x) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in Section 2(a)(11) of the Securities Act, and compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (y) the restrictions, if any, on the transferability of such securities and instruments; and (z) applicable regulatory approval.

15.    The shares of New Common Stock reserved for the Management Equity Program will be exempt from registration under the Securities Act of 1933 by virtue of section 4(2), which states that the provisions of section 5 shall not apply to transactions by an issuer not involving any public offering, and the rules contained in Regulation D promulgated thereunder.

22

**J.     Matters Relating to Implementation of the Plan**

Implementation of the Plan: Effectuating Documents

16.     In accordance with section 1142 of the Bankruptcy Code, the implementation and consummation of the Plan in accordance with its terms shall be and is, authorized and approved, and the Debtors, the Reorganized Debtors, the DIP Lenders, the Creditors' Committee or any other Person designated pursuant to the Plan shall be, and they hereby are, authorized, empowered and directed to issue, execute, deliver, file and record any document whether or not such document is specifically referred to in the Plan, the Disclosure Statement or any exhibit thereto, and to take any action necessary or appropriate to consummate the Plan in accordance with its terms, including, without limitation, execution, delivery and performance of the New Credit Facilities as set forth below, without further application to or order of this Court. To the extent that, under applicable non bankruptcy law, any of these actions otherwise would require the consent or approval of the shareholders or boards of directors of the Debtors, this Confirmation Order constitutes such consent, approval and direction.

17.     Without in any manner limiting the foregoing, the execution and delivery, performance, filing or recordation by the Debtors, the Reorganized Debtors, the Creditors' Committee or any other entity or Person designated pursuant to the Plan, of each of the documents, instruments, agreements, notes or filings contemplated by or necessary in connection with consummation of the Plan are hereby authorized and approved. On the Effective Date, all documents and all other agreements entered into or issued pursuant to the Plan, including without limitation any documents and all other agreements entered into or issued pursuant to the New Credit Facilities (the "New Credit Facilities Documents"), shall become effective, binding, and enforceable upon the parties thereto in accordance with their respective terms and conditions and shall be deemed to become effective simultaneously. The provisions of Fed.R.Bankr.P.

23

7070 are specifically made applicable for such a situation and may be used in an appropriate situation. The Debtors are hereby authorized and directed to make all payments and distributions required under the Plan and to implement the Plan in all respects (including the payment of any fees and/or expenses or indemnities in connection with the New Credit Facilities).

Binding Effect; Effectiveness; Successors and Assigns

18.    Notwithstanding Fed.R.Bankr.P. 3020(c), 6004(g), 7062, 8001, 8002 or otherwise, on the Effective Date, the terms of the Plan, the Plan Supplement and this Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, any and all holders of Claims or Equity Interests (irrespective of whether (i) such Claims or Equity Interests are Impaired under the Plan, and whether or not if Impaired, such holder accepted the Plan, (ii) the holders of such Claims or Equity Interests (a) accepted or were deemed to have accepted the Plan, or (b) rejected or were deemed to have rejected the Plan, (iii) the holders of such Claims or Equity Interests have filed proofs of claim or interest in the Chapter 11 Cases, and (iv) the holders of such Claims or Equity Interests are receiving any distributions under the Plan), all Persons and Entities that are party to or subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan or herein, each Person or Entity acquiring property under the Plan, and any and all non-Debtor parties to executory contracts and unexpired leases with the Debtors and the respective heirs, executors, administrators, successors or assigns, affiliates, officers, directors, agents, representatives, attorneys, beneficiaries, or guardians, if any, of any of the foregoing.

Limited Substantive Consolidation

19.    The limited substantive consolidation of the U.S. Debtors' Estates set forth in Article IV.A of the Plan is approved in its entirety solely for the purposes of voting on the Plan, confirmation thereof and distributions in effectuation thereof.

K&E 12254346.25
RLF1-3282747-1

Operation of the Debtors Between the Confirmation Date and the Effective Date

20.     The Debtors shall continue to operate as debtors in possession in the ordinary course, consistent with past practice, subject to the supervision of this Court and pursuant to the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure during the period from the Confirmation Date through and until the Effective Date.

Continued Corporate Existence; Vesting of Assets in the Reorganized Debtors

21.     On and after the Effective Date, the Reorganized Debtors shall remain in existence on the terms and conditions of the Plan and this Confirmation Order.

