# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| DURA AUTOMOTIVE SYSTEMS,INC., et al., | ) | Case No. 06-11202 (KJC) |
| | ) | |
| | ) | Jointly Administered |
| Debtors, | ) | |
| | ) | |
| James W. Korth, | ) | |
| Appellant | ) | Civil Action No. 08-349 (SLR) |
| | ) | |
| v. | ) | |
| | ) | |
| Dura Automotive Systems, Inc. et al | ) | |

Reorganized Debtors/Appellees

## APPELLANT'S RESPONSE TO REORGANIZED DEBTORS MOTION TO DISMISS APPEAL AS EQUITABLY MOOT

**EXHIBITS**

**A. J W KORTH'S OBJECTION TO THE CONFIRMATION OF THE REVISED PLAN OF REORGANIZATION**



FILED

AUG 15 2008

Scanned

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

**BACKGROUND**

As this appeal has been entered by the Appellant and not an attorney, it seems best to start with why I stand here alone. It is not for lack of funds, (many bondholders and myself could have contributed to a large budget) it is for lack of finding a Wilmington, Delaware law firm who would represent me and the hundreds of bondholders I am in contact with and the 30 bondholders for which I am a administrator. When the bankruptcy for Dura started we

participated actively in an ad hoc committee that retained Ballard Spahr. During late last summer and fall I actively presented many of my objections to confirmation along with the offer for funds to pursue them and was refused over and over again. Finally, in a telling moment I was told in so many words by a Ballard lawyer "that we have 3000 lawyers in Wilmington who all live off bankruptcy and none of us really want to upset the applecart driven by Kirkland and Ellis – because they (Kirkland) have threatened to take their cases to New York away from Wilmington if there is too much trouble here".

Upon this admission, Ballard was dismissed and I sought new counsel. In December I retained another firm on the promise that they would not be influenced by the eco-politics of Wilmington, but when push came to shove they refused to represent me and said I would be far better off representing myself. Consequently, they advised me on procedure but offered nothing regarding the facts of the case. I was left on my own with a new plan of reorganization filed by the debtor and little time to respond.

I also turned to US Bank as the Trustee for the Subordinated Bondholders. Up until September last year US Bank was actively pursuing the organization of a separate ad hoc committee of bond holders without any demand for support but suddenly that changed and they demanded $500,000 to go forward. I asked them to resign. They refused and simultaneously I learned they had made an arrangement with the Debtor that stated the Debtor would not object to $1 million

2

plus in expenses for US Bank. That was the last formal effort US Bank made to do anything outside of the Official Committee of Unsecured Creditors where they were a minor vote.

Further, I was a first hand witness to what I believe was an improper closed door meeting with Judge Kevin Carey and the attorneys for the Debtor, the Committee of Unsecured Creditors and the attorneys for the Second Lien Creditors just prior to a hearing in open court. I happened to learn of it quite by accident. As I was crossing the street behind the court house one hour before the scheduled hearing I saw Roger Higgins and two other of Kirkland's attorneys heading up the alley toward the court house. I followed and went directly upstairs behind them on the next elevator. By the time I reached the checkpoint on the fifth floor the bailiffs informed me that the meeting was not in the court room but in Judge Carey's chambers. I saw his clerk in the hall and told her to please tell the judge that I am here and that I believe I should attend the meeting. I was told that I could after signing a confidentiality agreement. This took approximately 20 minutes after which I was admitted to the meeting. As soon as I entered Judge Carey adjourned the meeting and I followed the attorneys out a back stairway to the street. We then proceeded to the main entrance like we just arrived. How many of these closed door meeting occurred at present I do not know. I was a party to the case and was never invited.

I am an investment banker with a very sound reputation and a firm with 15 professionals who offer corporate debt as a primary

3

product to our customers. Further I personally have organized and distributed many underwritings of corporate debt and am very well schooled in the financial structure of corporations. I filed my objections to confirmation by the date and time specified and my objections which appear as exhibit B are detailed, and well founded.

