IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| DURA AUTOMOTIVE SYSTEMS, INC., *et al.*, | ) |
| | ) Case No. 06-11202 (KJC) |
| | ) |
| Reorganized Debtors. | ) Jointly Administered |
| | ) |
| | ) |
| JAMES W. KORTH, | ) |
| | ) |
| Appellant, | ) |
| | ) Civ. A. No. 08-349-SLR |
| v. | ) |
| | ) |
| DURA AUTOMOTIVE SYSTEMS, INC., *et al.*, | ) |
| | ) |
| Appellees. | ) |
| | ) |

**MEMORANDUM ORDER**

At Wilmington this 23rd day of March, 2009, having reviewed  Dura Automative

Systems, Inc., and its subsidiaries' and affiliates' (collectively, "debtors") motion to

dismiss the appeal filed by James W. Korth ("Korth"), and the papers filed in connection

therewith;

IT IS ORDERED that said motion to dismiss (D.I. 7) is granted, for the reasons

that follow:

1. **Background.**[1]  On October 30, 2006, debtors filed chapter 11 petitions.  (D.I.

8 at 3)  Subsequently, debtors negotiated with their creditor constituencies in an effort

---

[1]The facts set forth in this background section, taken from the reorganized
debtors' statement of facts (D.I. 8), are not in dispute.

to formulate a confirmable reorganization plan. (*See id.* at 3-6) Helping shape the plan was debtors' determination that senior noteholders had priority over subordinated noteholders by virtue of the subordination provisions of the subordinated notes indenture. (*See id.* at 4-5) Consistent with that determination, and as a keystone to the plan they were contemplating, debtors entered into a backstop rights purchase agreement involving a backstopped common stock rights offering. (*Id.* at 5-6)

2. In July 2007, Korth and his company joined an ad hoc committee of subordinated noteholders that objected to the subordination provisions and anything predicated thereon, including the backstop rights purchase agreement. (*Id.* at 4-5) Certain members of the ad hoc committee also initiated an adversary proceeding against debtors challenging the subordination provisions.[2] (*Id.* at 5)

3. On August 20, 2007, the bankruptcy court approved the backstop rights purchase agreement over the ad hoc committee's objections. (*Id.* at 6) On August 22, 2007, debtors filed their first reorganization plan and disclosure statement. (*Id.*) Subsequently, after further negotiation with their creditor constituencies, debtors reached an agreement with the creditors committee and the senior notes indenture trustee predicated on a modified version of the original plan being confirmed. (*Id.* at 3-4) Accordingly, on September 28, 2007, debtors filed a modified plan and modified disclosure statement. (*Id.* at 4) Under this modified plan, Class 4 Subordinated Noteholders, including Korth's company, would not obtain any recovery. (*Id.*)

4. On October 1, 2007, Korth filed a letter opinion regarding the adequacy of the

---

[2]In fall 2007, incident to the adversary proceeding, debtors provided discovery to members of the ad hoc committee, including Korth. (D.I. 8 at 5)

2

disclosure statement (Bk. D.I. 1949). (*Id.*) On October 4, 2007, the bankruptcy court approved the disclosure statement and an amendment to the backstop rights purchase agreement. (*Id.*) On December 7, 2007, the court granted debtors' motion for summary judgment in the adversary proceeding, holding that the subordination provisions were valid and enforceable. (*See id.* at 6)

5. In mid-December 2007, debtors concluded that they would not be able to exit bankruptcy by year's end and so needed to extend their debtor-in-possession ("DIP") facility. (*Id.* at 7) Accordingly, on December 21, 2007, debtors moved for a one-month extension, which the bankruptcy court approved on December 28, 2007 and January 4, 2008. (*Id.*)

6. On January 21, 2008, foreseeing the need to further extend their DIP facility beyond January 31, 2008, debtors secured the commitment of a replacement DIP lender. (*Id.* at 8) The replacement DIP facility was set to expire on June 30, 2008, with imposed deadlines of June 9, 2008, for plan confirmation and June 20, 2008, for exiting bankruptcy. (*Id.*)

7. On March 7, 2008, debtors filed another revised plan reflecting several weeks of negotiations with key creditor constituencies, including the official committee of unsecured creditors ("creditors' committee"), the senior notes indenture trustee, and the group of second priority lenders holding or controlling, in the aggregate, a substantial portion of the debtors' pre-petition debt ("the second lien group"). (*Id.* at 9) The revised plan provided the following recoveries: DIP facility, priority, administrative, and other secured claimants (with exceptions not relevant here) were to receive a 100% recovery