Additional Transactions

22.     The transactions contemplated by Article IV.B.2 of the Plan, and set forth in the Plan Supplement are approved, and the Debtors and Reorganized Debtors and their officers are authorized and directed to take such actions as may be necessary and appropriate to effectuate the relevant transactions, including, without limitation, executing such documents as may be reasonably required in order to effectuate the transactions, including but not limited to the New Credit Facilities Documents (including, but not limited to, credit agreements, guarantee agreements, pledge and security agreements, mortgages and deeds of trust, UCC financing statements and deposit account control agreements).    On and after the Effective Date, the Reorganized Debtors may undertake transactions as may be necessary or appropriate under the circumstances.    Such transactions may include one or more mergers, sales, consolidations, restructurings, acquisitions, dispositions, liquidations or dissolutions, as may be determined by the Reorganized Debtors. The actions to effect these transactions may include: (a) the execution and delivery of appropriate agreements or other documents of merger, sale, consolidation, restructuring, disposition, liquidation or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable state law and such

25

other terms to which the applicable entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable entities may agree; (c) the filing of appropriate certificates or articles of merger, consolidation, incorporation, formation or dissolution pursuant to applicable state law; and (d) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law. Each and every federal, state, and local governmental agency or department is hereby directed to accept for filing and recording any and all documents and instruments necessary or appropriate to consummate the transactions contemplated by the transactions.

Treatment Is In Full Satisfaction

23.    The treatment set forth in the Plan is in full and complete satisfaction of the legal, contractual, and equitable rights (including any liens) that each Entity holding a Claim or an Equity Interest may have in or against the Debtors, the Estates, the Reorganized Debtors or their respective property.    This treatment supersedes and replaces any agreements or rights those Entities may have in or against the Debtors, the Estates, the Reorganized Debtors or their respective property.

Cancellation of Senior Notes, Subordinated Notes, Convertible Subordinated Debentures, and Equity Interests

24.    On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing the Senior Notes Claims, Subordinated Notes Claims, Convertible Subordinated Debentures Claims, Convertible Trust Guarantees and Equity Interests shall be canceled without any further action by any party and the

26

obligations of the Debtors thereunder or in any way related thereto shall be discharged. Classes 6, 7 and 8 shall neither receive nor retain property under the Plan.

Issuance of Securities and Execution of Related Documents

25.    On the Effective Date, the Reorganized Debtors shall issue or reserve for issuance all securities required to be issued pursuant the Plan, in the manner provided for in the Plan, which securities shall be distributed in accordance with the Plan.

26.    On the Effective Date, as set forth in Article IV.E.5 of the Plan, New Dura shall be a publicly reporting company under the Securities Exchange Act of 1934, as amended.

Corporate Governance, Directors and Officers and Corporate Action

27.    On or prior to the Effective Date, the Debtors shall file and serve an amendment to the Plan Supplement listing the identity of any individual, selected after the date hereof and prior to the Effective Date, proposed to serve on the New Board.

28.    On the Effective Date, the Reorganized Debtors shall file, as applicable, the New Organizational Documents with the appropriate state authorities in accordance with applicable state law.

29.    The structure and composition of the New Board and compensation of the members thereof shall be as set forth in the Plan and Plan Supplement. The Debtors' current management will continue as the management of the Reorganized Debtors, subject to review of the New Board. Each such director, officer and member shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents, or other constituent documents or the Delaware General Corporation Law. Pursuant to section 1129(a)(5)(A)(ii) of the Bankruptcy Code, this Court approves as consistent with the interests of creditors and Equity Interest holders and with public policy the selection, election, and/or continuance, as the case may be, of these individuals; *provided*, *however*, that nothing set forth herein shall prevent any of

27

the foregoing individuals from resigning or from being removed or replaced as an officer or director without further order of this Court. On the Effective Date, the operation of each Reorganized Debtor shall become the general responsibility of the officers and directors of that Reorganized Debtor.

30.    On the Effective Date (or on the Confirmation Date with respect to any actions taken prior to the Effective Date), the adoption and filing (as necessary) of the New Organizational Documents not otherwise specifically set forth in this Confirmation Order or the Plan, as the case may be, and all other approvals and corporate actions contemplated by the Plan and this Confirmation Order and not otherwise specifically enumerated in this Confirmation Order shall be authorized and approved in all respects (subject to the provisions hereof and to the provisions of the Plan). All matters provided for herein or in the Plan involving the corporate structure of the Reorganized Debtors and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the equity holders or directors of the Debtors or the Reorganized Debtors.