I am an American citizen entitled to a full hearing in your court room and am the administrator for 30 individuals who own Subordinated Bonds of the Debtor who have been wiped out by a process that was loaded against them from the beginning.

I asked the court to allow me time to investigate my objections to the confirmation and was refused. Clearly no one expected such detailed objections and when push came to shove and the Confirmation Hearing date of May 13 was imminent, I was buried the previous day with 3000 new papers filed by the debtor with hidden responses to my objections, offered many new witnesses with no time to depose them and then was effectively gagged at the Confirmation Hearing itself.

The debtor had subordinated notes and senior notes and in the confirmed plan the subordinated notes most likely improperly got nothing. The single strongest and easiest objection to investigate involves the fact that the Subordinated Notes may be parri-passu with the Senior Notes because the Senior Notes were issued in contravention of the indenture for the Subordinated Notes and clearly

4

without the accountants approval or a legal SEC Filing. The facts regarding this issuance are clear and compelling.

Hopefully this background incenses you to fervently look into this proceeding and let the appeal go forward. The hard earned savings of hundreds of individuals depend on it. The integrity of the US Courts depend on it. The bankruptcy courts have to represent all the stakeholders in a debtor and they should not be used to bully those stakeholders who find themselves unable to get representation.

THE REAL MATTER AT HAND - THE SUBORDINATED NOTES MOST LIKELY SHOULD HAVE RECEIVED A DISTRIBUTION EQUAL TO THE SENIOR NOTES BUT INSTEAD RECEIVED NOTHING

As you study this case, please set aside the legal fine points and the issues of procedure and timing and look closely at the real inequity being forced upon the persons who may have been severely damaged by first the actions of Dura's management and then by the bankruptcy court. The Subordinated Notes for Dura were issued prior to the issuance of the Senior Notes, the holders of which according to the Plan now own nearly 100% of the equity New Dura. The Senior Notes were issued to the public pursuant to a full S-4 Filing with the Securities and Exchange Commission. Under the securities laws, it is required that a public company issuing securities shall have its accountants formally consent to having their name appear in the prospectus for the offering.

The accountants refused to consent to Arthur Andersen's name appearing in the prospectus for the Senior Notes. Therefore the Senior Notes were issued to the public illegally and may be parri-passu with the Subordinated Notes.

The Indenture for the Subordinated Notes is very detailed and specific and one of its main features was that Dura could not issue any notes senior to the Subordinated Notes unless its fixed charge coverage ratio as defined by a detailed formula was 2.0 to 1.0 or higher. A review of the publicly filed financials for Dura at the time shows that the 2.0 to 1.0 ratio required in the Subordinated Notes Indenture was likely not achieved. This Indenture also states very clearly that any notes issued in contravention of its requirements are parri-passu with the Senior Notes.

My first objection to Confirmation was that the Subordinated Notes were parri-passu At the confirmation hearing the Company presented a piece of paper without any legends or titles that purportedly showed the fixed charge coverage ratio was 2.1 to 1.0 and had a financial expert review line by line what it said. What did not occur at the confirmation hearing (because I was stifled and Judge Carey cared not to initiate any investigation) was any questions regarding the source of the document, who prepared it, what schedules and assumptions were used to prepare the line items etc. Judge Carey just accepted it as fact along with the erroneous statement by the Debtor that Arthur Andersen was dismissed because of the Enron scandal and overruled my objection.

The statement regarding the dismissal was erroneous because the prospectus for the Senior Notes states as follows: "we have not been able to obtain, after reasonable efforts, the written consent of Arthur Andersen LLP to its being named in this prospectus". This is hardly a dismissal.

Further evidence that something was amiss at the issuance of the Senior Notes is that Kirkland and Ellis's opinion (who are also the attorneys for the Debtors) regarding the legality of the Senior Notes is conspicuously silent regarding the Subordinated Notes Indenture.