3

in the form of cash; Class 2 second lien claimants were to receive a 100% recovery in the form of convertible preferred stock; Class 3 senior notes claimants were to receive a 19% recovery in the form of approximately 95% of the new common stock; Class 5A U.S. other general unsecured claimants were to receive an 8% recovery in the form of approximately 5% of the new common stock; and Class 5B Canadian general unsecured claimants were to receive a 12.5% recovery in the form of cash on a pro rata basis. (*Id.* at 11-12) The remaining claimants, including Korth's company, were not to receive any recovery.[3] (*Id.*) Ultimately, each class of creditors entitled to vote approved the revised plan.[4] (*Id.* at 13)

8. On March 13, 2008, debtors filed a revised disclosure statement to accompany the revised plan. (*Id.*) On March 31, 2008, in response to objections over this revised disclosure statement, including Korth's March 28, 2008 objection, debtors filed a second modified and supplemental disclosure statement and form of revised plan accommodating certain of the objections. (*Id.* at 10)

9. On April 3, 2008, during a hearing at which Korth was present, the bankruptcy court overruled Korth's objection, approved the disclosure statement, and set the plan confirmation hearing for May 13, 2008. (*Id.* at 10, 14) On April 4, 2008, debtors filed a final modified disclosure statement to reflect final edits by key constituencies and to conform with the bankruptcy court's order from the previous day. (*Id.* at 11)

---

[3]The revised plan provided lower recoveries for Class 3 and Class 5 claimants than did the Fall 2007 version of the plan based in part on a downward revision in the estimated total enterprise value from $600 million to $495 million. (D.I. 8 at 13)

[4]Both the creditors' committee and senior notes indenture trustee publicly stated support for the revised plan. (D.I. 8 at 13)

4

10. On April 16, 2008, Korth moved the bankruptcy court to push back the date of the plan confirmation hearing. (*Id.* at 14) On April 23, 2008, during a hearing at which Korth was present, the bankruptcy court expressed its intention to deny Korth's motion to extend (which it subsequently did on April 29, 2008) and instructed debtors and Korth to provide expert reports and declarations, and to exchange witness and exhibit lists, on or before May 9, 2008. (*Id.* at 15)

11. On May 9, 2008, instead of producing materials pursuant to the bankruptcy court's instruction, Korth again moved for a continuance. On May 12, 2008, during a status conference at which Korth was present, the bankruptcy court denied Korth's motion. (*Id.*) On May 13, 2008, during a hearing at which Korth appeared via telephone, the bankruptcy court confirmed the plan over Korth's objections. (*Id.* at 16)

12. On May 21, 2008, Korth filed a notice of appeal of the plan confirmation and a motion to stay. (*Id.* at 16-17) On June 4, Korth modified his motion to stay. (*Id.* at 17) On June 5, 2008, the bankruptcy court denied Korth's motion to stay, holding that none of the stay factors supported staying the plan's implementation. (*Id.*)

13. Sometime prior to June 27, 2008, as contemplated by the plan, nominees for the creditors formed three new Delaware corporations: New Dura, Inc. ("New Dura"); New Dura's wholly-owned direct subsidiary, New Dura Holdco, Inc. ("New Dura Holdco"); and New Dura's wholly-owned indirect subsidiary, New Dura Opco, Inc. ("New Dura Opco"). (*Id.* at 25) On June 26, 2008, Dura Automotive Systems, Inc., amended its certificate of incorporation to change its name to "Old Dura, Inc." ("Old Dura"); immediately thereafter New Dura amended its certificate of incorporation to change its

5

name to "Dura Automotive Systems, Inc." (*Id.*)

14.  On June 27, 2008, debtors acted to consummate the plan through the following transactions:

- Old Dura sold its holdings of Atwood Automotive, Inc., to New Dura Holdco and substantially all of its other assets (including the stock of DOC[5]) to New Dura Opco in exchange for 8.4 million shares of common stock, par value $0.01 per share, of New Dura (the "new common stock") and 2.281 million shares of Series A Redeemable Voting Mandatorily Convertible Preferred Stock, par value of $0.01 per share (the "new series A preferred stock"). (*Id.* at 25)

- Old Dura entered into an Asset Purchase Agreement with New Dura Opco whereby Old Dura sold substantially all of its assets to New Dura, including all of the outstanding equity interests in DOC, in exchange for New Dura Opco's holdings of new series A preferred stock and new common stock. (*Id.* at 26)