Treatment of Claims of DIP Lenders

31.    The superpriority administrative claims granted to the DIP Lenders pursuant to the Final DIP Orders shall continue through the Effective Date. In accordance with Article II.B of the Plan, and without limiting the generality of such section, simultaneously with the closing of the New Credit Facilities (and in no event on any date later than the Effective Date), all of the Debtors' obligations to the DIP Lenders pursuant to the DIP Facility, other than those surviving obligations set forth in Article IX.D.4 of the Plan, shall be fully satisfied in Cash in accordance with the terms of the DIP Facility, and cash collateral with respect to letters of credit outstanding

on the Effective Date shall be provided in accordance with the terms of the DIP Facility in full and final satisfaction of such obligations.

New Credit Facilities

32.    The New Credit Facilities (including the transactions contemplated thereby, such as any supplementation or additional syndication of the New Credit Facilities, and all actions to be taken, undertakings to be made, liens granted and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) are hereby authorized and approved.  The Reorganized Debtors are authorized to enter into and execute the New Credit Facilities Documents (including, but not limited to, credit agreements, guarantee agreements, pledge and security agreements, mortgages and deeds of trust, UCC financing statements and deposit account control agreements) and such other documents, instruments, agreements, notes or filings as required under the New Credit Facilities or which the New Credit Facilities lenders may reasonably require to effectuate the treatment afforded to such lenders pursuant to the New Credit Facilities without further notice to or order of this Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any person or entity (other than as expressly required by the New Credit Facilities).  The liens and security interests to be granted by the Reorganized Debtors pursuant to the terms of the New Credit Facilities (including, but not limited to, credit agreements, guarantee agreements, pledge and security agreements, mortgages and deeds of trust, UCC financing statements and deposit account control agreements) shall be deemed perfected on the Effective Date without the requirement of any additional filing, subject only to such liens and security interests as may be permitted under the New Credit Facilities.  The Reorganized Debtors may use the New Credit Facilities for any purpose permitted thereunder, including the funding of obligations under the Plan, such as the payment of Administrative

K&E 12254046 25
RLF1-3282747-1

Claims, and satisfaction of ongoing working capital needs. Upon the Effective Date, the jurisdiction and choice of law provisions in the New Credit Facilities Documents shall govern such documents.

33.    The Debtors may enter into the New Credit Facilities on the Effective Date only after consultation with the Creditors' Committee and Second Lien Group.

New Credit Facilities Liens

34.    The New Credit Facilities will be secured, as applicable, by first priority and second priority perfected liens on the assets of the Reorganized Debtors as set forth in the New Credit Facilities Documents.  The security interests and liens granted pursuant to, or in connection with, the New Credit Facilities (and all documents, instruments and agreements related thereto and annexes, exhibits and schedules appended thereto) shall constitute, as of the Effective Date, legal, valid and duly perfected first priority liens and security interests on and in the collateral specified therein, subject only, where applicable, to the pre-existing liens and security interests specified or permitted in the New Credit Facilities or the documents, instruments or agreements contemplated thereby.  On the Effective Date, all of the liens and security interests to be created under, or in connection with, the New Credit Facilities shall be deemed created and shall be valid and perfected and shall afford to the secured party all remedies for default customarily granted to the holder of such security interest including, without limitation, a private power of sale and right to nonjudicial foreclosure, without any requirement of filing or recording of financing statements, mortgages or other evidence of such liens and security interests and without any approvals or consents from governmental entities or any other persons and regardless of whether or not there are any errors, deficiencies or omissions in any property descriptions attached to any filing and no further act shall be required for perfection of

30

liens and security interests. Notwithstanding the foregoing, the parties granting such liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such liens and security interests under the provisions of state, provincial, federal, or other law (whether foreign or domestic) that would be applicable in the absence of this Confirmation Order, and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties.

Release of Liens

35.    Except as otherwise provided in this Confirmation Order or the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, and/or concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, liens, pledges, or other security interests against any property of the Debtors' Estates (including the DIP Lenders' liens) shall be fully released, and discharged (except for charging Liens of the Indenture Trustees to the extent the Indenture Trustee's fees and expenses are not paid pursuant to the Plan), and all of the right, title, and interest of any holder of such mortgages, deeds of trust, liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns; provided, however, that this provision shall not prevent liens from attaching to the Reorganized Debtors' assets as provided for by the Plan, any New Credit Facilities or otherwise necessary or appropriate to implement the Plan.