If you dismiss the appeal hundreds of Subordinated Note Holders will never get there hearing on these matters. Judge Carey clearly erred by not fully investigating the issuance of the Senior Notes to which he turned over the entire equity of the Debtor and gave nothing to the Subordinated Notes.

THE APPEAL IS NOT EQUITABLY MOOT

I hereby limit the scope of my appeal to only my first objection which is **"The 8 5/8% Notes were issued in contravention of the Indenture for the 9.0% Senior Subordinated Notes and Consequently They are Parri Passu with the 8 5/8% Notes."**

The Debtor will have you believe that if it is found that the Senior Notes were issued in contravention of the Subordinated Notes Indenture and that both securities are parri-passu then the entire confirmation would have to be thrown out and redone. This is simply not the case. To make the holders of each of the notes equal would simply require issuance of proportionately the same number of common shares per bond to the Subordinated Holders as received by the Senior Holders to date and then the right amount of shares to the other distributes to effectuate no dilution. It could be done quite easily and not any other interested party whether it be a customer, creditor, supplier or employee would be effected.

In my appellant's brief, I am going to ask you to do the following:

1. Determine first that the Confirmation was legitimate for everyone except those who received common stock and that the Company shall proceed out of bankruptcy without hindrance.

2. Enforce the responses to an interrogatory regarding the issuance of the Senior Notes and certain parties who were involved.

3. Allow me to depose the following parties who were actively engaged in the issuance of the Senior Notes:

   a. The Chief Executive Officer of Dura
   b. The Chief Financial Officer of Dura

c. Other financial officers whose reports effected the fixed
   charge coverage ratio

d. The attorneys at Kirkland and Ellis who wrote the legal
   opinion

e. The accountants at Arthur Andersen who refused to lend
   their firm's name to the prospectus

f. The investment bankers who issued the Notes to the public
   without the accountant's consent.

4. Have a full evidentiary hearing at the proper time to determine
   the validity of my parri-passu objection and rule after that
   hearing as to what level of equity certain bondholders should
   receive and then order the company to distribute additional
   shares to effectuate the ruling.

OTHER MATTERS

The equities of the situation and its relatively easy solution
of issuing additional shares make the timeliness of my objections a
moot point. $560,000,000 in bonds and its thousands of holders should
not be eliminated because I discovered the problem with the issuance
of the Senior Notes in late April. The company was able to
continually revise its plans and until a revised plan was presented
there was simply no reason to do any more work until it was known

what the plan said. My objections were greatly detailed and filed on time.

At the confirmation hearing, Judge Carey listened to testimony from the debtor but failed to question any of their assertions and indeed accepted the statement regarding Arthur Andersen's dismissal which was clearly erroneous.

My motion to stay pending the appeal was rejected and having had every single timing request I made rejected I had the reasonable expectation that no matter what the truth was Judge Carey would reject the stay. During the entire effort it was as if I was trying to stop a roaring locomotive by waving a warning flag.

At the Confirmation hearing itself I was stifled. Told flat out I could only read my statement and then shut-up and listen.

In my statement regarding the issues on appeal I claim that Judge Carey made four crucial errors.

**1. I had insufficient notice that I was required to appear at the confirmation hearing.**

It is true that the Procedures for the Delaware Bankruptcy Court say I must appear in person to make arguments or cross examine witnesses but I was told by Judge Carey in the first hearing I attended in Delaware that I could appear in a future hearing by telephone and after Judge Carey wished me a safe trip home. I relied on the assumption that I could in the future appear by telephone. He rescinded this 22 hours before the Confirmation Hearing and because my father was gravely ill in the hospital it was absolutely wrong for

10

me to for go my father's needs and appear at a hearing for which I was not able to prepare anyway.

**2. I had insufficient time to review the debtor's responses to my objections to confirmation and 3. I had insufficient time to prepare to cross examine witnesses at the confirmation hearing**

The debtors in their Opening Brief in Support of Debtors Motion to Dismiss the Appeal as Equitably Moot completely gloss over and misdirect the readers attention to both these allegations on page 19. It is almost laughable that they somehow use contorted logic to say because I was involved in the Chapter 11 case for a long time that receiving 3000 documents and their responses and a witness list one day before the most critical hearing was timely.