- Except to the extent otherwise provided in the plan, Old Dura's notes, stock, instruments, certificates, and other documents evidencing the senior notes claims, subordinated notes claims, convertible subordinated debentures claims, convertible trust guarantees, and equity interests (including 18,904,222 shares of Old Dura's Class A Common Stock, par value $0.01 per share, which were outstanding as of June 1, 2007) existing immediately prior to the June 27, 2008, were cancelled. (*Id.* at 26)  The following securities were also cancelled: 8.625% Senior Notes due April 15, 2012, issued to the Indenture dated April 18, 2002; 9% Senior Subordinated Notes due May 1, 2009, issued pursuant to the Indentures, dated April 22, 1999, April 22, 1999, and June 22, 2001; 7.5% Convertible Subordinated Debentures due March 31, 2028, issued pursuant to the Junior Convertible Subordinated Indenture, dated as of March 20, 1998; and old common stock. (*Id.* at 27)

- New Dura, Dura Opco (as "borrower"), and certain of their domestic subsidiaries (as "guarantors") entered into the Senior Secured Revolving Credit and Guaranty Agreement ("the senior secured facility") with a syndicate of lenders:  General Electric Capital Corporation as administrative and collateral agent, Wachovia Bank, National Association as syndication agent, and Bank of America, N.A. as issuing bank and documentation agent (*Id.* at 22)  The senior secured facility consists of a $110 million revolving loan facility for a term of four years, including

---

[5]In their papers, debtors do not clearly identify "DOC."  As these facts are uncontested, the court simply refers to DOC consistent with debtors' papers.

a letter of credit subfacility of $25 million.[6] (*Id.*)  The senior secured facility requires borrower to pay to the lenders certain fees in addition to interest, including annual fees of $100,000 to the agent; $2.2 million as a closing fee to be allocated among the lenders proportionately based on their respective committed amounts of the $110 million; monthly fees; premium payments; and all reasonable costs and expenses, including legal and auditing expenses, enforcement costs, and expenses of the agent and lenders.[7] (*Id.* at 23)

- New Dura, DOC (as "borrower") and certain other domestic subsidiaries (as "guarantors") entered into the Senior Secured Second Lien Credit and Guaranty Agreement ("the second lien facility") with a syndicate of new second lien lenders and Wilmington Trust Company as administrative agent and collateral agent. (*Id.*)  The second lien facility is a second lien term loan for a term of five years in a principal amount of $83.75 million issued with an original issue discount of 20% of the principal amount.[8] (*Id.*)  In addition to interest, the borrower paid a funding fee of $8.375 million (10% of the aggregate loan principal without taking into account the original issue discount), which was allocated among the lenders pro rata according to their respective commitments.[9] (*Id.* at 24)

---

[6]The collateral agent for the senior secured facility received as collateral a first priority perfect security interest in substantially all existing and after-acquired property of the borrower and each of the guarantors. (D.I. 8 at 22)  The senior secured facility is also secured by a first priority lien on the collateral of the borrower and guarantors, except for that portion of the collateral on which the second lien term loan (as defined hereafter) has a first priority lien. (*Id.*)  On that portion of collateral, the senior secured facility has a second priority lien. (*Id.*)  All obligations under the senior secured facility are cross-collateralized with each other and with collateral provided by any DOC subsidiary or other guarantor. (*Id.* at 23)

[7]As of June 27, 2008, $24.5 million was outstanding under the senior secured facility.  (D.I. 8 at 23)

[8]The second lien facility is secured by:  (1) a first priority lien on the portion of the collateral consisting of all intercompany indebtedness owed to New Dura, DOC, and all guarantors from any foreign subsidiaries and up to 100% of the equity interests of all first-tier foreign subsidiaries of New Dura, DOC, and all other guarantors; and (2) a second priority lien on all collateral, junior to the senior secured facility's liens.  (D.I. 8 at 23)

[9]Loans made on June 27, 2008 under the second lien facility were used to refinance the existing indebtedness under the replacement DIP facility, to otherwise enable consummation of the plan, and to fund working capital and general corporate purposes. (D.I. 8 at 24)  As June 27, 2008, $83.75 million was outstanding under the second lien facility. (*Id.*)

- New Dura issued 83,750 shares of new series A preferred stock to the lenders under its new Senior Secured Second Lien Credit Facility (the "new second lien lenders") as consideration for providing the facility. (*Id.* at 25) Also issued were 2,281,000 shares of new series A preferred stock to the second lien facility claimants and 7,234,060 shares of new common stock to the senior notes indenture trustee on behalf of the senior notes holders.[10] (*Id.* at 26)