Preparation, Delivery and Execution of Additional Documents By Third Parties

36.    All holders of Claims or Equity Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

31

K.    Release, Injunctive, Exculpation and Related Provisions

    37.    The following provisions of Article IX of the Plan shall be, and hereby are approved in their entirety:

> ***Releases by the Debtors.***  **Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for the good and valuable consideration provided by each of the Releasees, including, but not limited to: (a) the discharge of debt and all other good and valuable consideration paid pursuant to the Plan or otherwise; and (b) the services of the Debtors' present and former officers and directors as of the Petition Date or thereafter in facilitating the expeditious implementation of the restructuring contemplated by the Plan, and in view of the indemnification pursuant to Article V.D; each of the Debtors hereby provides a full discharge and release to the Releasees (and each such Releasee so released shall be deemed released and discharged by the Debtors) and their respective properties from any and all Claims, Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, at equity, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, including, without limitation, those that any of the Debtors or the Reorganized Debtors would have been legally entitled to assert (whether individually or collectively) or that any holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for or on behalf of any of the Debtors or Estates and further including those in any way related to the Commitment Letter, Exit Facility, New Money Second Lien Loan, New Organizational Documents, Chapter 11 Cases, the Original Plan or the Plan; *provided, however,* that the foregoing provisions of this Article IX.B.1 shall not operate to waive or release from any Causes of Action expressly set forth in and preserved by the Plan or Plan Supplement or any defenses thereto; *provided, further, however* that the foregoing provisions of this Article IX.B.1 shall not operate to waive or release any Causes of Action accrued by the Debtors in the ordinary course of business against holders of Other General Unsecured Claims.**

K&E 12254346.25
RLF1-3282747-1

***Third Party Release.*** **Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, the Releasing Parties hereby provide a full discharge and release (and each Entity so released shall be deemed released by the Releasing Parties) to the Releasees and each of their respective Representatives (each of the foregoing in its individual capacity as such), and their respective property from any and all Claims, Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, at equity, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, including those in any way related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan, Original Plan, Disclosure Statement, Commitment Letter, New Organizational Documents, New Money Second Lien Loan, Exit Credit Facility or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan, or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors; *provided, however,* that the foregoing provisions of this Article IX.B.2 shall not operate to waive or release any of the Claims, Causes of Action or other obligations expressly set forth in and preserved by the Plan or Plan Supplement or any defenses thereto; *provided, further, however,* that the foregoing provisions of this Article IX.B.2 shall not operate to waive or release any Allowed Claims of Releasing Parties treated under the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases set forth in this Article IX.B pursuant to Fed.R.Bankr.P. 9019 and its finding that they are: (a) in exchange for good and valuable consideration, representing a good faith settlement and compromise of the Claims and Causes of Action thereby released; (b) in the best interests of the Debtors and all holders of Claims; (c) fair, equitable, and reasonable; (d) approved after due notice and opportunity for hearing; and (e) a bar to any of the Debtors, Reorganized Debtors or Releasing Parties asserting any Claim or Cause of Action thereby released.**

***Exculpation.*** **Notwithstanding anything contained in the Plan**

33

to the contrary, the Exculpated Parties shall neither have nor incur any liability to any Entity for any and all Claims, Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, at equity, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, including, without limitation, those that any of the Debtors or the Reorganized Debtors would have been legally entitled to assert (whether individually or collectively) or that any holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for or on behalf of any of the Debtors or Estates and further including those in any way related to the Commitment Letters, New Organizational Documents, Chapter 11 Cases, the Original Plan, or the Plan arising on or after the Petition Date, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan, New Money Second Lien Loan, Exit Credit Facility, the Disclosure Statement, New Organizational Documents, Commitment Letters, DIP Facility, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan, Original Plan or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors; *provided, however*, that the foregoing provisions of this Article IX.C shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; *provided, further, however* that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above referenced documents; *provided, further, however* that the foregoing provisions of this Article IX.C shall not apply to any acts, omissions, Claims, Causes of Action or other obligations expressly set forth in and preserved by the Plan or Plan Supplement or any defenses thereto.

K&E 12254346.25
RLF1-3282747-1

**L.    No Successor Liability**

38.    Except as otherwise expressly provided in the Plan or this Confirmation Order, none of the Released Parties shall be determined to be successors to any of the Debtors or to any Entity for which the Debtors or the Reorganized Debtors may be held legally responsible, by reason of any theory of law or equity, and none can be responsible for any successor or transferee liability of any kind or character. The Released Parties shall not have any obligation, responsibility, or liability to perform, pay, or indemnify creditors or otherwise have any responsibilities for any liabilities or obligations of the Debtors or the Reorganized Debtors, whether arising before, on, or after the Confirmation Date, except as otherwise expressly provided in the Plan or this Confirmation Order.