It is absolutely factual that I did not receive the Debtors responses to my objections until the day before the confirmation hearing. There is no individual, no law firm large or small that could have been prepared traveled to the hearing and put on a developed cross examination of their witnesses and questioned the documents that were presented. Can you imagine the yowling if this was done to Kirkland and Ellis? This was a mis-carriage of justice and I and effectively all the Subordinated Noteholders were denied due process of law. In fact this action by the court and the debtor to essentially hamstring and nullify any ability to cross examine or probe their presentation the next day at the confirmation hearing makes moot the fact I did not appear at the hearing physically.

Giving even five to seven days I would have been ready. This was wrong and the appeal should go forward.

## 4. I claimed the court failed to investigate my objections

On page 20 of their brief the quotes they give from Judge Carey say he reviewed my objections, reviewed their responses and then in one fell swoop he finds no merit in any on them - all 11 all at once all of which had substantial facts and documents supporting them. The bankruptcy code requires the judge to make critical judgments as to the fairness of the plan. He had 11 separate clearly defined sign posts (Please see Exhibit B. J W Korth's Objections to Confirmation of the Revised Plan of Reorganization) where things may have been inequitable and he did not ask one question and simply dismissed them all. I am limiting my appeal now to just the first objection but this action by the Judge Carey is unsupportable and the appeal should go forward.

### SUMMARY

I have limited my appeal to my first objection and I have provided a path that makes it reasonable to investigate and act on my objection to the confirmation. I have shown very clearly that I was denied due process and that my objections overall were not investigated and that my number one objection has great likelihood of being true. The Senior and Subordinated Notes may very well be parri-passu and the issuance of the Senior Notes was improper and now the

issuance of the equity of the debtor only to the senior note holders is wrong. The results of my appeal will affect only the common stock holders and the company itself and its creditors, employees and suppliers and customers will be unaffected. Therefore my appeal is not equitably moot. It is rather a very clearly focused attempt to be sure that certain stakeholders receive the common stock that is due them without disrupting anyone else. The only holders that will be affected are the current common stockholders who received their stock as a result of ownership of the Senior Notes. If they sold it to others it was bought and sold properly because my appeal is a matter of public record.

My appeal should go forward and my first objection should be fully investigated and you should deny the Debtors motion to dismiss.

Dated: August 14, 2008

James W. Korth –      for Himself and as Administrator for other
                          bondholders
3339 Virginia Street
Suite 104
Miami, Florida 33133
305 668-8485