- Dura Holding Germany GmbH, a non-domestic subsidiary of DOC, and certain of Dura Holding GmbH's non-domestic subsidiaries entered into the Credit Agreement (the "European first lien term loan") with Blackstone Distressed Securities Fund (Luxembourg) SARL and GSO Domestic Capital Funding (Luxembourg) SARL as lenders and Deutsche Bank Trust Company Americas as administrative agent and collateral agent. (*Id.* at 24) The European first lien term loan consists of a €32.2 million term loan for a term of four years.[11] (*Id.*)

- Dura Holding Germany GmbH and certain of Dura Holding Germany GmbH's non-domestic subsidiaries entered into certain receivables factoring agreements, including with GEFactoFrance for the purchase of receivables from a French subsidiary of New Dura and the purchase of receivables from COFACE Finance GmbH in an amount outstanding of €32.7 million as of June 27, 2008. (*Id.* at 25)

- Debtors issued $260 million in cash in satisfaction of the replacement DIP facility claim. (*Id.* at 26)

   15. As of July 30, 2008, distributions to DIP claimants and second lien facility

claimants had been completed. (*Id.* at ex. B, ¶ 3) Distributions to all other claimants

had commenced but had not been completed. (*Id.* at ex. B, ¶¶ 3-4)

   16. In debtors' business, there is significant lead time – orders received now are

---

[10]The plan provides that approximately 146,000 shares of new common stock will be distributed to Allowed Class 5A claimants, with the remaining 1,019,940 shares to be held in reserve for disputed claims. (D.I. 8 at 27)

[11]The European first lien term loan is secured by a first priority lien on all intercompany indebtedness of Dura Automotive Systems, Inc., Dura Operating Corp., and all other guarantors owing to foreign subsidiaries of Dura European Holding LLC & Co. KG and the guarantors and 100% of the equity interests and assets (other than accounts receivable) of certain subsidiaries of Dura European Holding LLC & Co. KG (collectively, the "European first lien term loan priority collateral"). (D.I. 8 at 24) As of June 27, 2008, €32.2 million was outstanding under the European first lien term loan. (*Id.* at 25)

filled three to five years from now. (*Id.* at 27)  Suppliers and customers unsure of

debtors' future viability are unlikely to commit resources to debtors. (*Id.*)  After the plan

was confirmed on May 13, 2008, debtors received new customer commitments. (*Id.* at

28)

     17.  **Analysis.**  Under the doctrine of equitable mootness, a bankruptcy appeal

should be dismissed as equitably moot if affording the appellant the relief he seeks

"would be inequitable."  *In re PWS Holding Corp.*, 228 F.3d 224, 236 (3d Cir. 2000)

(citing *In re Continental Airlines*, 91 F.3d 553, 559 (3d Cir. 1996)).  In determining

whether the doctrine applies, courts in the Third Circuit are to consider the following

factors:

> (1) whether the reorganization plan has been substantially consummated, (2)
> whether a stay has been obtained, (3) whether the relief requested would
> affect the rights of parties not before the court, (4) whether the relief
> requested would affect the success of the plan, and (5) the public policy of
> affording finality to bankruptcy judgments.

*Continental*, 91 F.3d at 560.

     18.  The court concludes in the case at bar that each of the *Continental* factors

cuts in favor of applying the equitable mootness doctrine.  First, and "foremost", *see id.*,

the plan has been substantially consummated.  The Bankruptcy Code defines

"substantial consummation" as the:

> (A) transfer of all or substantially all of the property proposed by the plan to
> be transferred; (B) assumption by the debtor or by the successor to the
> debtor under the plan of the business or of the management of all or
> substantially all of the property dealt with by the plan; and (C)
> commencement of distribution under the plan.

11 U.S.C. § 1101(2).  Each of these conditions has been met in this case.  Moreover,

9

substantial consummation here has involved numerous complex transactions and outside parties taking equity interests in the reorganized debtors, facts that "especially" support application of the equitable mootness doctrine. *See Continental*, 91 F.3d at 560-61 (substantial consummation is the "foremost consideration . . . especially . . . where the reorganization involves intricate transactions . . . or where outside investors have relied on the confirmation plan") (internal citations omitted).