**M.    Existing Injunction and Stays Remain in Effect until Effective Date**

39.    All injunctions or stays provided in, or in connection with, the Chapter 11 Cases, whether pursuant to sections 105 or 362 of the Bankruptcy Code, or any other applicable law or court order, in effect immediately prior to the Confirmation of the Plan, shall remain in full force and effect thereafter if so provided by this Confirmation Order, the Plan or their own terms. Nothing herein shall bar the taking of such other actions as are necessary to effectuate the transactions specifically contemplated by the Plan or by this Confirmation Order.

**N.    Discharge**

40.    The discharge of Claims and termination of Equity Interests set forth in Article IX.E of the Plan are hereby approved.

**O.    Extension of Second Lien Preference Action**

41.    The time period for the Creditors' Committee to file any complaint or proper pleading relating to any potential action seeking to invalidate, subordinate or otherwise challenge the Prepetition Second Priority Liens is extended through and including the Effective Date.

K&E 12254346.25
RLF1-3282747-1

**P.**     **Failure to Consummate the Plan**

42.     If the consummation of the Plan does not occur, then the provisions of Article VIII.C of the Plan shall govern.

**Q.**     **Retention of Jurisdiction**

43.     Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, and sections 157 and 1334 of title 28 of the United States Code, notwithstanding the entry of this Confirmation Order and the occurrence of the Effective Date, this Court shall retain exclusive jurisdiction over all matters arising out of or related to the Chapter 11 Cases and the Plan after the Effective Date, to the fullest extent permitted by law, on the terms set forth in Article X of the Plan; *provided, however*, that the foregoing shall not apply to matters arising out of the New Credit Facilities.

**R.**     **Limited Survival of Creditors' Committee Post-Effective Date**

44.     In addition to those situations described Article XI.A.3 of the Plan, which are approved pursuant to this Confirmation Order, the Creditors' Committee shall continue to survive after the Effective Date for the limited purpose of responding to creditor inquiries made within 90 days from the Effective Date. All reasonable fees and expenses incurred therein shall be paid by the Debtors or Reorganized Debtors, as applicable, without further order of the Bankruptcy Court.

**S.**     **Payment of Statutory Fees**

45.     All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid on the earlier of when due or the Effective Date, or as soon thereafter as practicable. From and after the Effective Date, the Debtors and the Reorganized Debtors shall be jointly liable for and shall pay the fees under 28 U.S.C. § 1930 assessed against the Reorganized Debtors' Estates under 28 U.S.C. § 1930 until entry of an order closing the Chapter 11 Cases.

36

In addition, the Debtors or the Reorganized Debtors (as the case may be) shall file post-confirmation quarterly reports or any pre-confirmation monthly operating reports not filed as of the Confirmation Hearing in conformity with the U.S. Trustee guidelines, until entry of an order closing or converting the Chapter 11 Cases. The U.S. Trustee shall not be required to file a request for payment of its quarterly fees, which shall be deemed an administrative expense claim against the Debtors and their Estates.

## T.    Section 346 Exemption

46.    Section 346 of the Bankruptcy Code shall apply to any taxes that may potentially result from, or may be related to, the events, transactions and occurrences of these Chapter 11 Cases, and, in particular, pursuant to section 346(j) of the Bankruptcy Code, no state or local tax imposed on, or measured by, income shall be imposed on the Debtors or the Reorganized Debtors, including, but not limited to, franchise taxes, to the extent that any such franchise taxes are measured by book or taxable income of the Debtors or the Reorganized Debtors, as result of the forgiveness or discharge of indebtedness of the Debtors arising from the confirmation and consummation of this Plan, including, but not limited to, undertaking the transactions contemplated by any provision of the Plan or this Confirmation Order.

## U.    Section 1146 Exemption

47.    The issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, Lien, pledge or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, if any, and all loan documents executed in connection with the New Credit Facilities shall be exempt from documentary stamp taxes, intangible taxes, mortgage recording taxes, transfer taxes, and all other taxes pursuant to section 1146(a) of the Bankruptcy Code. All governmental officials and agents shall forego the

37

assessment and collection of any such tax or governmental assessment and shall accept for filing and recordation any of the foregoing instruments or other documents without payment of such tax or other governmental assessment. In addition, section 1146(a) of the Bankruptcy Code shall apply on the terms set forth in Article XLI of the Plan.