Exhibit A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
In re                              )  Chapter 11
                                   )
DURA AUTOMOTIVE SYSTEMS, INC.,     )  Case No. 06-1122
et al.,                            )  (KJC)
                                   )
                   Debtors,   )  Jointly
                                   )  Administered
                                   )
```

# J W KORTH'S OBJECTION TO THE CONFIRMATION OF THE REVISED

## PLAN OF REORGANIZATION.

Now comes James W. Korth to object to the Confirmation of
the Revised Plan of Reorganization (the "Plan") for the above
captioned Debtor. James Korth is a Managing Underwriter of
Corporate Bonds and Manages J W Korth & Company a 25 year old
investment bank specializing in fixed income securities. James
Korth has extensive experience in analyzing financial statements
and underwriting arrangements and can speak with authority
concerning the matters below.

### List of Exhibits

A. Section 4.09 of the Indenture for the 9.0% Notes

B. Fixed Charges Coverage As Filed with SEC for 8 5/8s Notes

C. 8k SEC Filing Showing Dismissal of Arthur Anderson

D. Opinion Letter of Kirkland Ellis for 8 5/8% Notes

1

E. Definition of Senior Debt in 9.0% Notes Indenture

F. Letter From the Debtor Regarding the Patents.

G. The list of US Patents and Patent Applications

H. The list of Non-US Patents and Patent Applications

I. Assets From Latest Monthly Operating Report Showing
   Investment in Non-Debtor Subsidiaries

J. Liquidation Analysis Showing Non Debtor Subsidiaries' Book
   Value as N/A.

K. Report From Debtor on Investment in Non-Debtor Subsidiaries

L. Report of Debt of Guarantors on Balance Sheets from 2006
   10k.


## OBJECTIONS TO CONFIRMATION


**1. - The 8 5/8% Notes were issued in contravention of the
Indenture for the 9.0% Senior Subordinated Notes and Consequently
They are Parri Passu with the 8 5/8% Notes.**

The Debtor has two issues of corporate notes, the 9.0% Senior
Subordinated Notes and the 8 5/8% Senior Notes. The 9.0% Senior
Subordinated Notes were issue first pursuant to a detailed
indenture in 1999 and are Class 4 in the Revised Plan of
Reorganization. The indenture for the 9.0% notes requires that to
issue new debt (other than certain bank "Credit Facilities") the
Fixed Charge Coverage Ratio of the Debtor must have been 2.0 to
1.0.(See Exhibit A)

The 8 5/8% Notes were issued to the public on 5-21-2002 under an new S-4 filing containing a prospectus and a statement that the Fixed Charge Coverage (See Exhibit B) for the was 1.30 to 1 fixed charge coverage ratio substantially below the requirement in the 9.0% Notes indenture.

This discrepancy may have caused a disagreement with Arthur Anderson, the Debtors accountants. They either were fired or resigned, the same day as the filing of the S-4 for the 8 5/8% Notes 5-21-2002[1]

The following day, 5-22-2002, the Debtor filed an amended S-4 with the Securities and Exchange Commission containing the following statement in the prospectus:

> "We have not been able to obtain, after reasonable efforts, the written consent of Arthur Andersen LLP to its being named in this prospectus as having certified the consolidated financial statements of the Company as of December 31, 2001 and 2000 and for each of the three years in the period ended December 31, 2001, as required by Section 7 of the Securities Act. Accordingly, you will not be able to sue Arthur Andersen pursuant to Section 11(a)(4) of the Securities Act and therefore your right of recovery under that section may be limited as a result of the lack of consent."

A further problem is the Opinion Letter which reviews the validity of the 8 5/8% notes filed by Kirkland and Ellis with the

_____

[1] Right in the middle of the underwriting, the Debtors board met and dismissed

after     12 years and hired Deloitte and Touche. (See Exhibit C)

original S-4 filing fails to state they reviewed the Indenture
for the 9.0% Senior Subordinated Notes.[2]

According to the Indenture for the 9.0% Senior Subordinated
Notes, any indebtedness incurred in violation of that indenture
would be parri passu with the 9.0% Notes and not senior to
them.[3]

Therefore the Revised Plan should not be confirmed because it
unfairly discriminates as prohibited by the Bankruptcy Code. The
9.0% Notes should then receive the same distribution on a pro
rata basis as the 8 5/8% Notes and should be in the same class.

**II. - The Plan Unfairly Discriminates between Class 4 and Class 5
Because It Pays a Distribution to Unsecured Creditors while the
Subordinated Notes who are to Receive Nothing are Parri Passu