19. Second, no stay has been obtained. "The existence or absence of a stay is a critical factor in determining whether to dismiss an appeal under the doctrine of equitable mootness." *In re Grand Union Co.*, 200 B.R. 101, 105 (citing *Continental*, 91 F.3d at 561-63). Where no stay has been obtained, the reorganization plan goes forward, and it is difficult to undo the acts of third parties proceeding under the plan without prejudicing those third parties. *See generally Continental*, 91 F.3d at 561-63; *In re Highway Truck Drivers & Helpers Local Union #107*, 888 F.2d 293, 297 (3d Cir. 1989). Such is the reality here.

20. Third, Korth's requested relief would detrimentally affect the rights of numerous third parties not before the court. Equitable mootness "protects the interests of non-adverse third parties who are not before the reviewing court but who have acted in reliance upon the plan as implemented." *Continental*, 91 F.3d at 362 (quoting *In re Manges*, 29 F.3d 1034, 1039 (5th Cir. 1994) (quotation marks omitted). Granting Korth's requested relief in this case would adversely affect several third parties that have acted in reliance on the plan's confirmation, including exit funding lenders expecting repayment, stockholders that received (and possibly traded) new common

10

stock or preferred stock expecting that stock to be marketable, and customers and suppliers that have committed resources to the reorganized debtors expecting that debtors will be exiting bankruptcy and will be able to perform on a schedule corresponding to that exit.

21. Fourth, Korth's requested relief would detrimentally affect the success of the plan. A plan's success is detrimentally affected where granting appellant's requested relief effectively "impos[es] a different plan of reorganization on the parties." *See Matter of Speciality Equip. Companies, Inc.*, 3 F.3d 1043, 1049 (7th Cir. 1993) (cited in *Continental*, 91 F.3d at 564-65). Likewise, a plan's success is detrimentally affected where granting appellant's requested relief "'create[s] an unmanageable, uncontrollable situation for the Bankruptcy Court.'" *Matter of Quality Spice Corp.*, 107 B.R. 843, 855 (D.N.J. 1989) (quoting *In re Roberts Farms, Inc.*, 652 F.2d 793, 797 (9th Cir. 1981)). Here, to grant appellant's relief would require, at minimum, recovering distributions of 7,234,060 shares of new common stock made to senior notes claimants and redistributing those shares among senior notes claimants and subordinated notes claimants. Doing this, however, supplants the confirmed plan – a plan resulting from lengthy negotiation involving several parties and approved by all voting creditor classes – and imposes in its stead a new plan requiring the bankruptcy court to track down shares that, because they were eligible to be traded, could be scattered to the four winds, which amounts to an unmanageable situation. For both these reasons, then, Korth's desired relief puts the plan in jeopardy.

22. Fifth and finally, affording finality to the bankruptcy court's confirmation of the plan is consistent with public policy. "[T]he importance of allowing approved

11

reorganizations to go forward in reliance on bankruptcy court confirmation orders may be the central animating force behind the equitable mootness doctrine." *Continental*, 91 F.3d at 565. Given the number of parties involved in the negotiation, approval, and substantial consummation of the plan, the court concludes that public policy favors leaving the plan undisturbed, Korth's objections notwithstanding.[12]

23. **Conclusion.** Consistent with the foregoing analysis, the court concludes that the equitable mootness doctrine applies. Accordingly, debtors' motion to dismiss (D.I. 7) is granted.

_____
United States District Judge

_____

[12]It is not clear from the papers that Korth even has standing to appeal the bankruptcy court's confirmation of the plan. Generally, to have prudential standing, a party "must assert his own legal rights and interests." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). Appellate standing in bankruptcy cases, however, "is more limited than standing under Article III or the prudential requirements associated therewith." *In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000). To wit, whereas 11 U.S.C. § 1109(b) confers broad standing at the trial level, that provision does not extend to appellate standing. *Id.* at 248-49. Appellate standing in bankruptcy, rather, is limited to "person[s] aggrieved." *Id.* (internal quotations omitted). Courts "consider . . . person[s] to be aggrieved only if the bankruptcy court's order 'diminishes their property, increases their burdens, or impairs their rights.'" *Id.* (quoting *In re Dykes*, 10 F.3d 184, 187 (3d Cir. 1993)). In other words, "only those 'whose rights or interests are directly and adversely affected may bring an appeal.'" *Id.* (quoting *In re Dykes*, 10 F.3d at 187). In this case, it appears that the bankruptcy court's confirmation of the plan **directly** affects the rights and interests of Korth's company but not the rights and interests of Korth himself. Thus, Korth would not be a person aggrieved and would lack standing to appeal.