## V.    References to Plan Provisions

48.    The Plan is confirmed in its entirety and hereby incorporated into this Confirmation Order by reference. The failure to reference or discuss any particular provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of, or otherwise affect, the validity, binding effect and enforceability of such provision, and each provision of the Plan shall have the same validity, binding effect and enforceability as if fully set forth in this Confirmation Order.

## W.    Headings

49.    Headings utilized herein are for convenience and reference only, and shall not constitute a part of the Plan or this Confirmation Order for any other purpose.

## X.    Effect of Conflict Between Plan and Confirmation Order

50.    If there is any direct conflict between the terms of the Plan or the Plan Supplement and the terms of this Confirmation Order, the terms of this Confirmation Order shall control.

## Y.    Post-Confirmation Notices and Bar Dates

*Notice of Entry of this Confirmation Order*

51.    In accordance with Fed.R.Bankr.P. 2002 and 3020(c), within five business days of the date of entry of this Confirmation Order, the Debtors (or their agents) shall give notice of the entry of this Confirmation Order (the "Confirmation Notice") by United States mail, first class postage prepaid, by hand, or by overnight courier service to all parties having been served with

KJ&E 12254346.25
RLF1-3282747-1

the Confirmation Hearing Notice; *provided, however*, that no notice or service of any kind shall be required to be mailed or made upon any person to whom the Debtors mailed a Confirmation Hearing Notice, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such person, or are otherwise aware, of that person's new address. To supplement the notice described in the preceding sentence, within fifteen business days of the date of this Confirmation Order the Debtors shall publish the Confirmation Notice in the *National Post, The New York Times, Detroit Free Press, Detroit News, Globe and Mail, Wall Street Journal*, and *Automotive News*.

52.    Mailing and publication of the Confirmation Notice in the time and manner set forth in the preceding paragraph are good and sufficient notice under the particular circumstances and in accordance with the requirements of Fed.R.Bankr.P. 2002 and 3020(c), and no other or further notice is necessary.

*Notice of Entry of the Effective Date*

53.    On or before the fifth business day following the Effective Date, notice of entry of this Confirmation Order and the occurrence of the Effective Date shall be mailed by the Reorganized Debtors to all creditors, equity security holders and all other parties which are entitled to notice.

Bar Date for Requests for Administrative Claims

54.    Requests for administrative expenses pursuant to section 503 of the Bankruptcy Code, from parties other than Retained Professionals and the DIP Lenders, must be filed with both this Court and the Voting Agent within sixty (60) days of the date of entry of this Confirmation Order (the "Administrative Claim Bar Date"); *provided, however*, that parties requesting compensation or expense reimbursement for making a substantial contribution in the

39

Chapter 11 Cases pursuant to sections 503(b)(3), (4) and (5) of the Bankruptcy Code must file an application with this Court on or prior to the Administrative Claim Bar Date, or be forever barred from seeking such compensation or expense reimbursement.

55.     The deadline for submission by Retained Professionals of applications for Bankruptcy Court approval of Accrued Professional Compensation set forth in Article XI.B.2 of the Plan (the "Final Fee Application Deadline") is hereby approved.

56.     The Confirmation Notice shall conspicuously set forth the Administrative Claim Bar Date and Final Fee Application Deadline, which shall constitute good and sufficient notice of the bar date and, in accordance with the requirements of Fed.R.Bankr.P. 2002 and 3020, no other or further notice of the bar date is necessary.

## Z.     Non-Material Changes

57.     Article XI.D of the Plan shall govern post-Confirmation Plan modifications.

## AA.     Resolution of Objections

### *Automotive Components Holdings, LLC*

58.     For the avoidance of doubt, notwithstanding Article IX.F ("Injunction") of the Plan, any other provision of the Plan, any supplement to the Plan, or the other provisions of this Confirmation Order, the assertion of setoff and recoupment rights by Automotive Components Holdings, LLC, with regard to mutual prepetition claims between it and the Debtors shall not be enjoined or impaired.

### *Hazen Transport, Inc.*

59.     Notwithstanding anything to the contrary contained herein or in the Plan, any effective date of the rejection of the Transportation Service Agreement dated February 15, 2005, between Hazen Transport, Inc. and Atwood Mobile Products, Inc., and the effect of any such effective date of rejection on any claims asserted by Hazen Transport, Inc. for amounts due

under the Transportation Service Agreement shall be reserved and determined by this Court at the time such a claim, if any, is filed against the Debtors and brought before this Court for hearing. The Debtors reserve all rights and defenses with respect to any such claim asserted by Hazen Transport, Inc.