with those many of those Creditors.**

The indenture for the 9.0% Senior Subordinated Notes
specifically excludes "Trade Payables" from being Senior Debt
(Please see Exhibit E). Therefore the Unsecured Creditors
receiving a distribution in Class 5 of the Revised Plan of
Reorganization are parri passu with the holders of the 9.0%
Notes, Class 4. The Revised Plan should not be confirmed because
it discriminates unfairly as prohibited the Bankruptcy Code. The

---

[2] This is a typical letter for an underwriting transaction and it lists the various documents etc that the opining counsel reviewed. It is conspicuous that a key document like the indenture from the 9.0% Notes is not mentioned. Please See Exhibit D

[3] Please see Exhibit E The definition of Senior Debt in the 9.0% Indenture.

4

9.0% Notes should receive the same distribution on a pro rata basis as Unsecured Creditors.

**III. – The 9.0% Senior Subordinated Notes are Senior to Inter-company Indebtedness Owed From and DASI, Dura Operating Corp and Other Guarantors to any other Subsidiaries and the effect of this has not been addressed in the Revised Plan.**

The Indenture for the 9.0% Notes states "Senior Debt will not include: (2) any indebtedness of the Company or DASI to any of its Subsidiaries or other Affiliates." (See Exhibit E) In section 4.09 it goes on to add the inter-company debt of all Guarantors of the 9.0% Notes is subordinated to the 9.0% Notes. (See Exhibit A Item 4.09 (vi)(A))

At the end of 2006, the 10K shows the "Company" (Dura Operating Corp) owed and other Guarantors of the 9.0% Notes owed $1,036,615,000 in inter-company payables to affiliaes. (See Exhibit L) These debts are junior to the 9.0% Notes and cannot be paid without payment to the 9.0% Notes. The Revised Plan does not address these obligations and therefore should not be confirmed based on the inability of the Court to address the fairness of plans going forward regarding these obligations.

**IV -The Terms of the Preferred Stock Allow the Second Lien Holders to receive more than 100.00% on their investment.**

5

The Debtor, based on its Pro Forma Projected Balance Sheet at emergence, will have $228 million face value of Preferred Stock issued to Class 2. This is equal to the face value of the Second Lien Notes. According to the Revised Plan, the Debtor at emergence will have Total Equity beyond the preferred stock of $106 million. This causes the $228 million of Preferred Stock to be received by Class 2 to have asset coverage of nearly 150.00% and not to be greatly at risk.

Preferred Stocks generally have a dividend in the 7 to 9.0% range. This preferred stock has a 20% pay in kind dividend. This is too high based on the risk and therefore constitutes payment of over 100.00% on their investment. The Bankruptcy Code 1129 (b) (2) (A) (iii) requires that the holders of secured claims receive the "indubitable equivalent of such claims" not more. The Preferred Stock to be issued to Class 2 is unfairly discriminatory to the 8 5/8% Notes in Class 3 and the Court should not confirm the plan.

**V. – The Liquidation Analysis Provided by the Debtor Does Not Analyze the Value of the Net Operating Loss Tax Carry Forward Amounts for Possible Purchasers of Subsidiaries.**

The Tax Code provides provide that acquiring companies can use the operating losses of acquired companies to offset future profits. Profitable acquiring companies are naturally willing to pay more companies with Net Operating Losses ("NOLs") they can use.  The NOLs of the Debtor are approximately $1 billion

Dollars. Many of these NOLs are in subsidiaries which could be sold to other companies in a liquidation. Other companies could save as much as $350 million or more in taxes by acquiring the subsidiaries with NOLs. The Liquidation Analysis in the Disclosure Statement does not address this possibility. Consequently, the Liquidation of the Debtor may have a higher return to the estate than the Revised Plan of Reorganization. Consequently, based on the "Best Interest Test" embodied in the Bankruptcy Code 1129 (7) (a) (ii), the Court should not confirm the Plan.

**VI. - The Liquidation Analysis Provided By the Debtor May Be Far Too Low Because Estimated Overhead Selling and General and Administrative Expenses are Far Too High.**

The entire valuation of the Debtor in the Disclosure Statement is based on a multiple of an Earnings Before Income Tax Depreciation and Amortization (EBITDA). This number is derived from subtracting the Costs of Goods Sold (generally the costs of labor and materials) and Overhead, Selling and General Administrative Expenses (SG&A) from the Net Sales for a given period of time. In the last 10k report filed by the Debtor for the year ened 2006, the company listed approximately 6.7% SG&A costs as a percent of sales. However, in the Debtor's new Financial Projections, SG&A has jumped to nearly 30%, over three times the average for comparable companies, and nearly 5 times what they reported in their last 10k.