### *Internal Revenue Service*

60.    Notwithstanding any provision to the contrary in the Plan and this Confirmation Order, confirmation of the Plan shall not affect any setoff and recoupment rights of the IRS. Notwithstanding the language appearing in the Plan at Article II.C.1(b), the total value of any Allowed Priority Tax Claims held by the Internal Revenue Service shall include interest at the rate and method specified in 26 U.S.C. §§ 6621 and 6622.

### *Karl Storrie and David Bovee*

61.    Notwithstanding anything to the contrary contained herein or in the Plan, any effective date of the rejection of the Debtors' Supplemental Executive Retirement Plan, effective January 1, 2003 (the "SERP") as applicable to Karl Storrie ("Storrie") and David Bovee ("Bovee"), and the effect of any such effective date of rejection on the claims of Storrie and Bovee for payments pursuant to the SERP shall be reserved and determined by this Court at the time of the hearing on the motions of Storrie and Bovee that are pending before this Court for allowance and payment of administrative expenses [Docket No. 2231 and 2232].

### *Lear Corporation*

62.    For the avoidance of doubt, Articles IX.B.2 ("Third Party Release") and IX.F ("Injunction") shall not alter or amend the rights of Lear Corporation under: (i) any executory contract between the Debtors and Lear Corporation and/or Johnson Electric assumed by the Debtors on or prior to the Effective Date; and (ii) any contract between the Debtors and Lear Corporation and/or Johnson Electric entered into after the Petition Date.

41

**Magna Donnelly Corporation**

63.      Nothing in the Plan or Disclosure Statement or this Confirmation Order (or in any exhibit, supplement, or amendment to any Plan, Disclosure Statement or this Confirmation Order) shall release, discharge, enjoin or impact in any way: (i) the claims, counterclaims, defenses or affirmative defenses of Magna (as "Magna" is defined in the stipulation between the Debtors and Magna Donnelly Corporation [Docket No. 2449] (the "Magna Stipulation")) asserted in the Counterclaim (as "Counterclaim" is defined in the Magna Stipulation) and/or other claims or defenses against the Debtors and/or the Reorganized Debtors and/or their successors-in-interest that Magna may possess (now or in the future) related to the subject matter of the District Court Action (as "District Court Action" is defined in the Magna Stipulation) and/or (ii) any claims, demands, counterclaims, rights, actions, causes of action, suits, damages, remedies, defenses, or affirmative defenses that Magna may have (now or in the future, and in any capacity whatsoever) against the Debtors and/or the Reorganized Debtors and/or their successors-in-interest based on any act, omission, transaction, or occurrence existing (or continuing to exist) after the Effective Date; provided, however, that nothing in this paragraph shall: (x) entitle Magna to a recovery from the Debtors for any prepetition monetary claims for which Magna did not comply with the requirements of the *Order Establishing Deadline for Filing Proofs of Claim Approving Form and Manner of Notice Thereof* [Docket No. 750], or (y) prejudice, in any way, Magna's right to move this Court for leave to file a late-filed proof of claim and to seek treatment *pari passu* to all timely-filed proofs of claim, in accordance with the provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and/or the Local Rules of this Court.  Except as otherwise provided in this Paragraph, pursuant to the Magna Stipulation and notwithstanding anything to the contrary in any notice, pleading, Plan, this Confirmation Order, or other order of this Court, Magna shall not be required to seek this Court's

42

approval (though an application for allowance of any administrative claim, or otherwise) in order to assert and/or protect Magna's monetary claims in the District Court Action.

### Michigan Workers' Compensation Agency

64.    For the avoidance of doubt, the Debtors' and Reorganized Debtors' obligations under Article V.H of the Plan include workers' compensation obligations related to Gel, Inc., which entity was purchased by the Debtors in 1997.