The average SG&A expense for auto parts suppliers is approximately 6 to 10.0%. Because a reduction in this expense would increase EBITDA and the Liquidation Analysis uses a 4.5x multiple to create the valuation it is a critical number. If SG&A in the Projections creating the Liquidation Analysis for the Debtor were at the level of their peers, then there would be nearly $200 million more EBITDA annually. Using the 4.5 times EBITDA multiple provided in the Liquidation Analysis, this would produce a Liquidation Value for the Debtors approximately $900 million higher than the level in Disclosure Statement. Therefore, it is entirely possible that the Liquidation Analysis is flawed and provides far too low a value. Consequently, it is presently impossible for the Court to make an accurate evaluation under the "Best Interest Test" embodied in the Bankruptcy Code 1129 (a)(7)(A) (ii) and the Court should not confirm the plan.

## VII. - 435 Patents and Patent Applications by the Debtor were not valued in the Liquidation Analysis

The Debtor's 2006 Annual Report states:

"…we intend to accelerate our investment in new product and process technologies in an effort to strengthen and differentiate our product portfolio. As a result, we believe that the protection of our intellectual property will become increasingly important to our business."

Contrary to this statement by the Debtor of their value, the Debtor in presenting its Liquidation Analysis neglected to value 435 Patents and Patent Applications (See Exhibits G and H) for all types of assemblies and other parts integral to many

8

automobiles around the world. Any one patent could be worth many millions of dollars if it were marketed to other manufacturers. The value of all the patents together could be in the hundreds of millions. Because the values have not been assessed separately the Court cannot be sure that the Revised Plan meets the "Best Interest Test" embodied in the Bankruptcy Code 1129 (a)(7)(A)(ii) and the plan should not be confirmed.[1]

**VIII - The Book Value of the Investment in Non-Debtor Subsidiaries has been Purposefully Obfuscated and the Liquidation Analysis Valuation For Them May Be Far To Low.**

The current Monthly Operating Report shows an investment of $900,159,000 (See Exhibit I) in the 54 Non-Debtor subsidiaries. The Liquidation Analysis shows N/A on the book value of these subsidiaries. (See Exhibit J). The Debtor sets a Liquidation Value of $200 million for all 54 subsidiaries. I asked for a detailed breakdown of the actual investments in these subsidiaries. I received Exhibit K from the Debtor. It only shows a few subsidiaries and then investments in cities. I believe both the use of N/A and the unclear report I received are an attempt to obfuscate the real value of these subsidiaries from a cash investment analysis. Consequently, the Debtors actions give large doubt to the Debtor's Liquidation Analysis. Because of this doubt it is impossible for the Court to make an accurate evaluation

---

[1] The Debtor provided a Statement to us Regarding the Patents. Please see Exhibit F. In this statement it clearly shows the patents were not separately valued. We completely disagree with the debtors assertion that the patents value is intrinsic in the cash flow analysis of the debtor. These patents could be marketed separately.

under the "Best Interest Test" embodied in the Bankruptcy Code
1129 (a)(7)(A) (ii) and the Court should not confirm the plan.

**VIII. – The Management of the Debtors had an arrangement to
Acquire Up to 10% of the New Dura stock – Creating a Large
Conflict of Interest. Consequently the Plan may not have been put
forth in "Good Faith".**

The original Plan of Reorganization provided a 10.00%
interest to the management of the Debtor upon emergence. This
gave the management of the Debtor every incentive to wipe out as
much debt as possible. The means to do this is to provide as low
a Liquidation Value as possible thereby coloring the Court's
review of the "Best Interest Test". The Liquidation Analysis for
the Revised Plan has been presented at a lower level than the
Original Plan and I have shown that the SG&A may be overstated,
that the 435 Patents were not valued, and the effect of Net