### Oracle Corporation

65.    Notwithstanding anything to the contrary in this Confirmation Order, the Plan, or Plan Supplement, with regard to the unexpired prepetition contracts among the Debtors and Oracle Corporation, successor in interest to Hyperion Software Operations, Inc. (d/b/a Hyperion Software Corporation) and Hyperion Solutions Corporation (collectively, "Oracle"): (i) the Software License Agreement (Dura-Trident), dated March 9, 1998, the Amendment to the Software License Agreement (Dura-Trident), dated September 9, 22, 1998, and the Upstream Software Terms and Conditions (Dura), dated April 1, 2000 (each, an "Assumed Oracle Agreement", and collectively, the "Assumed Oracle Agreements") shall be assumed pursuant to the Plan, *provided, however,* that any such assumption of any Assumed Oracle Agreement shall be conditioned upon the parties' reconciliation and agreement regarding the proper cure amount with respect to the related Assumed Oracle Agreement; and (ii) the Software and License Services Agreement (Dura), May 10, 2006, shall be rejected pursuant to the Plan.

### U.S. Environmental Protection Agency

66.    Any relief provided under the Plan or this Confirmation Order to non-debtors shall not release, discharge, enjoin, or preclude any liability of such non-debtors to a governmental unit under any federal, state, or local environmental laws.

43

*U.S. Securities and Exchange Commission*

67.    Notwithstanding any language to the contrary contained in the Plan or this Confirmation Order, Article IX.C of the Plan shall not release any non-debtor, including any current and/or former officer and/or director of the Debtors and/or any other non-debtor included in the Exculpated Parties, from liability to the United States Securities and Exchange Commission, in connection with any legal action or claim brought by such governmental unit against such person(s).

## BB.    <u>Recognition in Canada</u>

68.    The Court requests the aid and recognition of any court or any judicial, regulatory or administrative body in any province or territory of Canada and the Federal Court of Canada and any judicial, regulatory or administrative tribunal or other court constituted pursuant to the Parliament of Canada or the legislature of any province and any court or any judicial, regulatory or administrative body of any other nation or state to act in aid of and to be complementary to this Court in carrying out the terms of this Confirmation Order.

[remainder of page intentionally blank]

K&E 12254346.25
RLF1-3282747-1

**CC.    Final Order**

69.    This Confirmation Order is a final order and the period in which an appeal must be filed shall commence upon the entry hereof.

70.    Notwithstanding the possible applicability of Fed. R. Bankr. P. 6004(h), 7062, 9014, or otherwise, the terms and conditions of this Confirmation Order shall be immediately effective and enforceable upon its entry.

71.    If any or all of the provisions of this Confirmation Order are hereafter reversed, modified or vacated by subsequent order of this Court or any other court, such reversal, modification or vacatur shall not affect the validity of the acts or obligations incurred or undertaken under or in connection with the Plan prior to the Debtors' receipt of written notice of such order.  Notwithstanding any such reversal, modification or vacatur of this Confirmation Order, any such act or obligation incurred or undertaken pursuant to, and in reliance on, this Confirmation Order prior to the effective date of such reversal, modification or vacatur shall be governed in all respects by the provisions of this Confirmation Order and the Plan and all related documents or any amendments or modifications thereto.

**DD.    Authorization to Consummate**

72.    The Debtors are authorized to consummate the Plan at any time after the entry of this Confirmation Order, subject to the satisfaction or waiver of the conditions precedent to the Effective Date set forth in Article VIII of the Plan.

IT IS SO ORDERED.

Wilmington, Delaware
Dated: _____, 2008

Honorable Kevin J. Carey
United States Bankruptcy Judge

K&E 12254346.25
RLF1-3282747-1

## CERTIFICATE OF SERVICE

I, Marcos A. Ramos, do hereby certify that on July 31, 2008, a copy of the foregoing **Opening Brief in Support of Reorganized Debtors' Motion to Dismiss Appeal as Equitably Moot** was served on the attached service list in the manner indicated thereon.

_____
Marcos A. Ramos (No. 4450)

**James W. Korth v.**
**Dura Automotive Systems, Inc., et al,**
**Civ. Action No. 08-349 (SLR)**
**Service List**

## Via Hand Delivery

William K. Harrington
Office of the United States Trustee
844 King Street, Suite 2313, Lockbox 35
Wilmington, DE 19899-0035

*Representing the Official Committee of Unsecured Creditors*
M. Blake Cleary
Edmon Morton
Erin Edwards
Young Conaway Stargatt & Taylor, LLP
P.O. Box 391
The Brandywine Building
1000 West Street, 17th Floor,
Wilmington, DE 19899-0391

## Via First Class Mail

*Representing Official Committee of Unsecured Creditors*
Thomas Moers Mayer
David M. Feldman
Douglas Mannal
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036

James W. Korth
2701 S. Bayshore Drive, Suite 305
Coconut Grove, FL 33133

James W. Korth
3339 Virginia Street
Suite 104
Miami, FL 33133