Operating Loss Carry Forwards were not addressed and they are
obfuscating their investment in the Non-Debtor subsidiaries.
Taken together with this conflict of interest the Court cannot
confirm the plan as "fair and equitable" under the Code because
it cannot verify the Plan meets the Best Interest Test embodied
in the Bankruptcy Code 1129 (7) (a) (ii) and that the Revised
Plan may not have been put forth in the "good faith" required
under Bankruptcy Code 1129(a)(3).

10

**IX.- The Court Cannot Rely On the Recommendation of the Unsecured Creditor's Committee Because the Information Provided to Them may have been Flawed**

From my discussions with the Unsecured Creditor's Committee it was learned all the information (or lack thereof) that was analyzed by the Unsecured Creditor's Committee was provided by the management of the Debtors. This is the same management that had negotiated 10.0% equity for itself and failed in their Liquidation Analysis to value the 435 patents, the Net Operating Loss Carry Forwards, and has a highly skewed SG&A amount that is suddenly 5 times the pre-bankruptcy level. The Court cannot rely on the recommendation of the Unsecured Creditors Committee recommendation if it is heavily based on numbers provided by the management of the Debtor.

**X. - Contrary to Law There May be Insiders Voting for the Revised Plan**

Bankruptcy Code Section 101 (31) (B) (iii) Defines an "insider" of a corporation as a "person in control of the debtor"

The Revised Disclosure Statement states:

**"A Small Number of Holders or Voting Blocks May Control the Reorganized Debtors** Plan confirmation and consummation is likely to result in a small number of holders owning a significant percentage of the shares or voting power of outstanding Convertible Preferred Stock and/or New Common Stock. Those holders may therefore exercise a controlling influence over the businesses and affairs of the Reorganized Debtors, have the power to elect directors, approve significant mergers or other material corporate transactions or the sale of all or substantially all of the assets of the Reorganized Debtors."

11

There is every reason to believe that the holders to which the paragraph above refers are the current owners of the Second Lien Notes and the Senior Notes. It is logical to assume if they will have a control relationship with the Debtor they currently have a control relationship with the Second Lien Committee and the Committee of Unsecured Creditors. These two committees have openly has negotiated with management for them to receive a 10.0% equity participation, their employment contracts, a contract to sell the Debtor, negotiated the business plan and let them create the Liquidation Analysis that did not review the Net Operating Loss Carry Forwards, and the Patents, and did not challenge a highly skewed SG&A amount in the Projections which formed the basis of Liquidation Analysis. Further, these Committees have been subject to confidentiality agreements and received excessive amounts of strategic information regarding the Debtor.

To the extent any one of these entities controlled the votes on their committee, they controlled the future plans of the Debtor including the Revised Reorganization Plan and the Court should deemed them "insiders" and therefore the Plan cannot be confirmed because it does not meet the requirement of Bankruptcy Code 1129(a)10.

## SUMMARY

The specific objections above have shown numerous problems with dividends on the Preferred Stock to be issued to Class 2, the issuance of the Class 3 8 5/8% Notes that negated their

Seniority to the Class 4 9.0% Notes, the missing valuations in Liquidation Analysis and improper SG&A levels, the questionable "good faith" of the management, and the voting of insiders.

Taken together the NOLs, the Patents, and a restated SG&A could add a total of over $900 million to the Liquidation Analysis. Far more than the additional $300 million required to find value under the Revised Plan's Class 4 who presently would receive nothing.

Therefore I believe:

1. For all the specific reasons above, the Revised Plan should not be confirmed; and,

2. Due to the mismanagement or lack of good faith shown by the omissions in the Financial Projections and the improper levels of SG&A in the Liquidation Value Analysis, and the issuance of a Prospectus for the 8 5/8% Notes contrary to Section 7 of the Securities Act, I hereby move to appoint a Trustee to supervise the Debtor as it completes amendments to its Revised Plan of Reorganization.

Respectfully Submitted,

James W. Korth

For Himself

13